IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| BEAR RANCH, LLC, § | |
| § | |
| Plaintiff, § | |
| § | Civil Action |
| v. § | No. 6:12-cv-00014 |
| § | |
| HEARTBRAND BEEF, INC., § | |
| AMERICAN AKAUSHI ASSOCIATION, INC., § | |
| and RONALD BEEMAN, § | |
| § | |
| Defendants. § | |

**PLAINTIFF BEAR RANCH'S FIRST AMENDED COMPLAINT**

Plaintiff Bear Ranch, LLC complains of defendants HeartBrand Beef, Inc., American Akaushi Association, Inc., and Ronald Beeman, based upon actual knowledge as to itself and its own actions and upon information and belief as to all other persons and matters, as follows:

### Nature of the Case

1. Bear Ranch brings this action seeking declaratory relief as to its rights and duties with regard to certain Akaushi cattle and cattle semen it now owns, as well as money damages for fraud and breach of contract.

### Parties

2. Plaintiff Bear Ranch, LLC is limited liability company whose member is a citizen of Florida.

3. Defendant HeartBrand Beef, Inc. is a Texas corporation with its principal place of business in this District.

4. Defendant American Akaushi Association, Inc. (AAA) is a Texas corporation with its principal place of business in this District.

5. Defendant Ronald Beeman is a citizen of Texas.

## Jurisdiction and Venue

6. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332. The citizenship of the parties is diverse, and the matter in controversy, without interest and costs, exceeds the sum or value of $75,000.

7. Venue exists in this District under 28 U.S.C. § 1391(b). All defendants reside in this District, a substantial part of the events or omissions giving rise to plaintiff's claims occurred here, and defendants are found and transact business here.

8. There is an actual, justiciable controversy between the parties concerning the rights and duties of plaintiff with regard to certain cattle and cattle semen it now owns. Declaratory relief will resolve this controversy.

## Factual Allegations

9. Akaushi cattle are a breed of cattle that trace their lineage to Japan. As a result of their unique genetics, Akaushi cattle are predisposed to develop a high amount of intramuscular fat (marbling) and a relatively high concentration of

monounsaturated fat to saturated fat.  As a result, beef from Akaushi cattle is prized for its rich flavor, tenderness, and juiciness.  The muscle fibers in Akaushi beef are longer and thinner than in beef from American breeds of cattle, and Akaushi beef has a higher water-binding capacity, which helps keep the beef moist and fresh.  Those attributes, in combination with the beef's particular fatty acid composition, result in significantly more tender beef, which is consistently rated several levels above USDA prime.

10. In addition, the particular fatty acid composition of Akaushi beef has health benefits over beef from traditional American breeds such as Angus beef. Akaushi beef is a significant source of oleic acid and conjugated linoleic acid, which studies have shown can lead to lower cholesterol levels and the prevention of coronary heart disease.  A study by a Texas A&M University researcher, for example, showed that daily consumption of Akaushi beef led to better health results than daily consumption of Angus beef.

11. Akaushi beef reaches consumers through the slaughter of Akaushi cattle raised specifically for beef production.  After being weaned, cattle spend a significant amount of time feeding until they reach a certain finished weight.  The cattle are then either sold or bailed to packers and transported to a packing plant, where they are killed and their carcasses are processed into various primal cuts, including rounds, chunks, loins, and flanks.  The primal cuts, or small sub-primal

cuts, are then packed for sale. The packer may itself sell the beef, or it may return the beef to the producer of the cattle to sell the beef, to customers.

12. Akaushi beef is a distinct product with a specialized group of customers, for whom the beef has no reasonable substitute. It differs from beef from American breeds of cattle because of the genetic predisposition of Akaushi cattle to intense marbling and higher proportions of unsaturated fat, oleic acid, and conjugated linoleic acid. The price of Akaushi beef is as much as ten times higher than the price of beef from American breeds of cattle and does not move in price harmony with that beef. There is no substitute food product to which customers for Akaushi beef likely would turn in sufficient numbers to render a small but significant non-transitory increase in price unprofitable.

