IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

BEAR RANCH, LLC,                    §
                                    §
              Plaintiff,            §
                                    §
v.                                  §          Civil Action No. 6:12-cv-14
                                    §
HEARTBRAND BEEF, INC.,              §
AMERICAN AKAUSHI                    §
ASSOCIATION,                        §
INC., and RONALD BEEMAN,            §
                                    §
              Defendants.           §

**DEFENDANTS HEARTBRAND BEEF, INC. AND RONALD BEEMAN'S
AMENDED COUNTERCLAIMS AND DEFENDANTS HEARTBRAND
BEEF, INC., AMERICAN AKAUSHI ASSOCIATION, INC. AND
RONALD BEEMAN'S ORIGINAL ANSWER TO
PLAINTIFF'S AMENDED COMPLAINT**

Pursuant to the Federal Rules of Civil Procedure, Defendants HeartBrand
Beef, Inc. ("HeartBrand") and Ronald Beeman ("Beeman") respectfully submit their
Amended Counterclaims against Bear Ranch.  Defendants HeartBrand, American
Akaushi Association, Inc. (the "Association" or the "Akaushi Association"), and
Beeman (collectively, the "Defendants") respectfully submit their Original Answer
to Plaintiff Bear Ranch, LLC's ("Bear Ranch") Amended Complaint (the
"Complaint").

### DEFENDANTS HEARTBRAND BEEF, INC. AND RONALD BEEMAN'S <u>AMENDED COUNTERCLAIMS</u>

This case concerns—and indeed, is the very means of—a billionaire's attempt to become a modern-day cattle rustler.  Bill Koch's Bear Ranch, pretending that it intended to be a business partner of HeartBrand's, bought more than a thousand head of Akaushi cattle from HeartBrand and its contracted producers at subsidized prices, then ignored, undermined, and directly challenged the contracts by which it acquired those cattle.  Now Bear Ranch seeks to repudiate its promises to partner with HeartBrand, so long as it can keep the valuable cattle it took from the HeartBrand family at a business partner's price.  Bear Ranch, having broken its promises and defrauded Defendants, should answer for its scheme to abscond with a Texas treasure.

### <u>PARTIES</u>

1.      HeartBrand is a Texas corporation with its principal place of business located at 101 W. S. Main Street, Flatonia, Texas, 78941.

2.      Beeman is a citizen and resident of the State of Texas.

3.      Upon information and belief, Bear Ranch is a limited liability company whose sole member is a citizen of Florida.

## JURISDICTION AND VENUE

4.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 as there is complete diversity among the parties and the amount in controversy exceeds $75,000.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) as a substantial part of the events or omissions giving rise to the claims occurred within this district.

## FACTUAL ALLEGATIONS

**I.     HeartBrand was formed to grow a herd of Akaushi cattle, one of several breeds of Japanese cattle.**

6.     HeartBrand is a Texas company engaged in breeding and producing meat from Akaushi cattle.

7.     Akaushi (also known as "Japanese Brown" or "Japanese Red") is one of four major breeds of cattle originating in Japan, the others being Kyroshi ("Japanese Black"), Japanese Shorthorn, and Japanese Polled.  These four breeds are sometimes referred to collectively as "wagyu," a generic description that translates as "Japanese cattle."

8.     In Japan, the black-hided Kyroshi breed is the dominant breed of cattle, and Japanese consumers even develop preferences for particular strains of Kyroshi that are named for their places of origin, such as the famed "Kobe" beef, named for the capital city in Japan's Hyogo Prefecture.  The red-hided Akaushi,

3

which originates from two southern prefectures in Japan (Kochi and Kumamoto), is less well-known, but it shares a number of characteristics with the black-hided Kyroshi, including a tendency to produce flavorful, well-marbled beef, with a favorable proportion of unsaturated fats to saturated fats. These tendencies are the result of long-standing breed management programs prevailing in Japan, under which Japanese cattle are selectively bred and deliberately managed to preserve and enhance desirable traits.

9.     Japanese law sharply limits the export of Japan's indigenous cattle and beef products. Relatively few wagyu of any kind are exported from Japan to the United States, and wagyu beef is exported from Japan in only limited quantities. Most cattle in the United States described as wagyu are black in color, predominantly comprising Kyroshi cattle, or cross-breeds of Kyroshi with more traditional domestic U.S. breeds like Angus.

10.     In or about 1994, a small breeding nucleus of eleven Akaushi cattle (three bulls and eight cows) were exported to the United States by individuals who later formed Heart Brand Cattle Company ("HBCC"). HBCC grew its Akaushi herd for more than ten years, but in 2006, difficulties brought on by financial mismanagement led the HBCC partners to seek new investors to either join with or buy the company.

11.    In 2006, Ronald Beeman, then the president of meat packer Eddy Packing Company, led a group of individuals and entities in acquiring the cattle assets of HBCC.  They formed a new entity, HeartBrand, paid off substantial HBCC debt, and began managing the Akaushi herd under the direction of Ronald Beeman and Dr. Jose Antonio Elias Calles, a former HBCC partner who became the president of HeartBrand.  Calles, having studied and worked with Akaushi cattle for twenty years, was and is one of the world's leading authorities on the Akaushi breed.

## II.    Bear Ranch discovered HeartBrand while searching for high-quality cattle to use as a luxury accessory.

12.    At the center of this case are contracts between (1) HeartBrand and Bear Ranch and (2) Beeman and Bear Ranch.  Bear Ranch is a limited liability company with a single member:  William "Bill" Koch, the president and CEO of Oxbow Carbon, one of the largest private companies in the United States and one of the world's largest suppliers of petroleum coke, sulfur, coal, and chemical products.

