UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| BEAR RANCH, LLC, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 6:12-CV-14 |
| | § | |
| HEARTBRAND BEEF, INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

The parties agree that this dispute over specialty Akaushi cattle "is ready for appropriate trimming" at this summary judgment phase, Docket Entry No. 73 at 1, but they disagree about which claims should be trimmed. The relationship between Plaintiff Bear Ranch and Defendant HeartBrand Beef began in July 2010, when Bear Ranch bought 424 Akaushi cattle from HeartBrand. A contract governing that transaction imposed a number of restrictions on Bear Ranch's use of the cattle. In a previous ruling at the pleadings stage, this Court rejected Bear Ranch's attempt to avoid the contractual restrictions based on its claim that HeartBrand fraudulently induced it to enter into the contract, but recognized that Bear Ranch might be able to recover damages if it could prove that it paid an above-market price because of HeartBrand misrepresentations about the exclusivity of the cattle it sold. *See Bear Ranch LLC v. HeartBrand Beef, Inc.*, 2013 WL 6190253 (S.D. Tex. Nov. 26, 2013).

1 / 31

The parties' cross motions for summary judgment address issues left unresolved by the earlier ruling. The primary issues raised in Bear Ranch's motion are the scope of the restrictions in its 2010 agreement with HeartBrand and whether those restrictions also apply to cattle Bear Ranch purchased in three subsequent transactions with other parties. HeartBrand's motion contends that Bear Ranch lacks any evidentiary support for its claim that it overpaid for the cattle.

## I.   BACKGROUND

Akaushi cattle (see Figure 1) are a specialty breed from Japan that produce beef prized for its rich flavor, tenderness, and health benefits. Although Japanese laws highly restrict the export of Akaushi cattle, in the 1990s, HeartBrand's predecessor acquired a small number of breeding cattle and HeartBrand steadily increased the herd size. *See Bear Ranch LLC*, 2013 WL 6190253, at *1.



Figure 1. Head of HeartBrand Akaushi Cattle. *HeartBrand Beef: Our History*, http://www.heartbrandbeef.com/?page=shop/history (last visited March 18, 2014).

HeartBrand began selling Akaushi cattle to a group of producers pursuant to contracts that sought to jointly "promote the raising of Akaushi cattle and the marketing of meat from such cattle outside of Japan so that the Akaushi breed of cattle may grow in stature and number to the mutual economic benefit of HeartBrand and Producer."  Full-Blood Contract, Docket Entry No. 73-2 at 2.  In July 2010, pursuant to the Full-Blood Contract, Bear Ranch purchased 424 Akaushi cattle and 10,000 units of Akaushi semen from HeartBrand for $2.4 million.  *Id.*; *see also* F1 Program Contract, Docket Entry No. 73-3.  In order to preserve "HeartBrand's preeminent position as the owner of Akaushi genetics outside of Japan," Docket Entry No. 73-2 at 2, the contract restricts Bear Ranch's sale and use of the cattle and their offspring through provisions governing: the sale of breeding stock, *id.* § I; registration with the American Akaushi Association, Inc. (AAA), *id.* § V; restrictions on sale of full-blood offspring, *id.* § VII; liens, *id.* § XIV; and marketing, *id.* § XV.

Bear Ranch subsequently purchased additional Akaushi cattle from three other HeartBrand Producers in "handshake" deals.  The circumstances surrounding these transactions, which are the focus of much of this opinion, are as follows:

(1) Spears Sale: Tony Spears introduced Bear Ranch to HeartBrand and earned a commission on Bear Ranch's 2010 purchase of cattle from HeartBrand.  Spears himself also bought Akaushi cows from HeartBrand, and Bear Ranch agreed to buy 50 of them in December 2010.  Gill Dep.,

Docket Entry No. 73-4 at 30:2–15, 189:3–22, 190:12–18; Fielding Dep., Docket Entry No. 73-5 at 187:24–188:3.

(2) <u>Beeman Sale</u>: In April 2011, HeartBrand asked if Bear Ranch was interested in buying more cattle.  The parties reached a deal for Bear Ranch to buy about 500 additional Akaushi from HeartBrand, but HeartBrand called off the sale after a dispute arose concerning the timing of payment.  When Bear Ranch's Ranch Manager, Rob Gill, went to HeartBrand headquarters "with hat in hand" to discuss what had happened, HeartBrand's Chairman, Ronald Beeman, said that he had personally bought the cattle.  Beeman individually then agreed to sell the cattle to Bear Ranch for a total price of $2.5 million.  Docket Entry No. 73-4 at 164:14–19, 168:6–8, 169:3–24, 172:3–25, 173:19–174:7; Docket Entry No. 73-6 at 151:2–152:20; Beeman Decl., Docket Entry No. 77-1 ¶ 15.

(3) <u>Twinwood Sale</u>:   From July through September 2011, Bear Ranch purchased an additional 195 head of Akaushi from Twinwood Cattle, another HeartBrand Producer.  Docket Entry No. 73-4 at 186:20–187:7.

