IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| BEAR RANCH, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 6:12-cv-00014 |
| HEARTBRAND BEEF, INC., et al., | § § § | |
| Defendants. | § § | |

**PLAINTIFF'S REPLY ON MOTION TO EXCLUDE THE
EXPERT TESTIMONY OF JEFFREY S. ANDRIEN**

Bear Ranch files this reply in support of its motion to exclude the expert testimony of expert Andrien (Dkt. #150). In his three-week-old report, he gives a valuation opinion on the 424 cattle (Part VI) and the rest of the cattle (Part V). His methodology is largely the same, so we filed a *Daubert* motion on both.

Neither of these opinions should be admitted at trial, for several reasons. His opinion as to the 424 has already been excluded as too late, coming long after the expert disclosure and discovery deadlines, and as being unrelated to the MSJ ruling. And his opinion on the other cattle goes to an equitable remedy, which is useful only to the Court after trial, if at all. Moreover, presenting either opinion to the jury in the last day of trial is calculated to inflame passions and confuse issues, by airing a speculative, and astronomical, valuation of HeartBrand's business, not of any recoverable loss.

1.     **The $50 Million Opinion on the 2010 Sale Is Untimely and Inadmissible.**

The Court ruled that Defendants not mention this opinion in the presence of the jury, without leave.  5/16/2014 Dkt. Entry (ruling); Dkt. #127 (*Limine* No. 16).  Andrien's opinion as to $50 million of "out of pocket" loss, which HeartBrand somehow overlooked until three weeks before trial, relates to a sale Bear Ranch has never disputed is under contract.  Because the new opinion does not relate to the MSJ ruling (such that Defendants could even argue surprise), the Court limined it as untimely.  *See* Fed. R. Civ. P. 26(a)(2)(D).

2.     **The $50 Million Opinion Is Irrelevant to Out-of-Pocket Loss.**

Defendants are far too stingy in saying Bear Ranch objects that Andrien omits an "arguable deduction."  Dkt. #152.  A $48 million omission is not a mere jury issue.  It is shooting at a legally impermissible target.

HeartBrand wishes to seek damages on the theory that there is a gap between its courthouse view of livestock value and what it willingly charged for them:



It's true that 50 – 2 = 48, but that's not the right formula.  Out-of-pocket damage is the difference between the value of what is given up and what is received.

*Formosa Plastics Corp. USA v. Presidio Eng'r & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). Yet HeartBrand willfully ignores part of what it received that day—contract obligations from Bear Ranch.

To start from first principles, a party claiming fraudulent inducement must elect between **rescission** of the contract (nullifying it), which allows restitutionary remedies focusing on avoiding unjust enrichment regardless of the extent of injury, and **affirmance** of the contract (not rescinding it), which allows benefit-of-the-bargain or out-of-pocket damages. *See id.* HeartBrand wrongly claims both: restitutionary remedies (unjust enrichment) but also out-of-pocket damages.

In reality, HeartBrand affirms the contract; for example, it invokes a contract provision it says authorizes cattle "repossession." The question thus becomes which type of damages it seeks. It does not seek benefit-of-the-bargain damages, likely because the value of registration fees and data at issue is hardly the $48 million it wants to put before the jury. That means HeartBrand must seek out-of-pocket damages.

But the only live fraud theory on this claim is of a false promise to perform a few contract duties, not a misrepresentation about what those duties are or about something external to the contract. HeartBrand has all the contract duties it required, and they allow it to compel the required conduct, or else be paid for it. Hence, the value of those duties, measured on the date of the contract (*id.*), makes

up the gap that it omits. And if those duties are worth less to HeartBrand than it thought, for whatever reason, that is not a result of the fraud alleged.

HeartBrand could pursue benefit-of-the-bargain damages on this false-promise claim, although they would mimic those same damages on its breach claim, if any. *Id.* Or, if it complains about whether it "would have sold to Bear Ranch"—*i.e.*, seeks a remedy regardless of the extent of the fraud-caused injury—that remedy is rescission and restitution.

