IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| BEAR RANCH, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 6:12-cv-00014 |
| | § | |
| HEARTBRAND BEEF, INC., et al., | § | |
| | § | |
| Defendants. | § | |

## BEAR RANCH'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FEDERAL RULE OF CIVIL PROCEDURE 50(b)

Pursuant to Federal Rule of Civil Procedure 50(b), Bear Ranch, LLC renews its motion for judgment as a matter of law.

### NATURE AND STAGE OF THE CASE

HeartBrand Beef brought four counterclaims that were submitted to the jury:

(1) fraud regarding a 2010 sale of cattle by HeartBrand to Bear Ranch;

(2) fraud regarding a 2011 sale of cattle by Ronald Beeman to Bear Ranch;

(3) fraud regarding a 2011 sale of cattle by Twinwood to Bear Ranch; and

(4) breach of Bear Ranch's 2010 contracts with HeartBrand.

Dkt. #172 at 10-22 (Verdict Form).  The jury was asked to award compensatory damages on HeartBrand's first fraud claim, *id.* at 17, but not on its other two fraud

claims or its breach claim, *id.* at 18-22. The jury was further asked to award exemplary damages on each fraud claim. *Id.* at 17-21.

The jury was then asked two questions as to remedies: (1) the amount of "unjust enrichment" in purchasing cattle from three sources: Tony Spears, Beeman, and Twinwood, *id.* at 20, and (2) the reasonable costs paid by Bear Ranch to acquire, produce, and maintain certain groups of cattle and reproductive material, *id.* at 24-25. Because those questions address equitable remedies for the Court to determine, the jury answered them only as an advisory jury. 5/27/14 Tr. 187:18-188:10, 410:12-22, 421:1-23 (Exh. 5). The Court noted that Bear Ranch could present responsive testimony and argument after the trial. *Id.* at 187:20-23. Accordingly, Bear Ranch will present its arguments on equitable remedies in response to HeartBrand's forthcoming motion for entry of judgment. Bear Ranch expressly does not waive any arguments relevant to that motion or to the findings of fact and conclusions of law to be made by the Court at the Rule 52(a) hearing.[1]

On May 29, 2014, the jury returned its verdict, finding liability on two of HeartBrand's claims: fraud regarding 2011 sale of cattle by Beeman, and breach of the contracts. Dkt. #172 at 18, 22. The jury found no fraud as to Bear Ranch's

---

[1] Bear Ranch incorporates by reference its motion for summary judgment (Dkt. #72) and reply in support (Dkt. #85), motion to exclude expert testimony of Jeffrey Andrien and briefing in support (Dkt. #150, 153, 155), and motion for judgment as a matter of law at the close of the defense case (Dkt. #158). *See Black v. J.I. Case Co.*, 22 F.3d 568, 571 nn.5-6 (5th Cir. 1994); *Maryland Cas. Co. v. Acceptance Indem. Ins. Co.*, 639 F.3d 701, 705 (5th Cir. 2011).

initial purchase of cattle in 2010 from HeartBrand, or its 2011 purchase from Twinwood. *Id.* at 17, 19. Because the jury found no liability as to the 2010 purchase, which was the only claim on which compensatory damages were sought, it awarded no compensatory damages. However, the jury sought to award $1.825 million in exemplary damages on the Beeman-sale fraud claim. *Id.* at 21.

As to the remedies questions, the advisory jury provided figures for unjust enrichment were Bear Ranch to keep the cattle purchased from Beeman, *id.* at 20, and for Bear Ranch's reasonable costs of acquiring, producing, and maintaining certain cattle and reproductive materials, *id.* at 25.

## STANDARD OF REVIEW

Judgment as a matter of law is warranted when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Under that standard, factual findings are reviewed for the presence of substantial evidence in support, and legal questions are decided by the Court. *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 498-99 (5th Cir. 2012).

## ISSUES TO BE DECIDED

1. As to the fraud claim, whether the alleged misrepresentations on which HeartBrand claims reliance are incapable of supporting liability, as a matter of law.

2. As to the fraud claim, whether HeartBrand suffered no injury as a matter of law because it lacked the veto right of which it claims it was deprived and, moreover, introduced no evidence that it suffered any injury.

3. As to the fraud claim, whether Bear Ranch is entitled to judgment as a matter of law on exemplary damages under Chapter 41 of the Texas Civil Practice and Remedies Code.

4. Whether the evidence is factually and legally insufficient to support liability on HeartBrand's breach-of-contract claim.

5. Whether Bear Ranch is entitled to judgment as a matter of law for additional reasons.

## ARGUMENT AND AUTHORITIES

**1.     There Is No Evidence of an Actionable Misrepresentation by Bear Ranch**

The two misrepresentations HeartBrand argued to the jury cannot support fraud liability, as a matter of law.   The argued misrepresentation that Bear Ranch would apply its 2010 contract obligations to the different cattle that Bear Ranch purchased in 2011 cannot support a finding of reliance, as the 2010 contracts contain a no-oral-modifications clause.   No such writing was shown.   Additionally, although HeartBrand's counterclaims allege a variant of this misrepresentation (that Bear Ranch intended to honor its 2010 contracts), that cannot support recovery because it was not charged and there is no proof of falsity.

Bear Ranch's alleged statement of an intention to sell 30% of its calves to HeartBrand, in turn, is too indefinite to support the claimed reliance as a matter of law.   No evidence shows any discussion of the critical price term, much less when the sales would occur or what type of offspring would be sold.   Moreover, even assuming a representation capable of supporting reliance, there is no proof of falsity.

