IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| BEAR RANCH, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 6:12-cv-00014 |
| | § | |
| HEARTBRAND BEEF, INC., et al., | § | |
| | § | |
| Defendants. | § | |

**BEAR RANCH'S REPLY IN SUPPORT OF
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
UNDER FEDERAL RULE OF CIVIL PROCEDURE 50(b)**

Bear Ranch submits this reply in support of its renewed motion for judgment as a matter of law (Dkt. #180).

**1.     There Is No Evidence of an Actionable Misrepresentation by Bear Ranch.**

**A.     The alleged oral agreement by Rob Gill that the 2010 contract would apply to additional cattle is not actionable.**

Striving to bring its claim outside the 2010 contract's no-oral-modifications clause, HeartBrand wrongly argues that Rob Gill's alleged commitment that the contract would apply to the cattle being bought from Beeman is not a modification of the contract.  It contends that a "modification" is different than a "new promise outside the four corners of the contract."  Resp. 7.  But every modification of a

contract is a promise outside of the contract's four corners.   That is what makes it a *modification* in the first place.

A contract modification is simply an agreement that the rights or duties the contract defines apply in some different way. And that exactly is what HeartBrand alleged—that the contract was to apply to certain additional cattle.   That is how HeartBrand's counsel, owner, and CEO all discussed the alleged promise at trial:

- "Q.   I want to know specifically, sir, did Mr. Gill acknowledge to you that this was going—these cattle *were going to be under the provisions of the fullblood contract.*   A.   Yes, sir, he did."   5/23/14 Tr. at 12-13 (Beeman) (emph. added)

- "Q.   And would you have made the recommendation to Mr. Beeman that he sell if Mr. Gill hadn't agreed *that the 2010 contract would apply?*   A.   Absolutely not."   5/27/14 Tr. at 47-48 (Fielding) (emph. added).

- "Q.   And if Mr. Gill had told you that he didn't *intend to treat those cattle as being covered by the contract* between Bear Ranch and HeartBrand, would you have tried to stop the sale?   A.   I would have recommended to Ronald that he not sell them and if he would have sold them, I would have resigned."   5/27/14 Tr. at 52 (Fielding) (emph. added).

HeartBrand likewise pleaded that Bear Ranch represented it would "*comply with its contractual obligations under* the Full-Blood Contract and F1 Program Contract," but "did not intend to comply."   Dkt. #111 at ¶30 (emph. added).   Unsurprisingly, then, the case was submitted to the jury on an alleged promise of compliance, for additional cattle, with the restrictions in the 2010 contracts.   Dkt. #172 at 18 (claim that Bear Ranch represented "that it would comply with the restrictions in the 2010 Agreements for the cattle purchased from Beeman").

HeartBrand's contention thus seems to come down to the idea that, if its witnesses did not use the word "modify" or "amend" in describing the alleged promise, it is not a modification or amendment.   But HeartBrand cites no rationale for such a magic-words rule.   It would wrongly privilege form over substance. And substance is what defeats HeartBrand's attempted evasion of the no-oral-modifications clause.   Unlike the *Hoescht* case on which HeartBrand relies, the oral promise alleged here does not "'exist[] apart from and with different conditions than the contract.'" Resp. 4 (quoting *Hoescht Celanese Corp. v. Arthur Bros., Inc.*, 882 S.W.2d 917, 924 (Tex. App.—Corpus Christi 1994, writ denied)). The whole dispute is about an alleged promise that *the contracts' restrictions* would henceforth apply to additional cattle, sold by Beeman.   That is how HeartBrand repeatedly described it at trial, as noted.   That is likely because HeartBrand viewed the 2010 contract as automatically applying to the new cattle, viewing Bear Ranch as simply confirming that fact.   *See infra* Part 2; *see also* Dkt. #77 (MSJ Resp.) ("As Fielding testified, 'a full-blood producer can sell to another full-blood producer because they're already covered under the full-blood contract.'").   But HeartBrand was wrong in believing that the contract so applies, Dkt. #91 at 13-16, and any agreement that it would so apply expressly requires a signed writing, PX1 at 6.

HeartBrand next calls Bear Ranch's position "nonsensical" because of Bear Ranch's "insistence" (correctly, of course) that its 2010 contract is not a master sales

agreement.  Resp. 6.  But where is the nonsense?  The limited scope of the restrictions stated in the contract is precisely why the next year's alleged promise to treat additional cattle as under the contract is a *modification* of contract scope. Indeed, it is hard to imagine what the no-oral-modifications clause would cover if not alleged oral promises like this one—that the contract applies to more than its text states.  The Court has already ruled that the 2010 contract is not a master sales agreement, Dkt. #91 at 15, and the alleged oral promise would effectively make it one.  That is a huge modification.  There is nothing "nonsensical" in explaining that a signed writing was required for such an important change.

The no-oral-modifications clause was a protection for both parties, setting the rules about which alleged future statements regarding contract scope would bind them.  It is no small thing for Bear Ranch to have that protection.  The reason parties often define such ground rules is to prevent just the sort of dispute raised here, where one party claims that the other said a contract would apply in some way different than the contract itself provides.  *See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858-59 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en banc) (explaining that a written-modifications requirement provides certainty and avoids dispute).  Just as the no-oral-modifications clause in *DRC* required rejecting the plaintiff's alleged reliance on pre- and post-contract oral representations that a right defined as non-exclusive would be exclusive, *id.* at 859,

the law does not recognize HeartBrand's alleged reliance on an oral representation that contract restrictions stated to apply to the cattle purchased under that contract would apply to additional cattle, without the required signed writing.

