IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| BEAR RANCH, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 6:12-cv-00014 |
| | § | |
| HEARTBRAND BEEF, INC., et al., | § | |
| | § | |
| Defendants. | § | |

**BEAR RANCH'S RESPONSE TO
DEFENDANTS' MOTION FOR ENTRY OF JUDGMENT**

## TABLE OF CONTENTS

Introduction ..................................................................................................4

Nature and Stage of the Case .......................................................................5

Argument and Authorities.............................................................................6

I.     HeartBrand Misconceives the Case's Posture.................................6

II.    Andrien's Opinion Cannot Support a Disgorgement Award. ........9

     A.     Overview of Andrien's Opinion...........................................10

     B.     HeartBrand's Own Tactics Undermine Andrien's Valuation. ............12

     C.     The Cattle Industry Does Not Value Cattle This Way.......................13

     D.     Nor Does Disgorgement Apply to Speculated Future Profits.............17

     E.     Andrien's Imagined Business Does Not Exist. ...................................22

     F.     Andrien's Cash-Flow Analysis Is Wildly Manipulated to Arrive at Profits. .......................................................................27

         (1)     Andrien's bull valuation ignores supply and demand. .............28

         (2)     An unproven start-up venture is more risky than established and diversified public companies.........................33

         (3)     Andrien's other assumptions are similarly results-oriented.........36

     G.     Andrien's Opinion Ignores Comparable Cattle. ................................37

     H.     Andrien's Valuation Methodology Is Internally Inconsistent. ..........39

     I.     The Problems with Andrien's Valuation Cannot Be Solved by Taking a Percentage of It. ......................................................39

     J.     HeartBrand Has Never Acted Like The Cattle Were Worth The Sums It Now Claims. ..........................................................40

III.    HeartBrand's Remedial Request Is Barred by the Statute of Frauds. ..........43

IV.    Exemplary Damages Are Limited by Texas Law. .......................................45

     A.     Exemplary Damages Require an Award of Actual Damages, Which Is Different than Disgorgement. ...............................45

     B.     Even Assuming Exemplary Damages Are Allowable Here, They Are Statutorily Limited to $200,000. .................................48

V.     Although the Contract Contemplates a Return Remedy in the Event of a
       Termination for Cause, It First Requires an Opportunity to Cure. ..............49

       A.     The Court Should Rule for Bear Ranch on Enrollment Duties
              and Allow the Required 30-Day Opportunity to Cure Once
              HeartBrand Begins Accepting Performance. .....................................50

       B.     If the Court Rules for HeartBrand on Enrollment Duties, Bear
              Ranch Is Prepared for an Appropriate Cattle Transfer. .....................52

              (1)    Any termination would require buying back Bear Ranch's
                     cattle, as HeartBrand has stated. .................................................52

              (2)    Bear Ranch is prepared to transfer the quantity of cattle
                     considered by the advisory jury for the cost it found. ..............53

              (3)    Compensation should be brought up to date to the time of
                     any repurchase, and HeartBrand must transport the cattle. .......53

              (4)    Rescission law is irrelevant..........................................................54

              (5)    HeartBrand cannot double-dip.......................................................54

VI.    Bear Ranch Will Respond on Attorney Fees and Litigation Expenses In
       Due Course, Following a Proper Motion. .....................................................55

VII.   Prejudgment Interest Is Not Recoverable Here. ...........................................56

Conclusion ..............................................................................................................57

Certificate of Service ..............................................................................................58

# INTRODUCTION

*And we're here to get back what was ours,*
*to get back what was taken from us.*

*[W]e're here because [they're our] cattle.*
*We need them back.*

*And Mr. Koch and Bear Ranch, too, will go*
*back to their lives, and all we're asking*
*is that it's not with [our] cattle.*

– HeartBrand's closing argument,
5/28/14 Tr. at 225-26, 279, 281

At trial, HeartBrand thought it could rescue its discredited valuation argument only by minimizing it, claiming to just want the cattle back.  Now, HeartBrand doesn't even ask to get cattle back on its fraud claim.  As its 180-degree pivot shows, even HeartBrand realizes that the millions of dollars it thinks it can get would be a once-in-a-lifetime windfall.  It would evidently make this the most expensive herd of cattle in history, and all based on speculated profits from a hypothetical new business, existing purely on paper.

If HeartBrand truly believes the cattle are worth more than Bear Ranch paid, why not stick to the story it told the jury and seek the cattle, so it can make the profits it alleges or just sell them for the huge sum it puts forth?   Or why not offer that Bear

4

Ranch sell off the cattle right now?   That would be a simple gauge of current value, and the profit HeartBrand imagines—if any—could be disgorged if unjust.

The answer is that HeartBrand knows the only "proof" supporting its alleged cattle valuation is sheer speculation.   As a valuation of a *business*, HeartBrand's approach fails.   And it is not how anyone in the industry values *cattle*.   The sort of speculative "proof" offered here is simply no proof at all; courts consistently reject awards built on such quicksand foundations.

## NATURE AND STAGE OF THE CASE

This case is now before the Court for a determination of appropriate remedies on the two counterclaims on which the jury assessed liability.   Bear Ranch assumes liability on those claims only for purposes of addressing remedies.   It preserves and does not waive the arguments in its pending motion for judgment as a matter of law. *See* Dkt. #180.

On HeartBrand's fraud claim, which concerns Beeman's 2011 sale of cattle ("Beeman Sale"), HeartBrand seeks disgorgement of Bear Ranch's alleged unjust enrichment from buying those cattle.   Mot. (Dkt. #193) at 3-5.   This Court explained that it will decide that equitable remedy after the upcoming hearing, and after Bear Ranch presents a full rebuttal case.   5/27/14 Tr. at 177:21-23 ("I'm better off making that determination [on the credibility of Andrien's opinion] after hearing his full testimony, after seeing if -- there's a lot of ifs for that to even matter");

5

5/27/14 Tr. at 187:20-23 ("the Court will have a separate hearing and the Court will allow as much time and as much testimony as Bear Ranch thinks is necessary on the unjust enrichment issue").   On its fraud claim, HeartBrand also seeks exemplary damages.   Mot. 7-9.

On its breach-of-contract claim, HeartBrand seeks an injunction compelling Bear Ranch to transfer cattle to HeartBrand in exchange for the amount assessed by the advisory jury for a fixed number of cattle.   Mot. 9-21.

The motion then discusses recovery of litigation expenses, although the parties agree that this issue will be briefed after entry of judgment.   *See* Fed. R. Civ. P. 54(d).   HeartBrand also seeks prejudgment interest, even though it recovered no damages and seeks only equitable relief.   5/27/14 Tr. at 410.

Bear Ranch intends to present rebuttal testimony and argument at the upcoming hearing, the basis of which is discussed in this response.

## ARGUMENT AND AUTHORITIES

### I.   HeartBrand Misconceives the Case's Posture.

HeartBrand wrongly portrays the nature of the jury's unjust-enrichment finding.   It argues that the Court is bound to use that figure, citing two Fifth Circuit cases holding that fact findings by a *non-advisory jury* are binding.   Mot. 5 & n.2. HeartBrand appears to have forgotten that, in arguing for the Court to admit its expert's unjust-enrichment opinion over Bear Ranch's argument about the equitable

nature of that remedy and the opportunity to develop a rebuttal, HeartBrand agreed that it was seeking "just an advisory" finding on the issue.   5/27/14 Tr. at 188:10 (HeartBrand counsel).   The Court confirmed that it was giving only "an advisory instruction" on unjust enrichment.   *Id.* at 410:18.

The Court's thinking was that the need to determine the amount of any unjust enrichment might never arise, and that, if it does, "the Court will have a separate hearing and the Court will allow as much time and as much testimony as Bear Ranch thinks is necessary."   *Id.* at 187:20-23; *accord id.* at 188:1-2 ("if they get an award based on the challenged testimony, I'll certainly consider everything you say after a full briefing").   After all, HeartBrand did not disclose its expert's opinion until well after the dispositive-motion deadline, and it relates to only an equitable remedy for the Court to decide.   So, even if the jury returned a figure, the Court explained, "it doesn't mean they're getting it."   *Id.* at 188:7-8.   Any finding would "just be a -- an advisory."   *Id.* at 188:9.

The federal rules provide that the finder of fact here is the Court.   Fed. R. Civ. P. 52(a) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially . . . .").   Indeed, the Court *may not* defer to the advisory jury's opinion, but rather must weigh all the evidence and make its own, independent findings.   *In re Incident Aboard D/B Ocean King*, 758 F.2d 1063, 1071 (5th Cir. 1985) ("When a district court sits with an advisory jury, the district court is

ultimately responsible for findings of fact."); *OCI Wyoming, L.P. v. PacifiCorp*, 479

F.3d 1199, 1206 (10th Cir. 2007) (remanding "with instructions that the district

court review the evidence previously presented and reach its own judgment, setting

forth sufficient findings of fact and conclusions of law pursuant to Rule 52(a)

without giving deference to the advisory jury's verdict").[1]

So the case now requires the Court to determine the appropriateness of

HeartBrand's requested remedy, as the Court has already said it intends to. *See*

5/22/14 Tr. at 41:6-8 ("[Court:] I wouldn't be bound by [the jury finding].   Like you

said, I wouldn't have to award anything if I don't think its warranted.").

HeartBrand acknowledges that framework only as a mere possibility, stating

that "to the extent" the Court "is inclined" to form its own view—as the law

requires—"the Court should adopt Andrien's calculation of $76.71 million."

---

[1] Deference would be particularly inappropriate here, for three reasons.   First, the jury did not hear the full rebuttal case that the Court expressly envisioned Bear Ranch presenting after trial.   5/27/14 Tr. at 187:19-23.   Second, it is unclear that lay juries are particularly well situated to decide questions about hypothetical market transactions, as opposed to questions of historical fact.   *Cf.* Fed. R. Evid. 702 (assigning judges a gatekeeping role on such opinion testimony); 5/27/14 Tr. at 421:17-19 (colloquy explaining that the instruction on Bear Ranch's reasonable costs would also be advisory: "[Bear Ranch:] We're not sure this is the sort of question that juries -- juries are particularly useful for. . . .   [Court:] You might be right.").   Third, the final word this jury heard on valuation included improper argument by HeartBrand.   5/28/14 Tr. at 277:22-24 (appealing to facts outside the record: "Does anybody think that this room is filled with these people because of $900,000?").   Bear Ranch and the jury had no way of knowing whom HeartBrand or its counsel brought to the courtroom, or interviewing attendees on whether the amount claimed by both sides until the month of trial—around a million dollars—was somehow not worth their time.

