Vinson&Elkins

James A. Reeder, Jr. jreeder@velaw.com
**Tel** +1.713.758.2202 **Fax** +1.713.615.5947

September 29, 2014

***Via CM/ECF***

The Honorable Gregg J. Costa
515 Rusk St., Room 4627
Houston, Texas 77002

Re: Cause No. 6:12-CV-14; *Bear Ranch, LLC v. HeartBrand Beef, Inc., et al.*; in the United States District Court for the Southern District of Texas

Dear Judge Costa:

Having now had an opportunity to review the slides used by Bear Ranch in Wednesday's hearing, we write to respond to certain statements made in Bear Ranch's slides, and by Bear Ranch at the hearing, that may be of assistance to the Court as it considers final remedies. We also respond to Bear Ranch's letter of September 27.

**Bear Ranch continues to misapply the "lost profits" standards.** At the hearing, Bear Ranch argued that the *iValue* case,[1] quoted on slides 19 and 21, stands for the proposition that any asset valuation exercise is subject to the same requirements as a lost-profits analysis in a consequential damages case. Bear Ranch misconstrues *iValue*, and in doing so, obscures the reason this issue is significant.

Bear Ranch's primary argument is that if HeartBrand and Bear Ranch are early-stage growth companies that have not yet had a consistent record of financial success, Texas law would prevent them from seeking lost profits in litigation. Defendants have previously explained that Texas law distinguishes between asset valuation (even when that asset valuation is based on the income approach) and a "lost profits" analysis because "the market value of an income-producing asset is inherently less speculative" and "represents what a buyer is willing to pay for the chance to earn the speculative profits." (Dkt. #208 at 5-8 (citing cases).)

Bear Ranch now argues that the income approach (also called the discounted cash flow approach) is similar to lost-profits analysis and must meet the same standards. This conflates different aspects of the lost-profit analysis. The cases acknowledge that the income approach to market value is analytically similar to lost-profits analysis—future cash flows are

---

[1] *M&A Technology, Inc. v. iValue Group*, 295 S.W.3d 356 (Tex. App.—El Paso 2009, pet. denied).

**Vinson & Elkins LLP Attorneys at Law**
Abu Dhabi Austin Beijing Dallas Dubai Hong Kong Houston London
Moscow New York Palo Alto Riyadh San Francisco Tokyo Washington

1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
**Tel** +1.713.758.2222 **Fax** +1.713.758.2346 **www.velaw.com**



being estimated in both exercises—but the cases also acknowledge that the income approach is *different* in that it is an objective value determination rather than a prediction of an individual business's likelihood of future success in the but-for world.

The expert in *iValue* did not value a specific asset, as Bear Ranch suggested at the hearing. Instead, the expert valued a business. That business was a new and never-before-profitable e-commerce website that contended its business had been destroyed by the defendants. *iValue*, 295 S.W.3d at 366-67. In other words, *iValue* was just like any ordinary lost-profits case. The question the *iValue* court considered was not whether asset valuation is generally equivalent to lost profits analysis; the question was whether valuing a *specific business* based on *that specific business's future cash flows* would follow the same analytical approach as valuing the lost profits for *that specific business*. *See id.* at 366. The facts showed that that business was new, untested, and unlikely to succeed. The expert in *iValue* forecasted that a specific company with no products to sell, no distribution contracts, no office space, no capital, no financing and a grand total of $238 in its bank account was about to become profitable. *Id.* at 366-67. That is substantially different from Andrien's approach, projecting potential income streams for a hypothetical buyer operating in an existing industry, realizing cash flows that he estimated based on documented carcass pricing, documented costs, and real-world examples of revenues from successful breeding operations.

On slide 20, Bear Ranch quotes *Fluorine On Call*,[2] a case cited by HeartBrand in the briefing because it actually undermines Bear Ranch's position. *Fluorine On Call* (which was cited by *iValue* with approval) explicitly states that a lost asset value analysis differs from a lost profit analysis and is not subject to the same requirements. *Id.* at 860. Accordingly, the *Fluorine On Call* court reversed a damages award because the expert had performed a pure lost profits analysis to determine the lost value of an exclusive license to manufacture and sell Fluorine generators—in fact admitting that his analysis did not consider what a hypothetical willing buyer would pay a hypothetical willing seller for the license. *Id.* at 861.

