YetterColeman LLP

October 13, 2014

*Via CM/ECF*

The Honorable Gregg J. Costa
515 Rusk Street, Room 4627
Houston, Texas 77002

Re: *Bear Ranch, LLC v. HeartBrand Beef Inc., et al.*, No. 6:12-cv-00014; in the United States District Court for the Southern District of Texas

Dear Judge Costa:

This replies to HeartBrand's September 29, 2014 post-argument letter brief. As you suspected, it was premature for us to label anything as "final" in this case. The Court now must fashion an equitable remedy that is based on established law and proof adduced at and since trial. We have offered practical solutions that meet both concerns. In contrast, HeartBrand is sticking to a shoot-for-the-moon strategy, hoping for a cash award contrary to basic principles of unjust enrichment law and to the voluminous factual record.

Its letter is a telling mix of extreme positions. In part, it tries to show HeartBrand really did "suffer" some sort of *loss* from cattle sales to Bear Ranch, even though it and Mr. Beeman profited at the time (especially in the 2011 drought). In part, it tries to finesse its flip-flop from trial, when it tearfully pleaded for *all* "its" cattle back, in now refusing to pay a *fraction* of what its discredited DCF model says the cattle are "worth." It calls the "massive herd" too much of a good thing, a veritable "fire hose" of value. And in part, it tries to explain why getting the contract restrictions it wanted so desperately at trial is now (a few months later) too little, too late. None of this makes much sense, except to demonstrate that HeartBrand will take virtually any position to try to secure a windfall award.

Ironically, what HeartBrand asks the Court to order will allow other breeders to compete by selling unrestricted bulls and cows, which is exactly what it fiercely tried to prevent with its restrictions. HeartBrand wants a large windfall as it is losing its competitive position, now that it is well known that it has no monopoly position.

**This case requires no speculative remedy.** Typically, the allegedly enriching asset has no ready market or cannot be sold, such as due to owner recalcitrance or dissipation of the asset.

www.yettercoleman.com
909 Fannin Street, Suite 3600, Houston, Texas 77010
phone 713.632.8000 fax 713.632.8002

This is the rare case in which the assets – the cattle – are in mint condition to return, in fact, fatter, healthier, and better than when we got them.

As a result, there are at least three simple, concrete remedies to prevent enrichment and eliminate speculation. HeartBrand opposes all of them. It wants Bear Ranch to *keep* these assets and presumably sell the cattle to all comers. In other words, the supposed enrichment is in the cattle, but *it doesn't want the cattle*. As the saying goes, the proof of the pudding is in the tasting, and HeartBrand refuses to taste its own pudding.

While this seems bizarre given its position at trial, its motive is hardly profound. It sees an exit strategy for an unprofitable business. But HeartBrand has a problem of proof. As it admitted at the hearing, merely taking a slice from its hypothetical $80 million DCF model *cannot* rationally support a $23 million (or any) award. Its model assumes that a hypothetical buyer forms a hypothetical firm to buy the cattle, uses them in a hypothetical breeding-bull business, and makes an eternity of hypothetical profits. This is just the sort of dreamy thinking, divorced from the reality of the marketplace, condemned by Fifth Circuit and Texas law. Since its model has no support, it is forced to scramble to avoid the feasible remedies.

**1. Cattle transfer.** HeartBrand worked hard to sell the jury on its desperate need to get back the cattle. Now, it offers two excuses for abandoning its story at trial.

First, it makes a scrambled-eggs argument about a partial cattle return. It says Bear Ranch is free to sell the cattle it purchased from Twinwood and Spears, which would let us or others "competitively replicate" Akaushi. Letter at 5. If so, this situation is not new; the eggs were scrambled decades ago. The original importer, Dr. Wood, sold Akaushi genetics widely and without restrictions. To see that, one need only look to the cattle registry he used to track the cattle produced with those genetics. Dkt. #199 at 37-38 & n.10. And the record is replete with proof that the availability of other full-blood Akaushi is widely known today.

But Bear Ranch is willing to sell back *all* of its cattle, including those bought from Spears and Twinwood, at the same reasonable $3,800 per head price. These "eggs" that we bought, at least, need not be scrambled. With the cattle back, HeartBrand can pursue any business model it chooses, while we will pursue a niche 7X business using unrestricted full-blood Akaushi animals from other sellers, who have registered them with respected Wagyu associations.

