UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| BEAR RANCH, LLC, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 6:12-CV-00014 |
| | § | |
| HEARTBRAND BEEF, INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

### I.    INTRODUCTION

This is the latest—and hopefully near final—chapter in this saga involving Akaushi specialty cattle.  HeartBrand Beef, a Texas cattle ranching and beef production company, acquired Akaushi breeding cattle from Japan in the early 1990s and has continued to grow its herd over the years.  HeartBrand sells some of its Akaushi cattle to third parties, including Bear Ranch.  These transactions are typically governed by contracts with restrictions designed to maintain the breed's purity.  The restrictions forbid purchasers from selling cattle to third parties without HeartBrand's permission; require purchasers to register all offspring with the American Akaushi Association (AAA), making them subject to the AAA's regulations; prohibit purchasers from collecting or selling semen from the purchased cattle or its offspring; and prevent purchasers, for fifty years following the contract's termination, from selling the beef under the name "Akaushi," or

1

marketing the beef as having the health benefits of Akaushi.  *See* Docket Entry No. 59 ¶ 22.  The purchasers may, however, slaughter the Akaushi and sell the beef under a different name.

The value of these restrictions was thought to be significant enough to prompt Bear Ranch to file this lawsuit seeking to invalidate them.  And enough was at stake for both sides to hire some of the best lawyers in Texas.  Indeed, for much of this litigation, the parties agreed that the value of Bear Ranch's Akaushi would greatly increase if they were not subject to the tight restrictions.  Bear Ranch originally focused on antitrust claims, seeking to invalidate the restrictions as unlawful restraints on trade.  HeartBrand vigorously defended against any attempts to invalidate the restrictions, asserting counterclaims also premised on the notion that allowing Bear Ranch to maintain unrestricted cattle—which would essentially allow Bear Ranch to be HeartBrand's full competitor, breeding and selling its own line of Akaushi—would undermine the integrity of the Akaushi genetics it had spent two decades maintaining.  That concern animated HeartBrand's final plea at trial, which was to get its cattle back, "to get back what was taken."  *See* Docket Entry No. 188-5, at 25-26.

The jury's verdict—rejecting Bear Ranch's claims and finding in favor of HeartBrand on some of its counterclaims—has changed things.  Now, the premium Bear Ranch placed on unrestricted Akaushi when it pursued its rejected claims is

gone, as it argues that allowing it to maintain unrestricted cattle would not confer a significant economic benefit.  For HeartBrand, the desire to get the cattle back is now secondary to a request for a large monetary judgment based on either its expert's or the advisory jury's valuation.

HeartBrand and Bear Ranch have debated the proper equitable remedy—and the Court has considered the issue—until the cows come home.  And finally, they are about to do just that.  In this opinion, the Court will explain why it concludes that the original premises of this lawsuit still hold true: the restrictions have value, but the most equitable way to prevent Bear Ranch from obtaining any benefit from their erosion is to give the cattle back to HeartBrand before Bear Ranch realizes any unjust enrichment from unrestricted use of the cattle.

## II.    BACKGROUND

The protean nature of this litigation requires further explanation.  Bear Ranch's allegations stemmed from a series of Akaushi cattle purchases it made in 2010 and 2011.  Bear Ranch, which is located in Colorado, first purchased 424 Akaushi cattle from HeartBrand in July 2010 pursuant to a written contract (the Full-Blood Contract[1]) restricting Bear Ranch's sale and use of the cattle.[2]  Docket

---

[1]  The Full-Blood Contract and a contemporaneous agreement between Bear Ranch and HeartBrand, the F1 Program Contract, will be referred to in this memorandum and order as the 2010 Agreements.

[2]  As the Court explained at the summary judgment stage: "In order to preserve 'HeartBrand's preeminent position as the owner of Akaushi genetics outside of Japan,' Docket Entry No. 73-2 at 2, the contract restricts Bear Ranch's sale and use of the cattle and their offspring through

Entry No. 59 ¶ 27.  Bear Ranch later made three other purchases in "handshake" deals:[3] in December 2010, Bear Ranch purchased 50 cattle from Tony Spears; in June 2011, it purchased about 500 cattle from Ronald Beeman, the owner of Beeman Ranch and HeartBrand's chairman; and in July and September 2011 Bear Ranch purchased another 195 cattle from Twinwood Cattle, another HeartBrand producer.  *Id.* ¶ 26.

Although the lawsuit originally focused on antitrust claims, after Bear Ranch amended its complaint and dropped those claims (apparently it was unable to prove a separate market for this type of specialty beef), it was left relying on its fraud and contract claims.  *See* Docket Entry No. 59.  The fraud claim alleged that HeartBrand induced it into entering the restrictive contract by falsely representing that HeartBrand controlled all Akaushi cattle and genetics outside of Japan.  It sought a declaration that this fraudulent inducement rendered the restrictions unenforceable.  The Court held, however, that even if this fraud occurred, a declaration invalidating part of the contract was not a permissible remedy; rescinding the entire contract was.  *See Bear Ranch, LLC v. HeartBrand Beef, Inc.*, 2013 WL 6190253, at *4-*6 (S.D. Tex. Nov. 26, 2013).  Bear Ranch also sought

---

provisions governing: the sale of breeding stock, *id.* § I; registration with the [AAA], *id.* § V; restrictions on sale of full-blood offspring, *id.* § VII; liens, *id.* § XIV; and marketing, *id.* § XV." *Bear Ranch LLC v. HeartBrand Beef Inc.*, 2014 WL 1052515, at *1 (S.D. Tex. Mar. 18, 2014).

[3] The only documents governing those transaction were invoices and emails.  *See Bear Ranch*, 2014 WL 1052515, at *2.  The testimony painted different pictures of their oral agreements and expectations governing the sales.

two declarations related to its breach of contract claim.  First, it sought a ruling that the Beeman, Twinwood, and Spears cattle (those obtained in the handshake deals), as well as their progeny, were not subject to the contractual restrictions that governed the cattle purchased directly from HeartBrand.  *See* Docket Entry No. 59 ¶ 52.  Second, it requested a ruling that any offspring of offspring (the grandcalves) and later generations of the cattle purchased directly from HeartBrand were not subject to the contractual restrictions.  *Id.* ¶ 56.

HeartBrand and Beeman (also named as a defendant in the lawsuit) answered Bear Ranch's amended complaint and asserted as counterclaims their own allegations of fraudulent inducement, common law fraud, and breach of contract.  *See* Docket Entry No. 61.  HeartBrand's theory of fraudulent inducement was that Bear Ranch had represented that it only intended to produce beef for personal use and that it would comply with the 2010 contractual obligations.  Instead, according to HeartBrand, Bear Ranch knew from the beginning that it wanted to become a rival marketer of specialty beef and never intended to abide by the restrictions.  *Id.* at 16.  Beeman alleged that his sale of Akaushi to Bear Ranch was also fraudulently induced by oral representations that the contractual restrictions governing the HeartBrand cattle would apply to the Beeman cattle and that Bear Ranch would sell back 30% of the full-blood Akaushi calves to HeartBrand.  *Id.* at 17-18.  According to HeartBrand, these and similar empty

5

promises by Bear Ranch—which formed the basis of HeartBrand's common law fraud claims—induced its assent[4] to the Beeman sale, *id*. at 18-19; to the Twinwood sale, *id*. at 19-20; and forestalled any enforcement of the 2010 contract, *id*. at 21-22.   Finally, HeartBrand alleged breach of contract for Bear Ranch's noncompliance with the 2010 contract terms, pointing to multiple alleged breaches including failure to register cattle and offspring with the AAA.   *Id.* at 22-23. HeartBrand sought to recover possession of the cattle, their offspring, and the related genetic material, as well as actual damages. *Id.* at 23-24.