13. Akaushi beef is sold to customers throughout the United States, and packers outside the United States face significant practical and financial barriers to importation of this beef. A small but significant, non-transitory increase in the price of Akaushi beef in the United States likely would not cause customers here to turn to foreign suppliers in sufficient volumes to make such a price increase unprofitable.

14. Akaushi beef and cattle are sold in interstate commerce.

15. Defendant HeartBrand produces fed Akaushi cattle in Texas and then sells the beef produced from its cattle to customers throughout the United States.

16. HeartBrand represents on its website that it is the only source in the United States for Akaushi beef, i.e., that it has a 100% market share.

17. HeartBrand acquired its market power because Japanese laws protect Akaushi cattle as a national treasure and highly restrict their export. HeartBrand's predecessor acquired a small nucleus of Akaushi breeding cattle in the United States in the 1990s, and HeartBrand grew that herd while declining to sell cattle from the herd. The Japanese export restrictions create significant barriers to entry into the market for the sale of Akaushi beef in the United States, by severely limiting the supply of Akaushi cattle.

18. HeartBrand has engaged in a practice of selling its Akaushi cattle to third parties while purporting to require those purchasers, through contractual provisions, not to compete with HeartBrand in the sale of fed Akaushi cattle.

19. HeartBrand has not limited its assertion of those anticompetitive restrictions to the Akaushi cattle sold to purchasers. Rather, it has asserted that restrictions on the sale or use of Akaushi cattle apply not only to cattle purchased from HeartBrand, but to offspring of those cattle and even to Akaushi cattle bought from other sellers and not subject to any contract with HeartBrand. And HeartBrand purports to contractually bar anyone who has purchased Akaushi cattle from it from marketing any of the purchaser's cattle or beef -- acquired from any

source whatsoever -- as being derived from or having the benefits of Akaushi cattle.

20. HeartBrand is not entitled to alienate its cattle while asserting that those cattle cannot be used to compete with it and, moreover, asserting that none of the purchaser's cattle can be used to compete with it. Likewise, HeartBrand is not entitled to conspire with the AAA, an Akaushi breed club, to force Akaushi cattle purchasers to abide by HeartBrand's unlawful restrictions.

21. HeartBrand has drafted a set of restrictions that it requires purchasers of Akaushi cattle to sign, purporting to restrict them from competing with HeartBrand by restricting purchasers' sale or transfer of fed Akaushi cattle for processing into Akaushi beef. Some of those restrictions directly prohibit competition with HeartBrand, and others rely on membership in a breed club that HeartBrand founded -- the AAA -- to require that purchasers of Akaushi cattle from HeartBrand may sell them only to third parties who are members of the AAA. Members of the AAA, in turn, have signed a contract with HeartBrand containing the same contractual restrictions.

22. The specific restrictions that HeartBrand purports to impose on purchasers of Akaushi cattle include:

- purchased cattle may not be sold to third parties;
- offspring of those cattle may be sold only to HeartBrand or AAA members;

- the purchaser must register all offspring of the purchased cattle with the AAA and must subject itself to AAA regulations;
- the purchaser may not collect or sell semen from the purchased cattle or from the progeny of those cattle; and
- after termination of the contract, the purchaser may not market any cattle or beef as derived from or having health benefits of Akaushi cattle for 50 years;

23. Those restrictions would require that all fed Akaushi cattle be returned to HeartBrand before being processed into Akaushi beef and sold to consumers, or the resulting beef may not be identified as Akaushi.

24. The contract containing these restrictions has a severability clause, by which the unenforceability, invalidity, or illegality of the restrictions does not affect the sale of the Akaushi cattle to the purchaser.

25. Defendants have asserted that the contract restrictions govern even Akaushi cattle purchased from other sources, even though these cattle are not subject to any purchase contract with HeartBrand.