13.    Bear Ranch's main asset is the Bear Ranch itself, a 4,200-acre estate near Aspen, Colorado.  The sequestered, self-contained compound is used exclusively for Koch's corporate retreats and personal leisure.  In addition to a resort-style residence and a private museum to display his collection of Western antiquities, Koch is building a "re-created Old West town" on the ranch, with more

than 70 buildings either in place or under construction, including about 40 structures acquired from historic sites, defunct tourist attractions, and movie sets. In 2010, Bear Ranch's considerable Western-style accoutrements included a herd of Longhorn and Saler cattle.

14.     While the animals on Koch's Colorado ranch mainly served an ornamental purpose, Koch was dissatisfied with the beef produced when some of them were slaughtered for personal consumption.   Koch therefore charged his ranch manager, Rob Gill, with locating a high-quality beef cattle that could graze at Bear Ranch and then could be slaughtered and served as meat at the ranch and at Koch's other personal estates.

15.     Gill, who had himself been the president of a meat company earlier in his career, researched the availability of Angus and other domestic breeds.  He also spoke with feeders of wagyu cattle, but determined that the genetic pool of available black wagyu cattle in the United States was too inconsistent in quality and purity to satisfy Koch's desires.

16.     In June 2010, Gill was introduced to Dr. Calles at a gathering in Texas.  Calles, who, at that time, was president of HeartBrand, explained the history and characteristics of the Akaushi breed to Gill, but told him that HeartBrand did not intend to make cattle available for purchase.

17.    In subsequent meetings in Florida and Texas with Calles and HeartBrand's chief executive officer, Bill Fielding, Gill again requested the opportunity to buy Akaushi cattle from HeartBrand.  Fielding explained to Gill that HeartBrand had not contemplated selling its cattle, but would be interested in working with Bear Ranch as a producer of cattle for HeartBrand.

18.    HeartBrand had recently entered into several producer agreements, under which it sold cattle and/or genetic material to contract partners at well-below-market prices and agreed to buy calves and fed cattle back from those contract partners later so that HeartBrand could sell meat.  These contracts allowed HeartBrand to leverage its genetic resources with other ranchers' production resources, rapidly growing the size of the Akaushi herd that fueled HeartBrand's meat operation.

## III.    Bear Ranch agreed to partner with HeartBrand as a producer, but from inception, paid little mind to its contractual agreements.

19.    Gill agreed to HeartBrand's terms on Bear Ranch's behalf, and on July 8, 2010, he signed a "Full-Blood Contract" and an "F1 Program Contract" under which Bear Ranch was designated a "Producer" of cattle for HeartBrand.  It was explained to Gill that, as a producer, Bear Ranch would receive Akaushi cattle from HeartBrand, and Bear Ranch would have the right to sell calves and cattle back to HeartBrand, keep cattle to build up its herd, or slaughter cattle for personal consumption, among other rights.  Because Bear Ranch intended to use its cattle

7

strictly for personal consumption at the Koch estates and had not decided to commercialize the herd, the contractual restrictions were of no concern to Gill or Bear Ranch.  Bear Ranch, in fact, had specifically represented to HeartBrand in June 2010 that its purpose in acquiring cattle was to satisfy grazing obligations in Colorado and produce meat for the Koch estates.

20.    Gill worked directly with Calles in the selection of 424 head of cattle that Bear Ranch would acquire, identifying some particular bulls he wanted based on his own experience and evaluation of their appearance.  He also told Calles that he wanted a variation of sires for genetic diversity purposes, so that Bear Ranch would have its own self-sustaining herd.

21.    Under the Full-Blood Contract, Bear Ranch agreed that it would register all the full-blood Akaushi calves it produced with the American Akaushi Association and comply with the Association's rules.  Among other things, those rules require the use of DNA test results to verify lineage, and the sharing of performance data to improve breed management.  Bear Ranch has never in its three years under contract complied with its obligation to register offspring.  On information and belief, Bear Ranch entered into the Full-Blood Contract without the intention to comply with its registration obligation under that contract, and arrogated to itself the option to register or not based solely on its own evaluation of the benefits of doing so.

22.     Likewise, under the F1 Program Contract, Bear Ranch agreed that it would enroll its F1 (*i.e.*, cross-bred) calves with the Association for the purpose of sharing performance data.   Bear Ranch has never enrolled any F1 calves.   On information and belief, Bear Ranch entered into the F1 Program Contract without the intention to comply with its enrollment obligation under that contract, and arrogated to itself the option to enroll or not based solely on its own evaluation of the benefits of doing so.

23.     The Full-Blood and F1 Program Contracts also provide that, in the event of breach by Bear Ranch, HeartBrand is entitled to obtain injunctive relief to ensure that it obtains possession of all cattle described in the agreement.   The contracts also provide that HeartBrand shall be entitled to recover damages in an amount equal to the amount that the value of the unique Akaushi brand and the sole control of the brand by HeartBrand has been reduced and that Bear Ranch will reimburse HeartBrand all of its attorneys' fees and other costs incurred in enforcing the terms of the contracts.

## IV.   Once Bear Ranch realized the commercial potential of Akaushi beef, Bear Ranch decided it would be better off without HeartBrand.