The parties paint contrasting pictures concerning the oral representations and agreements made in connection with these purchases.  Other than invoices and emails, there are no documents governing the transactions.  HeartBrand asserts that all parties understood through various meetings and conversations that its Full-Blood Contract with Bear Ranch would also apply to the cattle purchased from these other producers and that Bear Ranch would sell a certain percentage of its calves back to HeartBrand.  *See, e.g.*, Beeman Dep., Docket Entry No. 73-6 at 152:2–4 ("I sold cattle from one full-blood producer, under the same full-blood contract that they operated under . . . ."); *see also* Fielding Dep., Docket Entry No. 73-5 at 151:20–22 ("[I]n the cattle business, your word is your bond; and when you

agree to something and shake hands to something, then that's what you do."). On the other hand, Bear Ranch maintains that it never agreed that the Full-Blood Contract would apply to any of these subsequent purchases or that it would sell back a certain percentage of its calves to HeartBrand. *See* Gill Dep., Docket Entry No. 73-4 at 173:19–174:1 ("[T]here was no discussion at all about contracts."); *id.* at 187:1–7 ("[W]e had no discussion regarding contract.").

## II.  STANDARD OF REVIEW

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment.  *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

## III.  BEAR RANCH'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Bear Ranch seeks entry of judgment in its favor on its declaratory claim that the cattle it purchased from the three HeartBrand Producers are not subject to the contract restrictions in the Full-Blood Contract.  In addition, Bear Ranch seeks dismissal of several of Defendants' counterclaims, which allege fraud, fraudulent

inducement, and breach of contract. Because the Court's interpretation of the contract affects the viability of the fraud-based counterclaims, the Court will first address the contract issues.

## A. Contract Law Issues

### *1. Legal Principles*

Under Texas law, the interpretation of an unambiguous contract is a question of law for the court to decide. *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 842 (5th Cir. 2012). In construing a contract, the court's primary purpose is to ascertain the true intent of the parties as expressed in the written instrument. *State Farm Mut. Auto. Ins. Co. v. Scott*, 866 F. Supp. 2d 680, 686 (S.D. Tex. 2012); *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Parol evidence may not be considered unless the contract is ambiguous, and if "a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *Id*.

### *2. The Scope of Certain Contract Restrictions*

#### a.  The Marketing Provision

Although not the subject of a specific claim, the meaning of the Full-Blood Contract's "marketing provision" is central to several of the pending claims, so it will be addressed first. The marketing provision states:

> Regardless of the source of the cattle, PRODUCER will at no time market any of the cattle or beef sold by PRODUCER to any party for any purpose at any time as having unique health benefits similar to those of Akaushi beef or as having been derived from Akaushi cattle.

Docket Entry No. 73-2 § XV.  Bear Ranch interprets this provision as expressly allowing it to sell beef from the cattle so long as it does not promote the beef "as having unique health benefits similar to those of Akaushi beef or as having been derived from Akaushi cattle."  HeartBrand disagrees, arguing that the provision is restrictive, rather than permissive—"[w]hat this provision actually dictates is that a Producer will not sell *any* beef as though it were Akaushi . . . [it] does not expressly permit a Producer to sell Akaushi beef in generic form."  Docket Entry No. 77 at 22–23.

For at least three reasons, the Court agrees with Bear Ranch's reading of this provision.  First, its plain language expressly contemplates "beef sold by PRODUCER."  Second, if the provision were restrictive as HeartBrand contends and did not allow any sale of Akaushi beef even in generic form, then the words "as having unique health benefits similar to those of Akaushi beef or as having been derived from Akaushi cattle" are superfluous.  *See Transitional Learning Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000) ("[A] contract should be interpreted as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.").  Finally, even if supported by the contract

language, HeartBrand's argument that this provision "does not expressly permit a Producer to sell Akaushi beef in generic form" ignores that such permission is not necessary given the default principle that property is alienable, *see, e.g., Texas & P. Ry. Co. v. City of El Paso*, 85 S.W.2d 245, 249 (Tex. 1935) ("As a property right it was assignable, taxable, and alienable.")  (internal quotation marks omitted) (quoting *City of Owensboro v. Cumberland Tel. & Tel. Co*, 230 U.S. 58, 65 (1913)); the onus is on HeartBrand to show a clear restriction on Bear Ranch's ability to sell what it owns.  Such a restriction is not found among the numerous restrictions in the Full-Blood Contract.  Accordingly, sales of beef from Akaushi cattle that are not labeled as Akaushi beef or as having unique health benefits similar to Akaushi beef are allowed under the Full-Blood Contract.[1]

> **b. Was Bear Ranch required to sell offspring to HeartBrand? (HeartBrand's Breach of Contract Counterclaim)**

---

[1] Although the unambiguous language of this marketing provision means parol evidence is not relevant to its interpretation, that evidence is consistent with the contract language.  Beeman agreed that the contract "does not prohibit Bear Ranch from selling the beef from the Akaushi cattle" and allegedly told Gill that he would "welcome the competition."  Docket Entry Nos. 73-6 at 200:19–24; 73-4 at 174:17–23; *see also* Docket Entry No. 77-2 ¶ 18 ("[P]roducers are not supposed to sell their HeartBrand-derived beef *except as commodity beef* . . . .") (emphasis added).  And HeartBrand admits that it has traditionally allowed producers to sell "incidental" quantities of beef provided that they abide by the marketing restrictions, *id.*, arguing only that this "occasional dispensation" is not required by the contract language, Docket Entry No. 77 at 15.