HeartBrand could even recover actual out-of-pocket loss incurred in reliance on the expected performance, such as its purchase of a new file cabinet to store the data it says it wants (but refuses to accept under protest). But what it cannot do is ignore part of what it received in the deal, and then call the resulting gap "out of pocket" damages. That wrongly seeks the best of both worlds. It seeks to have Bear Ranch keep the cattle *with the restrictions* of the contract, and yet pay $48 million more based on the idea that the cattle can be sold *without those restrictions*. This is simply overreaching. A claim to $48 million, for activities Bear Ranch isn't allowed to do, is not a claim of "out of pocket" damage to anyone.

3. **The Case Upon Which HeartBrand Relies Is Inapposite.**

This case looks nothing like *Matrix Oncology, L.P. v. Priority Healthcare Corp.*, No. 08-10191 (5th Cir. 2009) (unpublished). That case is about an undisclosed fact making rights more valuable, not a false promise to perform.

In that case, Matrix held shares in a joint venture and was looking to sell its shares to Priority, its co-venturer. Matrix knew that a certain company (OEP) was thinking of acquiring Priority, which would increase the venture's value. But Priority told Matrix, untruthfully, that no other company was thinking of acquiring it, as would also increase the venture's value. *Id.* at 2-4. In reliance, Matrix signed a contract to sell its shares for $600,000 and to later receive a kicker payment if OEP bought Priority. The shares were then transferred. *Id.* at 4-5.

In truth, Priority was also in talks to be acquired by a second company (ESI). That deal, rather than the OEP deal, ultimately occurred. Pursuant to the contract, Matrix did not get the kicker payment. It sued for negligent misrepresentation, so the question was identifying Matrix's out-of-pocket damages. The value of what Matrix got in the deal was $600,000 (cash). And the value of the ownership stake it gave up was, based on the actual facts, $2.4 to $4.5 million. Subtracting the $600,000 it received, the evidence supported an out-of-pocket damages award of $1.8 to $3.9 million, so the Fifth Circuit held that the jury properly awarded $3 million. *See id.* at 15-16.

*Matrix* is about an untrue representation of facts external to the contract, not an alleged false representation of intent to perform contract duties (*i.e.*, the false-promise theory HeartBrand pursues). Unlike here, Matrix did not complain that it agreed to sell while wrongly thinking that Priority would perform the contract.

To adapt that case to HeartBrand's fraud theory, the liability theory there would have to be that Priority signed the contract without intending to fulfill its contract duty to make the kicker payment if it was bought by OEP. That would make a false-promise case. But then Matrix's out-of-pocket damages would be zero. Instead, it would have a contract claim on which it could recover the kicker payment as benefit-of-the-bargain damages, if Priority did not perform. If Matrix also proved fraudulent inducement, it could likewise recover that kicker payment as benefit-of-bargain damages on the fraud claim. *Formosa Plastics*, 960 S.W.2d at 49 (allowing such recovery so that a fraud claim will be at least as protective as a breach claim).

But those were not the facts of *Matrix*. It is inapposite to HeartBrand's fraud theory and provides no support for the legally impermissible calculation HeartBrand wishes to advance through Andrien's $50 million opinion.

4.     **The $50 Million and $90 Million Opinions Fail Under *Daubert*.**

In all events, Andrien's fair-market-value opinions are so speculative as to be inadmissible. HeartBrand points out that the income approach is accepted in valuation literature, but Andrien is valuing the wrong thing. He is assigning the value of a complex, decades-long breeding business—one that exists only on paper and has no real-world evidence supporting it—into a value for a herd of cattle. This does not pass even the minimum threshold for admissibility.

His opinion is in a different league than Dean or Bayley.  Dean uses his cost-of-production models with real-world ranchers.  Bayley's opinion is supported by the lack of evidence—even evidence identified by HeartBrand—of herd sales at the same per-head price as some auction prices of small quantities of goods that self-reproduce.  In contrast, Andrien assumes that flooding the market will have no effect, yet lacks examples of herds selling to close to the numbers he predicts.

Reality imposes limits.  One cannot value a single apple tree by the "income streams" it, its seeds, and so on might produce into perpetuity.  Exh. 1 at 30 (adding a "terminal value from the sixth year into perpetuity").  Unlike Bayley, who further checked against HeartBrand's books and with an experienced cattle consultant, Andrien does not perform any reality checks on his opinion other than having HeartBrand's employees say it sounds great.