4

**A.    Because the 2010 contracts must be modified by a signed writing, there can be no reasonable reliance on the alleged oral promise to apply those contracts to new cattle**

**(1)    The alleged oral agreement by Rob Gill does not support reliance, as a matter of law, because the parties agreed to modify the contract only by a signed writing**

A contract "is notice of binding duties, and when it requires that amendments be in writing, that is additional notice not to rely on oral representations." *Bluebonnet Sav. Bank, F.S.B. v. Grayridge Apartment Homes, Inc.*, 907 S.W.2d 904, 908 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (holding "as a matter of law, that appellees failed to prove they justifiably relied" on alleged oral promises by Bluebonnet, where contract required amendments to be in writing).   "[A] party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en banc).   Hence, Texas law does not recognize claimed reliance on an oral contract modification that is precluded by the contract or by law.   *See Montalvo v. Bank of Am. Corp.*, 2013 WL 870088, at *8 (W.D. Tex. 2013); *Ellen v. F.H. Partners, LLC*, 2010 WL 4909973, at *5 (Tex. App.—Austin 2010); *Kellogg Brown & Root Int'l, Inc. v. Altanmia Commercial Marketing Co. W.L.L.*, 2008 WL 5114962, at *23 (S.D. Tex. 2008).

Here, Bear Ranch and HeartBrand entered into written contracts in 2010 setting out their ongoing duties regarding Akaushi cattle.   PX1, PX2 (Full-Blood and F1 Program Contracts).   Each contract has a no-oral-modifications clause, requiring any amendments or modifications to be made by a signed writing.   PX1 at 6 ("This Agreement may be amended or modified at any time and in all respects only by an instrument in writing executed by both parties hereto.   No oral modification shall be effective.");   PX2 at 6 (same).   In other words, the parties laid down in advance the rules for what future statements about contract scope would bind them and which would not, and they expressly agreed that changes would require a signed writing to be effective.

That express, up-front agreement is incompatible with the claimed reliance on an alleged oral promise in 2011 to extend the contracts to the different cattle being purchased from Beeman.   Bear Ranch disputes that any oral promise was made at all.   But even assuming that Gill orally agreed to apply the original contract to the new cattle, the law precludes the claimed reliance.   As the Fourteenth Court of Appeals explained in finding no reasonable reliance as a matter of law on similar facts, the contract gives notice not to rely on oral representations modifying the contract.   *Bluebonnet*, 907 S.W.2d at 908.[2]

---

[2] *See also Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 297 (Tex. App.—El Paso 1992, writ denied) ("The written contract contained ample cautionary language which would preclude exclusive reliance by a reasonable businessperson on verbal

Indeed, the alleged oral agreement that the contracts would apply to the cattle sold by Beeman would produce several non-sequiturs and open questions. For example, Sections VIII and IX of the full-blood contract give Bear Ranch 1% of the stock of a HeartBrand subsidiary (Akaushi Semen International) for each 100 Akaushi cows that Bear Ranch purchased from HeartBrand. PX1 at 3-4. If the 500 additional cows Bear Ranch bought were going to be under contract, it would naturally expect 5% more stock. But simply agreeing to comply with the contract restrictions as to those cattle would not secure that result. Beeman himself bought those cows from HeartBrand, so Bear Ranch would not have any right to the matching stock, despite paying Beeman his full cost of purchase (and them some).[3]

In short, the contracts required modifications to be made by a signed writing for a very good reason: preventing future argument and incoherence.[4] HeartBrand's

_____

statements contradicting the written agreement."); *Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 652 (Tex. App.— Houston [14th Dist.] 2003, pet. denied) ("Given Schleider's awareness that modifications had to be in writing and given that any modification depended on the parties agreeing to an interest rate and due date, we conclude, as a matter of law, Schleider failed to prove he justifiably relied to his detriment on Dickenson's statements.").

[3] Similarly, the warranty section of the full-blood contract guarantees the good physical condition of cattle "selected by HeartBrand." PX1 at 2. If Bear Ranch was agreeing to a contract on the new Beeman cattle, it would want the same guarantee. But agreeing to follow the restrictions of the old contract would not secure them, both because that is a one-sided promise and because the cattle were sold by Beeman, not HeartBrand. Likewise, Section VI of the full-blood contract is HeartBrand's promise to pay a certain floor price for calves "produced by using the Akaushi cattle" purchased under the contract, if Bear Ranch offers them. *Id.* Without a writing committing HeartBrand to a similar obligation as to the new cattle purchased from Beeman, Bear Ranch would have no enforceable promise (the time to produce a weaned calf is more than a year), while allegedly still committing itself to the old contract restrictions.

[4] Those reasons for the parties' agreed-to mechanism for altering contract scope are the same reasons animating the statute of frauds. *See, e.g., Haase v. Glazner*, 62 S.W.3d 795, 799

own prerequisite of a signed writing for the expansion alleged here precludes reliance on the alleged oral agreement, as a matter of law.   *E.g.*, *Airborne Freight*, 847 S.W.2d at 297-98; *BioSilk Spa, L.P. v. HG Shopping Centers, L.P.*, 2008 WL 1991738, at *2 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (when the "written agreement addresses the substance of the oral statement and contains language precluding reliance on external representations, Texas courts find reliance on subsequent oral promises unreasonable").   Indeed, entertaining a claim of reliance despite the contracts' express text requiring written modification "would defeat the ability of written contracts to provide certainty and avoid dispute."   *DRC*, 112 S.W.3d at 859 (rejecting claimed reliance on pre- and post-contract representations that a right stated as non-exclusive in the contract was exclusive).