HeartBrand misses the point (Resp. 7) in addressing Bear Ranch's explanation that the oral promise alleged here would produce several non-sequiturs. That fact is noted simply to illustrate a sound reason for the parties' requirement that modifications be in writing, to confirm the existence and details of such a change.

HeartBrand's two cited cases, moreover, have nothing to do with oral modifications that are prohibited by a contract.   One case (*Anderson*) dealt only with a no-evidence challenge.   And the other case (*Burleson*) simply held that fraud that induces a contract can vitiate a merger clause in that very contract.   *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 614 (Tex. App.—Waco 2000, pet. denied) ("it follows that fraud, if admissible to vitiate a contract in its entirety, should also operate to vitiate the disclaiming clause, since the clause is but a part of the contract"); *see* Black's Law Dictionary 989 (6th ed. 1990) (explaining that "merger clause" is "[a] provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document").   That principle, of course, is irrelevant here because the jury has already determined that HeartBrand was not fraudulently induced into the 2010 contract.   *See Biosilk Spa, L.P. v. HG Shopping Centers, L.P.*, 2008 WL

1991738, at *3 (Tex. App.—Houston [14th Dist.] May 8, 2008, pet. denied) (making that same distinction in applying a no-oral-modifications clause to reject reliance on an alleged post-contract oral representation, thus distinguishing a prior case that "allowed the party asserting reliance to avoid the contractual [disclaimer] provision because the evidence showed they had been fraudulently induced to enter the contract" because the plaintiff at bar showed no such fraud).

### B.     The statute of frauds forecloses HeartBrand's claim.

Additionally, Bear Ranch has explained that the same general policies behind the contract's no-oral-modifications clause also animate the statute of frauds, which precludes a fraud recovery based on the benefit of an alleged promise within the statute's scope.   Mot. at 7-8 n.4.   As the Court has already ruled, the contract restrictions here trigger the statute of frauds because they contemplate performance over more than one year.   Dkt. #91 at 16-19.

Because the statute of frauds applies, HeartBrand cannot recover damages representing the benefit of the alleged oral promise.   *Haase v. Glazner*, 62 S.W.3d 795, 800 (Tex. 2001).   To be sure, HeartBrand could have pursued damages for any out-of-pocket loss.   *E.g.*, *Haase*, 62 S.W.3d at 800 ("Glazner hired a surveyor and entered into an earnest-money contract for a site on which he proposed to build his restaurant.   These kinds of damages are not part of the benefit of any alleged

bargain between the parties."). But HeartBrand in fact submitted no damages question on this fraud claim.

HeartBrand now seeks an equitable remedy awarding it money to prevent alleged unjust enrichment, but the award it seeks is just as inconsistent with the statute of frauds as are benefit-of-the-bargain damages. HeartBrand calculates the award it seeks based on the difference between the alleged value of the cattle *without* restrictions and the value Bear Ranch paid while allegedly promising the cattle *were* restricted. HeartBrand thus seeks to recover the alleged monetary value of the restrictions—the benefit allegedly promised.

But recovering the value of an alleged promise, when it cannot be enforced under the statute of frauds, would "circumvent the protections of the statute" and is forbidden by Texas law. *See Quigley v. Bennett*, 227 S.W.3d 51, 54 (Tex. 2007) (rejecting award on fraud claim because it was defined based on the value of an allegedly promised royalty interest, yet the statue of frauds bars enforcement of oral promises to transfer such interests); *Transcontinental Realty Investors, Inc. v. John T. Lupton Trust*, 286 S.W.3d 635, 646-47 (Tex. App.—Dallas 2009, no pet.) ("[T]he inquiry is whether the plaintiff seeks to recover the benefit of the alleged false representations, or its out-of-pocket costs expended in reliance on those representations. Where the statute of frauds bars enforcement of the representations, only out-of-pocket costs are recoverable.") (citation omitted); *Biko*

*v. Siemens Corp.*, 246 S.W.3d 148, 163 (Tex. App.—Dallas, pet. denied) (holding that statute of frauds barred claims where the plaintiffs "essentially argue they were damaged because they did not get the benefits they expected when appellees did not honor their contract"); *Bank of Texas, N.A. v. Gaubert*, 286 S.W.3d 546, 548 (Tex. App.—Dallas 2009) (applying statute of frauds to reject injunctive relief conveying the benefit of an alleged oral promise); *Hugh Symons Grp., plc v. Motorola, Inc.*, 292 F.3d 466, 470 (5th Cir. 2002) (summarizing law: "Generally, under Texas law, a plaintiff may not recover in tort for claims arising out of an unenforceable contract under the statute of frauds.   To the extent, however, that a plaintiff's fraud claim seeks *out-of-pocket damages* incurred by relying upon a defendant's misrepresentations, those damages are not part of the benefit of any bargain . . . [and] might be recoverable without contravening the statute of frauds") (emph. added).

HeartBrand has never attempted to show any out-of-pocket loss, such as money spent building fences to hold offspring or salaries spent on staff to process additional registration data.   HeartBrand now seeks to use tort law to be paid for the alleged benefit of a putative oral promise.   If that alleged promise was enforceable, HeartBrand could of course use contract law to do so.   But that is not the case, and its fraud claim trying to circumvent those limits is foreclosed.