Mot. 6.   HeartBrand thus puts all of its eggs in Andrien's basket.   Bear Ranch accordingly explains below why his opinion is wholly speculative and unreliable.

## II.    Andrien's Opinion Cannot Support a Disgorgement Award.

Andrien's opinion about unjust enrichment is not credible.   It rests entirely on projecting profits from a hypothetical new business supposedly selling hundreds of Akaushi bulls, year after year into eternity, for astronomical prices.   Andrien draws on no experience in the cattle industry, but rather only the say-so of HeartBrand's self-interested employees and owners.   A retired Texas A&M professor and 40-year veteran of this industry, Dr. Jim McGrann, explains that nobody in the industry values a herd of cattle this way—by equating cattle to the supposed present value of a hypothetical enterprise, of which cattle would be just one input.   McGrann Decl. (Exh. 1) at 5-6.   People in the industry always rely on market comparables to value cattle.   *Id.*

Yet Andrien's *enterprise* valuation fails even on its own terms.   As might be expected from someone unacquainted with the livestock industry, Andrien's Excel formulas may match up, but his assumptions are so bad that the result is absurd.   *Id.* at 5-7.   Even bringing just two assumptions back to reality removes over 95% of the alleged "herd value," and all of the alleged enrichment.   *Id.*   In other words: garbage in, garbage out.

HeartBrand's strategy here is to cram a wish list of profits over the next 50-plus years into the value today of a mere herd of cattle, to effectively force the sale of that fantasy company in the guise of a disgorgement remedy.   Yet its own actions show that HeartBrand cannot believe someone would pay millions of dollars more for the cattle sold here, a breed for which there is limited demand and whose genetics were sold widely by HeartBrand's own predecessor and others. HeartBrand thus hurries away from inviting this Court's independent review of the value of the cattle, and it does not even ask for the cattle back.   HeartBrand simply hopes for a windfall.

### A.    Overview of Andrien's Opinion

HeartBrand's claim that Bear Ranch has over $77 million of enrichment to disgorge is not based on any actual profit made by Bear Ranch.   In fact, it is undisputed that Bear Ranch's cattle business has never made a profit.   It has run at a loss each year, far short of hopeful internal projections.   5/22/14 Tr. at 137:9-11 (optimistic forecasts); 144:23-145:17 (but no profits); Bayley Decl. (Exh. 2) at 6 (laying out yearly losses).   And HeartBrand too has not booked a profit, except in the year 2010, when it sold cattle to Bear Ranch.   Cons. Fin. Stmts. (Exh. 3) at 2, 4, 6, 9 (financial statements for 2009–2013).   These two large owners of Akaushi cattle each lack the profits Andrien identifies.

Rather than focusing on any actual profits to be disgorged, HeartBrand's request is based on speculated future profits that someone is supposed to be able to make.  HeartBrand would have the Court conclude that (1) the law allows it to trace from an allegedly unjust transaction not just to future profits but to *assets* produced, regardless of whether they ever result in profit, (2) that HeartBrand has an equitable claim on the alleged value of all those new assets without any equitable apportionment for the effort creating them, and (3) that a buyer would value those cattle, not based on market-comparable herd sales, but by modeling speculative future profits from an imaginary new enterprise into which the cattle would be a mere input.   Suppl. Rpt. (Exh. 4) at 26-27 & Att. V; 5/27/14 Tr. at 267-01.

With those leaps assumed away, Andrien then sets about modeling profits from a new enterprise that does not exist anywhere today; Andrien cites no company with a track record of selling hundreds of bulls for $50,000 each, year after year. Suppl. Rpt. (Exh. 4) Att. V at 7.   The profits he imagines someone earning into perpetuity are then discounted to present value—a business-valuation method that is "extremely sensitive to changes in the input variables."   Shannon Pratt, *Valuing a Business* 224 (5th ed. 2008).   And nearly every assumption that Andrien uses to confect that imaginary business is based on the say-so of HeartBrand's own employees or owners, if explained at all.   Suppl. Rpt. (Exh. 4) Att. V at 2-4; Bayley Decl. (Exh. 2) at 4.   Andrien does not consider sales data on herds of other beef

cattle.   He categorically rejects the idea that a rancher would ever consider other breeds as an alternative constraining demand, though he consulted with no ranchers outside HeartBrand and has no livestock experience himself.   And even just staying within the Akaushi breed, Andrien says there is no constraining effect from any cattle outside of HeartBrand's control, whether cattle owned by Bear Ranch itself or the numerous parent-verified Akaushi cattle registered with other breed associations.   Suppl. Rpt. (Exh. 4) at 23-26.

Andrien concludes that Bear Ranch presently has around 1,780 Akaushi cattle assignable in some way to its purchase from Beeman, and that Bear Ranch is "enriched" by the market value of those cattle less Andrien's view of the costs to produce them.   Suppl. Rpt. (Exh. 4) at 27-28, Att. III at 1.   Andrien then treats all of that alleged "enrichment" as assignable to buying 514 cattle from Beeman three years ago (paying the full $2.5 million purchase price), with none of the alleged enrichment due to Bear Ranch's own land, labor, and commitment.   *Id.*

### B.    HeartBrand's Own Tactics Undermine Andrien's Valuation.

The strongest evidence that neither Andrien nor the witnesses feeding him his assumptions took care in their work is that HeartBrand no longer asks for the cattle back; it now argues that the Court should give no thought to value, and just award it the $23.2 million found by the advisory jury.   Mot. 3-6.   That is only 30% of the

alleged $76.7 million enrichment calculated by Andrien.[2]   If HeartBrand had any belief in Andrien's methodology, it would seek possession of the cattle.   It could then sell them for the $76.7 million it argues someone would be willing to pay right now, or just keep them and make the profits it imagines.

The advisory jury saw at least some of the problem with HeartBrand's approach, yet HeartBrand embraces that finding.   Why be content with an alleged $54 million cut in valuation unless HeartBrand knows its approach is unmoored from reality?   Indeed, why not offer that Bear Ranch can auction the cattle right now, and then turn over any profit found to be unjust—if any profit is made at all? That would at least be a neutral gauge of value.   It takes no Solomonic wisdom to see the answer.   Having perceived no real chance of proving its valuation at trial, HeartBrand said it was just fighting to get the cattle back.   *See supra* page 4; *see also, e.g.*, 5/27/14 Tr. at 305:24 ("HeartBrand would very much like to get these cattle back").   Yet HeartBrand no longer wants the cattle "very much" or evidently at all, because it thinks it has hit a jackpot.

## C.   The Cattle Industry Does Not Value Cattle This Way.

HeartBrand cites no evidence that industry participants value a herd of *cattle* by modeling a new business lasting into perpetuity and then computing a discounted

---

[2] It appears that the jury succumbed to the fallacy of the false compromise—the reasoning that compromising from an unreasonable extreme yields a reasonable outcome. *See* Bo Bennett, *Logically Fallacious: Argument to Moderation*, www.logicallyfallacious. com/index.php/logical-fallacies/57-argument-to-moderation.

cash flow on those forever profits.   A retired Texas A&M professor and veteran of the cattle industry, Dr. Jim McGrann, says that he has "never" seen cattle valued this way.   McGrann Decl. (Exh. 1) at 5-6.

HeartBrand's only answer is to argue that a valuation takes into account "the highest and best use to which participants in the market would put those assets." Dkt. #192 at 27 n.45 (JMOL Resp.) (citing its own expert).   But fair market value does not ask about the theoretical "highest price" based on speculated contingencies, but rather "the most probable price."   Pratt, *Valuing a Business*, at 43.   And that makes eminent sense.   The entire idea of the valuation Andrien performs is that Bear Ranch could sell the cattle today for the price Andrien imagines.   So that valuation obviously looks to what price Bear Ranch would most likely get (assuming any buyer could be found at all).   *See, e.g.*, *Olson v. United States*, 292 U.S. 246, 258 (1934) ("Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.").

Dr. McGrann explains that he has never seen a herd of cattle valued in the manner proposed by Andrien, rather than market comparables.   McGrann Decl.

(Exh. 1) at 5-6; *see Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 836 (7th Cir. 1985) ("Drawing on the test of self-interest (will people back up their views with cash?), market prices tend toward the value that the most astute investors place on the assets. Thus the strong preference of courts and the SEC for market-based values rather than ones manufactured by 'experts.'").   To use an analogy, one values a car according to market sales of similar cars, not by modeling a hypothetical taxi service started using the car.   Likewise here.

Indeed, the discounted-cash-flow method, when used at all, is typically used to value a *business*,[3] and the business that Andrien conjures up has many more parts than just the starter cattle.   It apparently involves:

- employing numerous ranch hands and managers for hundreds and then thousands of cattle, including helping the cattle birth; ensuring pasture assignments appropriate to grass levels; bringing the cattle in from the fields for weaning of offspring and receiving vaccines; tending to the needs of cattle in the field; handling unexpected changes in weather, cattle health, and food and water supplies; and facilitating transportation of cattle to feed yards;

- making breeding assignments supposedly producing hundreds of seedstock bulls consistently fetching huge prices, from a foundation set of just 14 bulls, *see* DX79 at 27-48 (showing most bulls are brothers);[4]

---

[3] *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 233 (3d Cir. 2000) (noting various methods for a "business enterprise valuation," including discounted cash flow); *In the Matter of Genesis Health Ventures, Inc.*, 266 B.R. 591, 613 (D. Del. Bankr. 2001) (noting the use of the discounted cash flow method as one method to support value of an enterprise); *Steiner Corp. v. Benninghoff*, 5 F. Supp. 2d 1117, 1130 (D. Nev. 1998) (explaining use of DCF method to assess "the current value of a company").

- providing marketing of this hypothetical owner's start-up business to differentiate it from thousands of others touting the superiority of their seedstock bulls, to do this in the first year of operation, and to hold that market position into perpetuity;

- arranging for grazing land for an ever-growing herd of thousands of head of cattle, again into perpetuity;

- employing the back-office staff to track finances, pay personnel, and do all the other administrative tasks required to make the business run.