Cases like *iValue* and *Texas Instruments* (cited on Slide 21 and discussed in both sides' briefing) are not asset valuation cases; they are consequential damages cases, in which a plaintiff alleges that in the but-for world, his untested business would have made profits. Andrien's model is precisely the opposite. Rather than assume that an untested business model would turn successful, Andrien estimates the value of assets by taking them out of an untested model and putting them into a traditional model. Bear Ranch sells a unique super-prime steak product, and voluntarily foregoes revenue by declining to sell many lesser cuts of meat; HeartBrand has a unique genetics-management program and voluntarily foregoes

---

[2] *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849 (5th Cir. 2004).



revenue by declining to sell breed stock in the absence of a restrictive contract.[3] Andrien did not attempt to project whether either of those business models would ever work. Instead, he calculated the fair market value of a specific asset—a herd of cattle—using the established income approach to determine the utility of the asset to a hypothetical buyer who would use that asset in an entirely traditional way: selling beef and unrestricted breeding cattle.

Indeed, Andrien's testimony at the post-trial hearing established that the unjust enrichment award would be $35 million—more than the jury awarded—if the hypothetical buyer simply focused on a breeding business selling cattle at only $7,000 per head. That number would be in line both with actual HeartBrand experience for restricted cattle and with actual breeding revenues for established breeders selling quality breed stock, as highlighted by Bear Ranch on slides 40 and 41.[4] These data constitute the kind of objective figures that support an income approach analysis to valuation; none of the cases cited by Bear Ranch require more than that.

**Bear Ranch's invocation of "lost profits" cases concerning remedies at law are inapposite.** Bear Ranch's arguments miss an important point about the unjust enrichment remedy—the remedy is designed to *resolve* more fundamental uncertainties that would otherwise allow wrongs to remain un-remedied. As Bear Ranch acknowledges, it is difficult to place a specific dollar value on the continued existence of the contract restrictions in the HeartBrand program, at least without making difficult judgments about the long-term prospects of HeartBrand's particular business. It is equally difficult to quantify the consequential damage to HeartBrand's business arising out of Bear Ranch's conduct.

We know that Bear Ranch caused harm. In the "but-for world," the one in which Bear Ranch does not commit fraud, Bear Ranch would not have these cattle.[5] Instead, a faithful and trusted supplier of calves to HeartBrand, Mr. Beeman, would own that large herd

---

3 *See* 5/20/2014 Tr. at 233 (Gill testimony that having a contract at all, as in the HeartBrand deal, differed from "any other cattle transaction I had been involved in"); 9/11/2014 Tr. at 171, 176, 195 (O'Donnell testimony that 7X/Bear Ranch keeps ground beef in "storage" or donates it rather than selling it cheaply because "For us, it's about exclusivity" and Bear Ranch is trying "to build just this high-end product").

4 As previously discussed, the unjust enrichment figure is *necessarily* higher than the per-head price of animals sold piecemeal, due to the higher income-generating potential of a sustainable breeding nucleus—a principle that has not been refuted by any Bear Ranch witness.

5 It was suggested at the hearing that the "but-for" world is one in which had Bear Ranch not committed fraud, Bear Ranch would have these cattle under contract, with restrictions. There is no evidence to support that possibility. Had Bear Ranch been honest about its intentions, the evidence showed that no sale to Bear Ranch would have taken place at all. Bear Ranch's holding the cattle under restrictions is not a but-for circumstance, but part of the circumstances that would have arisen had Bear Ranch's conduct conformed to its representations.



of cattle. That herd would be restricted, protected, and no threat to HeartBrand's business model. HeartBrand's meat program would have had additional cattle from Mr. Beeman in its meat engine over the last few years—not just 30% of his calf crop, but likely all of it—and HeartBrand would not have had to "short" its deliveries to meat customers as it actually did. HeartBrand has for these reasons suffered. It had a smaller supply of cattle than it should have had; it had fewer satisfied customers than it might have otherwise had; and it faced the overhang of a massive strategic threat that has interfered with its ability to develop its business these last two and a half years. Nevertheless, it is challenging to put a number on those consequential damages.