Second, HeartBrand complains about the cost found by the jury. Paradoxically, it *agrees* to the jury's cost for the HeartBrand sale group. *See* Dkt. #193-1 at 3.[1] While that cost is fine

---

[1] It agrees for a simple reason: it hopes to get something for nothing. It wants to ignore the trial proof and get 300 or more cattle *for free*. As we explained at the hearing, its proposed judgment would have it pay the jury price ($6 million) but get back *more* animals, with the extras for *free*.

for contracted cattle, it doesn't want to buy *too* many cattle at that reasonable cost. Here, the alleged oral promise is that the Beeman sale group would be under contract. On its own allegations, the same buyback price should apply. Similarly, while it now claims it's too poor to buy back the cattle, it told the jury it was ready to write a $10 million check for all the cattle. Flush after his sale of Eddy Packing for a reported $130 million, Mr. Beeman would "write them a check right now." May 23 Tr. at 34. Its post-trial lack of capital is a ruse to avoid the logical remedy of an at-cost buyback.

HeartBrand even resorts to explaining its change of heart with a fire hose analogy. "Unfortunately," it says, it will "drown" if "a massive supply" of cattle is "dropp[ed]" on it "all at once." Letter at 6 n.7. Somehow, in just months, it went from wanting all of this massive supply of cattle, in return for paying their reasonable cost, to wanting less than half of the Bear Ranch cattle. Neither its explanation nor analogy rings true. In fact, the fire hose analogy brings to mind a maxim at MIT (at which no one has drowned, as far as we know):




*See* http://hacks.mit.edu/Hacks/by_year/1991/fire_hydrant/ ("Getting an education from MIT is like trying to get a drink from a fire hose."). If the cattle were as valuable as it says, HeartBrand would attract a flood of funding to buy them at a discount now.[2]

If the cattle were truly worth more than what Bear Ranch paid with restrictions in 2010, HeartBrand would be jumping at the chance to buy them back for $6.8 million or $3,800 each. According to the jury award, HeartBrand would be getting cattle worth $30 million or $16,667

---

2 Nor should land be an issue for the buyback. Bear Ranch will work to assign its Pinehurst lease in East Texas back to HeartBrand, which originally had the lease, subject to consent of the owner. This will provide thousands of acres of greatly improved grazing land for the returned cattle.

each, for a cool profit of $23 million and a return of *329%*. The fact that it does not want to buy all the cattle shows that their market value – even restricted – is less than what we paid. Bear Ranch was not enriched, justly or unjustly.

This issue warrants prompt resolution, at least in part. If the Court decides that a contract termination return is warranted (despite the lack of notice or opportunity to cure), and while the fraud remedy is being considered, we respectfully ask for an immediate order directing the buyback of the HeartBrand sale cattle and genetics at the costs found by the jury, plus a $3,800 pro rata cost for extra cattle (above the 1548 used at trial). We will pay transportation costs and deliver all DNA and related paperwork. Every month that HeartBrand drags its feet, Bear Ranch spends hundreds of thousands of dollars to care for animals it offered to sell back months ago. Otherwise, should HeartBrand continue to delay, we ask the Court to direct that the eventual buyback price for all these cattle include our documented maintenance costs since trial.

**2. Market sale.** Bear Ranch has sold no cattle in part to allow for what HeartBrand wanted at trial: to buy back the animals at a reasonable price. Now, if its position turns on what Bear Ranch could sell the cattle for today, there's an easy and fair way to decide that, with minimal court involvement.

As we stated at the hearing, Bear Ranch is prepared to reduce the size of its herd. We are not competitors of HeartBrand and never were. We therefore ask that the Court direct an immediate sale at auction of a meaningful group of the cattle (say, 500), upon standard auction procedures approved by the Court. Bear Ranch will disgorge all sale proceeds (net of auction costs) above its reasonable costs, as found by the jury. We will not seek to recover our maintenance costs since trial or actual production costs. The auction results will end speculation about market value and foreclose any enrichment.