Both parties moved for partial summary judgment.   Bear Ranch sought judgment on its declaratory claim that most of the contract obligations governing the HeartBrand cattle were not applicable to the cattle from the Beeman, Twinwood, and Spears purchases. *Bear Ranch LLC v. HeartBrand Beef Inc.*, 2014 WL 1052515, at *3 (S.D. Tex. Mar. 18, 2014).   The Court agreed, finding that the contract restrictions governing the original HeartBrand sale did not extend to the other Akaushi cattle that Bear Ranch subsequently purchased. *See id.* at *5.   Nor was Bear Ranch's alleged oral promise that it would extend the contract restrictions to the Beeman sale enforceable because a written contract was required pursuant to the Texas statute of frauds. *See id.* at *6-*7 (explaining that a writing

---

[4] HeartBrand's assent was required because the terms of its contracts with producers (such as Bear Ranch and Beeman) restricted producers' abilities to sell Akaushi purchased from HeartBrand, including offspring. *See* Docket Entry No. 211-8 §§ I, VII.

6

is required under the statute of frauds if "any part of an oral agreement cannot be performed within one year" and finding that the written contract between HeartBrand and Bear Ranch contemplated a fifty-year obligation). Thus, none of the contract restrictions governing the HeartBrand purchase, other than those prohibiting Bear Ranch from marketing the beef as Akaushi and requiring Bear Ranch to register the cattle with the AAA,[5] were applicable to the cattle purchased from Spears, Beeman, and Twinwood. *Id.* at *7.

This summary judgment ruling changed the complexion of the case. It left Defendants with only their fraud-based counterclaims as a basis for any relief related to the three subsequent sales that the Court had found left Bear Ranch with unrestricted cattle. Given this major shift in the landscape of the case, the Court granted a continuance and allowed HeartBrand to revise its expert's report to value the equitable remedy of unjust enrichment on its fraud claims rather than the much less significant out-of-pocket damages. *See* Docket Entry No. 110 at 1-2; Docket Entry No. 150-1 (Supplemental Expert Report of Jeffrey S. Andrien, May 1, 2014). The revised expert report asserted that unrestricted Beeman, Twinwood, and Spears cattle would provide Bear Ranch with a benefit worth $89.8 million more

---

[5] The Court construed the terms of the Full-Blood Contract at summary judgment and determined that the marketing clause and possibly the registration clause in the contract were broadly applicable to all of Bear Ranch's Akaushi cattle, whereas the remaining contract restrictions applied only to the 424 cattle originally acquired from HeartBrand in 2010. *See Bear* Ranch, 2014 WL 1052515, at *5.

7

than it paid for what were believed to be restricted cattle; unrestricted Beeman cattle accounted for the bulk of this figure—$76.7 million.[6]

That value assessed for the Beeman cattle would become the focus based on the verdict the jury returned after an eight-day trial.  The jury rejected all of Bear Ranch's claims and some of HeartBrand's counterclaims, including the one that argued its entire relationship with Bear Ranch was tainted with fraud from the beginning.[7]  But the jury found for HeartBrand on two counterclaims, finding that (1) Bear Ranch fraudulently induced HeartBrand's approval of the Beeman purchase and (2) Bear Ranch failed to comply with the 2010 Agreements.[8]  *See* Docket Entry No. 172 at 18, 22.  With regard to the fraud related to the Beeman purchase, the jury advised that Bear Ranch was unjustly enriched by $23,199,000.000 and that HeartBrand should also be awarded $1,825,000.00 in exemplary damages due to the harm resulting from that fraud, which it found was

---

[6] Andrien's report calculated the "fair market value" of the Beeman, Twinwood, and Spears cattle and then subtracted Bear Ranch's cost to acquire and raise the cattle as of March 31, 2014. *See* Docket Entry No. 150-1 at 25-26.  "Fair market value" was derived using an income approach, which "involves forecasting cash flows that Bear Ranch can generate from the subject cattle."  *Id.* at 29.  Andrien determined that the fair market value of the Beeman, Twinwood, and Spears cattle was $96.1 million, less Bear Ranch's purchase amount and raising costs, which resulted in the valuation of $89.8 million.  *Id.* at 30.  The Beeman cattle accounted for $76.7 million of the total $89.8 million valuation.  *Id.* at 31.

[7] The jury made the following findings: (1) HeartBrand did not fraudulently induce Bear Ranch to enter into the 2010 Agreements by misrepresenting how rare Akaushi is, Docket Entry No. 172 at 15; (2) Bear Ranch did not fraudulently induce HeartBrand to enter into the 2010 Agreements by misrepresenting its intent to comply with the contractual restrictions, *id.* at 17; and (3) Bear Ranch did not fraudulently induce HeartBrand's approval of the Twinwood purchase, *id.* at 19.

[8] The jury found that Bear Ranch's failure to comply with the 2010 Agreements was not excused.  Docket Entry 172 at 23.

8

proved by clear and convincing evidence.  *Id.* at 20-21.  The jury also calculated Bear Ranch's costs of acquiring, producing, and maintaining the cattle from the various purchases in the event that the Court was to "award possession of the cattle . . . to HeartBrand" (the contractual remedy for the breach claim), thus requiring HeartBrand to "compensate Bear Ranch for the reasonable amount Bear Ranch spent." *Id.* at 24.  For the Beeman cattle, this figure was $6,832,000.  *Id*. at 25.

In oral rulings at a post-trial hearing, the Court denied Bear Ranch's Rule 50(b) motion for judgment as a matter of law as to the jury's liability findings.  *See* Hearing Transcript Sept. 24, 2014 at 62 (Docket Entry No. 225).  The Court reserved ruling on HeartBrand's motion for entry of judgment (Docket Entry No. 193) to allow for review of post-trial evidence that was admitted and the parties' briefing and argument.

## III.  ANALYSIS

### A. The Equitable Remedy for Unjust Enrichment

Defendants now move for entry of final judgment, requesting the Court to defer to the jury's advisory finding that Bear Ranch was unjustly enriched by $23,199,000, or if "the Court is inclined to consider its own remedy," to follow their expert's $76.7 million valuation of unjust enrichment.

Because the award of an equitable remedy falls squarely within the Court's discretion, neither of these valuations is binding on the Court.  *See Enserch Corp.*

9

*v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1502 (5th Cir. 1992).  And although the Court "may determine the amount of [an] award with the assistance of an advisory jury," *see Julian v. City of Houston, Tex.*, 314 F.3d 721, 728 n.25 (5th Cir. 2002), "it is in [the trial court's] discretion entirely whether to accept or reject, in whole or in part, the verdict or findings of the advisory jury."  Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2335 (3d ed.).  At trial, the advisory nature of the jury's finding on unjust enrichment was made abundantly clear, *see, e.g.*, Docket Entry No. 187-4 at 28 ("[I]t would be just a – an advisory number."); 187-10 at 10 ("[T]here's not going to be any award unless I find it's appropriate because it's an equitable remedy. . . . I view it as an advisory instruction."), and HeartBrand agreed it sought "just an advisory" damages figure. Docket Entry No. 187-4 at 28.  In light of that understanding, the Court allowed ample post-trial briefing and held two hearings—at one of which new testimony was admitted—to address how the Court should exercise its equitable discretion in fashioning a remedy for any unjust enrichment.