26. Bear Ranch has acquired hundreds of Akaushi cattle from such other sources. None of those purchases were from HeartBrand or made under a contract that purports to restrict the use or sale of the purchased cattle or their offspring, or to require registration of cattle with the AAA or compliance with AAA rules. Specifically:

- In June 2011, Bear Ranch purchased 514 Akaushi cattle from Beeman d/b/a Beeman Ranch for about $2.5 million. The purchase was not made from HeartBrand or made under a

  contract that purports to restrict the use or sale of the cattle or their offspring or to require registration of the cattle or their offspring with the AAA or compliance with AAA rules.

- In July 2011 and September 2011, Bear Ranch purchased 195 Akaushi cattle from Twinwood Cattle Company, Inc. The purchase was not made from HeartBrand or under a contract that purports to restrict the use or sale of the cattle or their offspring or to require registration of the cattle or their offspring with the AAA or compliance with AAA rules.

- In December 2010, Bear Ranch purchased 50 Akaushi cattle from Tony Spears. The purchase was not made from HeartBrand or under a contract that purports to restrict the use or sale of the cattle or their offspring or to require registration of the cattle or their offspring with the AAA or compliance with AAA rules.

27. Bear Ranch's sole purchase of Akaushi cattle from HeartBrand was in July 2010, when it purchased 424 Akaushi cattle and 10,000 units of Akaushi semen for a price of about $2.4 million. The contracts governing that purchase included the restrictions described above, subject to the severability clause.

28. Despite the fact that most of Bear Ranch's Akaushi cattle were purchased from sources other than HeartBrand, HeartBrand and the AAA have asserted that the restrictions in the contract with HeartBrand apply to all the Akaushi cattle.

29. Specifically, in August 2011, the AAA sent Bear Ranch a request to submit a "whole herd" inventory report, and, in September 2011, the AAA similarly sent Bear Ranch an invoice for a whole-herd reporting fee. Under its

whole-herd reporting system, the AAA assesses a fee on reproductively mature cattle that will bear offspring in a relevant season, spring or fall. The AAA calculated the reporting fee it demanded based on Bear Ranch's entire population of Akaushi cattle, and the AAA said that Bear Ranch's entire herd of Akaushi cattle is subject to the AAA reporting and inventory requirements.

30. Similarly, the AAA's regulations require the submission of DNA samples for Akaushi cattle that are required to be registered, and, in November 2011, the AAA sent Bear Ranch a notice that it must submit DNA samples for all its Akaushi cattle, without limitation. In January 2012, the AAA again sent Bear Ranch a demand to pay the reporting fee based on all of plaintiff's Akaushi cattle, without limitation. And HeartBrand's chairman, Beeman, endorsed the AAA's demands at a February 2012 meeting of AAA members, claiming that Bear Ranch was in violation of its contract. HeartBrand and the AAA have agreed or conspired to make those overbroad impositions of the contractual restrictions and thereby restrain Bear Ranch from competing with HeartBrand.

31. By its overbroad imposition of these contractual restrictions, HeartBrand intends to sell its cattle to purchasers while retaining control of the market for the sale of Akaushi beef in the United States. Under HeartBrand's strategy, all Akaushi beef must come to market through HeartBrand, or else the beef cannot be identified as Akaushi. That is an attempt to control the market by

creating contractually -- or simply asserting -- nonexistent intellectual-property rights in property sold to others, and even property that others have independently acquired or produced.

32. Similarly, HeartBrand illegitimately asserted a registered trademark in the word Akaushi. Specifically, the title of HeartBrand's website had a trademark registration symbol after the word Akaushi, stating: "Welcome to the only source for Akaushi® Beef." HeartBrand has not registered the word Akaushi as a trademark. Indeed, when HeartBrand applied to register a trademark on the phrase HEARTBRAND AKAUSHI BEEF (an application that it later abandoned), the U.S. Patent & Trademark Office required HeartBrand to disclaim the phrase AKAUSHI BEEF as merely descriptive of origin.

33. HeartBrand's exclusionary conduct will deny consumers the benefit of competition and will result in higher prices for the sale of Akaushi beef in the United States.