24.     In fall 2010, Dr. Calles decided to resign from HeartBrand to pursue other interests.   The day his resignation as president of HeartBrand became effective, Bear Ranch snapped him up to manage its Akaushi herd and serve as a consultant.   From October 1, 2010 to the present, Calles has worked for Bear

Ranch, and Bear Ranch has benefited from the considerable knowledge and experience Calles built while working for HeartBrand since its 2006 founding. Bear Ranch has similarly benefited from (and is charged with) the knowledge and experience Calles built while serving as a partner and employee of HBCC.

25.     The month Calles was hired by Bear Ranch, he made a presentation to Bear Ranch in which he addressed the commercial potential of the Akaushi breed in America.  Koch retained marketing consultants to analyze the prospects for commercializing his Akaushi herd independently of HeartBrand; on information and belief, he engaged these consultants to conduct their study after hearing Calles' presentation.  Koch's consultants did a substantial amount of industry research on beef production, on the competitive posture of the various wagyu breeds and wagyu producers in the industry,[1] and on Akaushi cattle specifically, drawing heavily on the knowledge and background of Calles as to the latter.  Although Koch's consultants were charged with developing detailed business plans and options for a new Koch-controlled Akaushi beef product, they were never asked to analyze the prospect of selling cattle to HeartBrand as a beef producer, in the manner to which Bear Ranch had agreed in the Full-Blood Contract and the F1 Contract.  Indeed, the consultants never even considered the possibility of Bear Ranch abiding by its contractual obligations and selling cattle to HeartBrand.

---

[1]     Among other things, Koch's consultants learned in November 2010 that the American Wagyu Association had registered a number of red wagyu cattle in the United States.

**V.     Bear Ranch plotted to build its herd rapidly through a scheme of concealment and deception before leaving HeartBrand behind.**

26.     After beginning the project to study independently commercializing the Akaushi cattle, Bear Ranch made a December 2010 deal to acquire 50 head of Akaushi cattle from Rancho Delhi, a HeartBrand-contracted Full-Blood producer. Bear Ranch used Calles to help carry out the deal, but it was Gill who negotiated directly with Rancho Delhi principal Tony Spears, learning from Spears that Rancho Delhi had agreed with HeartBrand to sell live cattle only to HeartBrand-contracted Full-Blood producers.  Bear Ranch, though still a Full-Blood producer in name, initially concealed the Rancho Delhi purchase from HeartBrand, and later claimed to HeartBrand that it had simply agreed to help manage Rancho Delhi's cattle rather than having bought them.

27.     In March 2011, Koch's consultants recommended to Koch that he start his own Akaushi beef brand independent of HeartBrand, and began mapping out strategies for growing the Bear Ranch Akaushi herd.  In April 2011, Gill was instructed to double the size of Bear Ranch's herd by acquiring the best cattle he could get from HeartBrand.

28.     At Koch's instruction, Gill contacted HeartBrand about acquiring additional Akaushi cattle, and negotiated terms of a new purchase of 514 head, which animals would be selected and/or evaluated by Calles as Bear Ranch's representative.  Gill did not disclose Koch's plans for the cattle when negotiating

11

with HeartBrand.  Over the next month, Bear Ranch dithered in finalizing the acquisition of the 514 head.  After repeated efforts to finalize the transaction failed, HeartBrand chose to discontinue its discussions with Bear Ranch, and sold the 514 head to Beeman's family ranch in June 2011.

29.    Gill, concerned that he had lost his chance to double the size of the Bear Ranch herd, made a personal appeal to Beeman and Fielding to sell Bear Ranch the cattle after all.  Personally coming down from Colorado to Texas with hat in hand, Gill told Beeman that Koch was "very demanding" and falsely represented to Beeman that Koch was likely to fire Gill unless he acquired the cattle.  Believing Gill's story that his personal livelihood was at stake, Beeman agreed to sell the cattle to Bear Ranch, with the understanding that the 514 head would be covered by Bear Ranch's existing Full-Blood Contract and F1 Program Contract with HeartBrand.

30.    In the course of that meeting and related communications, Gill also told Beeman and Fielding that Bear Ranch was considering marketing beef on its own, but that Bear Ranch intended to sell approximately 30% of its calves to HeartBrand going forward.  Beeman told Gill that, as long as Bear Ranch complied with its contractual obligation not to market beef under the name Akaushi and sold back 30% of its calves to HeartBrand, he had no objection to Bear Ranch's marketing beef on its own.  Gill represented that Bear Ranch would comply with

its contractual obligations under the Full-Blood Contract and F1 Program Contract and would not market beef as Akaushi.   Unbeknownst to Beeman or to HeartBrand, Gill and Bear Ranch's marketing team had been strategizing since late 2010 about ways to challenge that contractual restriction.   On information and belief, Bear Ranch did not intend to comply with the contractual restriction, and neither did it have any intention of selling calves to HeartBrand as Gill had represented.   Beeman reasonably relied on Gill's representations in entering into the sale transaction with Bear Ranch, and HeartBrand reasonably relied on those representations in allowing the sale to go forward as a sale between contracted Full-Blood producers.

31.    In July 2011, Bear Ranch made a separate deal to acquire 100 head of cattle from Twinwood Cattle Company, another contracted Full-Blood Producer. While Calles assisted in and guided the deal with Twinwood, it was Gill who informed HeartBrand of the Twinwood purchase.  In the course of wrapping up the purchase of 514 head from Beeman, Gill assured HeartBrand (which had asked for information needed to help plan its future beef sales) that he would keep HeartBrand apprised of his plans for the entire Koch-controlled herd.   These representations, and the omission of Bear Ranch's true plans, were material and induced HeartBrand's forbearance and/or permission to allow the sale to go

forward.  HeartBrand reasonably relied on these representations and omissions in not objecting to this sale.