The determination that Bear Ranch can sell its cattle as beef so long as it abides by the marketing restrictions informs the Court's analysis of another question: whether Bear Ranch's failure to sell the offspring of its cattle back to HeartBrand breached the Full-Blood Contract. Bear Ranch's right to sell the cattle as beef indicates it need not sell offspring to HeartBrand. HeartBrand contends that Bear Ranch must do so as part of the breach-of-contract claim alleged in Counterclaim Six.[2]

The two relevant contract sections state:

**VI.** **Full-Blood Offspring:** HEARTBRAND agrees that it will purchase all Full-Blood calves produced by using the Akaushi cattle at a price of [$X] for a 500 pound minimum weaned calf and [$X] for a finished 1500 pound animal offered for sale to HEARTBRAND by PRODUCER.

**VII.** **Full-Blood Offspring:** PRODUCER agrees that it will either keep the Full-Blood Offspring of the Akaushi Cattle in order to grow its herd or advise HEARTBRAND of its desire to sell a Full-Blood Akaushi animal. HEARTBRAND will either purchase the offspring pursuant to Paragraph VI above or will attempt to sell the animal to a member of the [AAA] in such a way as to obtain the highest price possible. This may be done either by an auction or private treaty at the sole discretion of HEARTBRAND. PRODUCER shall have the right to set a minimum price on its animals. If HEARTBRAND is unable to obtain the minimum price, the animal will be returned to PRODUCER. PRODUCER agrees to pay HEARTBRAND a commission equal to 10% of the price received for the sale of the offspring.

---

[2] Counterclaim Six also alleges that Bear Ranch breached the contract by failing to meet various registration requirements, but summary judgment was not sought on that part of the claim.

> HEARTBRAND will have the right to purchase any superior sire from PRODUCER for a price of [$X].  HEARTBRAND will have the right to purchase any superior female from PRODUCER for a price of [$X].

Docket Entry No. 73-2 §§ VI, VII.

Reading these provisions together and following their plain language, the Court concludes that the Full-Blood Contract establishes a system that encourages, but does not require, a producer like Bear Ranch to sell its offspring to HeartBrand. Section VI sets a floor price that HeartBrand agrees to pay for animals "offered for sale" by Bear Ranch.  Thus, Bear Ranch has discretion to decide whether to "offer" its calves for sale to HeartBrand or do something else with them (that is, keep the offspring "in order to grow its herd").  This is in contrast to the last two sentences of Section VII, which give HeartBrand the "right to purchase" superior sires and females for a specific price.  Further support for Breach Ranch's discretion in deciding whether to sell offspring can be found in Section VII, which refers to its "desire to sell a Full-Blood Akaushi animal," not its obligation to sell.

The separate "floor price" and "minimum price" terms also support this interpretation.  Section VI sets a floor price at which HeartBrand must purchase any offspring "offered for sale" by Bear Ranch.  But Bear Ranch has "the right to set a minimum price on its animals," and if HeartBrand "is unable to obtain the minimum price, the animal will be returned to [Bear Ranch.]"  *Id*. § VII.  Reading the contract to require Bear Ranch to sell offspring to HeartBrand renders Bear

Ranch's "right to set a minimum price" impotent because Bear Ranch would presumably have to sell at the floor price in Section VI. Bear Ranch's right to set a minimum price therefore makes sense only if it may, but need not, sell to HeartBrand at the Section VI floor price. And again, the default principle that Bear Ranch may do what it wishes with the cattle it purchases absent an express agreement to the contrary is important: HeartBrand must identify a contractual requirement that Bear Ranch sell its offspring to HeartBrand. Because it cannot do so, HeartBrand's breach of contract claim based on Bear Ranch's failure to sell offspring to HeartBrand is dismissed because the alleged breach is allowed by the contract.[3]

### 3. Do the Full-Blood Contract restrictions apply to subsequent transactions? (Bear Ranch Claim Four)

The final contract issue is whether the Full-Blood Contract restrictions apply to Bear Ranch's three acquisitions of Akaushi cattle from other producers. HeartBrand contends that the 2010 Full-Blood Contract and its restrictions automatically extend to any subsequent Bear Ranch purchases of Akaushi cattle from other HeartBrand producers. In the alternative, Beeman contends that an oral agreement to comply with the Full-Blood Contract existed for the cattle he sold.

---

[3] Bear Ranch also seeks summary judgment on the remedy HeartBrand requests for a breach of contract. But the Court need not decide that issue at this time, because no breach has yet been proven. The Court reserves ruling on the proper remedy until it is necessary.