That speculativeness is why Fifth Circuit case law recognizes that internal business projections such as these are no proper basis for damages.  *See Richter, S.A. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 939 F.2d 1176, 1188 (5th Cir. 1991) (evidence of damages was insufficient where an interested party testified he could have sold his interest for $1.6 million, where there was no evidence that anyone ever made such an offer and the party had previously admitted that the interest was worthless—similar to HeartBrand's own books recording its breeding cattle at less than $3,000/head on average); *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714,

724 (5th Cir. 2006) (unpub.) ("Carbo's revenue projections and operating profits for Keefe's business enterprise, even if based on Keefe's own figures and estimations, are inadmissible because they are speculative projections based on 'uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into an unknown or unviable market, or on the success of a new and unproven enterprise.'"); *Sportsband Network Recovery Fund, Inc. v. PGA Tour, Inc.*, 136 F.3d 1329 (5th Cir. 1998) (unpub.) (a party's internal business projections too speculative to support a damages award: "the speculative nature of SportsBand's figures is evidenced by the fact that SportsBand generated a cumulative loss of almost $3 million, in sharp contrast to its projected $4 million in future profits").

Thus, even if Andrien wishes to argue Bear Ranch projections, that affords his opinion no admissibility help. Indeed, each parties' financial deficits gut the idea that Andrien's imaginary business will be profitable from year one (Dkt. #150-1 at Attach. V, page 7). *See supra*; *see also Bridgen v. Scott*, 456 F. Supp. 1048, 1063 (S.D. Tex. 1978) ("[S]elf-serving speculative testimony concerning what a party would have done under different circumstances . . . does not provide the basis upon which a verdict can be predicated.").

Bear Ranch's admissibility objection is not merely that Andrien should have used more liberal or conservative numbers at points along the way. It is that he

ignored the basic dynamic that self-reproducing goods saturate the market quickly, a fact confirmed by the lack of any herd sales like he writes into paper existence, and that he relies on nothing but the *ipse dixit* say-so of HeartBrand's own people. Andrien's opinion verges into fantasy and should be excluded.

5.   **The $90 Million Opinion Relates to a Restitutionary Remedy.**

The Court can imagine the risk of inflaming jury passions if an "expert" begins discussing some $90 million in "equitable damages" at trial.  (Indeed, these unrealistic opinions make realistic settlement talks difficult.)  Yet there is no need to even make the admissibility decision now, as this opinion expressly relates to a restitutionary remedy, for the Court after trial.

Certainly, advisory jury questions can be appropriate in some circumstances. But particularly given the limited time left in trial, the usefulness of an advisory jury finding on fair market value (*i.e.*, on a hypothetical transaction) is greatly diminished.  And the sudden transformation of what has been around a $1 million case, not only in the past two years of litigation but in trial so far, into a $90 million case will only confuse the jury and would unfairly prejudice Bear Ranch even if the jury is ultimately directed not to consider that testimony.

Bear Ranch respectfully suggests that reserving this equitable-remedy question to the Court will best achieve the federal rules' goal of swift and rational resolution of claims.  It will also allow Bear Ranch to serve a rebuttal expert report

within 30 days of Andrien's new $90 million opinion, as contemplated by Federal Rule of Civil Procedure 26(a), and to have that fully-formed opinion considered by the Court in determining the correct equitable remedy, if any, post-trial. That same point about adequate time to rebut Andrien's calculations on an equitable "buy-back" remedy applies to HeartBrand's proposed advisory jury questions asking for a detailed assessment of a multitude of costs, to be rebutted by evidence Bear Ranch has not fully developed because this is an equitable-remedy question on which its rebuttal report is not yet due. *See, e.g.*, Exh. 1 (email chain with defense counsel about securing HeartBrand information on inventory and various costs).