> **(2)    The email from HeartBrand to Calles cannot support reliance, as a matter of law, both because it is not a signed writing and for additional, independent reasons**

Likewise, to the extent HeartBrand argues reliance on the May 12, 2011 email from Fielding to Calles (DX38) as a representation that the Full-Blood Contract would apply to the new cattle, that claim fails for the same reasons explained above.

---

(Tex. 2001) ("The Statute exists to prevent fraud and perjury in certain kinds of transactions by requiring agreements to be set out in a writing signed by the parties.").   Although *Haase* held that the statute of frauds does not preclude a claim for out-of-pocket damages based on an alleged misrepresentation, *id.*, HeartBrand has not pursued such damages.   It put on no such proof and did not propose an out-of-pocket-damages jury question on this fraud claim.   That claim thus is outside the *Haase* exception.   *See* Dkt. #73 at 19-20 (Bear Ranch's MSJ).

It is not a signed writing, *id.*, which HeartBrand agreed was required to modify the contracts.    There is simply no evidence of such a writing.    That is dispositive.

But any claimed reliance on that email is precluded for additional reasons. First, no evidence allows a jury to find that any implicit assent by Calles was binding on Bear Ranch.    Second, that email expressly concerns a deal that was cancelled.

### (i)    No evidence supports a finding that Calles had actual or apparent authority to bind Bear Ranch

In the May 12 email, Fielding states that the "full blood contract [will] apply to these cattle."    DX38.    Even assuming a jury finding that Calles assented to that statement, no evidence shows Calles's authority to bind Bear Ranch.

"An agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)."    *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007).    Agency must be proved issue by issue; for example, authority to negotiate terms is not the same as authority to bind the principal to a deal.    *See id.* at 184 ("the relevant issue is whether Thompson's agency included the authority to alter the express requirements . . . and commit [the principal]").    HeartBrand bears the burden to prove agency.    *Capital Fin. & Commerce AG v. Sinopec Overseas Oil & Gas, Ltd.*, 260 S.W.3d 67, 83 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

Here, there was no evidence that Calles had actual authority to bind Bear Ranch to any deal with HeartBrand (or Beeman).    Calles was hired as a contractor

providing breeding services.   PX157 (Independent Contractor Agreement).   Gill testified that Calles was not Bear Ranch's agent and that Gill even thought Calles was getting a commission from HeartBrand; no witness testified to granting Calles authority to bind Bear Ranch in a deal.   5/20/14 Tr. 250:21-24 (Exh. 1); 5/21/14 Tr. 69:5-23 (Exh. 2).   Indeed, Calles was still a HeartBrand director and shareholder at the time.   5/23/11 Tr. 98:19-23 (Exh. 4); 5/27/14 Tr. 105:13-16 (Exh. 5).

The question is thus whether Calles had apparent or implied authority to bind Bear Ranch to a contract on the new cattle.   Testimony as to that issue came only from Bill Fielding, HeartBrand's CEO.   Fielding testified that Calles "did the negotiating" on "Bear Ranch['s] behalf," 5/27/14 Tr. 36:14-15 (Exh. 5), and that his "understanding" was that Calles was "working full time for Koch Industries [he likely meant Bear Ranch, as Koch Industries is not owned by Bear Ranch's owner]" and "was their representative," *id.* at 37:20-21.   Fielding testified that he "negotiated with Dr. Calles," *id.* at 38:1-2, and "understood [Calles] was working for Bear Ranch" when sending Calles the May 12 email, *id.* at 41:5.

Ronald Beeman, HeartBrand's chairman and majority owner, testified only that he "underst[ood] that [Bear Ranch] had reached some agreement" on buying cattle from HeartBrand in 2011; he did not testify to his understanding of Calles's role, if any, in that agreement.   5/23/14 Tr. 4:13-14 (Exh. 4).   Indeed, Beeman's testimony about his personal role in that deal was that, once the balance due wasn't

paid when Beeman expected it, he "called Rob Gill," "called Rob again," "had several phone calls with Rob," and instructed an employee to "send an email . . . to Rob Gill" about payment.  *Id.* at 5:18, 5:22, 6:1-2, 6:9-10.

That record is insufficient as a matter of law to support a finding that Calles had apparent authority to bind Bear Ranch.   Apparent authority, the Texas Supreme Court has explained, "is based on estoppel, arising 'either from a principal knowingly permitting an agent to hold [himself] out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he] purports to exercise.'"  *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007) (citation omitted).   *Gaines* recites three precepts that ensure a finding of apparent authority is based on just proof:

- "the principal's full knowledge of all material facts is essential to establish a claim of apparent authority based on estoppel";

- "when making that determination, only the conduct of the principal is relevant"; and

- "the standard is that of a reasonably prudent person, using diligence and discretion to ascertain the agent's authority."

*Id.* at 182-83.   Thus, the law requires proof of "the conduct of the principal and the reasonableness of the third party's assumptions about authority."  *Id.* at 183.

On all three scores, the factual record here fails.   First, no evidence supports a finding that Bear Ranch knew that Calles purported to bind Bear Ranch to contracts

on the new cattle (if that is indeed what Calles did).  Fielding's May 12 email to Calles is not copied to anyone at Bear Ranch, DX38, and there was no evidence that anyone at Bear Ranch saw it.   Indeed, that email actually contains a payment term inconsistent with the email that *was* sent to Rob Gill the next day, which caused confusion when HeartBrand called off the deal for not paying sooner.  *Compare* DX38 (email to Calles requiring payment by the end of the next week), *with* PX7 (email to Gill that balance is due on inventory confirmation) *and* PX8 (Gill's email that he was waiting for final inventory to pay the balance).