### C.   The email from Fielding to Calles cannot support reliance, as a matter of law.

Bear Ranch raised and discussed Fielding's May 12, 2011 email to Calles because it is a writing about the 2010 contracts.   DX38 (Fielding's email stating, "our full blood contract apply to these cattle").   Bear Ranch's first point was simply that this writing was sent *by* Fielding and thus is *not* signed by Calles.   So even assuming Calles had authority to bind Bear Ranch to Fielding's proposed terms, this email is not the signed writing that the parties agreed is required for contract modifications.   HeartBrand does not disagree that the email is no signed writing.   *See* Resp. 7-13.

While that point alone is enough to address any reliance claim based on the email, Bear Ranch also noted that such a reliance claim is precluded for two additional reasons—Calles' lack of authority, and the email's disconnect to the actual sale by Beeman.   HeartBrand responds only to those additional reasons.

### (1)   Calles lacked authority to bind Bear Ranch to a contract.

Bear Ranch argued the issue of Calles' authority as an additional reason that his conduct cannot support the required reliance.   HeartBrand calls that argument a "red herring" (Resp. 7).   If HeartBrand intends to forgo any agency argument as to Calles and to rely only on Gill's alleged statements, that would indeed take the agency issue off the table.   Bear Ranch does not perceive that as HeartBrand's intent, and thus Bear Ranch addresses below Calles' agency.   Gill, in contrast,

undisputedly had authority to bind Bear Ranch.   But, as explained above, any alleged oral promise by him "to abide by terms that Calles negotiated with HeartBrand" (Resp. 9)—where the relevant term is that the "full blood contract apply [sic] to these cattle" (DX38)—is simply an oral agreement that cannot support reliance in light of the contract's no-oral-modifications clause.

Assuming the Court sees a need to reach Calles' authority to bind Bear Ranch, it should find none.   No evidence shows his actual or apparent authority to commit Bear Ranch to contract terms.   HeartBrand argues that "Fielding's emails to Calles show that he [Fielding] believed his communications to Calles were communications to Bear Ranch, as Fielding further confirmed in testimony." Resp. 11.   But that argument gets HeartBrand nowhere, for the initial reason that it is about the wrong thing.   That argument and Fielding's testimony are about whether Calles had authority to pass and take messages—what HeartBrand calls "negotiating" the deal—not to bind Bear Ranch to terms of indefinite duration that restrict basic rights like alienability of property.   Your real estate agent is authorized to negotiate with house sellers, but that does not confer authority to commit you to buy a house.   You still have to sign on the dotted line.   The Texas Supreme Court has emphasized that courts must pay careful attention to the scope of agency, which HeartBrand fails to do.   *Gaines v. Kelley*, 235 S.W.3d 179, 184 (Tex. 2007).

HeartBrand then argues that "Bear Ranch never corrected any alleged misunderstanding." Resp. 11. But how could it? It was correct that Bear Ranch believed Calles was a broker and used him as such. 5/21/4 Tr. at 69:5-23. And there is no evidence that Bear Ranch understood that Calles purported to bind Bear Ranch to cattle restrictions, if that is indeed what he did (Fielding talks only about "negotiating" for Bear Ranch). *See Gaines*, 235 S.W.3d at 182 ("the principal's full knowledge of all material facts is essential to establish a claim of apparent authority based on estoppel"); *see, e.g.*, *Utilities Optimization Group, L.L.C. v. TIN, Inc.*, 440 Fed. App'x 249, 253 (5th Cir. 2011) (holding evidence insufficient to allow a finding of authority to waive a contractual term, even assuming the existence of authority to "coordinate" the required waiver, because the putative agent's holding himself out as having authority to waive the term is not evidence that the principal knew of that conduct or neglected the matter).

HeartBrand argues that Gill "was aware of Calles's previous negotiations" when making the Beeman deal and embraced the "original deal," which HeartBrand assumes means the terms that Fielding stated to Calles. Resp. 12. Fielding of course never testified to hearing Gill say that, but only that this was Fielding's understanding. 5/27/14 Tr. at 44-45. Moreover, this is again testimony about what Gill was allegedly promising orally, *id.*, not that Gill knew Calles had not only negotiated terms, but actually purported to bind Bear Ranch, if that is the claim.

Aside from that argument, HeartBrand then relies only on Fielding's professed beliefs about authority based on his communications with the putative agent himself, Calles.   Resp. 11.   Again, such communications are irrelevant under Texas law.   *Gaines*, 235 S.W.3d at 182.

HeartBrand also fails to satisfy the reasonable-prudence element of a claim of apparent authority.   *See Utilities Optimization*, 440 Fed. App'x at 252 (discussing requirement); *2616 S. Loop L.L.C. v. Health Source Home Care, Inc.*, 201 S.W.3d 349, 356 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (same).   It makes no sense that Calles would have authority to commit Bear Ranch.   Calles was HeartBrand's own director and large shareholder, with a financial incentive and fiduciary duty to see HeartBrand's interests advanced.   A person with such dueling allegiances might be authorized to broker a deal for Bear Ranch, but it cannot be reasonable to think him authorized to bind Bear Ranch, without ever posing the question to Bear Ranch.