Even more may be involved—Andrien doesn't tell us.   But Andrien does not even purport to account for many of these features.   Suppl. Rpt. (Exh. 4) Att. V at 7.[5]

The initial cattle to start that hypothetical business are merely one part of a much bigger imagined operation, and Andrien provides no support for assigning all of that entity's alleged profits to the starter cattle.   Why not to the initial ranch land? Why not to the genius behind the marketing campaign?   Why not to the trademarks

---

[4] Rather than using just the 14 bulls from the Beeman Sale, Andrien's imagined business also includes 30 more bulls bought from Twinwood with no fraud (as confirmed by the jury), thus wrongly assigning unjustness where none exists.   Andrien then computes an alleged business value and only then assigns part of that alleged "herd" value to the Beeman Sale.   Suppl. Rpt. (Exh. 4) Att. V at 1.

[5] Nor can HeartBrand claim that there is some unjust enrichment by the hypothetical owner of this Akaushi business marketing them as their breed name of "Akaushi" (Bear Ranch cannot by contract do so).   HeartBrand admits that it cannot get a trademark on that name—having tried unsuccessfully to do so—because it is simply a generic term describing the breed.   5/21/14 Tr. at 21:22-22:19.   As one would expect, then, other Akaushi owners market their cattle as Akaushi.   E.g., PX288 at 3 (Six Buck Ranch); Henschel Depo. Tr. 17:21-18:4 (describing website); Exh. 21 at 4 (Chisholm Cattle Co. website); Exh. 22 (V-Bar-V marketing); Wallace Depo. Tr. 66:8-15 (describing V-Bar-V marketing).   Indeed, even producers under a contract with HeartBrand are evidently using the "Akaushi" breed name in marketing.   Exh. 23 at 5 ¶XVI (Dove Creek Ranch contract); Exh. 24 (Dove Creek advertising Akaushi beef); Exh. 25 at 5 ¶XVI (Brown Ranch contract); Exh. 26 (Brown Ranch advertising Akaushi cattle).

protecting the new business's supposed market differentiation?   Just as a group of cars is not a taxi service, a group of cattle is not a seedstock business.   Andrien is valuing the wrong thing.

### D.    Nor Does Disgorgement Apply to Speculated Future Profits.

In general (and putting aside statute-of-frauds limitations), a tort plaintiff may pursue equitable remedies focused on avoiding unjust enrichment, such as recovery of assets wrongfully obtained or disgorgement of profits made using those assets. But HeartBrand cites no case allowing the award it seeks here, "disgorgement" of speculated future profits not earned by anyone.

In general, several equitable remedies may be pursued, although the appropriateness of a given remedy is of course determined on a case-by-case basis. First, a tort plaintiff can generally seek the value of benefits received less any amount paid.   Restatement (First) of Restitution §§ 157, 158.   Second, a plaintiff may pursue a return of assets.   Restatement (Second) of Torts § 951 (order to transfer chattels); Restatement (First) of Restitution § 169 (discussing use of constructive trusts to account for profits and compel asset transfers); *id.* at § 158 (requiring compensation for benefits conferred when getting property back).   Third, a plaintiff can pursue disgorgement of profits attributable to the underlying wrong, as opposed to the defendant's own capital and industry.   Restatement (Third) of Restitution and Unjust Enrichment § 51(4).

HeartBrand seeks none of these.   It does not try to value the 514 cattle as of the date they were purchased in June 2011.   It does not seek a return of any cattle.[6] And it does not seek the disgorgement of any profits earned.   (In fact, no profits have been earned.   5/22/14 Tr. at 144:23-145:17.)

Instead, HeartBrand seeks a "disgorgement" award derived from the supposed current market value of a large group of cattle, comprising both the surviving purchased cattle and many more inferred offspring.   Mot. 3 (seeking disgorgement of "a gain"); Mot. 5-6 (valuing that gain by the alleged "fair market value" of the cattle); Suppl. Rpt. (Exh. 4) Att. IV at 1 (listing the group of cattle assigned to the Beeman Sale).

But HeartBrand supports that formulation of a proper "disgorgement" award only by mixing and matching language from the Restatement it cites.   Mot. 4.   In cutting that new equitable remedy from whole cloth, HeartBrand obscures the Restatement's focus on both *profit* and *apportionment* when considering disgorgement of gains made using wrongfully obtained assets.

Specifically, HeartBrand cites § 49 of the Restatement (Third) of Restitution and Unjust Enrichment ("Restatement") to argue for an award measured by the current market value of all assets stemming even in part from the Beeman Sale.

---

[6] Because HeartBrand does not even ask for a return of cattle, Bear Ranch has not presented its argument and testimony that the return price assigned by the advisory jury is abysmally low for the number of cattle it was asked to consider.

Mot. 4 (calling this "the increase in the defendant's assets resulting from the fraudulent transaction").   But the provision HeartBrand invokes deals only with valuing the benefits obtained by a wrong, not consequential gains derived from those benefits.   Restatement § 49(2) ("Enrichment from a money payment is measured by the amount of the payment or the resulting increase in the defendant's net assets, *whichever is less*.") (emph. added) (dealing with cases where the money paid may not increase a defendant's net assets because of offsetting obligations).

In fact, subsection (4) of that same section explains that, when trying to measure a wrongful gain, the standard is *profit* (in contrast to assets).   Restatement § 49(4) ("When restitution is intended to strip the defendant of a wrongful gain, the standard of liability is not the value of the benefit conferred but the amount of the ***profit*** wrongfully obtained.   Unjust enrichment in such cases is measured by the rules of § 51(4)-(5).") (emph. added).   And the cited § 51 explains that such a disgorgement remedy deals only with profit *attributable* to the wrong:

> [Unless seeking only the value of the thing obtained,] the unjust enrichment of a conscious wrongdoer . . . is the net profit ***attributable*** to the underlying wrong.   The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty.   Restitution remedies that pursue this object are often called "disgorgement" or "accounting."

Restatement § 51(4) (emph. added).   Section 51(5) then sets out apportionment principles.   *See also* Daniel Friedmann, *Restitution for Wrongs: The Measure of Recovery*, 79 Tex. L. Rev. 1879 (2001) (explaining apportionment considerations).

19

HeartBrand cites no authority ignoring those hallmark characteristics of the remedy it seeks.   One cannot "disgorge" market value, which is merely a construct predicting future income.   If alleged enrichment from market value is to be avoided, it is by enjoining any such sale or imposing a constructive trust.   Indeed, telling a defendant to disgorge the "market value" of an asset less the costs of producing and selling it would in many cases effectively compel a sale of that asset, simply to earn the money that must be disgorged.   But if that is required, then the sale should actually occur so the court can look to actual profits rather than speculation.

The case HeartBrand cites (Mot. 4) deals with "disgorgement of profits" from the use of assets, not disgorgement of market value.   *Robertson v. ADJ P'ship, Ltd.*, 204 S.W.3d 484, 495 (Tex. App.—Beaumont 2006, pet. denied) (affirming disgorgement of royalties actually paid to the defendant, in addition to an award of actual damages); *cf. Green Garden Packaging Co., Inc. v. Schoenmann Produce Co., Inc.*, 2010 WL 4395448 (Tex. App.—Houston [1st Dist.] Nov. 4, 2010, no pet.) (affirming judgment denying disgorgement: "[Green Garden] argues that it is entitled to seek the disgorgement of Schoenmann's profits as a remedy for Schoenmann's alleged fraud.   However, as Green Garden admits, the record contains no evidence of Schoenmann's profits.").

Indeed, Bear Ranch could not lawfully make the profits Andrien calculates even if his numbers bore some semblance to reality.   Many of Bear Ranch's cattle

are at a feed yard where, by regulation, they can be removed only for slaughter, not for the breeding use Andrien imagines.   Gill Decl. (Exh. 6) at 1.

Moreover, even if disgorgement could be based, not on profits, but on the alleged market value of derived assets, the law would require that this "enrichment" be attributable to the wrong.   Restatement § 51(4) (so requiring of profits).   To use a stylized example, if Leonardo da Vinci stole paints and canvas from an art store and painted the Mona Lisa, the store owner would have no claim to the value of the painting, without allowance for the value of Leonardo's labor, skill, and reputation.

This is not a question of accounting for the capital sunk by Bear Ranch into the cattle, although even Andrien's computation of those costs is much lower than reality and the jury's own advisory finding on reasonable costs.[7]   The question is whether, given that "the net profit in question has been realized [or, here, would allegedly be realized at some point] in part as a result of the wrong to the claimant and in part from the defendant's legitimate activities," what part of the net "profit" is equitably attributable to the wrong as opposed to legitimate activities?   Restatement § 51 cmt. g.   HeartBrand gives no attention to that issue, despite the fact that Bear Ranch has dedicated its land, capital, and skill to improving the condition of the cattle; that full-blood Akaushi are available from sellers other than HeartBrand, *see*

---

[7] *See, e.g.*, Dkt. #172 at 25 (advisory jury's $8.0 million); Suppl. Rpt. (Exh. 4) Att. V at 1 (Andrien's $6.3 million for those groups of cattle).

*infra* Part II(G); and that the asset acquired in the first place was a herd of cattle, not the complex operating business from which Andrien imagines profits.

### E.     Andrien's Imagined Business Does Not Exist.

Even assuming that a market-value calculation is relevant, and that this value would be determined in the marketplace by projecting profits into eternity from using the cattle to become yet another seedstock producer promoting its breed, nothing supports Andrien's application of that supposed valuation method.  His imagined business is fantasy.

HeartBrand offers no evidence that any business selling hundreds of bulls a year for breeding purposes exists in the marketplace today, let alone that it gets average per-head prices above even the amount Bear Ranch paid, much less the astronomical amounts surmised by Andrien.   Absent such evidence, Texas law does not permit a conclusion on future profits:

> Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered.   Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.

*Burkhart Grob Luft und Raumfahrt GmbH & Co. KG v. E-Sys., Inc.*, 257 F.3d 461, 467 (5th Cir. 2001) (quoting *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994)) (discussing lost-profits award); *accord Carbo*

*Ceramics, Inc. v. Keefe*, 166 Fed. App'x 714, 724 (5th Cir. 2006).  Both parties' own poor performance despite earlier projections shows how speculative Andrien's profits are.  *See* Bayley Decl. (Exh. 2) at 6 (showing parties' consistently booked losses in respective lines of business); *Sportsband Network Recovery Fund, Inc. v. PGA Tour, Inc.*, 136 F.3d 1329, at *11 (5th Cir. 1998) ("the speculative nature of SportsBand's figures is evidenced by the fact that SportsBand generated a cumulative loss of almost $3 million, in sharp contrast to its projected $4 million in future profits).