But the difficulty of quantifying the harm from HeartBrand's perspective does not mean that Bear Ranch cannot be held to account for its fraudulent conduct; equity will not permit a wrong to go un-remedied simply because quantifying the effect is difficult. That is why equity turns to the remedy of unjust enrichment: to allow courts to focus on the more concrete question of the market value of specific assets. Questions of valuation are complicated, but they are not insurmountable. Courts take those valuation questions on because, complicated as those questions are, they are simpler questions than trying to predict what might occur to a specific given complainant in the but-for world, or trying to precisely determine what financial results would obtain in that world.

**Bear Ranch's claim that HeartBrand does not treat its cattle as valuable is false.** On slide 34, Bear Ranch cites HeartBrand financial statements for the proposition that HeartBrand booked a value of less than $2,000 a head for the cattle in its inventory. As explained at trial, HeartBrand accounts for its inventory on the "lower of cost or market" method, and as such, its cattle assets are booked at production costs, not market value. (5/23/2014 Tr. at 167-68; PX 171 at 9.) Bear Ranch's implication—that outside the litigation context HeartBrand ascribes only a low value to their cattle—is utterly false. We refer the Court to HeartBrand's 2008 business plan, in which HeartBrand estimates that bulls used for full-blood breeding purposes are worth $100,000 a head, and that bulls more suited to F-1 breeding have a value of $50,000 per head. (DX 9 at 851.) Bear Ranch also claims that HeartBrand does not insure its bulls. This, too, is false. HeartBrand does not financially insure the bulls, but as Mr. Fielding explained at trial, HeartBrand insures against the risk of losing a bull by incurring the cost of collecting and storing each bull's semen—400,000 straws as of the time of trial—to accomplish the same goal that a live bull would otherwise accomplish. (5/27/2014 Tr. at 114.)

**Bear Ranch has not proven that its cavalcade of alternative remedies is equitable.** At the hearing, Bear Ranch expressed a willingness to negotiate virtually any alternative to actually paying a remedy for the cattle it fraudulently obtained, but it primarily

focused on ordering that HeartBrand pay it more than $14 million for approximately 3,600 head of cattle, bailing out Bear Ranch of the vast majority of its investment in the cattle business and (ironically) leaving the wrongdoer in a better position than it would have been absent the fraud.[6] Bear Ranch, of course, knows that HeartBrand's capital constraints make financing such a purchase on short notice exceedingly difficult, particularly if Bear Ranch retains a breeding nucleus that any potential lenders or joint venturers would know is ready to competitively replicate and undermine the assets to be financed. Bear Ranch may assume that if it can succeed in making a remedy contingent on the victim financing that remedy, HeartBrand may never obtain any remedy—an outcome which would be anathema to the principles of equity.

Moreover, in no but-for world would HeartBrand have had to pay $14 million to Bear Ranch, or to anyone else, for a massive herd of unknown cattle. If HeartBrand were to create a herd of this size for its own account, it would have done so more efficiently, using more sensible industry-standard approaches, building the herd less expensively than Bear Ranch did. It would have financed the growth in part through offsetting revenues by selling cattle from the herd for meat or breeding as it grew. That opportunity is lost. Paying Bear Ranch for a massive herd at Bear Ranch's inflated costs is eminently inequitable.

In the true but-for world, HeartBrand would have acquired calves from Mr. Beeman over an extended period of time. The number of cattle arriving would have been appropriately moderated, not a bulk sale occasioned by a breeder's accelerating growth to start its own independent business. The cattle would have been delivered at the appropriate times to fit HeartBrand's business model (weaned calves ready for feeding, or fed cattle ready for slaughter), with no cattle coming in an overfed state or older than the preferred age that produces high-quality beef carcasses. HeartBrand would be taking cattle to feedlots or slaughter houses, not searching for ranchland to accommodate more than three thousand head and trying to quickly determine the condition, age, health, and breeding suitability of those cattle. No but-for world would have put to HeartBrand the burden of a wholesale transfer of that kind, and Bear Ranch has put on no evidence whatsoever of whether the burdens it means to impose are manageable or would exceed the subjective value (*i.e.*, the value as used in HeartBrand's business model) of whatever cattle they have to deliver in whatever condition they are in. In other words, Bear Ranch has not proven that the remedies it prefers are equitable.

---

[6] See Slide 28 from the HeartBrand hearing presentation for the calculations, showing how the $14 million payment to Bear Ranch would leave it with a per-head net cost of cattle retained or consumed that is less than what Bear Ranch paid to acquire Akaushi cattle and approximately the same as its cost to raise Akaushi cattle.