Of course, many of Bear Ranch's cattle cannot be sold for breeding. They are castrated males headed to a feed lot or are in a quarantined feed lot already. On top of that, any cattle that can be sold for breeding cannot be identified as Akaushi, because the marketing restriction lasts for 50 years. PX1 at 5. So the only sale Bear Ranch can make is of cattle that it cannot call Akaushi, many of which cannot be bred. If HeartBrand truly believes that such a sale would bring in millions more than our costs, there's no need to guess.[3]

---

[3] In this regard, the Court should know that hundreds of cross-bred Akaushi breeding animals are coming on the market through public auction. According to one producer, HeartBrand is not buying back the animals and is allowing them to be sold *unrestricted* to the high bidder. Here is what that producer, Slator Ranch, is offering: "Oct. 25, 2014 @ 12:00 noon CST. Exclusive opportunity to purchase ½ and ¾ certified percentage Akaushi – English females bred back to full blood Akaushi bulls from the SLATOR RANCH in Llano, Texas. Over 300 hd are offered for sale ranging in ages from weaned ¾ blood heifers to ½ blood cows aged 3-5 yrs old." PX411-13.

**3. Cattle restriction.** There is a third simple solution: should HeartBrand buy back the 2010 contracted cattle and 2011 alleged-to-be-contracted cattle, and their progeny, at the jury's pro rata cost for all animals, Bear Ranch will agree not to sell its remaining cattle for breeding. HeartBrand's argument for why Bear Ranch is enriched by the cattle, which must be fed and cared for, is that the herd can be *sold* to someone else to run a breeding-bull business. If no such sale can occur, the supposed enrichment is gone.

This will require no ongoing judicial involvement. A restriction against selling breeding animals is simple, and Bear Ranch has been complying for years, as to both its contracted cattle and the rest. HeartBrand's complaint that this is somehow not fully compensatory ignores the *remedy* it seeks. Unjust enrichment is not to compensate a claimant for loss, or restore it to a preferred but-for world, but a remedy to prevent a defendant's undeserved enrichment.

**HeartBrand raises new and unproven damages theories.** Much of its letter is directed to its own supposed losses, rather than enrichment to Bear Ranch from the cattle. It argues about what "opportunity is lost," "lost opportunities," "what HeartBrand expected," and "consequential damages." Letter at 4-6. Indeed, its focus is on a "but-for world," *i.e.*, what it lost. *Id.* at 2-6. None of this is tied to the remedy that it seeks: unjust enrichment. HeartBrand did not prove *any* loss at trial, and it openly admits it has *no* provable loss.

For good reason, HeartBrand did not pursue damages for an alleged loss. The statute of frauds prohibits it. It is no answer now to ask the Court for a big check, based on the flimsiest of proof, in the name of "doing equity." The statute of frauds—by its very name—reflects its purpose of preventing fraudulent recoveries on alleged oral promises. *See* Dkt. #91 at 16.

Nor are out-of-pocket damages in the picture. HeartBrand had every chance to come forward with such proof. Instead, it withdrew its proposed jury instruction on such damages. It chose to pursue an unjust-enrichment remedy, rather than prove its own alleged loss. As it said, "we're not going to be presenting a damages model as such with the Beeman fraud. What we're going to be seeking is the equitable remedy of unjust enrichment." Tr. at 39:15-17.

The remedy of unjust enrichment exists because sometimes a defendant's gain from a tort is more than the plaintiff's loss. Other times, the defendant gains nothing at all. That is the case here. Bear Ranch was never enriched. To argue that it will be in "a better position" someday from having the cattle is contrary to the evidence. Bill Koch put $20 million into this endeavor, including his initial overpayment for the cattle. If HeartBrand buys back the two herds for $14 million, he still will lose a substantial amount, $6 million, from his investment. And even if HeartBrand buys back *all* the cattle at the jury's per head price, it still will pay only part of the *actual* costs it avoided for the past years, and Bear Ranch will be out of pocket millions of dollars and three years of effort. Bear Ranch's losses grow with every passing month of upkeep.

Nor is an award warranted by any sort of egregious conduct. For years, Bear Ranch tried to meet the letter and spirit of the HeartBrand contract. The complaint at trial was that we failed to register data on certain animals (after we were told there was no hurry and then locked out of

the AAA registry) and pay certain fees (after our check was not cashed). Even as to the Beeman sale cattle, we indisputably complied with the contract terms, but for registration and fees. And there is no evidence that HeartBrand ever tried to buy back any of the Bear Ranch calves, much less 30% of them or at a price that any full-blood producer would accept. In other words, a cash award is entirely disproportionate to the actions in dispute.