That discretion is considerable.  "Under the system of blended law and equity prevailing in the State of Texas, a district judge presides in the same capacity as a chancellor under the English equity procedure with full power and authority as such in all proceedings wherein equity is properly invoked."  34 Tex. Jur. 3d *Equity* § 3 (2015); *see also Penick v. Penick*, 783 S.W.2d 194, 198 (Tex.

1988) (explaining in the context of a claim for reimbursement that "great latitude must be given to the trial court in applying equitable principles"). Any judgment must capture the unjust enrichment that resulted from Bear Ranch's fraud against HeartBrand, measured by the benefit conferred on Bear Ranch, not any injury to HeartBrand.[9] *See* Restatement (Third) of Restitution and Unjust Enrichment § 13, cmt. e (2010) [hereinafter Restatement] (pointing out that the "standard condition of unjust enrichment" is "that the *transferee* has realized a benefit at the transferor's expense" unlike the "requirement in tort" that the "*transferor* has suffered economic injury" (emphasis added)).[10]

What is the benefit conferred on Bear Ranch that allegedly causes it to be "unjustly enriched" from its fraud? By misrepresenting that it would abide by the contractual restrictions from the original purchase when it obtained HeartBrand's approval for the subsequent "handshake" deal with Beeman, Bear Ranch obtained restriction-free Akaushi.[11] So the unjust enrichment is the difference between the

---

[9] This difference was the reason HeartBrand sought a continuance to allow its expert to amend his report to reflect the greater value of the benefit conferred on Bear Ranch.

[10] Twice in recent years, the Supreme Court of Texas drew upon the guidance of the Restatement. *See Neese v. Lyon*, --- S.W.3d ----, 2015 WL 4600046, at *7 (Tex. App.—Dallas July 31, 2015, no pet. h.) (describing *Morton v. Nguyen*, 412 S.W.3d 506 (Tex. 2013) and *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817 (Tex. 2012), as cases in which the court "relied heavily on common-law rescission and restitution as explained in the Restatement (Third) of Restitution and Unjust Enrichment" in its interpretation of "statutes that make rescission-like remedies available"); *see also Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 55 (Tex. 2008) (Hecht, J., dissenting) (explaining that the Restatement "provides a balanced, practical, and principled rule for resolving the issue presented by this case").

[11] The other misrepresentation at issue in the fraud claim on which HeartBrand prevailed—that

value of the unrestricted cattle received and the restricted cattle that were orally promised, as illustrated by the following simple formula:

$$\text{Unjust Enrichment} = \text{Value of Unrestricted Akaushi} - \text{Amount Paid for Restricted Akaushi}$$

The parties devote much of their briefing to attacking or defending the methodology that HeartBrand's expert applied in trying to calculate this difference. He contends that the unrestricted cattle are worth more than $75 million above the price Bear Ranch paid based on Beeman's mistaken belief that he was selling restricted cattle. At the hearing on this motion, most of the testimony pertained to the proper method for valuing the cattle in dollars. *See, e.g.*, Hearing Transcript Sept. 11, 2014 at 12-13 (Docket Entry No. 223) (valuation testimony of William Koch, owner of Bear Ranch); *id.* at 102 (valuation testimony of McGrann, Bear Ranch's expert); *id.* at 199 (valuation testimony of Andrien, HeartBrand's expert). Both parties' experts acknowledge, however, that a nontrivial number of sales of

Bear Ranch would sell back 30% of the cattle—is not the basis for the expert valuation or any other evidence presented at trial to establish an unjust enrichment award. In any event, the Court's remedy of returning the Beeman cattle addresses any unjust enrichment caused by this fraud because HeartBrand will be able to buy back all of the cattle, not just 30%.

unrestricted Akaushi cattle—which would offer meaningful comparables, a commonly used source for calculating value[12]—do not exist.  *See, e.g.*, Docket Entry No. 150-1 at 29 (Andrien report for HeartBrand) ("Because there is no information on sales of comparable cattle, I have not used the market approach to value the cattle, but have relied on sales of other breeds of full-blood cattle as a reasonableness check on my valuation."); Docket Entry No. 185-1 at 12 (Tr. Transcript May 22, 2014) (testimony of Scott Bayley for Bear Ranch) ("I attempted to obtain information about sales of a herd the size of the one that Bear Ranch acquired from HeartBrand, and I didn't find any transaction data on that.  In other words, . . . there was no information available about another large herd of Akaushi that had been sold, other than the ones that had been involved with HeartBrand.").  There is thus a significant degree of speculation in any of the methodologies the parties suggest—some more esoteric than others—to value the unjust enrichment resulting from the fraud.  For that reason, awarding the advisory jury's $23 million figure may overvalue the unrestricted cattle, as Bear Ranch argues, *see* Docket Entry No. 199 at 40 (characterizing the jury's advisory finding

---

[12] "If the goal of an appraisal is to ascertain market value, then logically there can be no better guide than the prices that willing buyers and sellers actually negotiate in the relevant market. Under a comparable sales analysis, the appraiser finds data for sales of similar property, then makes upward or downward adjustments to these sales prices based on differences in the subject property."  *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001); *see also State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 871 (Tex. 2009) (explaining in the context of real property that of the three methods of valuing property—the comparable sales method, the cost method, and the income method—"[t]he comparable sales method is the favored approach").

as "astronomical"); Hearing Transcript Sept. 11, 2014 at 102 (McGrann describing the jury's $23 million value as "completely unrealistic"), or it may undervalue the unrestricted cattle to the tune of $50 million, as HeartBrand's expert suggests, *see* Docket Entry No. 193 at 6-7; Hearing Transcript Sept. 11, 2014 at 227 (Andrien stating that he "stand[s] behind [his] valuation, absolutely").

The Court need not resolve this debate.  Even assuming that Andrien's testimony on valuation passes muster under *Daubert* and could support a jury verdict, the Court's duty is to fashion the most equitable remedy, not to decide whether another possible remedy might be supported by the evidence.  In determining that appropriate equitable remedy, the Court considers the "two principal kinds" of remedies available for unjust enrichment: money judgments in the amount of the unjust enrichment or "asset-based" equitable remedies that permit the "claimant to obtain restitution via rights in specifically identifiable property in the hands of the defendant" through, for example, a constructive trust or rescission.  Restatement ch. 7, intro. note.

There are two main reasons why the Court concludes that the latter "asset-based" remedy is appropriate in this case.  First is the uncertainty, discussed previously, as to any valuation because of the essentially nonexistent market for unrestricted Akaushi.  A nonmonetary remedy removes that speculation and risk of misvaluation.  *See* Restatement ch. 7, topic 2, intro. note ("Asset-based remedies

are often simpler to administer, because they avoid the need to litigate valuations and other issues pertaining to the measure of the defendant's enrichment."); *see also id.* ch.7, intro. note ("If the case is one in which the defendant's enrichment is more easily encompassed by specific restitution than valued in money . . . the same restitution claim will find a more effective remedy if the claimant can identify particular property representing the unjust enrichment in the hands of the defendant.").