34. Defendants' strategy injures Bear Ranch in its business by seeking to restrict Bear Ranch's ability to sell fed Akaushi cattle to packers for processing into Akaushi beef sold in the United States and to outsource the processing of those cattle and itself sell Akaushi beef in the United States.

## First Claim
## (Fraudulent Inducement of Contract)

35.  Plaintiff realleges the material factual allegations in the preceding paragraphs.

36.  Before execution of the contract for Bear Ranch's purchase of Akaushi cattle, HeartBrand represented orally and in writing that it was the only source of full-blood Akaushi cattle and genetics outside of Japan.  Those representations were made in the July 2010 contracts between HeartBrand and Bear Ranch for the purchase of Akaushi cattle and semen.  The contracts represent that a small number of Akaushi cattle were the only Akaushi cattle exported from Japan and that HeartBrand is the sole owner of those cattle.  Also, the contracts represent that HeartBrand is "the owner" of Akaushi genetics outside of Japan, stating that the restrictive contractual provisions were included to preserve that "preeminent" position.  The contracts refer to "the sole control" of an Akaushi "brand" by HeartBrand.  In addition, in spring and summer 2010, HeartBrand executives falsely represented to Bear Ranch that HeartBrand owned or controlled all Akaushi cattle and genetics outside of Japan, and the HeartBrand website falsely represented that Akaushi genetics were controlled by HeartBrand.

37.  HeartBrand made those representations with intent to induce Bear Ranch to enter into the contracts, knowing they were false or recklessly as a positive assertion without knowledge of their truth.  As Defendants intended, those

representations induced Bear Ranch to enter into the contracts in justifiable reliance on the representations. Those representations are material because they reasonably affect the basis for the one-sided restrictions of the contracts.

38. HeartBrand's representations were false. Defendants knew that Akaushi cattle and genetics had previously been widely marketed and sold by HeartBrand's predecessor and were possessed by other persons outside of Japan, including Johnie Broussard of Pine Island, Louisiana, Ultimate Kobe Beef near Tyler, Texas, and Mazda Wagyu of Australia. For example, Broussard's cattle were derived from the same group of cattle imported from Japan that HeartBrand now owns.

39. HeartBrand's fraudulent inducement of Bear Ranch to execute the contracts injured Bear Ranch by subjecting an unrestricted purchase of cattle and semen to burdensome purported restrictions that would greatly limit its ability to use and sell property it validly purchased. The fraudulent inducement caused damages from overpayment for cattle and limitation on Bear Ranch's ability to sell and market its cattle and beef.

40. Defendants knowingly participated in and abetted the deception. Having knowingly participated in and abetted the deception, Defendants are liable for actual damages, exemplary damages (if/as warranted by the evidence), costs, and interest.

## Second Claim
### (Declaration of Affirmative Defense of Fraudulent Inducement of Contract)

41. Plaintiff realleges the material factual allegations in the preceding paragraphs.

42. As a result of the fraudulent inducement of contract alleged above, the collateral restrictions in the contract are unenforceable. Bear Ranch seeks a judgment adjudging and declaring that it has a valid defense of fraudulent inducement that defeats any enforcement by Defendants of any contract with Bear Ranch, a defense pleaded in Bear Ranch's Answer of June 28, 2012.

## Third Claim
### (Breach of Contract)

43. Plaintiff realleges the material factual allegations in the preceding paragraphs.

44. Bear Ranch maintains its position that any contractual restrictions on its use of the cattle and semen it purchased from HeartBrand are unenforceable. The contracts memorialize HeartBrand's promises and representations that it has sole control of Akaushi cattle and genetics outside of Japan, as the basis for the contractual restrictions.

45. Bear Ranch performed the contracts by purchasing and paying for the cattle and semen. However, HeartBrand has breached its promises and

representations in the contracts that it has sole control of Akaushi cattle and genetics outside of Japan.