32.    By the fall of 2011, Bear Ranch's failures to comply with its obligations with respect to the Akaushi Association had become conspicuous, though its intentions were still unclear.  After the Association reminded Bear Ranch of its unmet obligations, Bear Ranch representatives specifically represented to the Association in September 2011 and November 2011 that it intended to register its calves.  Bear Ranch made these representations knowing that, if it did not comply with Association registration rules, Bear Ranch would be in breach of its Full-Blood Contract with HeartBrand.  Without any intent to comply, Bear Ranch represented that it would register calves, and did so to induce the Association's forbearance while Bear Ranch secretly encouraged at least one other producer not to register calves.  Bear Ranch also knew that by inducing the Association's forbearance, Bear Ranch stalled any enforcement action that HeartBrand could have taken had it known of Bear Ranch's secret intentions.

33.    Bear Ranch representatives continued stalling the Association for months while they formulated a litigation strategy to challenge the HeartBrand contracts.  Not once did Bear Ranch contact HeartBrand to discuss the contracts between them, to complain about any unfairness in the contract terms, to suggest that the contracts were in any way anti-competitive, or to request any relief or

renegotiation of the contracts.  Instead, without warning, Bear Ranch filed this lawsuit in March 2012.  In the complaint, Bear Ranch alleged—without factual support, and entirely contrary to the beliefs expressed in Bear Ranch's own internal documentation—that Akaushi cattle represented a separate market that competed with no other beef.  Bear Ranch further alleged that it had been fraudulently induced to purchase its cattle, but inexplicably sought neither rescission of the contract nor the recovery of damages.  The explanation for that bizarre strategy turns out to be rather simple:  the lawsuit was simply the latest salvo in a scheme dating back to at least October 2010, when Bear Ranch decided it would rather develop an Akaushi herd on its own without HeartBrand.  Since that time, Bear Ranch has repeatedly broken its promises, concealed and misrepresented its intentions, and strung HeartBrand along, waiting for the time when Bear Ranch would have the herd it wanted and could then use pressure tactics or even litigation to pull the rug out from under HeartBrand's feet.

## COUNT ONE: FRAUDULENT INDUCEMENT

34.   HeartBrand hereby incorporates the allegations contained in Paragraphs 1 through 33 as though fully set forth herein.

35.   In July 2010, in connection with Bear Ranch's purchase of more than 400 head of full-blood Akaushi cattle from HeartBrand, Bear Ranch represented that its purpose in acquiring these cattle was to satisfy Bear Ranch's grazing

obligations in Colorado and to produce beef to be served at the Koch estates. Additionally, Bear Ranch represented that it would comply with its contractual obligation under the Full-Blood and F1 Program Contracts, including its obligations to register offspring of the cattle it purchased with the American Akaushi Association and to follow the rules of the American Akaushi Association. Each of these representations was material and, but for these representations, HeartBrand would not have sold these cattle to Bear Ranch.

36.    Bear Ranch made these representations with the intent to induce HeartBrand to sell these cattle and with full knowledge that these representations were false.  In fact, upon information and belief, at the same time that Bear Ranch made these representations, it had no intent to comply with its registration obligations or to follow the rules of the American Akaushi Association.

37.    Bear Ranch's fraudulent inducement injured HeartBrand because it sold more than 400 head of full-blood Akaushi cattle to Bear Ranch at a price premised on Bear Ranch's compliance with the terms of the Full-Blood and F1 Program Contracts, because it was deprived of access to cattle that could have been sold in HeartBrand's beef program and deprived of access to important genetic and performance data concerning the cattle sold to Bear Ranch and their offspring.

38.    As a result, HeartBrand is entitled to rescission of its sale to Bear Ranch, and any actual damages incurred, including, but not limited to, any lost

16

sales or depreciation of the cattle that was incurred while in Bear Ranch's possession, and exemplary damages.

## COUNT TWO: FRAUDULENT INDUCEMENT

39.    Beeman hereby incorporates the allegations contained in Paragraphs 1 through 38 as though fully set forth herein.

40.    In July 2011, in connection with Bear Ranch's purchase of more than 500 head of full-blood Akaushi cattle from Beeman, Bear Ranch represented that it would comply with its contractual obligation under the Full-Blood and F1 Program Contracts including its obligations to register offspring of the cattle it purchased with the Akaushi Association, to follow the rules of the Association, and not to market its beef as Akaushi.  Additionally, Bear Ranch also represented that it would sell approximately 30% of its full-blood Akaushi calves to HeartBrand going forward.  Each of these representations was material and, but for these representations, Beeman would not have sold these cattle to Bear Ranch and HeartBrand would not have allowed the sale to go forward.

41.    Bear Ranch made those representations with the intent to induce Beeman to sell these cattle at a business partner's price with full knowledge that these representations were false.  In fact, upon information and belief, at the same time that Bear Ranch made these representations, it was strategizing about ways to

challenge its contractual obligations under the Full-Blood and F1 Program Contracts.

42.     As a result, Beeman is entitled to rescission of his sale to Bear Ranch , any actual damages incurred, including, but not limited to, any lost sales or depreciation of the cattle that was incurred while in Bear Ranch's possession, and exemplary damages.

## COUNT THREE: COMMON LAW FRAUD

43.     HeartBrand hereby incorporates the allegations contained in Paragraphs 1 through 42 as though fully set forth herein.