Bear Ranch disagrees and argues that it is entitled to a declaratory judgment stating that its three subsequent purchases are free of the restrictions.[4]

### a. Does the 2010 Full-Blood Contract apply to all subsequent purchases?

The Full-Blood Contract provides for the sale of 424 Full-Blood Akaushi cattle to Bear Ranch "subject to the promises and conditions contained herein." Docket Entry No. 73-2 § I.  All parties agree that one restriction contained in the contract—the previously discussed "marketing provision"—applies to all of Bear Ranch's Akaushi cattle, even those obtained in later transactions from other producers.  *Id.* § XV (marketing restriction applies "[r]egardless of the source of the cattle" and to "any of the cattle or beef sold by Producer").  Another restriction—the "registration provision"—which requires Bear Ranch to "at all times . . . comply with the Rules of the [AAA]," *id.* § V, may also apply to the

---

[4] Bear Ranch also seeks a declaration that the third-party "use" restriction applies only to the Akaushi cattle that Bear Ranch purchased pursuant to the July 2010 contract, *not* their offspring. *See* Docket Entry No 73-2 § I ("Producer further agrees that it will not allow any third party to use any Full-Blood Akaushi animal purchased pursuant to this agreement for any purpose without the express written permission of HeartBrand.")  But Bear Ranch's request is not concrete enough for the Court to understand what "third-party use" they seek and are currently prevented from doing. Thus the Court, in its discretion, declines to issue declaratory relief on the third-party use provision.  *See* Advisory Comm. Note to 1937 Adoption to Fed. R. Civ. P. 58 ("The demand for relief shall state with precision the declaratory judgment desired . . . ."); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287–89 (1995) (explaining that the court has discretion to decline declaratory relief based on "considerations of practicality and wise judicial administration").

subsequently purchased cattle, depending on a later interpretation of the AAA rules.[5]

The main dispute is whether the remaining contract restrictions are limited to the 424 cattle obtained from HeartBrand or also apply to the three later purchases from Spears, Beeman, and Twinwood.  Unlike the broad scope of the marketing and registration provisions discussed above, these other restrictions refer to Akaushi cattle "purchased pursuant to this agreement" or "purchased by this agreement."  *See, e.g.*, *id.* § I ("Producer agrees that it will never sell, lease or give any Full-Blood Akaushi animal purchased pursuant to this agreement or any offspring thereof to any party other than HeartBrand."); *id.* ("Producer . . . will not allow any third party to use any Full-Blood Akaushi animal purchased pursuant to this agreement for any purpose . . ."); *id.* § V ("[A]s soon as practical all offspring produced by using any of the cattle purchased [hereinafter referred to as the 'Akaushi cattle'] by this agreement will be registered . . ."); *id.* § VII ("Producer agrees that it will either keep the Full-Blood Offspring of the Akaushi Cattle in order to grow its herd or . . .").  The plain meaning of this limiting language means that these restrictions apply only to the 424 cattle acquired in the Full-Blood contract and their offspring.

---

[5] The registration provision only applies to subsequent purchases of Akaushi cattle if the AAA Rules contain provisions that apply to a producer's entire herd of Akaushi cattle regardless of the source. The Court has not been asked to interpret the lengthy set of AAA rules at this phase, *see* Docket Entry No. 85 at 25, and therefore will leave the issue of whether any of the AAA rules apply to Bear Ranch's subsequent purchases of Akaushi cattle for later, if needed.

HeartBrand's interpretation of the phrase "pursuant to this agreement" is unpersuasive. Relying on a Texas real property case, HeartBrand argues that Bear Ranch's subsequent purchases "were in fact, 'pursuant to this agreement,' because . . . but for Bear Ranch's having signed a full-blood contract ('this agreement'), it would not have been able to make those other purchases." Docket Entry No. 77 at 26 (citing *Syntax, Inc. v. Hall*, 899 S.W.2d 189, 191 (Tex. 1995) (interpreting the statutory language "pursuant to foreclosure of a tax lien" as encompassing both the initial foreclosure sale and the resale of the foreclosed property by a taxing authority because the "only reason they hold this property at all is 'pursuant to' their powers of foreclosure as a taxing entity")). HeartBrand reads the phrase "pursuant to this agreement" as essentially meaning "pursuant to this agreement and other future purchases of Akaushi cattle," ignoring its ordinary meaning in this sales contract. Unlike in *Syntax* where the court interpreted the statutory language to cover a subsequent sale of the same property, HeartBrand seeks to apply a contract governing the purchase of certain cattle to a subsequent purchase of different cattle from a different seller. In this latter context, it does not make sense to say that cattle purchased on a different date from a different party are "pursuant to this agreement." "Pursuant to this agreement" is commonly used in contracts to refer solely to the instant deal. *See, e.g.*, *A&A Global Indus., Inc. v. Wolfe*, 2001 WL 1388020, at *3 (N.D. Tex. Nov. 6, 2001) (referring to a covenant not to

compete "with respect to the product items purchased pursuant to this Agreement"—that is, as required by the asset purchase agreement); *In re MPF Holding U.S. LLC*, 495 B.R. 303, 315 (Bankr. S.D. Tex. 2013) (explaining that "debtor may not later pursue an avoidance claim for preferential payments made pursuant to that contract," that is, to satisfy the contract). The Full-Blood Contract does not purport to be a master sales agreement covering any future purchases of Akaushi cattle. The Court therefore concludes that the phrases "purchased pursuant to this agreement" and "purchased by this agreement" unambiguously refer to the 2010 purchase of 424 Akaushi cattle, and thus the Court need not look to parol evidence to interpret its meaning. *See Nat'l Union*, 907 S.W.2d at 520.