And it is clear that Andrien's $90 million opinion relates to restitution. His report, Dkt. #150-1, explains the theory on which he was asked to opine:

> [B]ut for the fraud by which Bear Ranch persuaded HeartBrand to sell them cattle, Bear Ranch would not have been able to acquire additional full-blood Akaushi cattle from Beeman, Twinwood, and Rancho Delhi. . . .
> Accordingly, if the Court finds that HeartBrand was fraudulently induced into selling cattle to Bear Ranch, Bear Ranch has been unjustly enriched, as it is in possession of full-blood Akaushi cattle purchased subsequently (from Beeman, Rancho Delhi, and Twinwood) that it would not possess but for its fraudulent acts.
>
> I have quantified Bear Ranch's unjust enrichment by determining the fair market value of [the cattle from those sellers].

*Id.* at 21-22. So Andrien's opinion is about a restitutionary remedy HeartBrand seeks on its fraud claim regarding the 2010 sale. If that sale was not fraudulently induced (and it was not), the relevance of this opinion vanishes.

So, the best course is to allow the jury to determine liability and properly-calculated compensatory damages (if any) on HeartBrand's claims, and to reserve Andrien's opinion about unjust enrichment until after trial and a timely rebuttal report, if even needed.

Likewise, the question of whether the later sales were "unjust" because they "trace" to the first sale (an issue Bear Ranch disputes) is a counter-factual question requiring interpretation of several other producers' contracts. There may not even be a need to resolve those questions, depending on the jury verdict. And, if there is, it requires interpretation of at least three different contracts (Spears' 2011 contract, Beeman's 2009 contract, and Twinwood's 2009 contract), which will only confuse a jury asked to decide questions about the events here.

Moreover, as Bear Ranch has explained, the proper restitutionary remedy, if any, is not payment of $90 million that somebody allegedly might earn in the future (effectively, forcing a sale of an imaginary business) but rather a constructive trust or injunction limiting use or transferring ownership of cattle. But again, there is no need to compress the entire course of post-trial proceedings—which may not even occur—into advisory jury questions, submitted even before the deadline for a rebuttal report relevant to those potential equitable issues.

6.     **Moreover, Counterclaim One Is Ripe for Summary Judgment.**

For yet another reason, the Court need not even address this *Daubert* issue. The only fraud theory remaining in HeartBrand's claim as to the 2010 sale is an alleged false promise to comply with the contract's AAA rule/registration provisions. *See* Dkt. #91 at 23 (granting MSJ on first fraud theory, and asking if HeartBrand pleaded more in its second theory, to which it has not responded).

As Bear Ranch's pending MSJ notes, the record has no evidence of an original intent not to abide by these obligations. Dkt. #73 at 12-13 (noting the evidence of Bear Ranch's past performance and desire not to breach). HeartBrand responded on MSJ with putative evidence of an intent not to sell back calves—which it wrongly believed was a contract duty—but it simply failed to identify any evidence of an intent not to comply with the rule/registration duties. Dkt. #77 at 28-30. Our reply on MSJ noted as much. Dkt. #85 at 29 (HeartBrand "has not identified any evidence of an original fraudulent intent not to perform those [registration] duties"). The Court should grant the pending MSJ on Counterclaim 1, which will remove the need to address Andrien's unfounded valuation opinion.

## Conclusion

For the reasons stated above, Bear Ranch respectfully requests that the Court exclude certain testimony of Defendants' damages expert, Jeffrey S. Andrien, and grant Bear Ranch all other just relief to which it is entitled.

Dated: May 24, 2014                    Respectfully submitted,

/s/ R. Paul Yetter
R. Paul Yetter
Attorney-in-Charge
State Bar No. 22154200
Collin J. Cox
State Bar No. 24031977
J. Campbell Barker
State Bar No. 24049125
Y<small>ETTER</small> C<small>OLEMAN</small> LLP
909 Fannin, Suite 3600
Houston, Texas 77010
(713) 632-8000
(713) 632-8002 (Fax)

Andrew R. Seger
State Bar No. 24046815
M<small>C</small>W<small>HORTER</small>, C<small>OBB</small> & J<small>OHNSON</small>, LLP
1722 Broadway
Lubbock, Texas 79401
(806) 762-0214
(806) 762-8014 (Fax)

Attorneys for Plaintiff Bear Ranch, LLC

### Certificate of Service

I certify that on May 24, 2014, a copy of this document was served on all counsel of record using the Court's e-filing system.

/s/ J. Campbell Barker
J. Campbell Barker