Second, even accepting Fielding's testimony as to his "understanding" as a result of discussing with Calles whether the contracts would apply to the new cattle, that fact is irrelevant because "only the conduct of the principal is relevant" to the implied-authority issue.  *Gaines*, 235 S.W.3d at 182 (affirming summary judgment where the evidence "consists almost entirely of acts or statements attributed to the alleged agent, Thompson, rather than the putative principal").   No witness testified to any Bear Ranch conduct authorizing Calles to bind it to a new contract.   Calles had never before done so; only Gill had.   Hence, invoices were sent to Gill, *e.g.*, PX7 at 3, and Beeman likewise dealt with Gill on contract issues, as noted.

Even assuming that Calles had apparent authority to bring the parties together and negotiate, that is not evidence of apparent authority to bind Bear Ranch.  *See Gaines*, 235 S.W.3d at 184 (noting that "relevant issue" is the "scope of that agency"

and that, "even if we assume Thompson was authorized to fill in the loan forms, that is no evidence he was authorized to sign them on Southwest Guaranty's behalf"). In *Gaines*, the Court in fact distinguished a prior case on grounds instructive here: the agent in the prior case was "actively involved" in securing the bond (no such evidence here), the agent's efforts were "accepted and ratified" by the principal (no such evidence here), and the principal confirmed through a director its understanding of the agent's authority to act on its behalf (no such evidence here). *Id.* at 183.

Third, the reasonable-prudence standard further precludes any finding of apparent authority.  Fielding did not testify to taking any steps to confirm Calles's alleged authority to bind Bear Ranch to a new contract.   There is no evidence that Fielding or anyone at HeartBrand ever sent the May 12 email to Bear Ranch, despite their argument that extending the contract to the new cattle was highly material. And the fact that Calles was still a director and shareholder of HeartBrand, with a financial stake in HeartBrand's profit and a fiduciary duty to the company, only confirms that it is wholly unreasonable to conclude without any affirmative conduct by Bear Ranch that Calles had authority to commit Bear Ranch to a contract.

In short, as in *Gaines*, the record fails as a matter of law to allow a finding that Calles had actual or apparent authority to bind Bear Ranch.  *See also, e.g.*, *Sanders v. Total Heat & Air, Inc.*, 238 S.W.3d 907, 916-17 (Tex. App.—Dallas 2008, no

pet.) (reversing judgment where record lacked competent evidence to show a grant of actual or apparent authority); *Paragon Indus. Applications, Inc. v. Stan Excavating, LLC*, 2014 WL 1795313, at *6 (Tex. App.—Texarkana May 6, 2014, no pet.) ("even though one of the parties may be operating under a good-faith belief that the person with whom they are dealing is the agent of another, that fact alone is not enough to bind the purported principal").   Fielding's email to Calles and any implied assent by Calles to its statements provides no cognizable evidence supporting the claimed reliance.[5]

> ### (ii)   The email to Calles, moreover, concerned a deal that was expressly cancelled

On top of all that, the email to Calles does not even concern the deal about which HeartBrand complains.   It was sent to negotiate a sale by HeartBrand. DX38 (email); PX6 (HeartBrand invoice).   That deal, however, was cancelled. PX10 (invoice refunding price).

The sale that did occur, and as to which HeartBrand argues representations on which it relied, was made by Beeman personally.   PX11.   The parties expressly distinguished that deal as made by a separate seller, with separate price and commission terms.   *E.g.*, PX11; DX44.   Just as the email's statement of a

---

[5] That point also confirms the lack of proof of fraudulent scienter.   "To determine whether a statement by the corporation was made with the requisite scienter, the appropriate focus is on the state of mind of the individual corporate official who made the statement rather than on the collective knowledge of all the corporation's officers and employees." *Peak Tech. Servs., Inc. v. Land & Sea Eng'g, LLC*, 2011 WL 2118762, at *4 (S.D. Tex. May 27, 2011).

commission term did not apply to the separate Beeman sale, neither would its statement about a contract supply a basis of reliance in the later Beeman sale.   That distinction also informs the agency analysis above, further showing the lack of any Bear Ranch conduct or reasonable prudence by HeartBrand confirming a professed understanding of agency.   In short, the claimed reliance cannot as a matter of law be premised on either the alleged oral agreement by Gill or any alleged assent by Calles shown by the email.   No evidence allows the necessary finding of reliance.

### B.   The alleged Bear Ranch representation of its intent to comply with the 2010 contracts was not a basis of the jury's finding, and no evidence shows falsity in any event

The jury was charged on the theory that Bear Ranch misrepresented that the 2010 contracts would apply to the cattle Beeman sold.   Dkt. #172 at 18.   Bear Ranch has demonstrated its entitlement to judgment on that theory.

In its counterclaims, however, HeartBrand pleaded that, in connection with the Beeman sale, "Bear Ranch represented that it would comply with its contractual obligation under [the 2010 contracts]."   Dkt. # 111 ¶44.   Bear Ranch views that as a different fraud theory—that Bear Ranch said it intended to comply with the contracts, not that it would extend those contracts to cattle they do not cover.[6]

---

[6] The pleaded theory is the theory on which Bear Ranch sought summary judgment.   Dkt. #72 at 17-18 (describing the pleaded theory, and arguing that "Defendants have no evidence that this alleged representation was any more false in June 2011 than in July 2010").   In contrast, HeartBrand pleaded a promise to *extend* the 2010 contracts only in Counterclaim 4, which covers the Twinwood cattle.   Dkt. #111 at ¶49.   Bear Ranch addressed that different theory as to Twinwood.   Dkt. #72 at 20 (noting that "new false representation" alleged as to Twinwood).