Lastly, HeartBrand quibbles (Resp. 13) with Bear Ranch's description of the capacity in which it hired Calles.   But the relevant issue is what facts HeartBrand knew and acted upon in reaching its professed conclusion of agency.   *Rourke*, 530 S.W.2d at 804 (holding that apparent authority "cannot be established except by facts known to the party dealing with the agent and relied upon by him in such dealings").   The only evidence of HeartBrand's view about Calles' position was

that he left HeartBrand to go out "on his own" (5/22/14 Tr. at 210:4) and then was a "representative" of Bear Ranch (5/27/14 Tr. at 37:21).   This is not a case where a putative agent was given a title like "president" that could confer apparent authority to contract for a principal.   HeartBrand has not shown that Calles had actual or apparent authority to bind Bear Ranch.

### (2)   The email to Calles concerned a deal that was cancelled.

Moreover, the reliance issue here relates to alleged representations made in Beeman's June 2011 sale of cattle.   Bear Ranch noted that reliance on any alleged conduct by Calles in response to the May 2011 email about a sale by HeartBrand is further undercut because that deal was expressly cancelled.   Mot. 14-15. HeartBrand replies by pointing to a July 2011 email exchange between Fielding and Gill containing the words "original deal," Resp. 9, but that is no answer.   That email comes after HeartBrand's alleged reliance in June 2011.   Statements made after an alleged decision obviously cannot influence it.

### D.   The alleged representation of an intent to sell calves to HeartBrand in the future is too indefinite to support cognizable reliance.

It is not disputed that the trial testimony, if viewed in HeartBrand's favor, does allow a finding that Gill said Bear Ranch intended to sell 30% of its calves to HeartBrand going forward.   But that representation is too indefinite to support cognizable reliance, and it has not been shown false in any event.   HeartBrand resists the first point; it does not respond on the second.   Resp. 13-19.

13

First, HeartBrand wrongly argues that the cases on promissory estoppel and breach of contract cited by Bear Ranch are irrelevant.   Resp. 14.   It is well-settled that a promissory-estoppel claim requires the same justifiable reliance as does a fraud claim.   *Gilmartin v. KVTV-Channel 13*, 985 S.W.2d 553, 558 (Tex. App.—San Antonio 1998, no pet.) ("A central element of both equitable estoppel (or fraud) and promissory estoppel is detrimental reliance. Reliance on the promise must be reasonable and justified."); *Ortiz v. Collins*, 203 S.W.3d 414, 421 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ("Ortiz sued appellees for fraud, negligent misrepresentation, and promissory estoppel based on their alleged misrepresentations during the negotiation process . . . .   All three claims share the common element of reliance.").[1] Thus, adjudication of reliance as to one claim controls as to the other.   *E.g., Ortiz*, 203 S.W.3d at 423 ("since justifiable reliance is also an element of promissory estoppel, the summary judgment motions [on fraud] were broad enough to cover Ortiz's later-pleaded promissory estoppel claim").

Similarly, Texas courts adjudicating the reasonableness of claimed reliance on a false promise look to whether the promise is sufficiently definite to be enforced in contract law.   *Gilmartin*, 985 S.W.2d at 558 (doing just that and observing about a cited breach-of-contract case: "While the *Brown* court was only considering the

---

[1]  *Accord Simulis, L.L.C. v. General Electric Capital Corp.*, No. 14- 13- 00383- CV, slip op. at 11 (Tex. App.—Houston [14th Dist.] July 31, 2014, no pet. h.) ("Fraud and negligent misrepresentation claims share this reliance element in common with promissory estoppel.").

reasonableness of reliance for purposes of a contract claim, other courts have applied similar consideration to estoppel claims."). That is because the basic idea is the same: Texas law protects reliance on definite promises of particular conduct, but not indefinite promises that leave key matters open for future decision.

HeartBrand attempts to distinguish cases like *Gillum* and *Allied Vista* based on level of specificity, Resp. 15, but the alleged promise here is no more specific. In *Gillum*, the alleged promises included that a hospital would remain primarily for doctors of osteopathy. *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 570 (Tex. App.—Dallas 1989, no pet.). That alleged promise concerned a specific hospital and a specific medical specialty, but its contours were still too open-ended; there was no commitment that a specific ratio of osteopaths would remain. In other words, the promise had some specifics, but a key detail was left open. Just so here. While quantity was allegedly discussed, there was no testimony that Bear Ranch committed to sell cattle at any specific price, much less of a certain type or at a certain time. The need for follow-up discussions on basic terms like those is a hallmark of an indefinite assurance. *See Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 139, 142 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (finding no definite promise capable of supporting reliance where no specific sales or prices were discussed, and the plaintiff, after being told that only two pieces of equipment would be available, never called back to ask for additional items or even that equipment).

As in *Allied Vista*, HeartBrand never followed up on any specific sales, and never made any offer to buy cattle at a certain price.

Just as a mere "agreement to agree" is not a definite promise capable of enforcement in contract law, it is not a definite promise capable of supporting a reliance claim.   Unsettled future contingencies—such as what type of cattle are contemplated to be sold and whether a fair price could be agreed—means that no definite performance is in fact promised.   *Cf., e.g.*, *Landmark Org., L.P. v. Tremco Inc.*, 2010 WL 2629863 (Tex. App.—Austin June 30, 2010, no pet.) (finding no cognizable reliance on an alleged promise to issue a warranty after installation of a product; that was not a sufficiently specific promise because it would require a warranty without regard to future developments, such as how the product was installed).   If you say that you will sell me your car, but I offer only an unacceptably low price when the time comes to talk price, that illustrates that we had no definite agreement at all.