Where no history of relevant past profits exists, a claimant must produce "some other objective data, such as future contracts, from which lost profits can be calculated with reasonable certainty." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 505 (Tex. 2001).   And where there are not past profits because the venture is a new and unproven enterprise, the law simply does not allow a finding of future profitability.  *Tex. Instruments*, 877 S.W.2d at 279.   "The mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits." *Id.* at 280.  And the same standard applies when seeking the lost value of a business enterprise.  *See M&A Tech., Inc. v. iValue Group, Inc.*, 295 S.W.3d 356, 365 (Tex. App.—El Paso 2009, pet. denied).

No objective data supports Andrien's alleged future profits; he has not identified any business that operates according to his model.   The profits

hypothesized come almost exclusively from the sale of hundreds of breeding bulls for $50,000 each, year after year, but Andrien has not—and cannot—point to any existing business with those sales at those prices.   Suppl. Rpt. (Exh. 4) Att. V at 7. In the absence of any such business, there is of course no evidence of profits from such a business.   Even worse, there is evidence that HeartBrand, which could pursue Andrien's model, has had losses year after year.   Cons. Fin. Stmts. (Exh. 3) at 4, 6, 9 (financials for 2011–2013).

HeartBrand simply fails to satisfy the requirements of Texas law.   It argues a valuation based entirely on speculated future profits, but fails to show any historical profits from such a business.   Neither does it produce "some other objective data, such as future contracts," from which the supposed profits can be calculated "with reasonable certainty."   *Helena Chem.*, 47 S.W.3d at 505.

Instead, Andrien relies on the statements made by HeartBrand owner and chairman Ronald Beeman, HeartBrand owner and chief executive officer William Fielding, HeartBrand owner and past-president Antonio Calles, and HeartBrand employees Bubba Bain and JoJo Corrales.   Suppl. Rpt. (Exh. 4) Att. V at 2-4. Those self-interested statements are speculation—not testimony about an actual pattern of sales—and are not the "competent evidence" required by Texas law to establish future profits with reasonable certainty.   *See, e.g.*, *Burkhart*, 257 F.3d at 467-69; *Tex. Instruments*, 877 S.W.2d at 280-81; *Szczepanik v. First S. Trust Co.*,

883 S.W.2d 648, 650 (Tex. 1994) (rejecting a claim of lost profits of $250,000 to $500,000 per year, holding it legally insufficient because "this evidence, elicited from the testimony of FST's secretary and treasurer, is pure speculation" and "is purely speculative and conclusory").

Indeed, both cattle-industry-veteran Dr. McGrann and certified-business-valuation-expert Scott Bayley explain that nobody would opine on even *enterprise* valuation based on just the say-so of its owners and employees.   McGrann Decl. (Exh. 1) at 9-10; Bayley Decl. (Exh. 2) at 6.   HeartBrand's *ipse dixit* is the bedrock of Andrien's modeling, as shown by this chart of his assumptions:

| | | |
|---|---|---|
| Percentage of Live Calves Produced | 90% | Based on conversations with Bill Fielding. |
| Cow Replacement | 10% | Based on conversations with Ronald Beeman. |
| Bull Replacement | 10% | Based on conversations with Ronald Beeman. |
| Heifers Retained for Breeding | 60% | Based on conversations with Bubba Bain, Bill Fielding and Ronald Beeman. |
| Bulls Retained for Breeding | 40% | Based on conversations with Bubba Bain, Bill Fielding and Ronald Beeman. |
| Revenue per Prime carcass | $ 3,159 | Verified by Ronald Beeman and Bill Fielding … based on their experience. |
| Revenue per Prime carcass | $ 2,202 | Verified by Ronald Beeman and Bill Fielding … based on their experience. |
| Feedlot and Slaughter Cost per Head | $ 1,165 | Verified by Ronald Beeman and Bill Fielding … based on their experience. |
| Maintenance Cost for Cow and Calf Until Weaning | $ 700 | Based on conversations with Ronald Beeman, Bill Fielding and Jojo Carrales. |
| Full Blood Prime Percentage | 80% | Ronald Beeman and Bill Fielding have both stated that in their experience…. |
| Full Blood Choice Percentage | 20% | Ronald Beeman and Bill Fielding have both stated that in their experience…. |
| Sales Price for Full Blood Bull | $50,000 | Based on testimony of Dr. Antonio Calles. |
| Sales Price for Full Blood Cow | $35,000 | Based on testimony of Dr. Antonio Calles. |
| Cost to Raise 1,100 lb Breeding Cow | $1,430 | Based on conversations with Bill Fielding and Ronald Beeman. |
| Cost to Raise 1,350 lb Breeding Bull | $1,670 | Based on conversations with Bill Fielding and Ronald Beeman. |
| Annual Maintenance Cost Per Animal | $350 | Based on conversations with Bill Fielding and Ronald Beeman. |
| Inflation | 3% | Unsupported. |
| Long-term growth rate | 5% | Unsupported. |
| Risk Adjusted Discount Rate | 12.4% | Unsupported.  Guideline companies are not comparable. |

Bayley Decl. (Exh. 2) at 4.

Yet objective data exists.   HeartBrand surely can access grade sheets for its own carcasses, showing the percentage of its carcasses grading Prime using at least

its own growing practices.   Its inventory would show the percentage of pregnancies that produced a calf and, more importantly, the percentage of calves that survive past weaning.   And there have in fact been sales of full-blood Akaushi bulls unburdened by sale or use restrictions, such as Bear Ranch's own purchases from Twinwood (at $3,500 for most of those bulls and $7,000 for a few), *see* Suppl. Rpt. (Exh. 4) Att. V at 8, as well as sales of breeding herds of other breeds.

Andrien's opinion rests on no objective data or results.   Nor did he rely on his own industry experience; he has none.   The assumptions on which he builds his model simply "rest on [HeartBrand's] say-so" and "represent hopes" rather than results.   *See Zenith Elec. Corp. v. WH-TV Broad Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (rejecting such an approach: "[r]eliable inferences depend on more").   A party's internal projections and wishes are not the basis of a proper valuation opinion.   *E.g.*, *Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 822-23 (Tex. App.—Hous. [14th Dist.] 2006, pet. denied) (rejecting claim that expert's calculations are conservative because they fall within other party's internal projections, explaining that "[c]ompanies are free to create speculative, optimistic, and conjectural projections and to rely upon them in making business decisions" but that party hopes are not evidence showing non-speculative future profits).[8]

---

[8]  *Accord, e.g.*, *Zenith,* 395 F.3d at 419-20 (rejecting reliance on such speculation); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F.Supp.2d 870, 887-88 (E.D. Wis.) (excluding expert testimony as unreliable where the underlying internal data on which the expert

**F.     Andrien's Cash-Flow Analysis Is Wildly Manipulated to Arrive at Profits.**

Andrien's own common sense should have stopped him from proceeding on such obviously unrealistic assumptions as he was fed here.   But Bear Ranch now provides something more: the knowledge of cattle-industry veteran, Dr. Jim McGrann.   Dr. McGrann is an agricultural economist who spent his entire career assessing the production and finances of ranching operations.   McGrann Decl. (Exh. 1) at 1-3.   He spent 32 years as a member of the Texas A&M faculty, culminating in his induction into the Department of Agricultural Economics' Honor Registry, the highest department-level honor for a former student.   *Id.*   He also served as a specialist in the Texas A&M AgriLife Extension Service, providing research-based education and analysis of ranch operations across Texas.   *Id.*   Dr. McGrann explains that "[i]n all my life, I have never seen such a distorted view of a niche cattle operation projection."   *Id.* at 4.

Dr. McGrann notes that "almost all of Mr. Andrien's underlying assumptions are aggressive, [and] the assumed average price per breeding bull of $50,000 and discount rate of 12% are indefensible."   *Id.* at 7.   And he explains that "there is an

---

relied were "anything more than a hopeful projection, a far cry from being 'reliable sources of information' that an expert can rely on in forming an opinion"); *Victory Records, Inc. v. Virgin Records Am., Inc.*, 2011 WL 382743, at *2 (N.D. Ill. 2011) ("opinion testimony regarding damages founded on a party's internal projections . . . may not be delivered by a witness with a gloss of expertise under Rule 702").   Bear Ranch is not waiving its argument on admissibility, which it incorporates herein to the extent necessary.

extremely high risk of failure" for niche beef market start-ups, making Andrien's mere 12.4% discount rate half a more realistic 25%.   *Id.* at 6, 9 (also explaining that nobody models operations like these going into perpetuity).   Those assumptions have a huge effect on Andrien's calculations.   *See* Pratt, *Valuing a Business*, at 224 (5th ed. 2008) ("[The DCF] methods are extremely sensitive to changes in the input variables—that is, the projected cash flows and the discount rate.").

Indeed, even dialing back to reality just two of Andrien's assumptions—bull price and discount rate—removes over 90% of the alleged herd value, and removes all of the alleged unjust enrichment.   McGrann Decl. (Exh. 1) at 8-9.   A valuation based on such unrealistic inputs and fickle modeling is no reliable valuation at all. *See, e.g.*, *Peltz v. Hatten*, 279 B.R. 710, 741-42 (D. Del. 2002) (holding that "DCF studies that are done after-the-fact and for the purpose of proving a point in an adversarial proceeding are too subjective and too subject to manipulation, and are not particularly probative," and thus "find[ing] most probative the values that the market placed on comparable acquisitions"); Pratt, *Valuing a Business*, at 176 ("Without supportable projections, the discounted economic income method can convey an aura of precision that is not justified.").

### (1)   Andrien's bull valuation ignores supply and demand.

Andrien imagines an operation that continually grows its breeding herd, slaughters female cattle for meat, and sells hundreds of bulls to unknown buyers for

$50,000 per bull, year after year.   Suppl. Rpt. (Exh. 4) Att. V at 7.   This is make-believe.   No company has such a track record.   HeartBrand itself has not booked the millions in profits it claims can be made.   Indeed, its books show no profit in the past five years except for the year Bear Ranch bought cattle from it. *See supra* page 10.   Nor is Bear Ranch running such an operation.   Bayley Decl. (Exh. 2) at 6 (showing Bear Ranch and HeartBrand historical losses).   Bear Ranch has thus found the beef market much less hospitable than projected.