**Restrictions will not right the wrong.**  The difficulty of quantifying the but-for world ties to an important question the Court asked at the hearing: whether restricting the cattle in Bear Ranch's possession would fully restore HeartBrand.  Regrettably, it would not.  From HeartBrand's perspective, the but-for world is not a world in which Bear Ranch holds the Beeman cattle under restrictions.  The but-for world is one in which Mr. Beeman continued to hold the cattle, selling calves to HeartBrand in a steady and deliberate fashion, supplying HeartBrand's meat engine and producing full-blood bulls that HeartBrand could sell to F1 producers.  That additional meat supply and breeding stock has not been available to HeartBrand the last three years, and the company is weaker for it.[7]

Simply placing restrictions on the cattle in Bear Ranch's hands does not restore HeartBrand to its original position.  It would, potentially, restore one element of HeartBrand's expectancy from the fraudulently induced Bear Ranch transaction.  But as Bear Ranch has reminded us often, HeartBrand cannot seek its expectancy due to the statute of frauds.  Even if HeartBrand could seek its expectancy, the lone element of re-imposing restrictions would not restore HeartBrand's lost opportunities.  HeartBrand gave up a calf supply from a trusted partner, Mr. Beeman, in hopes of nurturing a relationship with a then-still-new partner and prospective calf supplier, Bear Ranch.  Placing restrictions on a Bear Ranch that still refuses to sell calves to HeartBrand will accomplish neither what HeartBrand expected from the 2011 transaction, nor will it restore HeartBrand to where it would have been had Mr. Beeman retained the cattle.

Moreover, placing restrictions on the cattle leaves both parties in a difficult position.  As both sides indicated at the hearing, in light of what has transpired, neither side wishes to be partners with the other.  From HeartBrand's perspective, doing business with Bear Ranch creates commercial risk and future litigation risk that would not be tolerable in an ordinary business relationship.  From Bear Ranch's perspective, Bear Ranch would no doubt be troubled by restrictions that would its complicate the plans it announced to the Court to sell off part of its herd in rapid fashion.  Were the parties required to continue dealing with one another, it is possible that future Court oversight would be necessary.  HeartBrand has come to accept that, in light of the remedies afforded by the jury's verdict, a clean break from Bear Ranch is the best way to preserve its business.

**Bear Ranch's additional citation on the exemplary damages cap issue is not persuasive.**  Bear Ranch cites *THI of Tex. at Lubbock I, LLC v. Perea*, 329 S.W.3d 548 (Tex.

---

[7] Unfortunately, dropping a massive supply on HeartBrand all at once and forcing HeartBrand to both finance Bear Ranch's costs these last three years (by paying three years of costs for the cattle) and finance the cost of accommodating those cattle and integrating them into the business may do just as much harm.  No matter how thirsty a man is, he will drown if he tries to drink from a fire hose.

App.—Amarillo 2010, pet. denied), for the proposition that the exemplary damages cap in Chapter 41 of the Civil Practice & Remedies Code need not be plead as an affirmative defense. While the Amarillo court held in *THI* that the exemplary damages cap is not an affirmative defense, *id.* at 587-88, the court found that the exemplary damages cap had been "sufficiently raised," noting that a motion to amend the pleadings had been filed but otherwise not specifically identifying the manner in which the cap had been raised. *Id.* To the extent that *THI* held that no pleading was required, it has not been followed by any Texas appeals court. Meanwhile, litigants have cited the *THI* case to the Corpus Christi Court of Appeals for the proposition that there is no pleading requirement. Finding the *THI* reasoning unpersuasive, the Corpus Christi court reaffirmed the *Wackenhut* holding as being consistent with Texas Supreme Court authority. *Zorrilla v. Aypco Construction II, LLC*, 421 S.W.3d 54, 67-68 (Corpus Christi 2013, pet. filed).

*   *   *

We thank the Court for its consideration of these issues and for its dedicated service in this matter.

Sincerely,

James A. Reeder, Jr.

cc: *Via Email*
Mr. Arturo A. Rivera, Case Manager
Arturo_Rivera@txs.uscourts.gov

*Via CM/ECF*
Mr. Paul Yetter