**Equity does not ignore the law.** At bottom, much of HeartBrand's response to these unjust-enrichment remedies is that it is good, and Bear Ranch is bad. The law defines types of remedies for torts, of course, and there are clear limits to the remedy HeartBrand has elected.

But if HeartBrand wishes to rely on a free-wheeling assessment of the perceived equities of this dispute, we should consider its own prevarications:

- HeartBrand falsely claimed a trademark on "Akaushi," PX17 at 1,when none exists.

- It falsely claimed that Beeman imported its "nucleus" Akaushi, and these "were the only Full Blood Akaushi to come to this country." PX125; PX113 at 1; PX253 at 1; May 23 Tr. at 112. He had no such role. The person who did import them, Dr. Wood, was just one of three importers in the 1990s (along with Japanese Venture Partners and Wagyu Sekai). And two Akaushi bulls were imported in the 1970s.

- It falsely created a breed club pretending to be for all Akaushi cattle. But the club does not define Akaushi as descendants of the imported animals on the registry where they were first recorded, which even the AAA's president found no reason to fault. May 21 Tr. at 220-21 (B. Bain). Instead, the club says Akaushi is defined by one man: HeartBrand's president. PX128 at 4.

- It falsely suggested that its registry is based on DNA verification. May 21 Tr. at 125 (B. Bain: "The DNA is the basis"). The registry shows 1,200 cattle produced since 2007 where the sire is unknown, much less DNA-verified. PX276. Indeed, the cattle sold to Bear Ranch were *not* all DNA-verified: "There are still a number of problem cases where the sire and/or dam of record were excluded by DNA testing." PX241; May 27 Tr. at 155-56 (J. Bain).

- It falsely promised that it was the only owner of Akaushi physically imported from Japan. PX1 at 1; May 27 Tr. at 371. In fact, Wagyu Sekai still owns an Akaushi named Kaedemaru that it imported in dam in 1994. PX272 at 439; Kurosawatsu Depo. (Dkt. #163-5) at 10 ("Kaedemaru was born I believe January 1, 1995. . . . She's 18 and she's still alive.").

- Beeman falsely declared a deadline for Bear Ranch's payment to HeartBrand in 2011, when that was not part of the deal. PX7 at 2; PX8. Even though we paid on a day's notice of the new deadline, PX9, he still cancelled the sale. May 23 Tr. at 145

(Beeman). He then sold the same cattle to Bear Ranch, making a profit of $146,000 in the process and skipping a $100,000 commission to Tony Spears. *Id*. at 158. At the same time, HeartBrand unloaded 514 animals that it would have had to feed and maintain in the depths of the brutal 2011 drought, saving itself from even greater losses (which Bear Ranch then bore).

Given the falsity of its claims, HeartBrand is hardly entitled to a litigation windfall that is contrary to the remedies available under the law. By seeking a big check, it reveals that it too knows that its DCF model, if adopted in the real world, would result in substantial losses. That is why the model is entirely unprecedented – not followed by HeartBrand or *any* cattle producer anywhere – and never surfaced until the month of trial. That is why HeartBrand is refusing to buy back the cattle, even at discounted costs. And that is why it is not jumping at the chance to buy cattle at the jury's cost of $3,800/head, despite its model's fantastical "values." Lastly, what the industry now knows will further reduce the acceptance and value of the breed: HeartBrand is not the sole source of full-blood Akaushi cattle, nor their original importer; it sells restricted animals but buys back calves at extremely low prices; it will not buy back the original animals except at prices lower than the original sale prices, unrestrained by open-market competition; its president is the person who decides what is an "Akaushi," rather than actual lineage records; and its program is a huge money-loser for full-blood producers. Based on their trial testimony, producers like Bear Ranch see the program as, in blunt terms, a clever con game.

In short, the HeartBrand model is a mirage, presented to sway the jury to accept its pleas to get back the cattle, but which evaporates in the harsh glare of examination. To use an analogy from trial, it is yet another fake Billy the Kid photograph.

**In determining value, speculation is anathema.** Should the Court itself try to find the true market value of the cattle, the DCF model is no help. As in *Flourine,* the model is merely a calculation of hypothetical future profits, discounted to today. Andrien did nothing to transform his assumed DCF figures into a real world market value, other than his assertion that it's what he thinks a mythical buyer might pay for the herds. His model is like the rejected value opinion in *Flourine*. The Fifth Circuit found such a model to be no evidence of market value at all, thus reversing an award based on it. And *Flourine* was an *asset*-valuation case. The Court applied the same principles as for lost-profit damages, because it would not elevate form over substance.