Second is another unusual feature of this case: although in theory Bear Ranch has been unjustly enriched because it has the right to do as it wishes with the Beeman cattle in light of the Court's ruling that they are unrestricted, it has not yet exercised any of those rights.  Despite strenuously fighting for the right to do so in this litigation, Bear Ranch has never sold the unrestricted Akaushi cattle or their genetics.  Bear Ranch has not acted on the Court's summary judgment ruling—and with good reason as that summary judgment ruling is subject to appeal.  It has neither bred nor sold any unrestricted cattle.  *See* Hearing Transcript Sept. 24, 2014 at 139-40 ("[A]s we said before, we have abided by every restriction.  We've never sold any live animals.  We've never marketed them.").

That Bear Ranch has not yet realized any of the gains from its theoretical unjust enrichment presents a sharp contrast with the classic cases of unjust enrichment.  In cases such as a painter mistakenly painting the wrong house or a

homebuilder building a home on the wrong plot of land, *see* Restatement § 10, cmt. a, the benefit conferred cannot be undone, leaving monetary compensation to the party providing the benefit as the only means of redress.  *See* Restatement § 49, cmt. f  ("Liability in restitution for the market value of goods or services . . . is the usual measurement of enrichment in cases where *nonreturnable* benefits have been furnished at the defendant's request, but where the parties made no enforceable agreement as to price." (emphasis added)).  In contrast, this is an ideal case for a property-based solution as the Beeman cattle are readily identifiable and have been maintained in good condition.  The Court therefore concludes that the surefire way to prevent Bear Ranch from being unjustly enriched as a result of obtaining the unrestricted use of the cattle under false pretenses is to keep that unjust enrichment from happening in the first place.[13]

What remedy will accomplish that?  As described below, the Court believes that a constructive trust, along with limited injunctive relief, is sufficient and appropriate in these circumstances.[14]

---

[13] A useful analogy to this case is a situation in which a defendant fraudulently obtains an interest in a privately held business.  Without a sale of those shares, the defendant's gain is not yet realized.

[14] The relief fashioned by the Court tracks what HeartBrand requested in its amended answer: "Return or transfer the cattle purchased from Ronald Beeman, [Spears], and Twinwood (along with their offspring and any other cattle Bear Ranch obtained or produced as a result of those purchases), subject to any payment or refund that may be adjudged required under the terms of the [2010 Agreements] or by the Court as a matter of equity," and "such other and further relief . . . legal or equitable, to which HeartBrand and Beeman may show themselves to be justly entitled."  *See* Docket Entry No. 111 at 24-25 (First Amended Answer).

### 1.    Constructive Trust

One-half of the Court's proposed remedy is the imposition of a constructive trust over the Beeman cattle.[15]  *See Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999) ("[W]hether a constructive trust should be imposed must be determined by a court based on the equity of the circumstances."); *see also KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015) ("A constructive trust is an equitable, court-created remedy designed to prevent unjust enrichment."); *Meadows v. Bierschwale*, 516 S.W.2d 125, 128 (Tex. 1974) ("Actual fraud . . . justifies the imposition of a constructive trust."); Restatement § 55(1) ("If a defendant is unjustly enriched by the acquisition of title to identifiable property at the expense of the claimant or in violation of the claimant's rights, the defendant may be declared a constructive trustee, for the benefit of the claimant, of the property in question and its traceable product.").  To obtain a constructive trust, Texas law requires: "(1) . . . actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) an identifiable res that can be traced back to the original

---

[15] Although the Court has termed the remedy a constructive trust, "'rescission' may also be used to describe the avoidance of a transfer when there is no contract to be set aside."  *See* Restatement § 54, cmt. a.  Although the availability of the rescission remedy in Texas is not as clear as the Restatement suggests absent an enforceable contract, *see Southern Methodist Univ. v. Evans*, 115 S.W.2d 622, 624 (Tex. 1938), the Court nonetheless fashions the constructive trust remedy similarly to a rescission remedy.   "Neither the underlying theory of liability, the availability of defenses, nor the outcome of a particular case should depend on the language used to describe the remedy."  Restatement § 54, cmt. a.  The Court thus prioritizes substance over form.

property." *See KCM Fin.*, 457 S.W.3d at 87.  Each of these elements is established in this case.[16]

Thus, Bear Ranch will hold the Beeman cattle in constructive trust for HeartBrand: HeartBrand will have an equitable claim to the cattle, and Bear Ranch must surrender those cattle to HeartBrand upon receipt of payment for Bear Ranch's costs as described below.  *See* Restatement § 55, cmt. b; Ward Farnsworth, RESTITUTION: CIVIL LIABILITY FOR UNJUST ENRICHMENT 119 (2014) ("A *constructive trust* is an order stating that property to which the defendant holds title should and does belong to the plaintiff and must be delivered to him.  It can be used simply to recover property to which the defendant obtained title wrongfully, as by fraud[.]" (emphasis in original)).  This remedy of allowing HeartBrand to take possession of the cattle has the added benefit of being identical to the one the parties agreed to in their original contract,[17] and the remedy that would apply if the

---

[16] It is irrelevant that the Beeman cattle were not transferred directly from HeartBrand to Bear Ranch.  "In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, [or] concealments . . . which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, *although he may never perhaps have had any legal estate therein*[.]"  4 S. Symons, Pomeroy's Equity Jurisprudence § 1053 (5th ed. 1941) (emphasis added).

[17] The Full-Blood Contract includes a provision setting out remedies in the event of breach.  It states:

> In the event of a breach of any of the provisions of this Agreement by [Bear Ranch], HEARTBRAND shall be allowed to entitled to [sic] obtain injunctive relief to insure that it obtains possession of all cattle described in this agreement and to prevent [Bear Ranch] from delivering any data obtained under this agreement to any party and to enforce all other provisions of this agreement. [Bear Ranch] understands and agrees that the data and genetics of this agreement

appellate court agrees with HeartBrand that either (1) the original contract applies to subsequent sales, or (2) the oral promise that the Beeman transaction would be governed by the original contract is enforceable.  The parties' choice of remedy in a similar—and perhaps, depending on what happens on appeal, exact—situation is entitled to weight in the Court's consideration of the equities.

As with that contractual remedy, HeartBrand cannot claim the cattle without first reimbursing Bear Ranch for its acquisition, production, and maintenance costs.[18]  *See* Restatement § 55, cmt. l ("A constructive trustee who has improved the constructive trust property or defrayed necessary expenses in good faith has a claim in unjust enrichment against the equitable owner by the rule of § 27 [Claimant's Expectation of Ownership], remediable where appropriate via

_____

are confidential trade secrets which can only be protected by injunctive relief.  In addition, [Bear Ranch] understands that the unique nature of the Akaushi cattle and their reputation in the community is an essential element in the value of the cattle and the business of HEARTBRAND.

Docket Entry No. 211-8 § XVI.