46. HeartBrand's breach of the contracts caused Bear Ranch injury through burdensome restrictions associated with the use and marketing of the Akaushi cattle and beef and by causing Bear Ranch to pay more than the purchased cattle are worth.

47. As a result of breach of the contracts, HeartBrand is liable to Bear Ranch for actual damages, costs, interest, and attorney's fees.

## Fourth Claim
### (Declaration of No Contract Restrictions)

48. Plaintiff realleges the material factual allegations in the preceding paragraphs.

49. Bear Ranch maintains its position that the contractual restrictions on its use of the cattle it purchased from HeartBrand are unenforceable.

50. Bear Ranch has made several unrestricted purchases of Akaushi cattle that are not subject to any contract with HeartBrand. Specifically, Bear Ranch bought 514 Akaushi cattle from Beeman d/b/a Beeman Ranch, 195 Akaushi cattle from Twinwood Cattle Company, Inc., and 50 Akaushi cattle from Tony Spears.

51. Those cattle and their descendants are not subject to restrictions under any contract with HeartBrand or any contract restricting how Bear Ranch may use

or sell the cattle or requiring registration of cattle with the AAA or compliance with AAA rules.

52. Bear Ranch seeks a judgment adjudging and declaring that the cattle it purchased from sellers other than HeartBrand, and the descendants of those cattle, are not subject to restrictions under a contract with HeartBrand, the AAA, or Beeman and are not subject to any registration or other requirements with the AAA.

## Fifth Claim
### (Declaration of No Contract Restrictions)

53. Plaintiff realleges the material factual allegations in the preceding paragraphs.

54. Bear Ranch maintains its position that the contractual restrictions on its use of the cattle it purchased from HeartBrand are unenforceable.

55. Bear Ranch's herd of Akaushi cattle now includes offspring of the offspring of the cattle it purchased from HeartBrand. Bear Ranch's contract with HeartBrand for the purchase of cattle does not purport to restrict such offspring of offspring, or any later generations of cattle, and those cattle are not subject to restrictions under a contract with HeartBrand.

56. Bear Ranch seeks a judgment adjudging and declaring that offspring of offspring, and later-generation descendants, of the cattle it purchased from HeartBrand are not subject to any restrictions under a contract with HeartBrand,

the AAA, or Beeman and are not subject to any registration or other requirements with the AAA.

## Prayer for Relief

Wherefore, Bear Ranch respectfully requests that the Court enter judgment as follows:

    A.    Declaring that Bear Ranch's defense of fraudulent inducement precludes liability on any contract with Defendants;

    B.    Awarding Bear Ranch actual damages and, if/as warranted by the evidence, exemplary damages;

    C.    Declaring that the cattle Bear Ranch purchased from sellers other than HeartBrand, and the descendants of those cattle, are not subject to restrictions under a contract with HeartBrand, the AAA, or Beeman and are not subject to any registration or other requirements with the AAA;

    D.    Declaring that offspring of offspring, and later-generation descendants, of the cattle Bear Ranch purchased from HeartBrand are not subject to any restrictions under a contract with HeartBrand, the AAA, or Beeman and are not subject to any registration or other requirements with the AAA; and

    E.    Awarding Bear Ranch all other relief as the Court may consider necessary or appropriate, including interest, costs, and reasonable attorney's fees.

Respectfully submitted,

s/ R. Paul Yetter_____
R. Paul Yetter
Attorney in Charge
State Bar No. 22154200
J. Campbell Barker
State Bar No. 24049125
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
(713) 632-8000
(713) 632-8002 (Fax)

Andrew R. Seger
State Bar No. 24046815
MCWHORTER, COBB & JOHNSON, LLP
1722 Broadway
Lubbock, Texas 79401
(806) 762-0214
(806) 762-8014 (Fax)

Attorneys for Plaintiff Bear Ranch, LLC

## Certificate of Service

I certify that on August 27, 2013, I served a copy of this document on all counsel of record using the Court's e-filing system.

s/ J. Campbell Barker
J. Campbell Barker