44.     In July 2011, in connection with Bear Ranch's purchase of more than 500 head of full-blood Akaushi cattle from Beeman, Bear Ranch represented that it would comply with its contractual obligation under the Full-Blood and F1 Program Contracts including its obligations to register offspring of the cattle it purchased with the Akaushi Association, to follow the rules of the Association, and not to market its beef as Akaushi.  Additionally, Bear Ranch also represented that it would sell approximately 30% of its full-blood Akaushi calves to HeartBrand going forward.  Each of these representations was material and induced HeartBrand's forbearance and/or permission to allow the sale to go forward.

45.     Bear Ranch made those representations with the intent to induce HeartBrand to allow the sale to go forward with full knowledge that these

representations were false.  In fact, upon information and belief, at the same time that Bear Ranch made these representations, it was strategizing about ways to challenge its contractual obligations under the Full-Blood and F1 Program Contracts and to avoid selling any of its full-blood calves to HeartBrand.

46.  Bear Ranch's fraudulent inducement injured HeartBrand because it was deprived of access to cattle that could have been sold in HeartBrand's meat program and deprived of access to important genetic and performance data concerning the cattle sold by Beeman to Bear Ranch and their offspring.

47.  As a result, HeartBrand is entitled to recover actual damages it suffered as a result of Bear Ranch's fraudulent inducement, exemplary damages, interest, and costs.

## COUNT FOUR: COMMON LAW FRAUD

48.  HeartBrand hereby incorporates the allegations contained in Paragraphs 1 through 47 as though fully set forth herein.

49.  In July 2011, in connection with Bear Ranch's purchase of 100 head of full-blood Akaushi cattle from Twinwood, Bear Ranch represented to HeartBrand that the terms of the Full-Blood and F1 Program Contracts would apply to this purchase and that Bear Ranch would continue to keep HeartBrand apprised as to the status of its herd. Additionally, Bear Ranch represented that it would comply with its contractual obligation under the Full-Blood and F1 Program

19

Contracts, including its obligations to register offspring of the cattle it purchased from Twinwood with the Akaushi Association and to follow the rules of the Association.  Each of these representations was material and induced HeartBrand's forbearance and/or permission to allow the sale to go forward.

50.    Bear Ranch made these representations with the intent to induce HeartBrand to allow Bear Ranch's purchase from Twinwood and with full knowledge that these representations were false.  In fact, upon information and belief, at the same time that Bear Ranch made these representations, it had no intent to comply with its registration obligations or to follow the rules of the American Akaushi Association and was strategizing about ways to challenge its contractual obligations under the Full-Blood and F1 Program Contracts and to avoid selling any of its full-blood calves to HeartBrand.

51.    Bear Ranch's fraud injured HeartBrand because it was deprived of access to cattle that could have been sold in HeartBrand's meat program and deprived of access to important genetic and performance data concerning the cattle sold to Bear Ranch and their offspring.

52.    As a result, HeartBrand is entitled to recover actual damages it suffered as a result of Bear Ranch's fraud, exemplary damages, interest, and costs.

## COUNT FIVE: COMMON LAW FRAUD

53.     HeartBrand hereby incorporates the allegations contained in Paragraphs 1 through 52 as though fully set forth herein.

54.     In the fall of 2011, representatives of the Association reminded Bear Ranch of its failure to register the offspring of the cattle it had purchased and to follow the rules of the Association.  In response, in September 2011 and November 2011, Bear Ranch specifically represented to the Association that it would begin registering its calves.   Bear Ranch made these representations with the intent or expectation that these representations would have been conveyed to HeartBrand. Each of these representations was material and, but for these representations, HeartBrand would have commenced an action based on Bear Ranch's failure to comply with the terms of the Full-Blood and F1 Program Contracts.

55.     Bear Ranch made these representations with the intent to stall any enforcement action by HeartBrand with full knowledge that these representations were false.  In fact, upon information and belief, at the same time that Bear Ranch made these representations, it had no intent to comply with its registration obligations or to follow the rules of the  Akaushi Association and was strategizing about ways to challenge its contractual obligations under the Full-Blood and F1 Program.

56.     Bear Ranch's fraud injured HeartBrand because it was delayed in receiving access to cattle that could have been sold in HeartBrand's meat program and delayed in receiving access to important genetic and performance data concerning the cattle sold to Bear Ranch and their offspring.

57.     As a result, HeartBrand is entitled to recover actual damages it suffered as a result of Bear Ranch's fraud, exemplary damages, interest, and costs.

## COUNT SIX: BREACH OF FULL-BLOOD AND F1 PROGRAM CONTRACTS

58.     HeartBrand hereby incorporates the allegations contained in Paragraphs 1 through 57 as though fully set forth herein.

59.     The Full-Blood and F1 Program Contracts between HeartBrand and Bear Ranch were valid and binding contracts.

60.     HeartBrand performed each of its obligations under these contracts including, but not limited to, selling the cattle and semen provided for in the agreements.

61.     Bear Ranch has committed multiple breaches of these contracts by: (i) failing to register the offspring produced from the cattle and/or semen purchased from HeartBrand and Beeman with the American Akaushi Association; (ii) failing to enroll its Akaushi cattle in the American Akaushi Association's Whole Herd Reporting System or pay the assessment fees for its entire herd; (iii) failing to comply with the rules of the American Akaushi Association; (iv) failing to submit

DNA test results for offspring produced from its Akaushi cattle and from any calves produced from the semen purchased from HeartBrand; and (v) failing to sell to HeartBrand  the full-blood offspring of the Akaushi cattle Bear Ranch did not intend to keep to grow its herd.