Even if the Court were to consider the parol evidence presented by HeartBrand, however, it is not convinced by HeartBrand's arguments about the purpose and "mutually understood intentions" of the contract. *See also* Docket Entry No. 77 at 9 (arguing that Bear Ranch's "construction of the relevant contracts [] would undermine the contracts' express purposes and render the contracts absurd"). The Court's interpretation of the contract does not unravel HeartBrand's carefully crafted system to maintain the integrity of Akaushi genetics nor would it allow producers "to circumvent their contract restrictions by swapping their full-blood cattle with each other." *Id.* at 30. The key to HeartBrand's ability to control subsequent sales of Akaushi cattle was its power to control sellers of the

cattle, not buyers.  HeartBrand itself states that under the contract signed by Bear Ranch, the Producer is limited to "three options—keep each Full-Blood animal; sell it to HeartBrand; or sell it *through HeartBrand* to an Association member." Docket Entry No. 77 at 10 (emphasis added); *see also* Docket Entry No. 73-2 §§ I, VII.  Because HeartBrand had to authorize any resale of Akaushi cattle, it had the authority to condition those sales (if it allowed them at all) on the purchaser agreeing to the restrictions in the Full-Blood Contract.  Its failure to do so with respect to the three sales to Bear Ranch by other HeartBrand Producers does not warrant expanding the reach of the Full-Blood Contract beyond its terms.

### b. Does an oral agreement apply the restrictions to the Beeman transaction?

Defendants contend that there was such an agreement—an oral one—to extend the Full-Blood Contract to the Beeman purchase.  As is often the case with alleged oral agreements, the other side strongly contests its existence.  The only documentation concerning the Beeman transaction is an email and an invoice with price and quantity terms.  Docket Entry Nos. 73-7; 77-11.  But the Court need not evaluate the conflicting evidence concerning whether such an agreement existed, because any oral agreement to apply the Full-Blood Contract restrictions would be barred by the statute of frauds, which has the purpose of "remov[ing] uncertainty, prevent[ing] fraudulent claims, and reduc[ing] litigation" in situations like this

when the parties hotly contest whether oral promises apply to a significant transaction. *Givens v. Dougherty,* 671 S.W.2d 877, 878 (Tex. 1984).

Despite (or perhaps because of) the prevalence of "handshake" deals in classically Texan industries like ranching and oil, the State's statute of frauds applies if any part of an oral agreement cannot be performed within one year. Tex. Bus. & Com. Code § 26.01(b)(6); *Upson v. Fitzgerald,* 103 S.W.2d 147, 150 (Tex. 1937) ("If the contract is entire and part is within the statute it is unenforceable as a whole"; the only exception is an agreement divisible into two parts not dependent on each other (internal quotation marks and citation omitted)). A contract that "could possibly be performed within a year, however improbable performance within one year may be, does not fall within the statute of frauds." *Wilhoite v. Sims*, 401 S.W.3d 752, 758–59 (Tex. App.—Dallas 2013, no pet.) (internal citation, emphasis, and quotation marks omitted). The possibility of terminating a contract prior to performance intended to span more than one year does not remove it from the statute of frauds. *Westside Wrecker Serv., Inc. v. Skafi*, 361 S.W.3d 153, 164 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

The statute of frauds applies to an oral agreement extending the Full-Blood Contract because, as Defendants concede, the marketing provision contemplates performance lasting far longer than a year—it imposes a fifty year obligation. Docket Entry No. 77 at 33 n.34; Docket Entry No. 73-2 § XV ("Producer will at no

time market any of the cattle or beef sold by Producer to any party for any purpose at any time . . . .  This agreement shall survive this agreement and *continue for a period of fifty (50) years* after the termination of this agreement." (emphasis added)).  Although conceding that this provision cannot be performed within a year, Defendants argue that because the marketing provision already applies to any subsequently purchased Akaushi cattle from the original Full-Blood Contract Bear Ranch signed, there are "no *disputed* obligations in the Beeman purchase that cannot be performed within a year."  Docket Entry No. 77 at 32, 33 n.34 (emphasis added).  But Defendants cite no authority for this view that the test is whether only the parts of an alleged agreement that would not be redundant of a prior agreement can be performed within a year.  And it would be odd that an oral agreement between Beeman and Bear Ranch would be enforceable because of Bear Ranch's prior agreement with another party, but an oral agreement Beeman reached with another ranch would not.  The marketing provision is an integral part of the entire agreement that allows HeartBrand to maintain exclusive control over the Akaushi brand, and thus is not divisible from the rest of the contract.  *Upson*, 103 S.W.2d at 150.  Thus, straightforward application of the statute-of-frauds standard renders unenforceable any oral agreement to apply the Full-Blood Contract to the Akaushi cattle purchased from Beeman.  *See Kalmus v. Oliver*, 390 S.W.3d 586, 590 (Tex. App.—Dallas 2012, pet. denied) ("In deciding whether an agreement is capable of

being performed within one year, we compare the date of the agreement to the date when the performance under the agreement is to be completed.  If there is a year or more between those two reference points, a writing is required to render the agreement enforceable." (internal citations omitted)).

For these reasons, the Court will grant summary judgment in Bear Ranch's favor on its request for a declaration that the Full-Blood Contract restrictions, with the exception of the marketing and registration provisions, do not apply to the cattle it purchased from Spears, Beeman, and Twinwood.