Although the jury was not charged on that pleaded theory, Bear Ranch briefly addresses it for completeness.   Most obviously, it cannot support recovery because the jury was not instructed on it.   Yet, even if Bear Ranch's intent to comply with the 2010 contracts were relevant, there is no evidence of a false statement in June 2011.   Indeed, in the first year of the contracts, Bear Ranch paid HeartBrand "every penny that HeartBrand had coming to it," 5/23/14 Tr. 39-40 (Exh. 4) and "honored" its "end of the contract," *id.* at 42.   HeartBrand's complaints about breach concern events beginning in the fall of 2011, after the Beeman sale.   Hence, even if relevant, this pleaded representation does not support liability.

### C. The alleged Bear Ranch promise to sell 30% of its offspring to HeartBrand at undefined prices and times is at most an agreement to agree, too indefinite to support reliance as a matter of law

The other alleged misrepresentation on which HeartBrand claims reliance is that Bear Ranch intended to sell to HeartBrand 30% of its calves going forward. Dkt. #172 at 18.   Fielding and Beeman did testify that Gill said Bear Ranch "intended to sell 30 percent of their calves back."   *E.g.*, 5/23/14 Tr. 12:23 (Exh. 4) (Beeman testimony); 5/27/14 Tr. 50:15-18 (Exh. 5) (Fielding testimony).   But even accepting that testimony, there was no evidence of any discussion of price or any other terms constituting a promise capable of supporting reliance.

When a party claims an untrue promise of future conduct, the reliance element of a fraud claim requires the representation to be a "specific, detailed promise."

*Simulis, L.L.C. v. Gen. Elec. Capital Corp.*, 2008 WL 1747483, at *2 (Tex. App.—Houston [14th Dist.] 2008, no pet.).   Reliance on a "vague, indefinite promise of future business is unreasonable as a matter of law." *Id.* (affirming grant of summary judgment on promissory-estoppel claim with same reliance element, where the parties allegedly discussed future business, but never specific pieces, prices, timing, or other terms).

The hallmark of an indefinite promise is the absence of key details describing what the party allegedly commits to do.   For example, in *Gillum v. Republic Health Corp.*, 778 S.W.2d 558 (Tex. App.—Dallas 1989, no pet.), the court affirmed summary judgment where the claimant alleged reliance on statements that the business acquiring a hospital would have sufficient funding to upgrade the hospital's equipment care, that the hospital would remain primarily a hospital for doctors of osteopathy, and that a new hospital facility was to be constructed. *Id.* at 570.   As a matter of law, those alleged promises were too indefinite to support the claimant's promissory-estoppel claim because no specifics were agreed on. *Id.*

Similarly, in *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 139 (Tex. App.—Houston [14th Dist.] 1999, pet. denied), the court reversed a judgment that was based on alleged promises to provide equipment to start a recycling plant, where the parties did not discuss the specific equipment and how it would be paid for; the court held that the claimed "reliance was not reasonable or justified as a matter of

17

law," *id.* at 142.   Other courts have applied the same reasoning to reach similar results.   *E.g., Simulis*, 2008 WL 1747483, at *2 (no reasonable reliance where the parties never negotiated the business allegedly to be provided, the price, when and for how long, or any other terms); *City of Beaumont v. Excavators & Constructors, Inc.*, 870 S.W.2d 123, 138 (Tex. App.—Beaumont 1993) (reliance not established where "there was no definite or set time frame" for the future conduct discussed); *Weitzman v. Steinberg*, 638 S.W.2d 171, 176 (Tex. App.—Dallas 1982, no writ) ("an agreement to agree" is too indefinite to establish promissory estoppel).

In other words, for a promise to be sufficiently definite to support reasonable reliance, it must not leave key matters open for further adjustment; it must be "more than speculation of future events, a statement of hope, an expression of opinion, an expectation, or an assumption."   *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 305 (Tex. App.—Dallas 2009, no pet.).   That is the same standard as for enforcement of a promise in contract: it must be "specific as to all essential terms, and no terms of the proposed agreement may be left to future negotiation."   *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 455 (Tex. App.—Fort Worth 2009, pet. denied).

The evidence of the alleged 30% promise lacks key details that would allow a finding of reliance.   Most importantly, there is no evidence of any discussion about price.   Nor is there evidence of discussion about when the sales would occur, or the type of offspring to be sold (e.g., weaned, backgrounded, or finished).   Without any

such evidence, the evidence supports a finding of at most an indefinite "agreement to agree" in the future, incapable as a matter of law of reliance.

Indeed, the idea of a definite promise to sell calves at some unspecified price *competes* with Beeman's and Fielding's testimony that Bear Ranch agreed to apply the 2010 contract to the new cattle.   As the Court has held, that contract allows Bear Ranch to set a minimum price on any offspring it desires to offer for sale to HeartBrand, and thus does not require it to sell any offspring.   Dkt. #91 at 10-11. But if Bear Ranch actually committed to sell 30% of its calves without agreeing on a price, as opposed to simply acknowledging HeartBrand's desire to buy that many, Bear Ranch would in essence have no right to set a minimum price under the contract.   It would be forcing itself to sell at whatever nominal price HeartBrand dictated.   The illogic of that outcome confirms the limits of the evidence here, which shows no promise of definite sales.   (Moreover, if that 30% promise is said to apply to the initial cattle, undisputedly under contract, it runs into the additional reliance roadblock noted above: the contract's no-oral-modifications clause.)