The only case HeartBrand cites (Resp. 15-16) as a purported contrast to those principles is *Frost Crushed Stone Co. v. Odell Geer Construction Co.*, 110 S.W.3d 41 (Tex. App.—Waco 2002, no pet).   But the promise there in fact *contained* a specific price term.   The plaintiff was alleged to have offered to supply a certain type of rock for a specific highway project at a specific price.   *Id.* at 44, 46.   *Frost* thus had the specific price term missing here.   Moreover, the court in *Frost* did not

even address the issue of definiteness; the defendant's argument was simply that its quote had not been given to the plaintiff before its claimed detrimental reliance.   *Id.* at 45.

HeartBrand attempts to get around the indefiniteness problem by arguing that Bear Ranch agreed to apply the 2010 contract to these cattle and that the contract supplies the missing price terms.   Resp. 16-17.   But the contract does not require Bear Ranch to sell its offspring at *any* price.   Dkt. #91 at 10-11 (Court's MSJ Order).   Moreover, it gives Bear Ranch the right to set a minimum price on any cattle it desires to offer for sale.   *Id.*   As the Court has explained, that right is rendered "impotent" if Bear Ranch is required to sell its offspring.   *Id.* at 11.   Bear Ranch was not agreeing in the contract to sell anything.[2]   Even if Bear Ranch did represent its intent to sell 30% of its calves—an unenforceable promise under Texas law[3]—HeartBrand's own argument that Bear Ranch promised to apply the 2010 contract *undermines* the existence a definite promise, capable of cognizable reliance.

---

[2] HeartBrand's contention that "the Full-Blood Contract guarantees this minimum price" as to the Beeman-sale cattle, Resp. 16, only confirms Bear Ranch's point in Part 1(A) that HeartBrand is claiming an oral expansion of that contract to additional cattle.

[3] *See John Wood Grp. USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 21 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ("[U]nder Texas law, an agreement to negotiate in the future is unenforceable, even if the agreement calls for a 'good faith effort' in the negotiations.").

HeartBrand next offers a few, competing possibilities on what price term might be implied.   The jury, of course, was not asked to find any implied price term. Dkt. #172 at 18.   It found liability simply based on the theory that "Bear Ranch misrepresented that it intended to sell to HeartBrand 30% of its calves."   *Id.*   It is that alleged representation whose definiteness is being judged.   In any event, each of HeartBrand's attempts to resuscitate its claim fails.

First, HeartBrand's argument that Gill committed to sell cattle at a "20-cent per pound premium over local market prices" (Resp. 17) is meritless.   There was no testimony of any discussion or agreement by Bear Ranch on those prices.   Those prices were mentioned by HeartBrand's witnesses only in describing a program it allegedly runs, and they explained that this program does *not* require sales by producers but rather aims to create an "incentive" for sales by paying a premium. 5/23/14 Tr. at 203; 5/27/14 Tr. at 10.   HeartBrand cannot seriously claim that its explanation of how it tried to *encourage* optional sales supplies a price term to which Gill allegedly *committed*, regardless of whether Bear Ranch would make any money at all.

Second, even more incredible is HeartBrand's suggestion that Bear Ranch's owner, Bill Koch, evaluated and agreed to sell offspring at the contract's guaranteed floor prices.   Resp. 17.   At the cited pages of the transcript, Koch in fact testified that the contract's floor prices were "extremely low"—too low to rationally

encourage any sales—but that Bear Ranch "would sell calves back to HeartBrand if they offered a price that was equivalent to what we could net out of selling the carcasses."   Koch's testimony is that, although Bear Ranch was willing to make sales at the right price, that price term was open for negotiation.   That is the opposite of agreeing to a sales price, and that is the fatal flaw in HeartBrand's claim of reliance on an allegedly represented intent to sell in the future.

Lastly, HeartBrand cannot credibly suggest that the missing price term can be filled in with some unspecified number from custom.   Resp. 18.   It cites *Sacks v. Hadden*, 266 S.W.3d 447, 450 (Tex. 2008), but that case simply holds that an enforceable contract for professional services can exist based on an agreed hourly rate, rather than a lump-sum total price.   Here, there was no evidence at trial of a promise to set a price using any mechanism, whether on a per-pound or per-carcass basis.   Indeed, HeartBrand cites or proposes three inconsistent alleged methods— use the 2010 contract's floor price, use some premium over "local market prices" (for unspecified types of cattle), or use the negotiation process to which Koch testified.   If Bear Ranch and HeartBrand had a course of dealing, that might provide an implied price term.   But again there is no such evidence here.

Price terms are almost universally critical to definiteness.   *Liberto v. D.F. Stauffer Biscuit Co., Inc.*, 441 F.3d 318, 324 (5th Cir. 2006) ("As a general matter, Texas courts have consistently held that a contract may be held void for

indefiniteness if it fails to specify 'the time of performance, *the price to be paid*, the work to be done, the service to be rendered, or the property to be transferred.'") (emph. added).   For instance, a promise to loan money that failed to include an agreed interest rate was held indefinite in *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218 (Tex. 1992).   Evidence that "that the Bank 'always charged' 1½ % to 2½ % over the prime rate" did not provide the needed specificity: "This testimony amounts to no evidence of the interest rate."   *Id.* at 221.   Just so with HeartBrand's various suggestions of inferred prices, including its suggestion that it "always" pays some premium above "market prices," which is like the rejected evidence in *T.O. Stanley*.   The price term is crucial, and there is simply no evidence that sales at some price were promised.   *E.g.*, *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 455 (Tex. App.—Fort Worth 2009, pet. denied) (affirming grant of JNOV because an alleged oral contract left open an essential term in failing to specify how to compute funds allegedly promised).