By far the biggest driver of Andrien's valuation result is his assumption that the hundreds of Akaushi bulls—the only gender sold under his model—would bring an average price of $50,000 each.   Suppl. Rpt. (Exh. 4) Att. V at 3; Andrien Depo. (Exh. 5) at 167:9-24.   Andrien has seen no evidence that HeartBrand ever sold a bull for that much.   In fact, just before this lawsuit, HeartBrand offered to buy unrestricted Akaushi bulls "showing satisfactory fertility" from a Louisiana rancher for one-tenth that price, at $5,000 a piece.   PX249 at 4; *see* Calles Depo. (Exh. 7) at 306-07 (explaining that Broussard purchased the bulls from HeartBrand free from restrictions).   HeartBrand likewise required someone leasing its bulls to take out life insurance on the bulls payable to HeartBrand for $5,000 each.   PX341 at 4 ¶XII.

The highest Akaushi bull price Andrien has ever seen is $10,000, paid by purchasers like Bear Ranch who were told they were buying from the only source. Andrien Depo. (Exh. 5) at 92 (highest price); *e.g.*, PX113 (Farr contract:

"HEARTBRAND is the sole owner of Akaushi Full-Blood cattle outside of Japan"). HeartBrand itself says that it sells its bulls with restrictions for "a good market price that people will pay" of "normally between about five to 7,000."  5/27/14 Tr. at 113:5-10.  HeartBrand's former president explains that they did not price the bulls any higher because they understood the market would not bear it.  Calles Depo. (Exh. 7) at 253:8-12 ("anything above $5,000 would have been very difficult to -- to sustain because the general perception of the cattle industry has some very -- lower values than that when they market genetics of different breeds, different kinds"). Put simply, even HeartBrand understands that while people might be willing to pay $5,000 to $7,000 and agree not to do some things with the bulls, that does not mean people are willing to pay multiples more to buy without those restrictions, instead of just shifting to another seller or breed.

HeartBrand simply has no evidence of any company selling hundreds of bulls, of any breed, for $50,000 each or even more than the $8,500 that Bear Ranch paid to Beeman.   No data supports Andrien's statement that this price is "common," much less "conservative."  Suppl. Rpt. (Exh. 4) Att. V at 3.   Those statements are utter speculation, based only on Andrien's say-so.  *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data

only by the *ipse dixit* of the expert.").   And Dr. McGrann confirms that the average

bull price in Andrien's model is "unheard of."   McGrann Decl. (Exh. 1) at 7.

Indeed, Andrien apparently did no research on average sale prices of breeding

bulls across hundreds of bulls.   He just cherry picked a few extreme outliers as a

supposed "sanity check."   5/27/14 Tr. at 273:10; *see* Suppl. Rpt. (Exh. 4) at 26 n.39.

One wonders how he could find those numbers without even running across average

sale prices.   This sort of "sanity check" shows only the insanity of HeartBrand's

approach.   It is like arguing that every 50-pack of baseball cards is worth millions of

dollars because a Honus Wagner card once sold for over $2 million and several

others have sold for hundreds of thousands.   It looks only to extreme outliers, not

average sale prices.

Andrien's assumption of $50,000 bulls sold by the hundreds defies the law of

supply and demand.   "A single bull can produce 15,000 straws of semen a year."

McGrann Decl. (Exh. 1) at 7-8.   So once initial bulls are sold, their semen becomes

widely available and would flood the market, reducing the value of the semen and

driving down demand for bulls.   *Id.*   That knowledge is part of what constrains bull

prices in the first place.   Yet Andrien nowhere accounts for that basic principle.

Suppl. Rpt. (Exh. 4) Att. V at 7.   He seeks to have the best of both worlds—attach

an astronomical value to bulls sold without use restrictions, but then ignore that the

unrestricted buyers can use them to produce and sell semen.   This is a fundamental and devastating flaw.

Moreover, Bear Ranch owns unrestricted Akaushi females, as have numerous other ranchers past and present.   *See infra* Part II(G).   And as Dr. McGrann explains, breeding cattle can be produced quickly with a limited number of animals, which further limits the market for breeding stock.   McGrann Decl. (Exh. 1) at 8.

And that is just within the breed.   Dr. McGrann explains that the appropriate comparison for breeding bull prices includes other breeds.   *Id.* at 7-8.   Indeed, he explains that less-established breeds like Akaushi will bring lower average prices than popular and proven breeds like Angus.   *Id.* at 8.

In short, Andrien's imagined new company is foreign to the cattle industry and thus unsupported by any actual sales history.   His bull price exists only to manipulate his calculation of forever profits.   Courts refuse to credit such unsound opinions.   *E.g.*, *Target Market Publ'g v. ADVO, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998) (affirming district court's rejection of expert's lost-profits opinion as "untenable," where the expert cited no company with a comparable track record and assumed that, contrary to actual performance of the venture at issue, it would become inordinately profitable); *id.* at 1142 (quoting the district court's explanation that the expert's opinion "'relies on mere assumptions—from which no reasonable inference of lost profits could be drawn'").

And the effect of this untenable bull-price assumption is huge.   Even using a generous $7,000 per head as the average price for the hundreds of bulls Andrien imagines an operation selling, Andrien's calculation of "herd" value drops by over 85%.   McGrann Decl. (Exh. 1) at 8.   And that is still assuming yearly profits into eternity, assuming no more risk than diversified public companies, and assuming cost inputs that Dr. McGrann explains are "unreliable."   *Id.* at 8-9.

### (2)   An unproven start-up venture is more risky than established and diversified public companies.

After calculating the yearly profits this imagined business would generate into perpetuity, Andrien discounts that cash flow to present value using a "risk-adjusted discount rate."   Suppl. Rpt. (Exh. 4) at 26 & Att. V at 4.   That is a rate meant to reflect returns investors would require to risk their money on a specific venture. The rate would be lower for a settled company expanding a reliable line of business than for a new company entering into a risky market.   Bayley Decl. (Exh. 2) at 5. And because that rate is applied using the exponential function, even a seemingly small change can have a big effect.   *United Air Lines, Inc. v. Reg'l Airports Imp. Corp.*, 564 F.3d 873, 879 (7th Cir. 2009) ("In a discounted-cash-flow analysis, the discount rate has a powerful effect on the present value."); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 835 (7th Cir. 1985) ("Such valuations are highly sensitive to assumptions about the firm's costs and rate of growth, and about the discount rate.   It is a simple matter to increase or reduce the outcome of a cash flow

analysis by 200% by making changes in assumptions that appear by themselves to be insignificant.").

That explains why Andrien goes through the tortuous exercise of constructing an inexplicable basket of allegedly comparable companies, rather than consulting neutral financial publications. Or he could have looked at HeartBrand's own predecessor-in-interest—HeartBrand Cattle Company—which did so poorly, despite having and selling male and female Akaushi genetics, that it imploded. Wood Depo. (Exh. 17) at 75-98, 148-52. Instead, Andrien decides without explanation that the new business he imagines someone starting upon buying a herd of cattle is comparable to:

- Akikawa Foods & Farms Co, Ltd., a **$15.8 million**, publicly traded Japanese company with multiple business lines including home-delivery services, fruit and vegetable production, and meat, processed food, and dairy sales, Exh. 8;

- Australian Agricultural Company, Ltd., a **$62.8 million**, publicly traded Australian company that raises and processes cattle, distributes beef products, and grows and harvests cotton, wheat, sorghum, and other crops, Exh. 9;

- Fortune Ng Fund Food (Hebei) Co., Ltd., a **$26.1 million**, publicly traded Chinese company with upstream and downstream businesses, including cattle and lamb production and processing, fast-food, dairy sales, and restaurants, Exh. 10;

- Grupo Bafar S.A.B. de C.V., a **$10.1 billion**, publicly traded Mexican company with multiple business segments, including meat, cheese, and prepared food production, distribution, and sales; grocery stores; and travel agency services, Exh. 11;

- Prima Meat Packers, Ltd., a **$470 million**, publicly traded Japanese company with multiple business segments, including pig production, processing, and sales; real estate; information processing; and consulting, Exh. 12; and

- Tyson Foods, Inc., a **$13.9 billion**, publicly traded U.S. company that produces, processes, distributes, and sells chicken, beef, pork, and prepared foods, Exh. 13.

Suppl. Rpt. at 26 & Att. V at 4.   Andrien provides no cogent reason for treating a start-up, niche-cattle business as being comparable to these multi-million-dollar companies, which are mostly foreign, publicly traded, and operating in multiple business segments.   *See* Bayley Decl. (Exh. 2) at 4-5 (noting different risk level).

From his hand-picked basket of "comparable publicly traded companies," Andrien derives a discount rate of 12%.   Suppl. Rpt. (Exh. 4) Att. V at 4.   Rather than taking that convoluted route, Andrien could have looked to neutral publications or industry professionals, which agree on a much-higher 25% discount rate for a start-up operation targeting a niche market like this one.   McGrann Decl. (Exh. 1) at 9; Bayley Decl. (Exh. 2) at 5.   As Dr. McGrann explains, a "beef cattle operation in the United States is subject to incredible volatility.   Weather, feed price, disease, and government regulation, in addition to Red Wagyu being a relatively unknown breed, require a higher discount rate to account for the risk in the industry. Additionally, the intense competition within the niche beef industry and Wagyu beef imports, as well as from pork and poultry also increases the risk of failure." McGrann Decl. (Exh. 1) at 9.

Making just that one further change to Andrien's contrived assumptions—after addressing his overblown breeding-bull price—brings his calculated "herd" value down over 90% from its original amount, and brings the alleged "unjust enrichment" calculation to a *negative* number.   *Id.*   Changing just two of Andrien's inputs to fall within the realm of reality means there is no enriching future profit at all.   Even if Bear Ranch cannot now recover for overpaying for the cattle, there is no cause for finding that it underpaid.

### (3)   Andrien's other assumptions are similarly results-oriented.

Dr. McGrann's declaration illustrates that Andrien's other assumptions are also overblown and "unrealistic."   *Id.* at 9.   Bear Ranch will not walk through each assumption here, but the point is that they again artificially inflate Andrien's valuation.   *See id.* at 9-10.   For instance, Andrien nowhere accounts for the taxes his imagined business would owe; apparently, the new owner of the cattle is a tax cheat.[9]   And he assumes easy access to land to sustain a herd growing 5% a year, even though land is a key constraint on most operations.   Andrien's assumptions lead to overstating revenue and understating costs, *id.*; even as a business valuation, his approach simply is not credible.

---

[9] Texas law affirmatively requires such accounting when a claimant is calculating lost earnings.   Tex. Civ. Prac. & Rem. Code § 18.091.