The same is true for *iValue*. Despite the claimant's attempt to distinguish a pure "income approach" as a *valuation*, rather than a calculation of lost profits, the court saw through the labeling to substance. Whether called lost-profit damages or income approach to value, the undertaking is identical – a DCF model of assumed future profits. Both calculations reduce a supposed income stream to a point in time, by discounting it to present value. Thus, the same rules apply, requiring objective facts, reasonable certainty, and no speculation.

In contrast, HeartBrand has been arguing that when an expert uses the magic phrase "market value," rather than "future profits," the identical calculation is no longer subject to

identical rules. Now it also tries to hedge, calling it a "traditional model" and saying that it really is based on "real-world examples of revenues from successful breeding operations." Letter at 2. Its expert has testified otherwise. *See* Sept. 11, 2014 Tr. at 211 ("Q. Is any company in the world following the model that you created from start to finish? Anybody? A. I don't know."); May 27, 2014 Tr. at 315 ("Q. In fact, you've found no cattle company . . . that has had the results that track what you have come up with . . . ? A. Well, I haven't looked at any other set of cattle.").

Moreover, the HeartBrand model is more aggressive than in *Flourine*. There, the asset valued was itself income-producing; it was a license to technology, which generated royalties. Here, the asset is cattle in a big hypothetical business with ranch hands, marketing, management, and production. The model values far more than just animals acquired by Bear Ranch, even if the sponsoring expert won't admit it.

At the hearing, HeartBrand proposed dumping its expert's trial assumptions altogether and finding other bases for a big cash award, like pointing to $7,000 as a good bull price. Of course, its basis for that change is the testimony of Dr. McGrann, the only livestock expert in this case. But HeartBrand ignores his testimony about the other "fantasies" in the DCF model. As he explained, just correcting the discount rate alone – leaving in the huge terminal value going into eternity – removes all of the alleged enrichment.[4]

Finally, it is notable to hear HeartBrand say that "it is difficult to place a specific dollar value" on the contract restrictions. Letter at 3. It took the opposite stance in moving to dismiss Bear Ranch's defense of fraudulent inducement, and the Court agreed. "Economists are able to monetize all sorts of things these days." Dkt. #70 at 15. Of course, HeartBrand never developed such testimony, but instead argued at trial that the restrictions actually *benefit* cattle producers.

To repeat, HeartBrand's arguments about whether its proposed valuation is based on a herd, a business, or cash flow is a debate about how many angels can dance on the head of a pin. The model is nothing more than a hypothetical buyer setting up a hypothetical firm to develop a hypothetical business to make speculative sales, at speculative prices, into a speculative market, with speculative profits that grow at a speculative inflation rate until the end of time.

**HeartBrand misstates the evidence.** Because it admittedly cannot defend the jury award as a slice of its DCF model, HeartBrand's slide deck goes fishing for tidbits to cobble into a pseudo-market-comparables analysis. As Dr. McGrann said, a comparables analysis looks at *actual*, truly comparable market transactions, like historical average sales prices for herds of top quality cattle. HeartBrand's last-gasp effort to build a comparables analysis falls far short, since it involves *no* actual, comparable market sales:

---

[4] HeartBrand offers from thin air that its model gives a $35 million result at $7,000 per bull. Letter at 3. In fact, setting the bull *and cow* price in its model to $7,000 results in $4.7 million, which is eliminated entirely when a realistic discount rate is used or taxes are applied. We are happy to provide an Excel copy of its model for the Court to confirm this.

- **Ray Record.** HeartBrand cites a 1996 letter by Ray Record. If it thinks that hearsay supports an award, there is no reason to rely on an 18-year-old opinion *expressly* good for only 2-3 years. PX56 at 3. Look at what he says today. Scott Bayley spoke to Record and "discussed with him my conclusion of 3,000 to 3,200" per head, and "in his opinion, that was a very reasonable amount." May 22 Tr. at 147.