[18] The Court recognizes that a lack of liquidity or financing may prevent HeartBrand from buying back all of the Beeman cattle, especially at one time.  It is already facing the prospect of expending a lot of money in a short time period based on its contractual right to buy back the cattle from the original 2010 purchase because of Bear Ranch's breach of the contract.  Thus, to the extent HeartBrand has a liquidity issue, the Court will consider ordering a judicial sale or auction in which the cattle will be sold directly, without first requiring HeartBrand to acquire them.   Such an auction or sale, conducted under the right conditions, should reflect the true market value of the unrestricted cattle, and HeartBrand would benefit from any value above the $6,832,000 required to "pay back" Bear Ranch.  *See* Hearing Transcript Sept. 11, 2014 at 24 (testimony of Koch stating that "the best way" to value an asset is to "sell it so you find out what the real market price is, and the best way to do that is put it up for an auction"); *see also id.* at 188 (testimony of Christina Wing-O'Donnell, CEO of Bear Ranch 7X (the ranch and cattle operation business owned by Koch) explaining that although Bear Ranch's "first choice would be to sell back," they also believe in "fair market value" and "would be fine taking them to auction at a mutually agreed upon way.").

equitable lien."). The jury's determination provides a basis for those costs.  *See* Docket Entry No. 172 at 24-25.  This will prevent HeartBrand from receiving a windfall and ensure that the remedy is limited to preventing Bear Ranch's unjust enrichment, that is, its enrichment attributable to the fraud.

The constructive trust ensures that any increased value once Bear Ranch's purchase price and costs of maintenance are taken into account would flow to HeartBrand, as equitable owner, rather than to Bear Ranch.  *Cf.* Restatement § 55, cmt. i ("The practical advantages of asset-based restitution are particularly apparent when the claimant obtains restoration of appreciated property without the need to prove its value.").  Indeed, if HeartBrand chooses to take possession of the cattle, it can resell them with or without restrictions to other buyers.  Assuming that its expert's valuation is correct, the market should allow it to sell the unrestricted cattle for hefty sums, including up to $50,000 for full-blood bulls and $35,000 for full-blood cows.  *See* Docket Entry no. 150-1 at 55 (Andrien report).

### 2.   Injunctive Relief for Remaining Cattle

The constructive trust remedy ensures that no unjust enrichment occurs, avoids valuation difficulties, and is consistent with the parties' desire that the deal be undone if their relationship spoiled, which it undoubtedly has.  It does not, however, address one problem.  Imposing a constructive trust over the Beeman cattle does not prevent Bear Ranch from selling unrestricted cattle from the

Twinwood and Spears sales.  There was no finding of fraud specifically related to these two later sales.  But any such unrestricted sales undermine the integrity of the Akaushi program and run the risk, given the possibility of intermingling, that Bear Ranch would be unjustly enriched on all the cattle it has obtained, including the Beeman cattle it obtained under fraudulent pretenses.

When the Court inquired at the post-trial hearing about its authority over these non-Beeman cattle, Bear Ranch responded that the Court's "equitable powers are broad."  *See* Hearing Transcript Sept. 24, 2014 at 102; *see also id*. at 103 ("[W]e think you have the power to say use those cattle for beef.").  Bear Ranch also expressed its willingness to comply with an equitable remedy that imposed the contractual restrictions on all Akaushi that Bear Ranch obtained from any of these sales.[19]  Taking these statements as a concession about the scope of the Court's equitable powers, and finding even without such a concession that equity requires ensuring that Bear Ranch not be able to sell any of the Akaushi (or their offspring) that are at issue in this suit, the Court will issue an injunction requiring Bear Ranch to abide by the 2010 contract restrictions for any Akaushi that remain.  The Court

---

[19] At the hearing, Bear Ranch suggested that "there might be" a possibility that it would stipulate to including the Twinwood and Spears cattle in the equitable remedy the Court fashioned.  *See* Hearing Transcript Sept. 24, 2014 at 103; *see also id*. at 139 (stating that Bear Ranch is "prepared to restrict [the last 200 cattle] so that we don't sell them for breeding purposes or they can buy them back, if they want to buy them back, at the same per animal price").  And in the post-hearing supplemental briefing, Bear Ranch indicated it "is willing to sell back *all* of its cattle, including those bought from Spears and Twinwood," Docket Entry No. 220 at 2, or to agree "not to sell its remaining cattle for breeding," *id*. at 5.

notes that it views this aspect of the remedy as critical to its overall attempt to craft an equitable remedy that prevents unjust enrichment and a windfall to any party. To the extent this aspect of the remedy is later deemed to be error, the Court views it as nonseverable from the other aspects of the remedy; its invalidation would thus prompt the Court to reconsider in full the exercise of its equitable discretion reflected in this Order.

To recap, the Court is willing to impose a constructive trust over the cattle from the Beeman sale, requiring Bear Ranch to surrender those cattle to HeartBrand if HeartBrand elects to buy them back on the same terms as the contractual remedy.  Alternatively, the Court will consider a judicial sale or auction of the Beeman cattle upon HeartBrand's request.  No matter which of these remedies HeartBrand elects, the Court will also issue an injunction requiring Bear Ranch to abide by the 2010 contractual obligations as to any remaining Akaushi cattle.

## B. Breach of Contract

Aside from its victory on the fraud claim, HeartBrand also obtained a favorable jury verdict on its breach of contract claim.  The jury found that Bear Ranch "fail[ed] to comply with the [2010 Agreements]" and that its failure was not excused.  *See* Docket Entry No. 172 at 22-23.  HeartBrand now seeks final judgment on the jury's verdict and enforcement of the contractual remedy that

entitles HeartBrand to repossess the cattle from the 2010 sale.  *See* Docket Entry No. 211-8 § XVI (Full-Blood Contract).

Bear Ranch objects that it attempted to comply with the AAA requirements by sending the required payment to the AAA but was locked out of the registry and thus could not perform its contractual obligations.   HeartBrand points out, however, that Bear Ranch in fact tendered payment only after the lawsuit was filed in 2012.  *See* Docket Entry No. 178-94 at 1-2 (Sept. 27, 2013 letter from Bear Ranch to AAA regarding March 2012 payment).  And Robert Gill agreed at trial that the AAA had not locked Bear Ranch out of the reporting portal nor had it threatened to suspend Bear Ranch at any point before Bear Ranch filed its lawsuit in March 2012.  *See* Docket Entry No. 184 at 19-20 (Tr. Transcript May 21, 2014). This issue was aired before the jury, and the Court finds no basis for undoing its determination that this tender does not excuse Bear Ranch's failure to perform its contractual duties.

Bear Ranch's main contention in its post-trial briefing is that it was not provided sufficient notice and opportunity to cure and should thus receive the contractually provided thirty-day opportunity to comply.   The notice and cure language is found in HeartBrand's termination clause:

> HEARTBRAND may terminate this Agreement, with cause, upon six (6) months advance written notice to PRODUCER in the event that PRODUCER violates the rules of the [AAA] or the terms of this agreement.  Upon receipt of the written notice, PRODUCER may

avoid the termination if PRODUCER is able to bring its position into compliance within thirty (30) days of receipt of the written notice.