62.    As a result of Bear Ranch's failure to fulfill its obligations under the Full-Blood and F1 Program Contracts, HeartBrand  is entitled to recover possession of the cattle to which those contracts applied, along with their offspring. HeartBrand is also entitled to recover its actual damages as well as its attorneys' fees pursuant to the terms of the Full-Blood and F1 Program Contracts and Texas Civil Practice & Remedies Code § 38.001-006.

## **PRAYER FOR RELIEF**

WHEREFORE, HeartBrand Beef, Inc. and Ronald Beeman respectfully request that this Court enter judgment in its favor and against Bear Ranch, LLC and order Bear Ranch to:

a.    Return the cattle and genetic material to which the Full-Blood and F1 Program Contracts apply, along with their offspring, subject to any payment or refund that may be adjudged required under the terms of those contracts;

b.    Return the cattle purchased from Ronald Beeman, along with their offspring, subject to any payment or refund that may be adjudged

23

required under the terms of the Full-Blood and F1 Program Contracts that governed the sale of those cattle;

c.   Pay the actual damages suffered by HeartBrand and Beeman, along with exemplary damages;

d.   Pay the attorneys' fees and expenses incurred by HeartBrand and Beeman, including those fees and expenses associated with overcoming Bear Ranch's defenses to the enforcement of HeartBrand and Beeman's contractual rights; and

e.   Provide such other and further relief, both general and special, legal or equitable, to which HeartBrand and Beeman may show themselves to be justly entitled.

## <u>DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED COMPLAINT</u>

1.   Defendants admit that Bear Ranch purports to assert claims for declaratory relief as well as money damages for fraud and breach of contract. Defendants deny that they have committed fraud or breached any contract to which Bear Ranch is a party.   Defendants also deny that Bear Ranch is entitled to the relief it seeks.   Defendants further deny each and every remaining allegation contained in paragraph 1.

2.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 2.

3.      Defendants admit the allegations contained in paragraph 3.

4.      Defendants admit the allegations contained in paragraph 4.

5.      Defendants admit the allegations contained in paragraph 5.

6.      Defendants admit the allegations contained in paragraph 6.

7.      Defendants admit the allegations contained in paragraph 7.

8.      Defendants admit that there is a dispute between HeartBrand, the American Akaushi Association, and Bear Ranch based upon Bear Ranch's failure to fulfill the terms of its contracts and Bear Ranch's failure to comply with the rules of the American Akaushi Association.   Defendants also admit that declaratory relief may resolve this dispute.   Defendants deny each and every remaining allegation contained in paragraph 8.

9.      Defendants admit that Akaushi cattle are indigenous to Japan. Defendants also admit that the marbling in Akaushi beef contains a higher concentration of monounsaturated fat relative to saturated fat.   Defendants also admit that Akaushi cattle are prized for their rich flavor, tenderness, and juiciness. Defendants further admit that Akaushi beef is more tender than certain competing types of beef and that it is consistently graded above USDA Prime in marbling content.   Defendants deny each and every remaining allegation contained in paragraph 9.

10.     Defendants admit the allegations contained in the first and second sentences of paragraph 10.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the third sentence of paragraph 10 as they are not aware of any such study focused on Akaushi beef. Defendants deny each and every remaining allegation contained in paragraph 10.

11.     Defendants admit that the allegations contained in paragraph 11 generally describe how beef reaches consumers, though individual instances may vary in certain respects.   Defendants lack knowledge or information sufficient to form a belief about the truth of Bear Ranch's allegations concerning how other producers produce and/or sell beef.   Defendants deny each and every remaining allegation contained in paragraph 11.

12.     Defendants admit that Akaushi cattle are genetically predisposed to produce higher levels of intramuscular fat and higher proportions of unsaturated fat, oleic acid, and conjugated linoleic acid than American breeds of cattle. Defendants admit that the price of Akaushi beef sold by HeartBrand is generally similar to but may in some instances be higher or lower than the price of beef from American breeds of cattle.   Defendants deny each and every remaining allegation contained in paragraph 12.

13.    Defendants admit that Akaushi beef is sold to customers throughout the United States.  Defendants deny each and every remaining allegation contained in paragraph 13.

14.    Defendants admit the allegations in paragraph 14.

15.    Defendants admit the allegations in paragraph 15.

16.    Defendants admit that HeartBrand is the only source of 100% pure Akaushi beef outside of Japan of which they are aware.  Defendants note that the representations on HeartBrand's web site speak for themselves.  Defendants otherwise deny each and every remaining allegation in paragraph 16.

17.    Defendants admit that Akaushi cattle are designated as a protected breed, are considered a national treasure of Japan, and Japanese law highly restricts their export.  Defendants also admit that HeartBrand acquired Akaushi cattle from an entity that represented that it had acquired a small nucleus of Akaushi cattle from Japan in the 1990s.   Defendants otherwise deny each and every allegation in paragraph 17.

18.    Defendants admit that HeartBrand has sold Akaushi cattle to third parties.  Defendants also admit that these sales were governed by written contracts that imposed obligations and restrictions on the purchasers and that the terms of these contracts speak for themselves.  Defendants otherwise deny each and every allegation in paragraph 18.

27

19.     Defendants admit that HeartBrand's sales of Akaushi cattle are governed by written contracts that impose obligations and restrictions on the purchasers and that the terms of these contracts speak for themselves. Defendants otherwise deny each and every allegation in paragraph 19.

20.     Defendants deny each and every allegation in paragraph 20.

21.     Defendants admit that HeartBrand's sales of Akaushi cattle are governed by written contracts that impose obligations and restrictions on the purchasers and that the terms of these contracts speak for themselves. Defendants also admit that HeartBrand has entered into contracts with members of the American Akaushi Association and that the terms of these contracts speak for themselves.  Defendants further admit that members of the American Akaushi Association agree to be bound by its rules and that these rules speak for themselves. Defendants otherwise deny each and every allegation in paragraph 21.