### B. Fraud and Fraudulent Inducement Claims

Although the statute of frauds prevents the alleged oral promises made by Bear Ranch in connection with its purchases of Akaushi cattle from creating any obligations under contract law, such oral representations may serve as the basis for fraud claims.   The Court now turns to whether the fraud counterclaims that HeartBrand and Beeman assert concerning these deals survive summary judgment.

### 1. Original July 2010 Purchase: HeartBrand's Fraudulent Inducement Claim

The first set of alleged misrepresentations relate to Bear Ranch's original July 2010 purchase from HeartBrand.   HeartBrand alleges that Bear Ranch fraudulently induced it to enter into that arrangement based on misrepresentations concerning (1) Bear Ranch's purpose in acquiring the cattle and (2) its intention to comply with its contractual obligations.  Bear Ranch moves for summary judgment

on both alleged misrepresentations, arguing there is no evidence of false representations, intent to induce reliance, or justifiable reliance.

Under Texas law, the elements of a fraudulent inducement claim are: a false material representation; the defendant's knowledge of the falsity or recklessness as to a positive assertion; intent to induce reliance; entry into a contract in reliance on the representation; and injury. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (elements of fraud); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex. 1998) (fraudulent inducement is fraud where reliance is entry into a contract).

HeartBrand contends that it entered into the Full-Blood Contract based on Bear Ranch's statement that its purpose in purchasing the Akaushi cattle was to satisfy its grazing obligations in Colorado and produce beef to be served at its owner's estates (rather than market its own line of beef and not sell any calves back to HeartBrand as it now seeks to do). *See* Docket Entry No. 73-8 at 2 (June 16, 2010 Email from Gill to Calles) ("[W]e would like to purchase enough cows and bulls to accommodate our ranching needs in Colorado and our beef (meat) needs at several estates."). Even assuming that this representation was made, that it was material, and that Bear Ranch knew it was false at the time, HeartBrand's reliance upon this statement was not justified. Under Texas law, reliance upon an

oral representation that is contradicted by the unambiguous terms of a written agreement is not justified as a matter of law. *Milton v. U.S. Bank Nat. Ass'n*, 508 F. App'x 326, 330 (5th Cir. 2013) ("[Plaintiff's] reliance on oral representations by customer service representatives that were contradicted by the terms of the loan agreement and the notice of foreclosure was not reasonable as a matter of [Texas] law."); *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858–59 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en banc) ("[A] party who enters into a written contract while relying on a contrary oral agreement does so at its peril."). "[T]he fraud must be something more than merely oral representations that conflict with the terms of the written contract." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997) (citing *Distrib. Inv. Co. v. Patton,* 110 S.W.2d 47, 48 (Tex. 1937)).

As the Court already determined, the Full-Blood Contract allows Bear Ranch to sell beef subject to certain marketing restrictions and does not require it to sell offspring back to HeartBrand. Thus, any representation by Bear Ranch that it would forego these options and limit its purpose solely to grazing and home consumption would be an assurance that it would not enforce its full contractual rights. While Bear Ranch's representation may not be "directly contrary to a provision in the contract in the sense that was present" in *DRC* and *Simpson*, *see DRC Parts & Accessories*, 112 S.W.3d at 858–59 (holding that manufacturer's

alleged oral representation that the distributor would have exclusive distribution rights contradicted the written contract provision providing a "non-exclusive" right, and thus distributor's reliance on the statement was not justified); *Simpson v. Woodbridge Props., L.L.C.*, 153 S.W.3d 682, 684 (Tex. App.—Dallas 2004, no pet.) (holding that a written contract with a specific closing date "vitiated any reliance [plaintiff] may have placed on" alleged oral representations about closing in a more timely manner), those cases' "reasoning is analogous" to a situation like this one in which a party represents that it will not enforce a contract provision. *See Alternative Delivery Solutions, Inc. v. R.R. Donnelley & Sons Co.*, 2005 WL 1862631, at *6–8 (W.D. Tex. July 8, 2005) (relying on *DRC* in its holding that reliance on an oral representation to not enforce a foreign forum selection clause in a written contract was not reasonable as a matter of law).  As the court reasoned in *Alternative Delivery Solutions*, if "the parties had agreed not to enforce a provision in a contract, they could have stricken the provision from the contract."  *Id.* at *8.

The second alleged misrepresentation is that "Bear Ranch represented that it would comply with its contractual obligations . . . including its obligations to register offspring of the cattle it purchased with the [AAA] and to follow the rules of the [AAA]."  Docket Entry No. 61 ¶ 35.  Because HeartBrand's briefing on these alleged misrepresentations is based at least in part on interpretations of the contract provisions that the Court has now rejected, it is unclear what the

remaining misrepresentation "to comply with the contractual obligations" encompasses. *See generally* Docket Entry No. 77 at 33–42. It may be limited to Bear Ranch's intent to comply with the registration and rules of the AAA. Or it may include additional alleged misrepresentations, such as "Bear Ranch's representation that it would sell calves to HeartBrand," *id.* at 40–41—which is allowed, but not required by the contract, as the Court determined above. Further argument on this issue in light of the Court's rulings on the contract issues would be helpful.