So the misrepresentations HeartBrand argues are not complementary; they are competing.   The evidence, however, is not.   It does not show any definite agreement to sell 30% of Bear Ranch's calves to HeartBrand.   It shows at most an agreement to negotiate for future sales of that portion of Bear Ranch's calves, which

is insufficient to establish reasonable reliance, as a matter of law.[7]

For much the same reasons, the record has no evidence of evidence of falsity of the alleged representation.   It is undisputed that Bear Ranch did not agree with HeartBrand during the Beeman sale on any specific price, date, or inventory for a sale of calves; those details would have to be worked out in the future.   Yet there is no evidence that Bear Ranch refused to sell calves to HeartBrand at any price. Indeed, there is no evidence that HeartBrand ever made Bear Ranch any offer with a price.   To be sure, Bear Ranch did not believe it had committed to sell 30% of its calves regardless of price, but its owner also testified without contradiction that Bear Ranch would consider selling calves at an agreeable price.   5/22/14 Tr. 17:11-19 (Exh. 3).   There is simply no proof of falsity even assuming that a supposed agreement to future sales at to-be-agreed prices is capable of cognizable reliance.

**2.    The Fraud Claim Fails Because HeartBrand Had No Veto Right As to the Beeman Sale and Has No Proof of Damages.**

Although it was Beeman who sold the cattle in 2011, HeartBrand also brought a fraud claim as to that sale.   The central premise of its claim is that it was injured because it had a veto right as against Beeman, but was misled into not exercising that right.   Dkt. #77 at 43-44 (Defs.' MSJ response) (stating that "Texas law allows a party fraudulently induced into refraining from exercising a legal right, contractual or

---

[7]  Additionally, to the extent HeartBrand argues reliance on statements in the May 12 email from Fielding to Calles—which are no more definite than the alleged oral agreement by Gill—that claimed reliance fails as a matter of law for the agency reasons explained above.

otherwise, to sue for fraud," and arguing that Beeman "only had the right to sell cattle to Bear Ranch" because of HeartBrand's approval).   The evidence disproves that premise as a matter of law.

Beeman bought cattle from HeartBrand on two separate occasions, but he had a contract with HeartBrand as to only the first herd.   Specifically, in 2009, Beeman bought 100 female Akaushi cattle from HeartBrand, signing a Full-Blood Contract for that sale.   DX117.   That form contract is identical in relevant respect to the contract Bear Ranch signed in 2010 when likewise buying cattle from HeartBrand.   *See* PX1. As relevant here, Beeman's contract has the same Section I setting forth a sales limitation that applies to "any Full-Blood Akaushi animal purchased *pursuant to this agreement* or any off-spring *thereof*."   DX117 at 1 (emph. added).   As this Court has already ruled with respect to the same language in Bear Ranch's contract, Beeman's 2009 contract with HeartBrand thus imposes a sales restriction for the cattle he bought at that time, not for cattle he might later buy: "The Full-Blood Contract does not purport to be a master sales agreement covering any future purchases of Akaushi cattle."   Dkt. #91 (MSJ Order) at 15.

Beeman bought 514 more Akaushi cattle from HeartBrand in May 2011 on the heels of the cancelled sale to Bear Ranch.   To be sure, Beeman and Fielding testified that they believed that Beeman's 2009 contract required HeartBrand's approval for him to sell that second batch of cattle to someone else.   5/23/14 Tr. 12:7-16 (Exh. 4)

("Beeman Ranch, who I represented, was a fullblood producer.  I was under a fullblood contract. . . .  [S]ince we were both fullblood producers and it was in our contract, that we could sell to an approved producer that is approved by HeartBrand."); 5/27/14 Tr. 51:20-23 (Exh. 5) (Fielding's view of Beeman's 2009 contract: "He could sell to another fullblood producer with HeartBrand's okay"). Indeed, that testimony shows the real reason that Beeman would have sold cattle to Bear Ranch if he truly felt that a contract must apply—not because of alleged reliance on oral statements, but because Beeman believed that Bear Ranch's 2010 contracts *already* applied of their own force to this sale.  Beeman's mistake, of course, is no evidence proving the claim of fraud.

HeartBrand's view of the contract, however, is wrong.  The meaning of an unambiguous contract is a matter of law, Dkt. #91 at 6, and this Court has already ruled that the language in Beeman's contract does not give HeartBrand a veto right as to cattle not bought pursuant to that contract, but bought in the future, *id.* at 15. HeartBrand never had the right it alleges it was injured by not exercising.  (That same point negates the materiality element.)  The claim fails as a matter of law.

Yet the injury element is not proved for another, independent reason.  Even assuming *arguendo* the existence of a veto right, HeartBrand failed to show injury from its alleged loss of that right.  As Bear Ranch's prior JMOL motion explained, the measure of any value of such a right would be any profits to HeartBrand if

Beeman kept the cattle; that would require proof with reasonable certainty of how many calves Beeman would sell (if any), what price he would demand and HeartBrand would pay, and what profits HeartBrand would make (if any).   *See* Dkt. #158 at 7-9.   HeartBrand introduced no proof on those points; any conclusion would be speculation.   For that reason as well, the claim fails for lack of proof of injury.

The opinion testimony of nominated defense expert Andrien was expressly not evidence of harm to HeartBrand, but rather alleged unjust enrichment to Bear Ranch, and even then it was predicated on a finding that the initial purchase from HeartBrand was tainted by fraud.   5/27/14 Tr. 299:4-24 (Exh. 5).   Moreover, that testimony is not even admissible because it is purely speculative, as explained in Bear Ranch's motion to exclude it.   It is a stealth method to effectively force the sale of complex and purely imaginary business operation in the guise of valuing cattle, while claiming paper profits based entirely on wishful speculation.   *See* Dkt. #150 (Bear Ranch's motion to exclude).[8]   Those points will be addressed, if necessary, in response to HeartBrand's motion for entry of judgment.