The fraud claim fails on yet another element.   Bear Ranch has noted (Mot. 20) that HeartBrand introduced no proof of falsity of the allegedly represented intent to sell offspring in the future, even assuming that promise is capable of reliance. HeartBrand has not responded.   Its claim fails for that independent reason.   As Bear Ranch explained, its owner testified without contradiction that, while Bear Ranch did not intend to sell regardless of price, Bear Ranch would sell cattle to

HeartBrand at a mutually agreeable price.   5/22/14 Tr. at 17.   Indeed, there is no evidence that HeartBrand ever offered a price to Bear Ranch.   That may be because HeartBrand was unable or unwilling to make a serious offer: That same year, it was offering Twinwood a price so low that Twinwood could not make any money, prompting it to offer its cattle to Bear Ranch instead.   5/20/14 Tr. at 149:22-150:5. But whatever the reason for the absence, the claim fails on the falsity element.

**2.    HeartBrand's Approval of Beeman's Sale of Cattle Was Not Necessary.**

Bear Ranch's point as to causation is that the facts do not support the required finding that HeartBrand's approval was necessary for Beeman to sell cattle to Bear Ranch.   HeartBrand responds by citing the testimony that Bear Ranch already noted—that Beeman and Fielding believed that Beeman's 2009 contract with HeartBrand required HeartBrand's approval before Beeman could sell later-acquired cattle to Bear Ranch.   Resp. 20.   But that contract is in evidence, DX117, and their view of it is legally wrong, as Bear Ranch has explained.

HeartBrand then argues that Beeman made an oral agreement in 2011 to give HeartBrand a right to approve his sale of the cattle he had just bought.   Resp. 21. While such an oral agreement could create a cognizable veto right, there is no evidence of such an agreement.   The witnesses testified only to a supposed approval right based on Beeman's pre-existing contract with HeartBrand.   5/23/14 Tr. at 12 ("[Bear Ranch] was under a fullblood contract, just like I was") (Beeman); *id.*

21

("Fielding had said [that] [s]ince we were both fullblood producers and it was in our contract, that we could sell to an approved producer that is approved by HeartBrand.") (Beeman); 5/27/14 Tr. at 51 (reviewing Beeman's 2009 contract and testifying that Beeman "could sell to another fullblood producers with HeartBrand's okay.").

Bear Ranch's point is simply that Beeman's 2009 contract was the alleged source of an approval right, but that the contract does not in fact make HeartBrand's approval necessary for Beeman's 2011 sale to Bear Ranch.   The jury was instructed that it could find liability only if HeartBrand's approval was necessary.   Dkt. #172 at 18.   So while HeartBrand now argues a causation theory based on the power of what HeartBrand "recommended" to Beeman, Resp. 20, that theory cannot support the verdict.   *See, e.g.*, *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 414 n.20 (5th Cir. 2009) (weighing sufficiency of evidence against the jury instructions, even if a different theory of the case might have been argued); *United States v. Porter*, 591 F.2d 1048, 1055 n.6 (5th Cir. 1979) (declining to consider a claim of pecuniary injury, as opposed to impairment of a government right, where "the case was not tried on that theory, and there were no jury instructions on such a theory").

**3.    Limitations on Exemplary Damages Will Be Addressed in Response to HeartBrand's Pending Motion for Entry of Judgment.**

Chapter 41 of the Texas Civil Practice and Remedies Code provides that exemplary damages may be awarded "only if damages other than nominal damages

are awarded," Tex. Civ. Prac. & Rem. Code § 41.004, and further limits exemplary damages to, as relevant here, the greater of either $200,000 or two times "economic damages," *id.* § 41.008, a defined term that means "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss," *id.* § 41.001(4). HeartBrand has now moved for entry of a judgment that includes exemplary damages on its fraud claim. Dkt. #193. Accordingly, Bear Ranch will further address these limitations on exemplary damages in response to HeartBrand's pending motion for entry of judgment.

Bear Ranch briefly notes, however, that HeartBrand's suggestion of waiver is meritless. Resp. 33-34. HeartBrand cites no authority requiring presentation of a limitation on exemplary damages via a pre-verdict motion for judgment as a matter of law. Those limitations are not entrusted to the jury, so it is unclear why Rule 50(a) would apply. *Cf.* Fed. R. Civ. P. 50(a)(1) (allowing claims that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" after the party "has been fully heard on an issue" during trial). Courts thus routinely consider exemplary-damages limitations raised in response to a post-verdict motion for entry of judgment or in a motion for remittitur.[4] Indeed, a defendant generally

---

[4] *See, e.g.*, Final J., *Vanderbilt Mortg. & Fin., Inc. v. Flores*, No. 09-cv-312, 2009 WL 767163 (S.D. Tex. Feb. 25, 2011) (ruling on motion for entry of judgment); Mem. Op. & Order, *Mullins v. TestAmerica, Inc.*, No. 3:02-cv-00106, 2006 WL 2167401 (N.D. Tex. Aug. 2, 2006) (ruling on motion for entry of judgment); Order, *Smith v. Lowe's Home Centers, Inc.*, No. 5:03-cv-01118, 2005 WL 1902544 (W.D. Tex. Mar. 30, 2005) (ruling on

will not know the amount of compensatory damages awarded—which triggers the limitations on exemplary damages—until after the jury returns its verdict.