### G.    Andrien's Opinion Ignores Comparable Cattle.

As Dr. McGrann explains based on his 40 years of experience in the industry, "cattle are always valued based on comparable cattle and never using an income approach valued into perpetuity like Mr. Andrien used."   McGrann Decl. (Exh. 1) at 5.   Andrien's valuation method "would not be accepted in the industry because it does not attempt to use any comparables."   *Id.* at 6.

Andrien gives no explanation of why ranchers would not consider other types of cattle in determining their willingness to pay for Akaushi.   Dr. McGrann explains that they would.   *Id.* at 5-6. He explains that Black Wagyu are a natural competitor, whose availability constrains demand and prices.   *Id.* (noting industry view that, using the same production practices, the carcasses are indistinguishable when the hide is removed).   Dr. McGrann further explains that ranchers have many other breeds to choose from, and that even Angus cattle can be a comparable, although one would have to adjust for that breed being more established.   *Id.* at 6.

Moreover, Dr. McGrann explains that producers considering buying Akaushi would consider the other Akaushi outside of HeartBrand's control.   McGrann Decl. (Exh. 1) at 5, 8.[10]   Andrien simply disregards those cattle, saying that they are not

---

[10]    *See* Summary of PX272, PX274 (Exh. 14) (chart summarizing the American Wagyu Association and Australian Wagyu Association registries of red, full-blood cattle, allowing tracing of cattle back to the foundation Akaushi imported from Japan); 5/19/14 Tr. at 147.   In fact, the Wagyu Association was selected to provide that registration service by the original owner of HeartBrand's Akaushi cattle (Dr. Wood).   5/27/14 Tr. at 74-75;

"proven to be comparable"—"[b]ased on a conversation with Ronald Beeman."
Suppl. Rpt. (Exh. 4) at 24 & n.35.   But the Court need not be satisfied with such a
stingy review of the facts.   Those other Akaushi are registered and parent-verified
with Wagyu breed associations, just not with the association HeartBrand has started
to promote only Red Wagyu.   Andrien does not undertake to examine the pedigrees
on those registries to see that they are Akaushi, or to explore the publicly advertised,
registered Akaushi cattle and genetics.   As Dr. McGrann explains, nobody in the
cattle industry would ignore not only cattle of comparable breeds, but cattle of the
same breed.   *Id.* at 5, 8.

---

PX48.   That breed club covers all cattle native to Japan ("Wagyu"), including the two
red-hided strains referred to as Red Wagyu and later also as "Akaushi."   *See* PX78; David
K. Lunt, *History of Wagyu Cattle* (Exh. 15), at WOOD002389.   In 1976, the first two Red
Wagyu bulls were imported into the United States.   *See* Lunt Article (Exh. 15) (*Judo* and
*Rueshaw*).   Their semen was collected, frozen, and sold.   *See* Exh. 14 (chart); 5/19/14 Tr.
at 152.   In 1994, several more Red Wagyu cattle were imported and distributed to multiple
owners.   One shipment had two cows, which went to Japanese Venture Partners (JVP).
Scott Depo. (Exh. 16) at 54-55. (names were *Kunisakae* and *27 Homare*); PX39, PX40.   A
second shipment had nine cows and three bulls, which went to Wagyu Sekai in Canada and
Dr. Wood in Texas.   Wood Depo. (Exh. 17) at 19-25; Kurosawatsu Depo. (Exh. 18) at
22-31; PX29 (cows were *Namiko, Ume, Naomi, Akiko, Haruko, Fuyoko, Dai 3 Namiaki,
Dai 9 Koubai 73*, and *Dai 8 Marunami*; bulls were *Shigemaru, Tamamaru,* and *Hikari*).
Several of those cows had been made pregnant in Japan and produced calves either before
or after their arrival here.   Exh. 18 at 32-33, 60-108; PX48 at 8, 18, 19, 23 (calves were *#1
Ringo, Kaedemaru, Momigimaru, Big Al, 504,* and *505*).   Genetics from those Akaushi
cattle, then called Red Wagyu, intermingled, and the full-blood descendants tracing
exclusively to those imported Akaushi were registered on the Wagyu registries.   Exh. 14
(chart); Scott Depo. (Exh. 16) at 60; Beattie Depo. (Exh. 19) at 22-23, 47.

## H.    Andrien's Valuation Methodology Is Internally Inconsistent.

Because Andrien's "income approach" treats the value of parent cattle as determined by the value of all of their descendants reaching into perpetuity, it produces bizarre inconsistencies.   Andrien states that the value of an average Akaushi bull is $50,000 and that the value of an average Akaushi cow is $35,000. Suppl. Rpt. (Exh. 4) Att. V at 3.   Applying those per-head prices to the 14 bulls and 500 cows purchased in June 2011 yields an alleged value of $18.2 million.   But applying Andrien's forever-profits approach to those same 14 bulls and 500 cows, changing nothing else, yields a then-present value of $50.3 million.   In other words, Andrien's income approach is so bizarre that it yields an instant $32 million increase over his own assumed values.   This is no credible valuation.

## I.    The Problems with Andrien's Valuation Cannot Be Solved by Taking a Percentage of It.

It is no answer to the fatal flaws in Andrien's methodology to simply use some arbitrary percentage of the "unjust enrichment" number it spits out.   To start with, a percentage of a positive number will always be a positive number, yet Bear Ranch has already shown how bringing just two of Andrien's assumptions to even a generous possible version of reality would produce a *negative* enrichment amount.

Just as importantly, simply discounting the extreme result of an unreliable method is logically unsound and doctrinally improper.   It is HeartBrand's burden to prove the amount of the disgorgement award it seeks, and that burden requires

adducing reliable proof, not "speculation and hypothesis" hoping for a discount that is not actually identified by HeartBrand and that Bear Ranch has no way of addressing because it would be arbitrarily chosen. *See supra* Part II(E) (explaining that speculative opinion is insufficient under Texas law); *accord, e.g.*, *R. S. E., Inc. v. Pennsy Supply, Inc.*, 523 F. Supp. 954, 969-70 (M.D. Pa. 1981) ("With regard to plaintiff's claimed 21.9 percent net profit on blacktop production, however, the court finds this assumption to be unsupported by the facts of record and to be so speculative as to render the lost profit damage model, or any verdict awarded thereon, unreasonable."). As appraisal literature notes, speculative opinions are no evidence at all. Pratt, *The Lawyer's Business Valuation Handbook* 176 (2000) ("When the appraiser relies on inappropriate information, the entire opinion can fail for lack of a credible basis.").

### J. HeartBrand Has Never Acted Like The Cattle Were Worth The Sums It Now Claims.

Both before and after this lawsuit—until the eve of trial—HeartBrand never acted like these cattle were worth $77 million, or even an astronomical $23 million. HeartBrand breezily struck through supposedly key terms in contracts with ranchers governing cattle allegedly worth tens of millions of dollars. PX113 ¶XIV (contract with Farr striking through a provision barring liens on his purchased Akaushi cattle, thus allowing creditors to foreclose and obtain possession of them); Rancho Delhi

PX166 ¶I (handwritten changes to Rancho Delhi's contract allow it to sell its Akaushi to other AAA-producers without going through HeartBrand).[11]

One might also expect HeartBrand to insure such a valuable asset, yet its CEO could not recall ever doing so.  Fielding Depo. (Exh. 20) at 22:24-25.  In fact, HeartBrand did once provide for insurance on its Akaushi bulls.  But it required insurance of only $5,000 a head.  PX341 at 4 ¶XII (2007 contract requiring a ranch leasing Akaushi bulls to pay an "annual premium for a life insurance policy on each bull in the face amount of $5,000, with HEARTBRAND as the loss payee.").  So outside of this litigation, nobody has valued HeartBrand's Akaushi cattle at close to the prices it now argues.[12]

Andrien's per-head valuation would mean that HeartBrand's own herds of Akaushi (around four thousand cattle as of 2009, *see* PX125) would be worth hundreds of millions of dollars.  Yet none of its books show figures on even the same order of magnitude.  Indeed, some of its balance sheets can be matched to categorized inventories of cattle, and they show book values of cattle at somewhere between $2,866 and $3,428 per head, depending on possible classifications.  *See*

---

[11] AAA membership does not require a contract with HeartBrand.  5/27/14 Tr. at 160:5-7 (Janie Bain: "[Q] Ms. Bain, you don't need a contract to with HeartBrand to join the association, do you?   [A] No.").

[12] HeartBrand wrongly suggests (Mot. 6) that Dr. Dustin Dean opined on a herd valuation.  Dr. Dean in fact calculated the cost of quickly growing a herd of 500 Akaushi cattle that is much less than the price Bear Ranch paid.  5/19/14 Tr. at 174:9-12.  No doubt deliberately, HeartBrand did not ask Dr. Dean for his opinion on the value of the herd of Akaushi bought here.

PX100 at 8-10 (identifying number of breeding cattle on 9/15/2009); PX171 at 5 (identifying book value of breeding cattle as of 9/30/2009).   HeartBrand has answered that those are not market values, as it records cattle value at only their cost of production.   Even assuming that is true—and that is questionable—Andrien's valuation would mean that HeartBrand's operation is a unique exception to the entire cattle industry, in which it can readily make profits of 1300% (the $50,000 alleged bull price over the highest cost) or 921% (the $35,000 alleged cow price over the highest cost).   And that is supposedly true for hundreds and hundreds of cattle of a breed whose genetics have already been freely sold.   The assertion refutes itself.

Andrien's outlandish valuation is further belied by HeartBrand's failure to claim that value in this litigation for more than two years, even though Bear Ranch pleaded on day one of this case that the cattle it bought from Beeman and others are "not subject to any restrictions under any contract with HeartBrand."   Dkt. #1 at 15 ¶69.   HeartBrand would have the Court believe that it simply forgot the tens of millions of dollars at stake for over two years, despite Andrien looking at valuation issues in two prior reports.   It only "realized" the exaggerated value 16 days before jury selection, when it faced a real prospect of going to trial with nothing to argue.

HeartBrand's valuation of the cattle is ludicrous—a number conjured by its "expert" at the last minute to put on a good show at trial.   No doubt realizing that its valuation cannot withstand serious scrutiny, HeartBrand now runs away from its

claimed $77 million amount, or from even asking for the cattle back.   It now wants only for the Court to enter judgment and cash out a perceived $23 million lottery ticket.   But the Court has already explained that it will make its own determination of the amount of any disgorgement award, and HeartBrand has no credible evidence supporting its fantasy valuation.