- **Jim Scott.** HeartBrand cites a 1996 letter by Jim Scott. Again, it can't rely on an old opinion that by its own terms was only valid "for a period of two to three years hence." PX57. Scott explained why: "with artificial insemination and . . . embryo transfer . . . you've got 10 or 50 times as many cattle year two as you had in year one." Scott Depo. (Dkt. #78-4) at 27. "[O]bviously, as there were more animals out there, there was . . . a price decline." *Id.* at 25.

- **Al Wood.** HeartBrand cites the price paid to import the original 11 animals two decades ago. But Dr. Wood grasped supply and demand. He followed the strategy of capturing his import price back by selling genetics in the first few years, before his buyers used the genetics to create competition. *See* Wood Depo. (Dkt. #78-2) at 176 (the genetics would be worth less today, "because of the increase in amount").

- **Single-animal auctions.** As Dr. McGrann said, the animals sold at auction on which HeartBrand relies are "very special" donor cows. A Michael-Jordan animal is simply not comparable to the average price for *hundreds* of breeders in a herd. This is shown by the Gardiner data relied upon by Andrien. *See* Bear Ranch slide 40. He picked the top-selling donor bull of the most popular breed (Angus), but ignored the average sale price that is reported *directly* above. And that is the average for a sale of only bulls (not cows), of a very saleable breed, in today's strong market.

- **Antonio Calles.** HeartBrand cites his speculation about what a bull or cow *could* sell for. He is its former president, whose livelihood is bound up with promoting this breed. Nor is he known for being accurate. *See* May 27 Tr. (Fielding) at 70 (Q: "[A]t one point you said there's very little he doesn't claim, true?" A: "That's true."). Yet even he never testified to *actual* herd sales at more than the prices Bear Ranch paid.

**Exemplary damages.** At the end, the letter addresses the punitives award. It basically argues that there is a circuit split in Texas. At least three courts of appeals have held that the statutory cap is *not* an affirmative defense, and their reasoning applies to both the pre- and post-amendment statute. The Corpus court held otherwise in *Zorilla*, but the Supreme Court has called for briefing on the merits in a petition for review of that decision.

Like with a statutory sentencing maximum, there is nothing for a defendant on a claim to prove. Indeed, if a defendant must plead each rule, law, or constitutional requirement that might restrict recovery, where does it end? Did Bear Ranch have to plead that Chapter 41 requires proof of fraud by clear and convincing evidence? Or that it does not allow post-judgment

interest on exemplary damages? Or that the Constitution prevents recovery of an excessive penalty (an issue we reserved pending decision on a monetary award, *see* Dkt. #199 at 48 n.15)?

Whether the statutory cap must be pleaded, and whether waiver would apply, has been clear to all Texas state courts but one. Any claimant who reads Chapter 41 understands what one must do to trigger the higher alternative cap of §41.008(b)(1) or to trigger an exception to the cap under §41.008(c) or (f). That notice from the statute is surely why HeartBrand did not plead Chapter 41 as an affirmative defense on Bear Ranch's claim for exemplary damages.

**In conclusion**, as explained above and without waiver of its stated positions, Bear Ranch respectfully suggests that the Court direct the following remedies, were it to decide a contract termination return is warranted, from which HeartBrand is to make an election:

1. An immediate buyback of the HeartBrand sale cattle and genetics, at the cost found by the jury, plus $3,800 for each animal above the number used at trial; <u>and</u> a buyback of the Beeman sale cattle, at the jury's cost, plus $3,800 for any animal above the number used at trial and reasonable maintenance costs since trial; <u>and</u> subject to the above buybacks, confirmation of Bear Ranch's agreement not to sell its remaining unrestricted animals for breeding stock;

   <u>or</u>

2. Alternatively, an immediate auction of a significant number (500 or more) of the Beeman sale cattle, pursuant to court-approved procedures, including that all proceeds above the jury's reasonable cost will be paid to HeartBrand.

The carrying cost of these animals, with no plan in sight, is a large ongoing penalty to Bear Ranch that the jury could not take into account. Bear Ranch is prepared to sell back the animals, to secure a long-term resolution of this dispute. If HeartBrand now is unsure about what it wants to do, there is no good reason that Bear Ranch should have to bear the upkeep costs for the animals while HeartBrand ponders its future.

Cordially yours,

YETTER COLEMAN LLP

By: [signature]
R. Paul Yetter

Counsel for Bear Ranch, LLC

cc: James A. Reeder, Jr., Esq.