Docket Entry No. 211-8 § XVII.  Bear Ranch did not raise the issue of notice and opportunity to cure in its Answer to HeartBrand's Amended Answer, at trial, in its Rule 50(a) or (b) Motions for Judgment as a Matter of Law, nor at any other time in this long-running lawsuit.  The Court thus finds that the issue is forfeited.[20]

Even if the argument had been timely raised, however, the Court finds that the HeartBrand termination clause does not apply.  An entirely separate provision, entitled "Remedies for Breach," lists the remedies available to HeartBrand "[i]n the event of a breach of any provisions of this Agreement by [Bear Ranch]." Docket Entry no. 211-8 § XVI.  The remedies provision does not itself require notice or an opportunity to cure.  *Id*.  Nor does it invoke, reference, or incorporate the notice and opportunity to cure requirements in the HeartBrand termination clause which immediately follows.  *See id*.  That is not unusual.  A termination clause, unless it states that it is exclusive, is generally considered a cumulative remedy that does not bar other breach of contract rights and remedies.  *See Olin v. Central Indus.*, 576 F.2d 642, 647 (5th Cir. 1978) (citing Williston, A Treatise on the Law of Contracts, sec. 842, 165 n. 1 (3d ed. 1962)).  And HeartBrand had little

---

[20] To the extent that the contract entitled Bear Ranch to notice and an opportunity to cure, and to the extent that that a fact issue existed as to notice and opportunity to cure, Bear Ranch's delay in raising the argument prevented its submission to the jury.  It also prevented HeartBrand from seeking an instruction on exceptions that might apply like futility.  This demonstrates the prejudice that resulted from Bear Ranch's late raising of this issue.

reason to try and terminate the contract which benefits the terminating party by relieving it of the obligation of further performance.    HeartBrand had no substantial obligations remaining under the contract to avoid and had been sued by Bear Ranch for breach of contract.  The Court thus concludes that the HeartBrand termination clause was not intended to supersede the breach clause or establish prerequisites for asserting a counterclaim for breach of contract.  The contract as written entitles Bear Ranch to notice and opportunity to cure only when HeartBrand attempts to terminate the agreement, but not when HeartBrand seeks injunctive relief for a breach.

Finally, the Court notes the substantial evidence that notice and opportunity to cure was either provided to Bear Ranch, or would have been futile.    AAA correspondence from 2011 cited Bear Ranch's noncompliance with the contract requirements.  *See* Docket Entry No. 211-30 (November 4, 2011 letter from AAA Executive Director Bubba Bain notifying Bear Ranch of its failure to timely pay its Whole Herd Reporting Invoice); *see also* Docket Entry No. 184 at 7-11 (Tr. Transcript May 21, 2014) (testimony by Robert Gill delineating numerous reminders Bain sent Bear Ranch regarding its failure to comply with the AAA rules before January 2012).    And Bear Ranch was certainly on notice when HeartBrand filed its counterclaim for breach of contract on May 7, 2012.  *See* Docket Entry No. 7.  HeartBrand asserted its breach claim only after Bear Ranch

25

initiated this lawsuit seeking to invalidate key portions of a contract that the jury, by its verdict, enforced.[21]   In that context, it makes little sense to say that Bear Ranch lacked notice of its alleged noncompliance with the contract's terms.   For all these reasons, the Court finds that Bear Ranch was not denied notice nor was it denied an opportunity to cure its noncompliance.

As for the liability finding, the Court found when it ruled on Bear Ranch's Rule 50(b) motion that there is sufficient evidence to support HeartBrand's claims of breach of contract based on any of the provisions HeartBrand cited to the jury, and that evidence supports the jury's finding to that effect.  *See* Hearing Transcript Sept. 24, 2014 at 61-62; *see also* Docket Entry No. 192 at 35-45 (Defendants' Response to Bear Ranch's Renewed Motion for Judgment as a Matter of Law) (detailing ample evidence supporting jury's verdict of breach including Bear Ranch's failure to register offspring of its Akaushi cattle with the AAA, failure to participate in the AAA Whole Herd Reporting System, and failure to submit required DNA test results).   Therefore, the Court enters judgment on the breach of contract claim and turns now to the remedy.

It is black-letter contracts law that parties to a contract "are free to limit or modify the remedies available for breach of their agreement."  *See Weaver v.*

---

[21] Although the Court ended up agreeing with Bear Ranch that the contract restrictions did not apply to subsequent sales of the cattle, recall that Bear Ranch through its antitrust and fraudulent inducement claims sought to invalidate the restrictions even with respect to the cattle obtained in the original sale.

*Jamar*, 383 S.W.3d 805, 812 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Bus. & Comm. Code § 2.719(a)(1) (allowing parties to a contract in goods to provide for remedies in addition or in place of statutory contract remedies). "If the parties agree to a contractual remedy, that remedy will be enforced unless it is illegal or against public policy." *SAVA gumarska in kemijska industria d.d. v. Adv. Polymer Sciences, Inc.*, 128 S.W.3d 304, 317 (Tex. App.—Dallas 2004, no pet.). The parties agreed in their 2010 arms-length bargain that "[i]n the event of a breach . . . by [Bear Ranch], HEARTBRAND shall be allowed to entitled to [sic] obtain injunctive relief to insure that it obtains possession of all cattle described in this agreement and to prevent [Bear Ranch] from delivering any data obtained under this agreement to any party and to enforce all other provisions of this agreement." *See* Docket Entry 211-8 § XVI.

There is no allegation that this remedy is either illegal or against public policy. Rather, Bear Ranch concedes that if this Court enters judgment for HeartBrand on its breach of contract claim "then Bear Ranch is prepared to accept termination of the contract upon an appropriate buy-back of cattle." *See* Docket Entry No. 199 at 52. And Bear Ranch agreed at the post-trial hearing that it was prepared to sell the cattle back to HeartBrand, including offspring related to the original HeartBrand sale, at the jury's price.[22] *See* Hearing Transcript Sept. 24,

---

[22] The jury found that Bear Ranch spent $6,034,000 acquiring, producing, and maintaining the

2014 at 24. The Court thus grants HeartBrand's request for the contractual remedy of repossession of the 1,548 head of cattle from the 2010 sale accounted for at the time of trial for $6,034,000, the price determined by the jury. The Court further finds that for any HeartBrand progeny that have come into existence since the evidence was presented at trial, the Court will require HeartBrand to pay $3,898 per head, the average price for each cattle extrapolated from the jury's verdict. The Court will allow the parties time to agree on what Bear Ranch should be compensated for its reasonable maintenance costs since the verdict.

### C. Exemplary Damages

Issues concerning the jury's award of exemplary damages remain. The jury found by clear and convincing evidence that Bear Ranch's fraud harmed HeartBrand, the showing required under Texas Civil Practice and Remedies Code section 41.003 to obtain exemplary damages. The jury then awarded $1,825,000 to HeartBrand as exemplary damages. *See* Docket Entry No. 172 at 20-21. Bear Ranch contends that the exemplary damages law bars this award.

HeartBrand asserts that Bear Ranch forfeited this argument because it did not object to the jury questions on exemplary damages or raise the issue in its Rule

---

cattle it acquired from HeartBrand in 2010. *See* Docket Entry No. 172 at 24-25. At the time of trial, that number covered 1,548 cattle. Bear Ranch and HeartBrand now disagree about how much "extra" HeartBrand must pay to repossess the later-born cattle (between the time of trial until now). At the September 24 hearing, counsel for Bear Ranch indicated that there could be at least 300 to 500 more cattle that were at least partially part of the HeartBrand group. *See* Hearing Transcript Sept. 24, 2014 at 26.