22.     Defendants admit that HeartBrand's sales of Akaushi cattle are governed by written contracts that impose obligations and restrictions on the purchasers and that the terms of these contracts speak for themselves. Defendants also admit that members of the American Akaushi Association agree to be bound by its rules which impose certain obligations and restrictions and that these rules speak for themselves. Defendants otherwise deny each and every allegation in paragraph 22.

23.     Defendants admit that HeartBrand's sales of Akaushi cattle are governed by written contracts that impose obligations and restrictions on the purchasers and that the terms of these contracts speak for themselves. Defendants otherwise deny each and every allegation in paragraph 23.

24.     Defendants admit that HeartBrand's sales of Akaushi cattle are governed by written contracts and that the terms of these contracts speak for themselves.  Defendants otherwise deny each and every allegation in paragraph 24.

25.     Defendants admit that HeartBrand's sales of Akaushi cattle are governed by written contracts that impose obligations and restrictions on the purchasers and that the terms of these contracts speak for themselves. Defendants otherwise deny each and every allegation in paragraph 25.

26.     Defendants admit that, in June 2011, Bear Ranch purchased 14 full-blood Akaushi bulls and approximately 500 full-blood Akaushi cows from Beeman Ranch for approximately $2.5 million.  Defendants lack independent knowledge or information sufficient to form a belief about the truth of Bear Ranch's allegations concerning its purchases of Akaushi cattle from sources other than HeartBrand and Beeman Ranch.  Defendants otherwise deny each and every remaining allegation contained in paragraph 26.

27.     Defendants admit that, in July 2010, Bear Ranch purchased 24 full-blood Akaushi bulls, 400 full-blood Akaushi cows, and 10,000 straws of Akaushi

semen from HeartBrand for approximately $2.4 million. Defendants admit that this purchase was governed by contracts, the terms of which speak for themselves. Defendants otherwise deny each and every allegation in paragraph 27.

28.    Defendants admit that Bear Ranch purchased Akaushi cattle from HeartBrand pursuant to contracts that imposed obligations and restrictions on Bear Ranch.   Defendants also admit that the terms of these contracts speak for themselves. Defendants otherwise deny each and every allegation in paragraph 28.

29.    With respect to the allegations contained in the first sentence of paragraph 29, Defendants admit that, in July 2011, the American Akaushi Association requested that Bear Ranch submit information required for the American Akaushi Association's Whole Herd Reporting System and that, in September 2011, the American Akaushi Association sent an invoice to Bear Ranch for the annual assessment associated with the American Akaushi Association's Whole Herd Reporting System.  Defendants admit the allegations contained in the remainder of paragraph 29.

30.    Defendants admit the allegations contained in the first, second, and third sentences of paragraph 30. Defendants deny the allegations contained in the fourth sentence of paragraph 30.

31.    Defendants admit that Bear Ranch has agreed that, during the term of its contract with HeartBrand and for a period of fifty years following the

termination of that contract, it will not market any cattle or beef as having unique health benefits similar to those of Akaushi beef or as having been derived from Akaushi cattle.  Defendants deny each and every remaining allegation contained in paragraph 31.

32.     Defendants admit that, at one time, the title of HeartBrand's web site contained a trademark registration symbol after the word Akaushi.  Defendants also admit that HeartBrand applied to register a trademark on the phrase "HeartBrand Akaushi Beef" but that HeartBrand later abandoned that application. Defendants further admit that HeartBrand does not currently have a registered trademark on the word Akaushi.  Defendants otherwise deny each and every remaining allegation contained in paragraph 32.

33.     Defendants deny each and every allegation contained in paragraph 33.

34.     Defendants deny each and every allegation contained in paragraph 34.

35.     The allegations in paragraph 35 are not factual assertions, and therefore require no response.   To the extent that a response is required, Defendants incorporate their responses contained in each of the above paragraphs.

36.     Defendants admit that, prior to July 2010, HeartBrand represented to Bear Ranch that it controlled the only breeding nucleus of full-blood Akaushi cattle outside of Japan.  Defendants also admit that the terms of the contracts between HeartBrand and Bear Ranch and the content of HeartBrand's web site

speak for themselves.   Defendants deny each and every remaining allegation contained in paragraph 36.

37.     Defendants deny each and every allegation contained in paragraph 37.

38.     Defendants admit that, at the time HeartBrand executed its contract with Bear Ranch, they understood that one or more members of the Broussard family of Pine Island, Louisiana (or an affiliated entity) possessed a small number of full-blood Akaushi bulls and straws of full-blood Akaushi semen derived from the same group of Akaushi cattle that were imported from Japan and that HeartBrand currently owns.   Defendants also admit that they understood that Heart Brand Cattle Company, LLC ("HBCC") previously marketed and sold Akaushi cattle and genetics but that any Akaushi breeding nucleus had been returned to the control of HBCC prior to HeartBrand's acquisition of any cattle assets of HBCC. Defendants otherwise deny each and every remaining allegation contained in paragraph 38.

39.     Defendants deny each and every allegation contained in paragraph 39.

40.     Defendants deny each and every allegation contained in paragraph 40.

41.     The allegations in paragraph 41 are not factual assertions, and therefore require no response.   To the extent that a response is required, Defendants incorporate their responses contained in each of the above paragraphs.