The Court therefore dismisses HeartBrand's fraudulent inducement claim based on the first alleged misrepresentation about Bear Ranch's purpose in entering into the July 2010 contract, but reserves ruling on the second alleged misrepresentation about complying with the contract's restrictions pending further clarification.

### 2. Beeman Purchase

Defendants assert two claims related to alleged oral representations made in connection with Bear Ranch's purchase of cattle from Beeman. Beeman asserts a fraudulent inducement claim; HeartBrand asserts a traditional fraud claim on the theory that Bear Ranch's fraudulent statements—that the Full-Blood restrictions would apply to cattle purchased from Beeman and that it would sell back a certain percentage of its offspring to HeartBrand—induced HeartBrand to allow the sale.

### a.  Beeman's Fraudulent Inducement Claim

Under Texas Law, "a plaintiff cannot assert a fraudulent inducement claim when there is no contract."  *Haase v. Glazner*, 62 S.W.3d 795, 799, 800 (2001) ("The Statute [of Frauds] exists to prevent fraud and perjury in certain kinds of transactions by requiring agreements to be set out in writing signed by the parties. But that purpose is frustrated and the Statute easily circumvented if a party can use a fraud claim essentially to enforce a contract the Statute makes unenforceable."). Because the Court already determined that the Full-Blood contract does not apply to the Beeman purchase, summary judgment is granted to Bear Ranch on this claim and Counterclaim Two is dismissed.

### b.  HeartBrand's Fraud Claim

Unlike a fraudulent inducement claim, which must be asserted by a party induced into agreeing to a contract, a traditional fraud claim can exist in the absence of a contract to the extent that it seeks to recover out-of-pocket damages, not benefit-of-the-bargain damages.  *Haase*, 62 S.W.3d at 799–800; *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) ("The statute of frauds does not bar the recovery of out-of-pocket damages for fraud.").  Texas law allows a party fraudulently induced into refraining from exercising a legal right, contractual or otherwise, to sue for fraud.  *Phippen v. Deere & Co.*, 965 S.W.2d 713, 721 (Tex. App.—Texarkana 1998, no writ) (sustaining fraud claim because plaintiff was

fraudulently induced into not exercising option).  HeartBrand seeks the proper out-of-pocket or "restitutionary" measure of damages, rather than expectancy damages.

Furthermore, HeartBrand has introduced sufficient evidence to demonstrate a fact issue concerning whether Bear Ranch misrepresented its intent to (1) comply with the Full-Blood contract and (2) sell back at least 30% of its calves to HeartBrand as part of the Beeman purchase.  HeartBrand's CEO, William Fielding, and Chairman, Ronald Beeman, both testified that Bear Ranch's ranch manager, Rob Gill, told them in a meeting that Bear Ranch would comply with the Full-Blood Contract if it could purchase additional cattle.  Docket Entry Nos. 77-2 ¶¶ 25–26; 77-1 ¶¶ 16, 20.  Several emails from Fielding to Bear Ranch employees throughout the contracting process confirm HeartBrand's "understanding" that Bear Ranch would sell back "at least 30%" or "around 30%" of its calves to HeartBrand.  Docket Entry Nos. 77-16 (May 2011 email from Fielding to Calles); 77-18 (July 2011 email from Fielding to Gill); *but see* Docket Entry No. 73-7 (June 2011 emails between Fielding and Gill summarizing the terms of the purchase that does not mention any sell-back obligations).  Bear Ranch's marketing consultant stated that the intention was "always . . . the commercialization of the beef," Docket Entry No. 77-13 at 22, 32–34, and an email from another consultant mentions the possibility of "controlling the entire breed."  Docket Entry No. 77-20 (March 2011 email from Kenneth Boulter to Bill Koch).  This evidence is more

than enough to demonstrate a fact issue on whether Bear Ranch made material misrepresentations and to satisfy the "slight circumstantial evidence" standard for fraudulent intent. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex. 1986).

Fielding and Beeman also testified that Gill made these representations to them, they relied upon them in allowing the sale of the cattle, and HeartBrand suffered economic injuries. Docket Entry Nos. 77-2 ¶¶ 25–26, 28; 77-1 ¶¶ 16, 20. This evidence is sufficient at the summary judgment phase to demonstrate that HeartBrand relied on Bear Ranch's representations in allowing the purchase from Beeman and that it was injured as a result. HeartBrand has identified sufficient evidence from which a jury could find in its favor on each fraud element, so this counterclaim will proceed to trial.

### 3. Twinwood Purchase

A fact issue also exists concerning whether Bear Ranch fraudulently induced HeartBrand's forbearance with respect to the Twinwood sale. HeartBrand includes emails and testimony demonstrating that Bear Ranch represented it would comply with the terms of the Full-Blood Contract and sell a percentage of the calves back to HeartBrand, and that HeartBrand's approval of the transaction was premised on these false representations. Docket Entry Nos. 77-2 ¶ 27; 77-16; 77-18. HeartBrand also relies on the same evidence from Bear Ranch's consultants and

employees to show that Bear Ranch did not intend to comply with these representations at the time of the contract.  Again, the combination of this evidence is sufficient to get this claim to a jury.