---

[8] *See, e.g.*, *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 724 (5th Cir. 2006) (unpub.) ("Carbo's revenue projections and operating profits for Keefe's business enterprise, even if based on Keefe's own figures and estimations, are inadmissible because they are speculative projections based on 'uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into an unknown or unviable market, or on the success of a new and unproven enterprise.'").

3.      **Chapter 41 of the Texas Civil Practice and Remedies Code Requires Judgment for Bear Ranch on Exemplary Damages.**

Texas law restricts the cases in which exemplary damages may be awarded. Section 41.004 of the Civil Practice and Remedies Code provides that, with one exception not relevant here, "exemplary damages may be awarded only if damages other than nominal damages are awarded."   The requirement of a damages award also finds expression in Section 41.008, which uses the amount of compensatory damages to limit the amount of exemplary damages.   *See* Tex. Civ. Prac. & Rem. Code § 41.008(b)(1) (setting forth a limitation calculated with reference to the amount of "economic damages" and "noneconomic damages").   The Code thus defines the two types of damages relevant to allowable punishment.   *Id.* § 41.001(4) and (12) (economic damages are "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss" and noneconomic damages are those "for the purpose of compensating a claimant for" pain, suffering, and listed other nonpecuniary harms).   Those limits are why Bear Ranch requested a jury interrogatory assigning any award of exemplary damages to a specific fraud claim. *See* 5/27/14 Tr. 411-12 (Exh. 5).

As noted above, the jury was asked to award damages on HeartBrand's first fraud claim (concerning the 2010 sale), Dkt. #172 at 17, but was not asked to award damages on the second fraud claim (concerning the 2011 Beeman sale), *id.* at 18. Because the jury did not award any compensatory damages on that fraud claim,

24

Section 41.004 precludes exemplary damages on the claim.   Tex. Civ. Prac. & Rem. Code § 41.004(a); *see, e.g.*, *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 417 (5th Cir. 2009) ("the predicate for punitive damages is not satisfied because no actual damages resulting from TestAmerica's alleged misrepresentation regarding the priority of the Note were requested or awarded") (citing cases).   Bear Ranch is thus entitled to judgment as a matter of law on the request for exemplary damages.

Independently of Section 41.004, Bear Ranch is entitled to judgment as a matter of law on the exemplary-damages request because the same shortcomings discussed above as to fraud liability necessarily mean that the jury could not find the same fraud by *clear and convincing evidence*, as required to award exemplary damages.   Tex. Civ. Prac. & Rem. Code § 41.003.   Indeed, even the existence of close questions under the preponderance standard (and there are none) would negate satisfaction of the higher, clear-and-convincing standard.

## 4.   The Evidence Precludes Liability for Each Alleged Breach of Contract

HeartBrand's claim of breach of contract turns on four specific allegations submitted to the jury.   Each fails under the evidence at trial.

### A.   Registering offspring when practical

First, HeartBrand pleaded that Bear Ranch breached the contracts by failing "to register the offspring produced from the cattle and/or semen purchased from HeartBrand and Beeman with the American Akaushi Association."   Dkt. # 111 at

¶61(i).   The Court has already ruled that no such contract duty exists as to cattle purchased from Beeman.   Dkt. #91 at 19 (MSJ Order).   As to the cattle/semen purchased from HeartBrand, the contracts only require registration of offspring "as soon as practical."   PX1 at 2; PX2 at 2.   But it was HeartBrand's duty to register offspring transferred with the purchased cattle.   The Association's Rule 102(d)(2) provides that "The first owner" must apply to register those calves.   PX128 at 10. So Bear Ranch had no contract duty to register the offspring it bought.   HeartBrand then failed to prove when Bear Ranch itself produced offspring and that it was practical to register them before the time HeartBrand refused to accept performance under protest, particularly given that ranch hand Brandstadt wrote HeartBrand to advise that it was *not* practical for Bear Ranch to register calves before weaning and to advise that Bear Ranch planned to register calves after weaning was completed, which HeartBrand approved.   PX14 (Brandstadt: "We plan to register all calves after weaning . . . ."); *id.* (Bain: "The calves can be entered at any time.").

The window for practical registration, moreover, was further narrowed by HeartBrand's own failure to deliver registration certificates on the cattle until at least December 23, 2011.   *See* PX241.   Under Association Rule 102, registration of an offspring requires the sire and dam to be registered, PX128 at 9, yet HeartBrand failed for a year and a half to provide papers establishing that requisite.   Following delivery of those papers, in late December 2011, Bear Ranch tendered AAA dues in

early March 2012, under protest because it had the claims alleged here.   PX255. But HeartBrand immediately shut Bear Ranch out of its reporting system and refused to explain whether it would accept Bear Ranch's performance under protest, despite multiple ongoing inquiries.   5/27/14 Tr. 173:3 (Exh. 5); PX268; PX296; PX297; PX299; PX301; PX324.   There was no evidence showing the practicality of registration before that time.   Bear Ranch was entitled to and did justifiably rely on HeartBrand's assurance that calves could be registered "any time" and, specifically, after weaning.   PX14; *see* 5/20/14 Tr. 92-95 (Exh. 1) (noting practical constraints). Indeed, time is ordinarily not of the essence in contract law, and even a stated date for performance does not mean that time is of the essence.   *E.g.*, *Cadle Co. v. Castle*, 913 S.W.2d 627, 637 (Tex. App.—Dallas 1995, writ denied) (agreeing that "failure to perform at the exact time called for is not a breach of contract").