HeartBrand also veers off course in intimating that Bear Ranch complains of charge error.   A defendant raising an exemplary-damages limitation is not making a Rule 51 objection to how the jury was charged; those limitations are not fact determinations entrusted to the jury.   The defendant is raising a statutory limitation on recovery based on the amount of compensatory damages awarded, if any. HeartBrand cites no authority for its suggestion of waiver.

### 4.    The Evidence Precludes Liability for Breach of Contract.

Nobody disputes that Bear Ranch has complied with all of the sale, use, and marketing restrictions in the contracts it was sued for breaching.   And nobody disputes that Bear Ranch collected the performance records and DNA required for the various registrations and enrollments contemplated.   HeartBrand's complaint is that Bear Ranch did not get all its data processed and dues paid, either before this lawsuit began on March 6, 2012, or after that date, when it was locked out of the reporting system.

### A.    The Defense of Waiver Applies to Post-Lawsuit Conduct.

As an initial matter, the defense of waiver applies to the complaint about post-lawsuit conduct.   HeartBrand locked Bear Ranch out of the registration system

---

motion for entry of judgment); Am. Mem. Op. & Order, *Poliner v. Tex. Health Sys.*, 239 F.R.D. 468, 477-78 (N.D. Tex. Oct. 2006) (ruling on motion for remittitur).

on the same day this lawsuit began.   5/27/14 Tr. at 173:3.   That is conduct manifestly inconsistent with a claimed right to receive performance.   You cannot lock someone out of the office and then complain that they are missing work. Indeed, there is no indication that the jury necessarily disagreed—it could well have found a breach occurring before that date, as the jury was not instructed on the defense of equitable estoppel, which applies to conduct in that pre-lawsuit period.

Likewise, although Bear Ranch submitted membership dues and registration fees on the cattle that are under contract, the undisputed evidence is that HeartBrand refused to cash the check.   HeartBrand argues that the payment was partial because it did not include cattle *not* bought under contract.   Resp. 38.   Of course, the Court has rejected the argument that the phrase "cattle purchased by this agreement" means cattle purchased in later sales also, and the Court has not decided whether the contract's reference to the AAA rules derivatively imposes duties as to later-acquired cattle.   Dkt. #91 at 13 & n.5.   For the reasons stated in Bear Ranch's motion for JMOL, it does not.

HeartBrand then adds nothing to debate by invoking the concept of "tender." That is a legal conclusion that allows a party who has tendered its performance to itself enforce a contract or recover damages for breach.   *See Krayem v. USRP (PAC) L.P.*, 194 S.W.3d 91, 94 (Tex. App.—Dallas 2006, pet. denied).   But the pertinent legal question here is not tender, but the defense of waiver—deliberate

25

conduct inconsistent with claiming a right.   Locking Bear Ranch out of the reporting system and refusing to accept any payment easily shows that conduct. The AAA could of course have accepted that performance and taken the position that more was required.   But it chose to institute a freeze-out on the day of the lawsuit, both as to data and payment.   That is the willful conduct of relevance.

HeartBrand's timing shows that its real objection was not partial performance, but rather the fact that Bear Ranch brought its claims in this lawsuit.   Hence, it took *two* subsequent letters from Bear Ranch asking HeartBrand for clarity on whether it would accept performance, PX268, 296, and HeartBrand responded by professing confusion about what it means to pay "under protest," i.e., with a concern about Bear Ranch's lawsuit.   PX297.   Yet even when that was answered—by reiterating the definition Bear Ranch gave on day one of this case, PX299—HeartBrand still would not cash the check or say whether it would accept performance, PX301, PX324.   As this deliberate freeze-out shows, HeartBrand was not interested in claiming a right to performance.   It was offended by and focused on the lawsuit.

**B.    The Defense of Equitable Estoppel Applies to Claims of Pre-Lawsuit Noncompliance, Much of Which Was Not Even Shown to Be Due During the Few Months at Issue.**

Given HeartBrand's intentional spurning of performance after March 6, 2012, the issue then becomes whether any breach liability arose before that date.   It did not.   The contract itself required registration and enrollment only when practical,

26

and HeartBrand is equitably estopped from arguing that DNA data should have been submitted in the narrow window it argues.   HeartBrand cannot tell Bear Ranch that it can collect and submit data on one schedule, and then sue once Bear Ranch has relied on those statements.

HeartBrand wrongly argues that the evidence shows that all of Bear Ranch's offspring were weaned by the fall of 2011.   Resp. 36.   At the cited transcript page, ranch hand Daniel Brandstadt was asked only whether Bear Ranch had a fall weaning, not whether that was the last weaning.   5/20/14 Tr. at 123.   There is no evidence that all cattle were weaned then, and they were not.   Brandstadt testified that, as of November 2011, he had not yet brought in all the offspring because it would have added a lot of stress to the cattle.   *Id.* at 107-08.   Thus, on the Bear Ranch inventory that Defendants introduced, the weaning date for several pages worth of offspring is not until January 2012.   DX79 at 72-83 (WWT column); *see* 5/20/14 Tr. at 103 (noting that data is recorded on the date of weaning).   Of course, Bear Ranch is not arguing on JMOL that the jury was compelled to consider individual entries on an inventory and conclude that they undermine HeartBrand's position.   The point is simply that this inventory is the only evidence of when all offspring were in fact weaned; without considering this, the jury simply had no evidence supporting the argument HeartBrand is now making.