**III.   HeartBrand's Remedial Request Is Barred by the Statute of Frauds.**

HeartBrand's requested disgorgement award is barred by the statute of frauds because it seeks payment that is not out-of-pocket loss.   *See Haase v. Glazner*, 62 S.W.3d 795, 800 (Tex. 2001) (explaining that the statute of frauds bars benefit-of-the-bargain recoveries on claims alleging an unenforceable oral promise, although it allows recovery of out-of-pocket damages on a fraud claim); *Quigley v. Bennett*, 227 S.W.3d 51, 54 (Tex. 2007) (rejecting award on fraud claim that was defined based on the value of an alleged promise that, under the statute of frauds, could not be enforced without a writing).

HeartBrand's desired remedy, at bottom, is based on valuing the allegedly promised cattle restrictions.   It computes the alleged value of cattle if sold without the contract restrictions, and then subtracts what Bear Ranch paid to buy them by allegedly promising that those restrictions would apply.   Without thus valuing the restrictions, there would be no award even on HeartBrand's view.   Yet that remedy impermissibly depends on the value of the alleged oral promise.

Because that oral promise is unenforceable under the statute of frauds, the award HeartBrand pursues is barred.  *See, e.g.*, *Beckham Res., Inc. v. Mantle Res., L.L.C.*, 2010 WL 672880, at *14 (Tex. App.—Edinburg Feb. 25, 2010, no pet.) (applying the statute of frauds to several requested remedies, including a "disgorgement of profits" award, because they were all valued based on "essentially the benefits it expected when Mantle allegedly did not honor its alleged oral promise"); *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 779 (Tex. App.—Dallas 2005, pet. denied) (explaining that out-of-pocket damages can be recovered in the face of the statute of frauds, but that this remedial theory is only "to recoup its *expenditures* made in reliance on the [false] representations" and cannot be characterized to include a "parted with" "opportunity to charge a higher price") (emph. in original).

HeartBrand did not ask the jury to determine any out-of-pocket damages on this fraud claim (unlike on its first fraud claim).   Dkt. #178 at 17-18.   It put on no evidence of such damages, such as money spent building fences or hiring personnel; in fact, it complains of refraining from taking action.  *Cf. Beckham*, 2010 WL 672880, at *14 (noting that the claimant's "own contention that it refrained from taking any action because of [the defendant's] alleged misrepresentation [that it would extend a lease] militates against a finding that [the plaintiff] suffered any reliance or out-of-pocket damages").   HeartBrand is seeking a remedy based on the

benefits of Bear Ranch's alleged oral promise to apply the 2010 contract to the cattle bought in 2011.   Because the alleged oral promise is unenforceable under the statute of frauds, that recovery is foreclosed.

## IV.   Exemplary Damages Are Limited by Texas Law.

Damages and unjust enrichment are two separate concepts.   Damages measure a plaintiff's loss.   Disgorgement ignores the plaintiff's loss; it turns only on a defendant's unjust gain.   In Texas, only an award of actual damages allows recovery of exemplary damages.   Because no actual damages were requested from the jury on this claim, exemplary damages are statutorily unrecoverable.

Even accepting *arguendo* HeartBrand's new claim that an award disgorging unjust enrichment is a "damages" award, HeartBrand itself agrees that it is not an award of compensatory damages.   Accordingly, even on HeartBrand's view, any exemplary damages would be statutorily capped at $200,000.

### A.   Exemplary Damages Require an Award of Actual Damages, Which Is Different than Disgorgement.

Damages are a legal remedy whose function is to compensate a person for loss.   Restatement § 3 cmt. b (noting that damages are "compensation for the injury caused by the defendant's tort or other breach of duty," in contrast to restitution).

Disgorgement, in contrast, is a species of restitutionary remedy that turns on a defendant's unjust gain.   It may be recovered regardless of the existence or extent

of a plaintiff's loss.  *Id.* (so noting); *id.* § 51 cmt. a ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.'");  *Henrey v. Masson*, 333 S.W.3d 825, 849 (Tex. App.—Hous. [1st Dist.] 2010, pet. denied) ("[d]isgorgement of profits is . . . an equitable remedy").  Such a restitutionary award entails no finding on the existence or extent of loss to the plaintiff.

Section 41.004(a) of the Texas Civil Practice and Remedies Code provides that, with one exception not applicable here, "exemplary damages may be awarded only if damages other than nominal damages are awarded."  That text requires an award of actual damages, not a restitutionary remedy that is agnostic to the existence or extent of a plaintiff's damages.  That policy makes sense.  Without an award of actual damages, litigants have no jury determination on whether the plaintiff suffered any losses as a result of the defendant's actions.[13]

At trial, HeartBrand said it was not seeking damages on this claim.  5/22/14 Charge Conf. Tr. at 39:15-17 (HeartBrand: "[W]e're not going to be presenting a damages model as such with the Beeman fraud.   What we're going to be seeking is the equitable remedy of unjust enrichment.").   And HeartBrand never once disclosed an alleged $77 million in damages, as would be required under Federal Rule of Civil Procedure 26(a)(1)(A)(iii).   Now, HeartBrand changes tune and

---

[13]  That policy also comports with the traditional understanding that courts of equity do not assist in recovery of a penalty.  *E.g.*, *Livingston v. Tompkins*, 4 Johns Ch. 415, loc. cit. 430, 431, 8 Am. Dec. 598 (Ch. Ct. N.Y. 1820).

pushes the oxymoron "unjust enrichment damages" as the name of the remedy it seeks.   Mot. 3.

HeartBrand's original label was right.   The Texas Supreme Court has flatly stated that "[t]here are two measures of damages for fraud," the out-of-pocket and benefit-of-the-bargain compensatory measures.   *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 681 (Tex. 2002).   HeartBrand did not ask the jury for the former. And it could not seek the latter, due to the statute of frauds.   Instead of damages, it sought an advisory jury finding on an equitable remedy.   5/27/14 Tr. at 187:19 ("[Court:] that's all an unjust enrichment theory, which is an equitable remedy"); *id.* at 188:8-10 (HeartBrand: "Yes, Your Honor, just an advisory.").   That verdict does not allow exemplary damages.

Bear Ranch recognizes that, before 1987 tort reform added § 41.004 to the Civil Practice and Remedies Code, *see* Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, eff. Sept. 1, 1987, some Texas cases allowed exemplary damages upon recovery of an equitable remedy, citing case law or policy arguments.   *See* Mot. 30-31 (relying on 1963 and 1985 cases).   Bear Ranch also recognizes that a few Texas lower-court decisions after the enactment of § 41.004 have cited pre-1987 case law.   *See* Mot. 31-32 (citing a 2000 and a 2011 case).   But the Texas Supreme Court in *Fortune Products* listed the two types of damages available for fraud, and HeartBrand has recovered neither.   That controls.   There is no third type of fraud damages.

**B.    Even Assuming Exemplary Damages Are Allowable Here, They Are Statutorily Limited to $200,000.**

Assuming for the sake of argument that a disgorgement of unjust enrichment qualifies as "damages" within the meaning of § 41.004 and thus allows exemplary damages, any exemplary damages here would be statutorily capped at $200,000. Tex. Civ. Prac. & Rem. Code § 41.008(b).[14]   Even HeartBrand agrees that the award it seeks is not compensatory damages.   Mot. 28 (arguing that compensatory damages are not required and that "unjust enrichment damages" suffice).

Because a disgorgement award is not compensatory damages, it could not meet the statutory definition of the two types of compensatory damages.   Tex. Civ. Prac. & Rem. Code § 41.001(4) ("economic damages"), (12) ("noneconomic damages").   That means that the statutory cap defined in § 41.008(b)(1) is zero. Accordingly, any exemplary damages would be capped under § 41.008(b)(2) at $200,000.   Even if exemplary damages are somehow allowable, they may not exceed that amount.[15]

---

[14]   Texas Civil Practice and Remedies Code § 41.008(b) provides:

> Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of: (1) (A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000.

[15]   Bear Ranch further reserves its right to move for remittitur of any such exemplary damages, but cannot do so at this point because the existence and amount of any disgorgement award has not been determined by the Court.

**V.    Although the Contract Contemplates a Return Remedy in the Event of a Termination for Cause, It First Requires an Opportunity to Cure.**

It is undisputed that Bear Ranch has dutifully followed all of the sale, use, and marketing restrictions in its contracts with HeartBrand.   Bear Ranch also has collected the required DNA samples and data on its cattle.   5/20/14 Tr. at 57, 77-78, 105-107; 5/21/14 Tr. at 14.   And, over two years ago, Bear Ranch sent payment of the required American Akaushi Association dues and fees for its cattle bought under contract.   But HeartBrand locked Bear Ranch out of the registry on the day of that payment, and it still has not cashed the check.   5/21/14 Tr. at 247-48; 5/27/14 Tr. at 169.

Given that Bear Ranch has sent in what it contends is the required payment and cannot add registry information because of the lock-out, there remains a dispute about Bear Ranch's chance to cure before any termination for cause.   That dispute turns on the parties' disagreement about the scope of the contract's enrollment requirement.   HeartBrand takes the view that the contract imposes enrollment duties as to, not just the cattle sold under the contract, but also in any herd bought later, from another seller, without a contract.   5/27/14 Tr. at 172-74.   Bear Ranch disagrees.

The Court has already ruled that most of the registration duties apply only to the cattle bought under the contract.   Dkt. #91 at 12-16.   The only disputed duty is enrollment of calves in the Whole Herd Reporting System.   That interpretation

issue is ready for the Court's decision on Bear Ranch's pending declaratory claim. Dkt. #59 ¶¶51-52 (Claim 4); Dkt. #91 at 12-13 & n.5 (leaving this issue open for later interpretation).   The contract plainly states that enrollment is required for offspring of cattle purchased "by this agreement," PX1 at 2 ¶V, not other agreements, as the Court has ruled.   And nothing in the AAA rules says that the contract does not in fact define the herd to be registered, or that the duty applies to other herds bought later.   And any abiding ambiguity on that point would be resolved against HeartBrand as the contract's drafter.

The enrollment duty is as stated in the contract.   That means that HeartBrand must enable Bear Ranch's account, accept its check, and give it 30 days from that point to cure any breach.

### A.    The Court Should Rule for Bear Ranch on Enrollment Duties and Allow the Required 30-Day Opportunity to Cure Once HeartBrand Begins Accepting Performance.