50(a) motion for judgment as a matter of law. *See* Docket Entry No. 208 at 32. To the extent that Bear Ranch's problem with the exemplary damages award is that it exceeds the statutory cap, HeartBrand's forfeiture argument is foreclosed by a recent Supreme Court of Texas opinion. In *Zorrilla v. Aypco Construction II, LLC*, the Court held that "the exemplary damages cap is not a 'matter constituting an avoidance or affirmative defense' and need not be affirmatively pleaded because it applies automatically when invoked and does not require proof of additional facts."[23] — S.W.3d —, 2015 WL 3641299, at *1 (Tex. June 12, 2015). And to invoke the cap in a Rule 50(a) motion prior to the verdict would have made little sense as there is no predicate award to cap until a verdict has been returned. The Court thus concludes that Bear Ranch did not waive the application of the statutory cap to the exemplary damages award.

But Bear Ranch raises a more fundamental objection to the exemplary damages award that is not answered by *Zorrilla*: it contends, based on arguments that will soon be described more fully, that an equitable remedy cannot support any award of exemplary damages. This objection could and should have been raised at the charge conference, as the proposed verdict form made clear that the jury would be asked to award exemplary damages on a claim for which no legal damages had been requested. *See* Docket Entry No. 18, 20. To the extent an exemplary award

---

[23] "In a diversity case, substantive state law determines what constitutes an affirmative defense." *LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014).

based on an equitable predicate remedy required additional findings, raising the issue prior to the jury charge would have allowed for further instructions. The Court thus finds that Bear Ranch's lack of objection in either its Rule 50(a) motion or at the charge conference forfeited this argument.

The Court will nonetheless address the meat of all the exemplary damages issues. Two questions must be addressed: (1) whether, as a matter of Texas common law, a nonmonetary equitable remedy can support an award of exemplary damages and, if so, (2) whether and how the exemplary damages statute applies to such an award.[24]

The Supreme Court of Texas answered the first question long ago. It explained that when "equity requires the return of property, this 'recovery of the consideration paid as a result of fraud constitutes actual damages and will serve as a basis for the recovery of exemplary damages.'" *Nabours v. Longview Savings & Loan Assoc.*, 700 S.W.2d 901, 904 (Tex. 1985) (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 583 (Tex. 1963)).[25] In such a situation, Texas law requires "findings of the fair market value of the property returned to the plaintiff"

---

[24] It is only the latter part of the second issue—how the cap applies to the award in this case—that the Court finds is preserved. Both the common law and statutory questions about whether an exemplary damages award can apply in any case with an equitable remedy was not preserved for the reasons discussed above.

[25] *Nabours* approvingly cited *Fillion v. Troy*, 656 S.W.2d 912, 915 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.), which had held that "[a]lthough there is authority to the contrary, the greater Texas authority supports the awarding of exemplary damages when rescission is allowed, even though no actual damages are awarded."

to allow a reviewing court to assess whether "punitive damages [] bear a reasonable proportion to actual damages." *Id*. at 904-05. *Nabours* thus treats a return of property via an equitable remedy such as rescission or a constructive trust as a form of "actual damages" for purposes of an exemplary damages award, even though "damages" traditionally refers to a legal rather than equitable remedy. *Id*.

Does Texas's exemplary damages statute, which was first enacted in 1987 a couple years after *Nabours* and then substantially amended in 1995, override *Nabours* and permit exemplary damages only when a legal remedy of damages has been awarded? Bear Ranch contends that it does, citing the following language: "exemplary damages may be awarded only if damages other than nominal damages are awarded." Tex. Civ. Prac. & Rem. Code § 41.004(a). HeartBrand counters that Bear Ranch's argument proves too much. HeartBrand focuses on the provision "appl[ying]" the exemplary damages statute "to any action in which a clamant seeks *damage*s relating to a cause of action." *Id*. § 41.002(a) (emphasis added). HeartBrand thus argues that the statutory scheme, by its own terms, has no application to an exemplary award supported by an underlying equitable remedy as permitted by *Nabours*.[26] *See* Docket Entry No. 208 at 33-34.

---

[26] The Fifth Circuit recently certified a related, but not controlling, question to the Supreme Court of Texas that implicates the scope of the "applicability" provision in section 41.002(a): does the phrase "action in which a clamant seeks damages relating to a cause of action" encompass an action for statutory civil penalties? *See Forte v. Wal-Mart Stores, Inc.*, 780 F.3d 272, 283 (5th Cir. 2015) (Question 1).

Both parties' arguments have some textual force.  A leading commentator agrees with Bear Ranch's view that "[e]quitable relief is apparently insufficient to support an award of exemplary damages under the exemplary damages statutes, although under common-law principles, equitable relief that requires the tortfeasor to return property to the injured party will support an exemplary damage award." *See* William V. Dorsaneo III, *Texas Litigation Guide* § 20.01[2][c][i] (2015) (citations to statute and *Nabours* omitted).  The treatise cites no cases supporting that view, however, and it is the interpretation that Texas courts have given the exemplary damages statute that matters most for this *Erie* question.  *See Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 177 (1940) ("An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.").  In the absence of guidance from the Supreme Court of Texas, federal courts must defer to the prevailing view of the state intermediate courts, even more so if that view is uniform, "unless convinced by other persuasive data that the highest court of the state would decide otherwise."  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (internal quotation marks and citation omitted).

Texas intermediate courts have consistently confirmed *Nabours*'s vitality since the enactment of the exemplary damages statute.[27] *See Van Voris v. Team Chop Shop, LLC*, 402 S.W.3d 915, 925 (Tex. App.—Dallas 2013, no pet.) (confirming that the "requirement of proof [of actual damages] . . . does not equate in all cases with entitlement to actual damages" and recognizing that "the Texas Supreme Court acknowledged in *Nabours* there may be instances in which actual damages are not recoverable; yet in those instances, the claimant still must secure a finding on the existence and amount of actual damages to support the punitive damages award"); *Kelley v. Kelley*, 2004 WL 2359986, at *4 (Tex. App.—Eastland 2004, no pet.) (finding that "[w]hile appellee did not recover monetary damages against appellant, he obtained an equitable recovery based upon appellant's fraud by virtue of the trial court rescinding the challenged conveyances," and because the statutory fraud statute allows equitable remedies recoverable as "actual damages," the rescission was sufficient to support exemplary damages); *Lesikar v. Rappeport*, 33 S.W.3d 282, 310 (Tex. App.—Texarkana 2000, pet. denied) (citing *Nabours*, 700 S.W.2d at 904 n.3, for the proposition that "the Supreme Court has authorized the recovery of punitive damages in actions sounding in equity, even where there is no award of typical actual damages" and finding that the recovery of a property

---

[27] The 1987 statutes included the language Bear Ranch relies on—"exemplary damages may be awarded only if damages other than nominal damages are awarded," 1987 Tex. Sess. Law 1st C.S. ch. 2 (S.B. No. 5) —so decisions since then are relevant to this inquiry.  In any event, all of the cases relied upon in this opinion postdate 1995, the year that the exemplary damages statutes were amended.