42.     Defendants admit that Bear Ranch purports to seek a judgment adjudging and declaring that it has a valid defense of fraudulent inducement that defeats any enforcement by Defendants of any contract with Bear Ranch, a defense pleaded in Bear Ranch's Answer of June 28, 2012. Defendants deny that Bear Ranch is entitled to the relief it seeks.  Defendants also deny each and every remaining allegation contained in paragraph 42.

43.     The allegations in paragraph 43 are not factual assertions, and therefore require no response.  To the extent that a response is required, Defendants incorporate their responses contained in each of the above paragraphs.

44.     Defendants admit that the contracts between HeartBrand and Bear Ranch speak for themselves.  Defendants deny each and every remaining allegation contained in paragraph 44.

45.     Defendants admit that Bear Ranch paid the purchase price set forth in its contract with HeartBrand.  Defendants deny each and every remaining allegation contained in paragraph 45.

46.     Defendants deny each and every allegation contained in paragraph 46.

47.     Defendants deny each and every allegation contained in paragraph 47

48.     The allegations in paragraph 48 are not factual assertions, and therefore require no response.  To the extent that a response is required, Defendants incorporate their responses contained in each of the above paragraphs.

49.     Defendants admit that Bear Ranch purports to assert that the contractual restrictions on its use of the cattle it purchased from HeartBrand are unenforceable.  Defendants deny that Bear Ranch is entitled to the relief it seeks.

50.     Defendants admit that, in June 2011, Bear Ranch purchased 14 full-blood Akaushi bulls and approximately 500 full-blood Akaushi cows from Beeman Ranch.  Defendants also admit that this purchase was subject to the same provisions and restrictions as those contained in Bear Ranch's contracts with HeartBrand.  Defendants lack independent knowledge or information sufficient to form a belief about the truth of Bear Ranch's allegations concerning its purchases of Akaushi cattle from sources other than HeartBrand and Beeman Ranch. Defendants otherwise deny each and every remaining allegation contained in paragraph 50.

51.     Defendants deny each and every allegation contained in paragraph 51.

52.     Defendants admit that Bear Ranch seeks a judgment adjudging and declaring that the cattle it purchased from sellers other than HeartBrand, and the descendants of those cattle, are not subject to restrictions under a contract with HeartBrand, the American Akaushi Association, or Beeman and are not subject to any registration or other requirements with the American Akaushi Association. Defendants deny that Bear Ranch is entitled to the relief it seeks.

53.     The allegations in paragraph 53 are not factual assertions, and therefore require no response.   To the extent that a response is required, Defendants incorporate their responses contained in each of the above paragraphs.

54.     Defendants admit that Bear Ranch purports to assert that the contractual restrictions on its use of the cattle it purchased from HeartBrand are unenforceable.  Defendants deny that Bear Ranch is entitled to the relief it seeks.

55.     Defendants lack knowledge or information sufficient to form a belief about the truth of Bear Ranch's allegations concerning its herd including offspring of the offspring of the cattle it purchased from HeartBrand.  Defendants deny each and every remaining allegation contained in paragraph 55.

56.     Defendants admit that Bear Ranch purports to seek a judgment adjudging and declaring that offspring of offspring, and later-generation descendants, of the cattle it purchased from HeartBrand are not subject to any restrictions under a contract with HeartBrand, the American Akaushi Association, or Beeman and not subject to any registration or other requirements with the American Akaushi Association.  Defendants deny that Bear Ranch is entitled to the relief it seeks.

## AFFIRMATIVE DEFENSES AND OTHER DEFENSIVE MATTERS

Without assuming any burden not otherwise imposed by applicable law, Defendants assert the following defenses to the allegations and claims for relief

asserted in the Amended Complaint. Moreover, nothing stated herein is intended to or shall be construed as an admission that any particular issue or subject matter is relevant to Bear Ranch's allegations.

Defendants reserve the right to amend or supplement these defenses as additional facts concerning their defenses become known.

1.     The Complaint, in whole or in part, fails to state a claim upon which relief may be granted.

2.     Bear Ranch's claims are barred, in whole or in part, by estoppel and/or quasi-estoppel.

3.     Bear Ranch's claims are barred, in whole or in part, by the doctrine of waiver.

4.     Bear Ranch's claims are barred, in whole or in part, by the doctrine of ratification.

5.     Bear Ranch's claims are barred, in whole or in part, by the doctrine of unclean hands.

6.     Bear Ranch's claims are barred, in whole or in part, due to Bear Ranch's fraud, as further set forth in HeartBrand and Beeman's Amended Counterclaims.

Respectfully submitted,

VINSON & ELKINS L.L.P.

 _/s/ James A. Reeder, Jr._____
James A. Reeder, Jr.
Attorney-in-Charge
Texas Bar No. 16695010
Federal Bar No. 12381
First City Tower, Suite 2500
1001 Fannin Street
Houston, Texas 77002-6760
Telephone:  713-758-2636
Facsimile:  713-615-5033

OF COUNSEL:

Jeffrey S. Johnston
Texas Bar No. 24002368
Federal Bar No. 22089
Jason M. Powers
Texas Bar No. 24007867
Federal Bar No. 23567
Stacy M. Neal
Texas Bar No. 24060322
Federal Bar No. 892868
First City Tower, Suite 2500
1001 Fannin Street
Houston, Texas 77002-6760

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of September, 2013, a true and correct copy of the foregoing document was filed with the Clerk of the U.S. District Court for the Southern District of Texas using the Court's CM/ECF system.

 _/s/ Stacy M. Neal_____
Stacy M. Neal