## IV.  DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FRAUDULENT INDUCEMENT

HeartBrand seeks summary judgment on Bear Ranch's fraudulent inducement claim alleging it overpaid in its original 2010 purchase because HeartBrand misrepresented that it was the only owner of Akaushi cattle outside of Japan.  HeartBrand contends this claim fails because there is no evidence to prove Bear Ranch paid more than the fair market value of the Akaushi cattle.  Using the cost method, Bear Ranch's experts Dustin Dean and Scott Bayley calculate that a producer could build a similarly-sized herd from artificial insemination and embryo transfers for less than what Bear Ranch paid.  HeartBrand contends that Bear Ranch should have instead relied on comparable market sales, rather than the cost method.   It also criticizes the Dean/Bayley model for having numerous analytical flaws.

Texas courts recognize several alternative approaches to assessing the value of property: comparable market sales, the cost of production, and the known ability to produce income. *See Religious of Sacred Heart of Tex. v. City of Houston*, 836 S.W.2d 606, 615–16 (Tex. 1992) (reviewing treatises describing those "three common methods," each "designed to reach the fair market value").  Bear Ranch's

experts addressed these other methods and found that they were not helpful in this situation.  For example, Bayley explains that the market comparable sales approach did not provide useful data because there were no comparable-sized sales and the "quantity of cattle purchased is a significant factor in assessing the comparability of cattle transactions, not only because of the general availability of bulk discounts, but because cattle are self-reproducing."  Docket Entry Nos. 78-20 ¶ 19 (noting that the largest sale of unrestricted Akaushi during the relevant time period was an Australian sale for six cows and one bull).  HeartBrand, on the other hand, points to sales in which Akaushi have sold for far in excess of what Bear Ranch paid.  *See* Docket Entry Nos. 72-17 at 36–37; 72-15 at 17–19 (citing evidence of an Akaushi female selling for over $40,000).  Whether comparable sales exist thus appears to be a fact question and a determination in Bear Ranch's favor on that issue could support use of the cost method.

The cost method can provide evidence of market value, particularly when there is "a lack of comparable sales to utilize the market data approach to determining market value."  *Sacred Heart*, 836 S.W.2d at 609, 615 (rejecting claim that cost method "failed to offer any evidence regarding the market value").  Texas courts regularly rely on the cost method to value real property.  *Id.* at 615–16.  Given the lack of analogous Texas case law on valuing large herds of specialty cattle, *cf. In re Marriage of Edwards*, 2012 WL 4503413, at *8 n.18 (Tex. App.—

Texarkana 2012) (discussing valuation of non-specialty cattle in divorce dispute); *Gutierrez v. Gutierrez*, 791 S.W.2d 659, 665 (Tex. App.—San Antonio 1990, no writ) (same), the Court concludes that a fact finder could find the cost method probative.

HeartBrand's numerous critiques of Bear Ranch's model—including differences in genetic heritage and age of the cattle, the failure to individually value the cattle, and erroneous maintenance cost assumptions—demonstrate a hotly contested debate over methodology and thus, a fact issue about the value of these specialty cattle. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."); *Brazos River Auth. v. Ionics, Inc.*, 2005 WL 5977558, at \*2 (W.D. Tex. Jan. 6, 2005) ("The Court is of the opinion that the dispute between the damages experts relates to the accuracy of the facts that support each of their opinions.  As such, the dispute between the experts relates to the weight to be accorded each expert's testimony and that is a matter to be decided by the jury.").  HeartBrand may be correct in its critiques, but that is a question for the fact finder.  Accordingly, summary judgment is denied on this claim.

## V.   CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Bear Ranch's Motion for Summary Judgment (Docket Entry No. 73) as follows:

- Claim Four: Summary judgment is **GRANTED IN PART** on Bear Ranch's declaratory claim—the Full-Blood Contract restrictions from July 2010, with the exception of the marketing and registration provisions, do not apply to the Akaushi cattle Bear Ranch purchased from Spears, Beeman, and Twinwood.

- Counterclaim One: Summary judgment is **GRANTED** as to the alleged misrepresentation about Bear Ranch's purpose in acquiring the cattle. The Court reserves ruling on other alleged misrepresentations pending further clarifications.

- Counterclaim Two: Summary judgment is **GRANTED**, and the claim is **DISMISSED**.

- Counterclaim Three: Summary judgment is **DENIED**.

- Counterclaim Four: Summary judgment is **DENIED**.

- Counterclaim Five:[6] Summary judgment is **GRANTED**, and the claim is **DISMISSED**.

- Counterclaim Six: Summary judgment is **GRANTED** with respect to the alleged breach of failing to sell offspring to HeartBrand, and that part of the breach of contract claim is **DISMISSED**. The other alleged breaches related to AAA registration, enrollment, reporting, and rules remain.

---

[6] Bear Ranch moved to dismiss HeartBrand's Counterclaim Five, and in its response, HeartBrand agreed to dismiss the claim as duplicative of its other claims. *See* Docket Entry No. 77 at 55.

The Court also **DENIES** Defendants' Motion for Summary Judgment (Docket Entry No. 72).

The trimmed case will proceed to trial.

**SIGNED** this 18th day of March, 2014.

_____
Gregg Costa
United States District Judge