In short, the contract required offspring registration only as soon as practical, and no evidence shows that such time fell before HeartBrand's waiver of its right to performance, beginning in March 2012 and continuing through this day.   Yet even if the contract itself is viewed as requiring registration sooner (ignoring the "practical" limitation), the defense of equitable estoppel through at least the time of weaning would defeat any liability.

### B.    Participation in the Whole Herd Reporting System

The second alleged breach by Bear Ranch is "failing to enroll its Akaushi cattle

27

in the American Akaushi Association's Whole Herd Reporting System or pay the assessment fees for its entire herd."   Dkt. #111 at ¶61(ii).   The contract duty to enroll cattle in the Whole Herd Reporting System, however, applies to offspring produced using the cattle purchased "by this agreement."   PX1 at 2.   Again, that does not include offspring of any cattle purchased later, such as from Beeman or others.   Dkt. #91 at 19.   And, again, the timing required is as soon "as practical."   PX1 at 2.   The same arguments made above as to practicality, equitable estoppel, and waiver thus apply here and are not repeated.

The contract follows that duty with a duty to "comply with the Rules of the American Akaushi Association," PX1 at 2, which HeartBrand has suggested means that Bear Ranch must pay fees and submit data as to all Akaushi it may come to own, not just offspring of the cattle described in the contract.   But the contract expressly defines the relevant group of cattle for Whole Herd Reporting; it is the offspring of the cattle purchased by the contract.   PX1 at 2.   Given that specific, express definition of the enrollment duty, there is no basis for reading the next sentence as imposing the same duty but as to a broader group of cattle, especially a hypothetical one.

Moreover, the requirement to comply with the Association Rules does not require Whole Herd Reporting on all herds Bear Ranch might acquire from any source.   In the document entitled "American Akaushi Association Rules," the Rules of the Association, numbered 100 through 1300, are distinct from the portion of the

28

document entitled "Whole Herd Reporting."   PX128 at 1-3.   The Rules thus do not appear to include Whole Herd Reporting, and any contract ambiguity on that point is resolved against HeartBrand as the drafter.   Moreover, the "Whole Herd Reporting" section does not define a requirement, but rather a condition. PX128 at 7(c)(5) ("If assessments are not paid . . . , no further services will be provided.").   Its text does not mandate compliance; it states requirements to receive services.   Neither the contract nor the Rules impose a duty as to offspring of cattle not under contract.

### C.   Compliance with AAA Rules

The third alleged breach by Bear Ranch is "failing to comply with the rules of the American Akaushi Association."   Dkt. #111 at ¶61(iii).   The only evidence on that point relates to registration and enrollment of offspring, discussed above.

### D.   DNA test results

The final alleged breach by Bear Ranch is "failing to submit DNA test results for offspring produced from its Akaushi cattle and from any calves produced from the semen purchased from HeartBrand."   *Id.* at ¶61(iv).   This concerns each contract's Section X, which recites a duty to "submit DNA results" for each calf produced under the contract "more than 30 days before the calf's weaning."   PX1 at 4; PX2 at 3. Although the jury could conclude that submission did not occur within the stated time, the evidence establishes Bear Ranch's defense of equitable estoppel and waiver as to that timing.   Bear Ranch was entitled to and did justifiably rely on HeartBrand's

representation that offspring could be registered after weaning.  PX14.  Once Bear Ranch submitted dues and fees under protest, however, HeartBrand refused to accept them, locked out Bear Ranch, and gave the silent treatment.  Any noncompliance does not exceed the scope of that equitable estoppel and waiver.  *See* 5/20/14 Tr. at 91:22-92:3, 92:20 (Exh. 1) (testimony that Bear Ranch spent "hundreds of hours" each year gathering the required DNA samples).

**5.   Bear Ranch Is Entitled to Judgment as a Matter of Law for Additional Reasons.**

Bear Ranch is entitled to judgment as a matter of law for additional reasons presented by its motion for judgment as a matter of law at the conclusion of the defense case, Dkt. #159.  To the extent the amount of "unjust enrichment" is relevant to any legal issue, HeartBrand has not introduced any sufficient evidence establishing that amount.  Andrien's expert testimony is so speculative and unfounded as to amount to no evidence, as Bear Ranch has explained.  HeartBrand's breach claim is barred, in turn, due to its own prior material breach of the contract by failing to deliver the exclusive cattle promised in the contract, much less timely registration papers.

## CONCLUSION

For the reasons explained herein and in its prior briefing, Bear Ranch respectfully requests that the Court direct the entry of judgment as a matter of law in its favor and award it all other just relief to which it may be entitled.

Dated:   June 26, 2014                    Respectfully submitted,

                                          /s/ R. Paul Yetter
                                          R. Paul Yetter
                                          Attorney-in-Charge
                                          State Bar No. 22154200
                                          Collin J. Cox
                                          State Bar No. 24031977
                                          J. Campbell Barker
                                          State Bar No. 24049125
                                          YETTER COLEMAN LLP
                                          909 Fannin, Suite 3600
                                          Houston, Texas 77010
                                          (713) 632-8000
                                          (713) 632-8002 (Fax)

                                          Andrew R. Seger
                                          State Bar No. 24046815
                                          THE SEGER FIRM, P.C.
                                          P.O. Box 98433
                                          Lubbock, Texas 79499
                                          (806) 793-1906
                                          (806) 793-1979 (Fax)

                                          Attorneys for Plaintiff Bear Ranch, LLC

### Certificate of Service

I certify that on June 26, 2014, a copy of this document was served on all counsel of record using the Court's e-filing system.

                                          /s/ J. Campbell Barker
                                          J. Campbell Barker