Furthermore, there was no evidence that it was practical to compile and submit the required data in the few weeks before Bear Ranch was locked out of its account, and its payment declined. Brandstadt testified to the demanding work required on the ranch and the practical burdens of ranch management. 5/20/14 Tr. at 130 ("I have one employee helping me take care of nearly a thousand head of cattle."); *id.* at 101 ("there's just a lot involved"); *id.* at 92 ("we didn't have much help in line"). Again, although the jury did not have to credit Brandstadt's testimony, the point is that there was no other evidence about Bear Ranch's operations from which they could conclude that it was practical to register the cattle and submit data in the few weeks before HeartBrand instituted the freeze-out.

The jury thus had no basis for concluding that nonperformance before that date was a breach at all, much less one that would be outside the defense of equitable estoppel. Bear Ranch has already explained that three of the four alleged contract obligations required no more than performance at a "practical" time. The fourth obligation (registering DNA data) was tied to the date of weaning. But failure to perform at the exact time called for "is not a breach of contract," *Cadle Co. v. Castle*, 913 S.W.2d 627, 637 (Tex. App.—Dallas 1995, writ. denied). Moreover, even if it were, that breach would be excused by the defense of equitable estoppel, as just explained. Bear Ranch set its timing plans based on HeartBrand's statement that calves could be registered at any time and, specifically, after weaning. PX14.

That is what Bear Ranch adopted as its schedule.   5/20/14 Tr. at 105.   Yet it was then sued for that choice.

HeartBrand then argues, without citing any evidence, that estoppel does not apply to enrollment in the Whole Herd Reporting system because the question of whether an animal has been weaned has no bearing on a rancher's ability to participate in the system as to the animal's dam and sire.   Resp. 43.   But Brandstadt undisputedly reported Whole Herd Reporting inventory information on Bear Ranch's cattle in fall 2011.   *Id.* at 96-97.   The next such report would not be due for six months, by which time Bear Ranch had been locked out.   Furthermore, Brandstadt testified that the normal time for ranchers to send data is after weaning, when the offspring have all been brought in for data collection and compilation.   *Id.* at 103, 106.   That is what Bear Ranch planned to do, and that choice is protected here by the defense of equitable estoppel.

Lastly, HeartBrand renews its argument that enrollment of animals in the AAA's Whole Herd Reporting system was required for all cattle herds that Bear Ranch might come to own, not just the herd that it bought under contract.   That legal argument relies on HeartBrand's unspoken and unexplained assumption that a "herd" refers to all cattle Bear Ranch may come to own, not just the cattle purchased under the contract that actually imposes the enrollment duty.   But "herd" has no defined meaning in the AAA rules.   Indeed, even HeartBrand has in another context

29

referred to the Akaushi "herds," plural, of one owner (itself).   Complaint ¶12, *HeartBrand Beef, Inc. v. Lobel's of New York, LLC*, No. 6:08-cv-00062 (S.D. Tex. July 25, 2008) ("herds of purebred Akaushi cattle have been grown in the United States, all of which are owned and controlled by the Plaintiff").   The term's meaning in the context here must come from some source external to the AAA rules. And the natural source is the contract's own definition of which animals must be enrolled in the Whole Herd Reporting System—those purchased from HeartBrand. PX1 at 2 ("all offspring *produced by using any of the cattle purchased . . . by this agreement* will be . . . enrolled in their Whole Herd Reporting System").

Given that nobody was contemplating a later sale at the time of the 2010 contract, there is no way to conclude that the parties had a meeting of the minds about how other cattle would be treated.   What if Bear Ranch bought Akaushi cattle from Bruce Hemmingsen, Ken Kurosawatsu, or others?   Would those have to be enrolled?   What if Bear Ranch bought Akaushi semen from Australia sellers and used it to make half-Akaushi and half-Angus offspring?   If they would have to be enrolled if owned by Bear Ranch, could not those cattle simply be transferred to an affiliated company?   After all, those other cattle could be bought without a contract preventing their transfer.   The ease of avoiding any enrollment requirement for cattle not under a transfer restriction shows the fallacy and illogic of concluding that the 2010 contract required reporting and registration on any and all cattle that might

30

later be acquired, regardless of whether they are under restrictions.   Nothing in the text of the contract or the AAA rules states such a requirement, and there simply was no meeting of the minds on that point.   No breach liability can be found based on the unrestricted cattle later bought by Bear Ranch.

## CONCLUSION

For the reasons explained herein and in its prior filings, Bear Ranch respectfully requests that the Court direct the entry of judgment as a matter of law in its favor and award it all other just relief to which it may be entitled.

Dated:   July 31, 2014

Respectfully submitted,

/s/ R. Paul Yetter
R. Paul Yetter
Attorney-in-Charge
State Bar No. 22154200
Collin J. Cox
State Bar No. 24031977
J. Campbell Barker
State Bar No. 24049125
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
(713) 632-8000
(713) 632-8002 (Fax)

Andrew R. Seger
State Bar No. 24046815
THE SEGER FIRM, P.C.
P.O. Box 98433
Lubbock, Texas 79499
(806) 793-1906

Attorneys for Plaintiff Bear Ranch, LLC

**Certificate of Service**

I certify that on July 31, 2014, a copy of this document was served on all counsel of record using the Court's e-filing system.

/s/ J. Campbell Barker
J. Campbell Barker