Because the Court should resolve this interpretation issue in Bear Ranch's favor, it should rule that the contract does not allow a compelled cattle transfer at this time.   The contract's termination clause gives Bear Ranch a 30-day opportunity to cure after a written notice of breach by HeartBrand.   PX1 at 5 ¶XVII; PX2 at 5 ¶XVIII.   Bear Ranch has not enjoyed that opportunity.   It received HeartBrand's counterclaim of breach on May 7, 2012.   Dkt. #7.   By that point, Bear Ranch's check paying the fees and dues for the cattle under contract had been submitted, and

Bear Ranch was locked out of the AAA's registration system.   5/21/14 Tr. at 247-49; 5/27/14 Tr. at 173.

HeartBrand refused to accept Bear Ranch's payment and data.   It apparently did so because it viewed the contract as requiring payment on more cattle.   5/21/14 Tr. at 249:16-20 (Bubba Bain: "[Y]ou have to assess all those animals . . . And under those circumstances, we're not going to accept any check.").   Likewise, the lock-out apparently came from a view about contract scope.   5/27/14 Tr. at 173:5-7 (Janie Bain: "If they would pay their dues and get caught up, I would unlock it and they could get started.   I am ready to accept all that DNA they've collected.").

That state of affairs persists.   HeartBrand's freeze-out is based on its claim that enrollment fees are due on Bear Ranch's later-acquired cattle not under contract. Bear Ranch has already explained, however, why the parties had no meeting of the minds on that point, why that view has no grounding in the contract text or the AAA rules.   PX1 at 2 ¶V.   Assuming the Court resolves that final contract-scope issue in Bear Ranch's favor, Bear Ranch's payment was complete and HeartBrand has wrongly refused Bear Ranch's performance.   Once HeartBrand lifts the lock-out, Bear Ranch will then have 30 days to cure any breach by submitting registration data and any newly invoiced fees based on that data.[16]

---

[16] That resolution would also make ripe for resolution Bear Ranch's declaratory claims regarding the scope of ongoing cattle restrictions.   Namely, Bear Ranch views an animal's "offspring" as "a child, the young of an animal," *Dictionary of Agriculture* 175

### B.     If the Court Rules for HeartBrand on Enrollment Duties, Bear Ranch Is Prepared for an Appropriate Cattle Transfer.

If the Court rules otherwise—that the contracts require enrollment of any future cattle Bear Ranch might own, regardless of whether they are under a contract and could simply be sold to a new entity—then Bear Ranch is prepared to accept termination of the contract upon an appropriate buy-back of cattle.

### (1)     Any termination would require buying back Bear Ranch's cattle, as HeartBrand has stated.

HeartBrand agreed at trial that, if the contract is terminated, "we'll just buy the cattle back."  5/27/14 Tr. at 30:20.   Now, HeartBrand hedges by stating that "it appears" an injunction would require compensating Bear Ranch for its reasonable costs of acquisition, production, and maintenance.   Mot. 19.   The Court should be clear that it does.    A transfer would otherwise be a penalty for breach, unenforceable under Texas law, as explained in Bear Ranch's MSJ briefing, which it incorporates herein by reference.   Dkt. #72 at 27; Dkt. #85 at 15-16.

---

(3d ed. 2006), which is different than "progeny," a different term used in the contrary embracing all descendants.  *Compare* PX1 at 1¶I, *with id.* at 3 ¶VII; *cf. Futrell v. Ind. Lumbermens Mut. Ins. Co.*, 471 S.W.2d 926, 928 (Tex. App.—Hous. [1st Dist.] 1971) (interpreting term "automobile" to be narrower than "vehicle" and thus exclude motorcycles).   Moreover, the "use" restriction in ¶ I of the contract does not apply to even "offspring," but rather only any animal purchased under the contract.   PX1 at ¶I.

### (2) Bear Ranch is prepared to transfer the quantity of cattle considered by the advisory jury for the cost it found.

To narrow the issues, Bear Ranch is prepared to transfer cattle based on the advisory jury's findings for the quantity it considered:

| Live cattle from the HeartBrand purchase and offspring of those cattle | 1,548 head | $6,034,000 |
|---|---|---|

Dkt. #172 at 25; *see* Suppl. Rpt. (Exh. 4) at 19-20 & Att. IV at 1.

To the extent HeartBrand demands more cattle and is found entitled to them, the corollary is that HeartBrand must buy back those additional cattle at the per-head costs found by the advisory jury.   Bear Ranch would otherwise show that the advisory jury's costs are less than its actual costs.

### (3) Compensation should be brought up to date to the time of any repurchase, and HeartBrand must transport the cattle.

The parties presented evidence of Bear Ranch's reasonable costs through March 31, 2014.   *See* Suppl. Rpt. (Exh. 4) Att. IV at 1.   Between that date and the date of any cattle transfer, Bear Ranch will incur ongoing costs of maintaining over a thousand head of cattle.   That additional maintenance cost, pro rated for the time period at issue, should be included in any price paid for the cattle.   And, as the party buying the cattle, HeartBrand should be responsible for transportation if it wishes to terminate the contract rather than accept continued performance.   *See* 5/27/14 Tr. at

30:20 (HeartBrand: "we'll just buy the cattle back"); *State v. Alpha Oil & Gas, Inc.*, 747 S.W.2d 378, 379 (Tex. 1988) (Texas contract law "is not punitive in nature").

### (4)    Rescission law is irrelevant.

It is unclear why HeartBrand spends over a page discussing standards from rescission law.   Mot. 19-21.   The contracts are not being rescinded.   HeartBrand's claim of fraudulent inducement of the contracts was rejected, and no other cause for rescission has been identified.   Indeed, rather than unwinding the contract, HeartBrand is pressing it forward by invoking the benefit of contractual provisions regarding remedies and attorney fees.   Mot. 9-23.

HeartBrand also cites the concept of material breach, Mot. 20, despite that issue having no apparent bearing on its requested remedy.   There is no material breach here and no need to respond.   Likewise, HeartBrand discusses reversing a transfer induced by fraud or conscious wrongdoing, even though it lost its fraud claim on this sale, and even though breach is not a tort requiring proof of *mens rea*. This discussion is irrelevant.

### (5)    HeartBrand cannot double-dip.

Certain offspring produced by Bear Ranch descend from ancestors purchased in different sales.   For example, a given offspring's mother may have been bought in the Beeman Sale, with its father bought in the HeartBrand Sale.   That breeding is

not prohibited by the contract, and HeartBrand was denied leave to add a claim that it is. *See* Dkt. #98-2 at 24; Dkt. #102 at 15; Dkt. #110 at 1-2.

If those offspring are returned, Bear Ranch obviously will not have them. That means they cannot represent any alleged "unjust enrichment" derived from the Beeman Sale.   Thus, in the event any disgorgement remedy is awarded on the fraud claim regarding the Beeman Sale, HeartBrand cannot double-dip.   That award must be computed by excluding any returned cattle.   Of course, Bear Ranch has already explained why a disgorgement award is not available on this record.

## VI.   Bear Ranch Will Respond on Attorney Fees and Litigation Expenses In Due Course, Following a Proper Motion.

Defendants note that they will present a request for attorney fees, expenses, and costs within 14 days after entry of judgment, in accordance with Rule 54(d) and the parties' stipulation (Dkt. #157).   Mot. 21.   Bear Ranch will do the same with its request for recovery of fees, expenses, and costs.

HeartBrand then previews its arguments on recovery and segregation.   Mot. 22-24.   Those arguments are unsupported by any evidence, and the motion does not state the amount sought or provide a fair estimate of it.   Accordingly, this is not a Rule 54(d) motion for fees and expenses, *see* Fed. R. Civ. P. 54(d)(2)(B)(iii), and the Court need not consider that issue at the upcoming hearing on entry of judgment.   If

necessary, HeartBrand's arguments will be addressed on a post-judgment motion for fees, expenses, and costs.

## VII.   Prejudgment Interest Is Not Recoverable Here.

HeartBrand's request for prejudgment interest running from the date of the advisory jury verdict is unfounded.   Mot. 27-28.   No statutory prejudgment interest applies, or is alleged to.   *Id.*   And common-law prejudgment interest is not available because no damages have been awarded.   *See Watkins v. Junker*, 40 S.W. 11 (1897) (explaining that such interest requires a measure of recovery "fixed by the conditions existing at the time that the injury is inflicted," such that "the person entitled to recover has also the right to have compensation for the detention of his money which he is entitled by reason of the wrong done to him").   The rationale behind that rule is that "prejudgment interest is available only when the amount of damages is definitely ascertainable at the date of the injury."   *Indust-Ri-Chem Lab., Inc. v. Par-Pak Co., Inc.*, 602 S.W.2d 282, 294 (Tex. Civ. App.—Dallas 1980, no pet.).

An equitable remedy disgorging present unjust enrichment requires no proof of loss suffered in the past; it is not a damages award.   *See supra* Part IV. HeartBrand's cited case does not hold otherwise or even address this issue.   *See Johnson & Higgins v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). The *Watkins* requisite simply is not met here; the jury did not award damages on this

claim.   Neither can the exemplary damages HeartBrand seeks support prejudgment interest.   Tex. Civ. Prac. & Rem. Code § 41.007 ("Prejudgment interest may not be assessed or recovered on an award of exemplary damages.").

## CONCLUSION

For the reasons explained above, the Court should enter a judgment denying HeartBrand its requested remedies, and awarding Bear Ranch all just relief to which it is entitled.

Dated:   August 11, 2014                      Respectfully submitted,

                                           /s/ R. Paul Yetter
                                           R. Paul Yetter
                                           Attorney-in-Charge
                                           State Bar No. 22154200
                                           Collin J. Cox
                                           State Bar No. 24031977
                                           J. Campbell Barker
                                           State Bar No. 24049125
                                           YETTER COLEMAN LLP
                                           909 Fannin, Suite 3600
                                           Houston, Texas 77010
                                           (713) 632-8000
                                           (713) 632-8002 (Fax)

                                           Andrew R. Seger
                                           State Bar No. 24046815
                                           THE SEGER FIRM, P.C.
                                           P.O. Box 98433
                                           Lubbock, Texas 79499
                                           (806) 793-1906
                                           (806) 793-1979 (Fax)

                                           Attorneys for Plaintiff Bear Ranch, LLC

## CERTIFICATE OF SERVICE

I certify that on August 11, 2014, a copy of this document was served on all counsel of record using the Court's e-filing system.

/s/ J. Campbell Barker
J. Campbell Barker