interest supported a punitive damages award); *Procom Energy, L.L.A. v. Roach,* 16 S.W.3d 377, 385 (Tex. App. —Tyler 2000, pet. denied) (holding that "punitive damages may be recoverable where equitable relief is granted [even when] the promised interest has not been conveyed, despite the absence of jury findings of actual damages");[28] *Scott v. Sebree*, 986 S.W.2d 364, 369 n.5 (Tex. App. —Austin 1999, pet. denied) (noting that since 1963 Texas courts have "often award[ed] exemplary damages in cases involving willful torts when a party elects equitable relief instead of actual damages" and citing cases including *Nabours*).  The issues in all of these cases are not identical to the issue in this case; only *Kelley, Lesikar*, and *Procom* involved review of an exemplary damages award with an underlying equitable remedy.  Nor did the defendants in all of these cases raise the same statutory arguments Bear Ranch asserts here.  But the uniform view of five Texas courts of appeals that *Nabours* continues to govern the availability of an award of exemplary damages when the underlying remedy is of a  nonmonetary equitable nature is strong evidence of the current state of Texas law on this subject.  *See Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 628 (5th Cir. 2000)

---

[28] The *Procom* court found that the Texas Supreme Court's reference to a "return of property" in *Nabours* was not a requirement that an equitable remedy involve return of property in order to support an exemplary damages award.  *See* 16 S.W.3d at 385.  The Court considers this interpretation of *Nabours* significant, as the Beeman cattle were not conveyed directly from HeartBrand to Bear Ranch and thus are not strictly being "returned."  In addition, the unique arrangement in which HeartBrand had to agree to the Beeman sale, and owned the cattle until a last-minute sale to Beeman, does make this case functionally equivalent to a return.

(following the view taken by four of five Louisiana intermediate courts that had addressed an issue).

Without any Texas decision lending support to its view,[29] Bear Ranch faces a difficult task in convincing this Court that Texas's highest court would disagree with the courts of appeals.  *See Howe*, 204 F.3d at 627 (noting that decisions of intermediate state courts are "datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise" (internal quotation marks and citation omitted)).  As previously noted, Bear Ranch's view does have some textual support (though so does HeartBrand's view that the "applicability" provision does not apply to a claim seeking equitable relief).  Yet some commonly accepted principles of statutory construction validate the unanimous view of the courts of appeals that have considered the issue.  Texas courts have long recognized a "presum[ption] that the Legislature acted with knowledge of the common law and court decisions."  *Phillips v. Beaber*, 995 S.W.2d 655, 658 (Tex. 1999) (citing *McBride v. Clayton*, 166 S.W.2d 125, 128 (1942)); *Koy v. Schneider*,

---

[29] The only case Bear Ranch supports for its position, *Mullins v. TestAmerica, Inc.*, 564 F.3d 386 (5th Cir. 2009), stands only for the well accepted principle that some underlying remedy for a cause of action must support an award of exemplary damages.  *Mullins* cited the statutory language in section 41.004 about "damages other than nominal damages" on which Bear Ranch relies, but was a situation in which no predicate for an exemplary award existed because the plaintiffs did not ask for any remedy on their fraud claim, either legal or equitable.  Because *Mullins* did not involve an award of equitable relief, it did not address *Nabours* or the Texas courts of appeals cases applying it since the enactment of section 41.004.

221 S.W. 880, 889 (1920). The language invoked by Bear Ranch was enacted in 1987, against the backdrop of the Supreme Court of Texas having recently reaffirmed that "damages" for purposes of the predicate remedy supporting an exemplary damages award can include an equitable return of property. *Nabours*, 700 S.W.2d at 904-05 & n.3; *see also Mack v. Newton*, 737 F.2d 1343, 1363 (5th Cir. 1984) (observing before *Nabours* that Texas, "contrary to what appears to be the majority rule, will not deny exemplary damages simply because an action is equitable, rather than legal") (citation omitted). There is not clear language in the exemplary damages statute indicating that the legislature intended to change Texas's common law position traced back to 1855 that an equitable "recovery of the consideration paid as a result of fraud constitutes *actual damages*, and will serve as a basis for the recovery of exemplary damages." *See Holloway*, 368 S.W.2d at 583 (emphasis added, internal quotation marks omitted) (tracing this view back to *Oliver v. Chapman*, 15 Tex. 400 (1855)); *see also* Antonin Scalia & Bryan Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 318 (2012) ("The better view is that statutes will not be interpreted as changing the common law unless they effect the change with clarity."). And Texas courts have long recognized that, so long as there is a valuation of the equitable remedy that allows for proportionality review, an equitable remedy may implicate the deterrence rationale of exemplary damages just as much as a legal one. *See Holloway*, 368

S.W.2d at 584 ("The remedy elected by plaintiff should not preclude the recovery of exemplary damages . . . .  It is consistent with equitable principles for equity to exact . . . not only the profits rightfully belonging to the [plaintiff] but an additional exaction for unconscionable conduct. There should be a deterrent to conduct which equity condemns and for which it will grant relief.").  The Court thus finds that the uniform view of all Texas courts of appeals that have considered the issue is the best predictor of the current state of Texas law: the Court's equitable remedy is a predicate form of "damages" that can support an exemplary award under section 41.004(a).

The Court now turns to the proportionality review that the statute requires. Exemplary damages cannot exceed "two times the amount of economic damages." *See* Tex. Civ. Prac. & Rem. Code § 41.008(b)(1)(A).  The jury awarded $1.825 million in exemplary damages to HeartBrand.[30]  It thus takes an equitable award transferring or auctioning property with a fair market value of only $912,500 to support the exemplary award.  *See Nabours*, 700 S.W.2d at 904-05 (finding significant that the jury in *Fillion* "made findings of the fair market value of the property returned to the plaintiff").  The jury, of course, determined that Bear Ranch was unjustly enriched by over $23 million, meaning that it assessed the

---

[30] "[T]he determination of whether to award exemplary damages and the amount of exemplary damages to be awarded is within the discretion of the trier of fact."  Tex. Civ. Prac. & Rem. Code § 41.010(b).

value of the restrictions at that amount.  Only four percent of the $23 million assessment need be supported by the evidence to support the exemplary award.

The Court concludes that that the record easily supports a valuation of the returned property of at least $912,500.  The Beeman cattle were purchased for a total of $2,494,000 ($4,750 per head for cows and $8,500 per head for bulls). Docket Entry No. 72-13.  That sale was made with the understanding that the cows would be restricted.  Review of the record in this case leaves little doubt that a premium exceeding 36% (the $912,500) would have been charged if this were the first sale of a sizeable number of HeartBrand-bred Akaushi without restrictions. Among other factors, this value is clear from the limited pricing date that does exist, the testimony concerning how an unrestricted herd of this size would enable Bear Ranch to quickly breed a competing line of Akaushi, and the fact that the restrictions were significant enough for Bear Ranch to file this lawsuit and incur hundreds of thousands of dollars in expenses in an effort to invalidate the restrictions.

The Court thus will enter a judgement reflecting the jury's exemplary damage award against Bear Ranch in the amount of $1,825,000.

## IV.   CONCLUSION

For these reasons, the Court **GRANTS IN PART** and **MODIFIES IN PART** HeartBrand's Motion for Entry of Final Judgment (Docket Entry No. 193). The Court will enter judgment in favor of HeartBrand on its fraud and breach of contract claims with the relief described above.  Within ten days of the issuance of this order, the parties shall jointly file a proposed final judgment reflecting this ruling as well as the previous rulings on the claims for declaratory relief.  If the parties cannot agree on the substance of certain aspects of that final judgment, the joint submission shall identify the parties' different positions.  Within thirty days of the issuance of this order, any request for costs or attorneys fees shall be filed.

SIGNED this 4th day of September, 2015.

_____
Gregg Costa
United States Circuit Judge
(Sitting by Designation)