# Vinson&Elkins

James A. Reeder, Jr.  jreeder@velaw.com
**Tel** +1.713.758.2202 **Fax** +1.713.615.5947

September 28, 2015

*Via CM/ECF*

The Honorable Gregg J. Costa
515 Rusk St., Room 4627
Houston, Texas 77002

   Re: Cause No. 6:12-CV-14; *Bear Ranch, LLC v. HeartBrand Beef, Inc., et al.*; in the United States District Court for the Southern District of Texas

Dear Judge Costa:

  Pursuant to the Court's memorandum and order of September 4 (Dkt. #240), Defendants submit this proposed final judgment.

  The parties have conferred in an attempt to reach agreement on a form of judgment, but those discussions have not resulted in an agreed form. HeartBrand therefore submits its own proposal and explains its position on the disputed issues. We rely on Bear Ranch to submit its proposal to the Court separately.

## Statement regarding Election of Remedies for Fraud

  In its order, the Court ordered nonmonetary relief to prevent Bear Ranch from enjoying unjust enrichment from its fraud, in part due to uncertainty regarding how to measure the unjust enrichment that would result if Bear Ranch exploited its Akaushi cattle outside the HeartBrand system. That nonmonetary relief allowed HeartBrand to elect to acquire the cattle Bear Ranch had purchased from Mr. Beeman in 2011, after reimbursing Bear Ranch for its acquisition, production, and maintenance costs.

  Unfortunately, the parties are in disagreement on what costs are in fact subject to reimbursement. Bear Ranch's proposed judgment sent to us today uses a different approach from what Bear Ranch described to us during the past two weeks, but our initial review of today's proposal suggests Bear Ranch is looking for more than $2 million (perhaps much more) for what they call "maintenance," an amount that would result in a windfall to Bear Ranch and an unfair burden to HeartBrand for reasons that will be described below. Rather than face the risk that electing acquisition or sale would require HeartBrand to assume Bear Ranch's unreasonable sunk costs, HeartBrand's proposed judgment is premised on HeartBrand declining the election as to the 2011 Beeman cattle and leaving those in Bear

**Vinson & Elkins LLP  Attorneys at Law**
Abu Dhabi  Austin  Beijing  Dallas  Dubai  Hong Kong  Houston  London
Moscow  New York  Palo Alto  Riyadh  San Francisco  Tokyo  Washington

1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
**Tel** +1.713.758.2222 **Fax** +1.713.758.2346 **www.velaw.com**

**V&E**

Ranch's hands under the terms of the 2010 Contract, as provided by the Court's order. (Dkt. #240 at 22.)

## Disputed Issues in the Form of Final Judgment

**Bear Ranch's approach to the election of remedies**

The primary issue in Bear Ranch's form of judgment is that Bear Ranch has chosen to make an election that the Court's order reserved for HeartBrand.

The Court ordered that Bear Ranch would surrender the Beeman cattle (the 2011 Cattle) to HeartBrand if HeartBrand elected to repurchase them on the same terms as the 2010 Cattle, with an alternative election available to HeartBrand of a judicial sale or auction "upon HeartBrand's request." (Dkt. #240 at 22.) The Court stated that regardless of those elections, Bear Ranch would be enjoined to abide the 2010 Contract obligations as to any remaining Akaushi cattle. *Id.* Bear Ranch ignores HeartBrand's right to elect, and interposes Bear Ranch's own request for a judicial sale against HeartBrand's wishes. Bear Ranch's approach undermines the Court's solution.

The jury's advisory remedy appeared to recognize there was uncertainty in the value of the cattle at issue, but allocated the risk of that uncertainty mainly to Bear Ranch as the wrongdoer through a balanced combination of damages and buyback rights at compromise figures. The Court's remedy resolves the uncertainty in a different fashion, by giving HeartBrand the right to participate in the uncertain value the cattle assets would have if they were sold but without requiring Bear Ranch to pay that uncertain value out of Bear Ranch's pocket. But the Court also was clear that its remedy was intended to preserve HeartBrand's closed system for the development of its genetic assets; hence, the coverage of the Spears and Twinwood cattle within the Court's injunctive relief.

Bear Ranch would turn this on its head. Whereas the Court-prescribed election was to allow HeartBrand to participate in the value of the assets (either through purchase or through an economic interest in auction results), Bear Ranch would change this to an election to either pay Bear Ranch or suffer the loss of HeartBrand's business, as though HeartBrand's right to preserve its business from inequitable fraud were outweighed by Bear Ranch's equitable right to reimbursement credit. Per Bear Ranch's order, if HeartBrand does not immediately pay Bear Ranch millions of dollars, then HeartBrand's Akaushi genetics will be unleashed on the open market in an undefined auction process. This makes the injunctive relief over remaining Akaushi cattle all but superfluous, and allows Bear Ranch to effect the very harm that both the jury and the Court have sought to prevent if possible, or remedy if not preventable.

Because Bear Ranch's form of judgment misconstrues the relief granted, it cannot be adopted. HeartBrand's form of judgment preserves the injunctive relief prescribed by the Court's order.

**2010 Cattle subject to repurchase obligation**

Setting aside the handling of 2011 Cattle, Bear Ranch's form of judgment creates issues pertinent to the 2010 Cattle subject to repurchase. Upon receipt of the Court's order, HeartBrand requested Bear Ranch's current inventory of cattle so that it could make election decisions. HeartBrand discovered several significant concerns that affect the number of cattle subject to repurchase. Bear Ranch's proposed judgment does not address these issues, the ramifications of which make Bear Ranch's judgment more onerous for HeartBrand.

*Identification issues.* First, Bear Ranch's proposed judgment ignores the fact that Bear Ranch has handled the cattle in a fashion different from what was understood at trial. The jury's cost award was based on the premise that the 2010 Cattle and the 2011 Cattle could be addressed separately, the expectation being that the 2010 Cattle and progeny at the Bear Ranch in Colorado remained segregated from the 2011 Cattle and progeny located at the Pinehurst Ranch in Texas. In fact, based on the inventory Bear Ranch recently shared with HeartBrand, the cattle have been mixed and interbred extensively, with hundreds of cattle from each group turning up in the other location. Moreover, even those animals that are supposed to be in the 2010 group per the inventory records are questionable, as hundreds of cattle in the inventory are missing the identification of at least one parent, and there are hundreds of cattle that are missing DNA test identification codes. The Bear Ranch judgment does not address these mixed-lineage issues at all, and would put HeartBrand to an obligation to make elections on cattle of "uncertain" lineage, the mere presence of which is surprising based on Bear Ranch's assurances at trial of its quality record-keeping.

HeartBrand should not be obligated to take cattle that are not part of the 2010 group. Any uncertainty about whether these animals are in fact part of the group to be repurchased as a contract remedy ought to fall on Bear Ranch, the party that created the uncertainty by failing to segregate the cattle and maintain basic records. Under HeartBrand's proposed judgment, HeartBrand would repurchase cattle identified as 2010 Cattle and progeny only where the parentage has been identified. As for the missing DNA information, HeartBrand proposes that it take cattle as to which parentage has been identified on Bear Ranch's inventory document even if those animals do not show a DNA code, subject to a right of return if subsequent testing reveals the animals were not as represented.

*Cattle lost to "terminal" status.* Second, HeartBrand should not be required to take cattle that have irretrievably been made part of Bear Ranch's meat program. Bear Ranch's

V&E

new inventory shows that it now has well over a thousand cattle designated "terminal" (*i.e.*, destined to become meat, not breed stock). Most of these terminal animals are at a feedlot in Colorado, but others are at the Bear Ranch facilities in Colorado and Texas. Many of these animals are three or four years old. Bear Ranch has never argued that HeartBrand should take Bear Ranch's meat, or take animals that are on the verge of becoming a meat product. Indeed, at the September 11, 2014, post-trial remedies hearing, Bear Ranch raised this terminal cattle issue simply to point out that its terminal cattle lacked the same value as breeders, because those terminal cattle were in a "quarantine" feed yard from which they could not be removed unless slaughtered for meat.[1] Bear Ranch nevertheless suggests a form of judgment under which those terminal cattle would be removed from feed lots and sold to HeartBrand at the same value as a breeding animal.

    Even if the animals are available for sale, the fact that these animals are now deep into the Bear Ranch feeding program makes them unsuitable for use by any producer other than Bear Ranch. They are undoubtedly in a condition much different from what they would have been had they been in HeartBrand's meat program, and thus are unsuitable for HeartBrand. As Bear Ranch explained at trial and after trial, Bear Ranch "long feed[s]" animals for its meat program nearly three years to get the especially intense marbling typical of ultra-premium wagyu products.[2] HeartBrand, on the other hand, feeds its meat animals only to 1350 or 1400 pounds, "the normal weight in the cattle industry," to offer a product that is palatable to typical American consumers.[3] Bear Ranch acknowledges that HeartBrand "slaughter[s] earlier" than Bear Ranch and HeartBrand's "cost of production is lower" because HeartBrand "is going after a different segment" than Bear Ranch, which tries to "get over $100 a steak."[4] Indeed, many of Bear Ranch's long-fed cattle would not even be eligible for a USDA-graded program like HeartBrand's due to over-maturity of the carcasses.

    Bear Ranch unreasonably overfed these animals because it chose to produce an unusual meat product for an especially narrow market, while acquiring and producing enough cattle for a much larger mass-market operation. Bear Ranch admits that it miscalculated in doing so.[5] Bear Ranch's attempt to force HeartBrand to take not just Bear Ranch's breeding stock but also animals that have been designated and fed for the Bear Ranch meat program is unreasonable and appears calculated to relieve Bear Ranch of the impact of a bad business decision in which HeartBrand played no part.

---

[1] 9/11/2014 Tr. at 53 (Brandstadt).

[2] 5/20/2014 Tr. at 87; 9/11/2014 Tr. at 49 (Brandstadt).

[3] 5/27/2014 Tr. at 10 (Fielding).

[4] 9/11/2014 Tr. at 174-75 (Wing-O'Donnell).

[5] 9/11/2014 Tr. at 17-18 (Koch), 187 (Wing-O'Donnell).

**V&E**

***Cattle lost to "salvage" status.*** Third, just as HeartBrand cannot take back cattle that Bear Ranch slaughtered since 2010, HeartBrand should also not be required to take back breeding cattle whose productive breeding life was entirely consumed by Bear Ranch. Breeding cattle in this population often reach "salvage" age at nine years for females, and eight years for males, though breeding lives vary. Several hundred of the 2010 Cattle are now at that salvage age or older, and HeartBrand should not take those cattle generally. (However, HeartBrand has reviewed Bear Ranch's inventory and identified 49 nine-year-old cows that produced a calf in 2015. Based on that recent calving history, HeartBrand includes those cows in the proposed repurchase notwithstanding their advanced age.) There is reason for concern even below that nine-year-old threshold, as Bear Ranch's inventory indicates that many of its sub-nine-year cows have not calved for several years. Though that calls their health and maintenance into question, HeartBrand would take the cattle under its proposed form of judgment, subject to a right of return if the cattle do not appear to be in good physical and reproductive condition on delivery.

**Profits disguised as maintenance costs**

In addition to its attempt to boost the number of cattle subject to repurchase, Bear Ranch proposes that HeartBrand pay seven figures' worth of maintenance costs on cattle born since the time of trial, allowing Bear Ranch to realize massive profits—this on a sale that by law is designed to prevent unjust enrichment, not facilitate it.

Bear Ranch claims it is entitled to be paid $3,898 per head for every animal delivered, including cattle born since the time of trial, plus "maintenance" costs that it claims were determined by HeartBrand's expert economist, Jeff Andrien. But what Bear Ranch refers to as "maintenance costs" actually comes from Mr. Andrien's testimony about the cost to *produce* a calf, wean it off its mother, and grow it to fed weight for slaughter—not *maintain* it.[6] Mr. Andrien's testimony on the magnitude and sources of these production costs were corroborated by Bear Ranch's own economist[7] and by the expectations manifested in the HeartBrand contract.[8]

---

[6] 5/27/2014 Tr. at 284-286 (Andrien). Mr. Andrien explained that producing a calf (*i.e.*, maintaining a cow-calf unit) for the seven-and-half-month period from birth (calving) to weaning costs between $350 and $700. Taking that same animal through the feeding stage to reach mature breeding weight costs another $730 for females, for an upper-end total of $1,430, or $970 for males, for an upper-end total of $1,670. *Id.*

[7] Mr. Bayley concluded that it costs HeartBrand $1600 total per head to produce a breeder, and $1,900 total per head to produce a fed animal. 5/22/2014 Tr. at 75 (Bayley).

[8] The Full-Blood Contract provides that HeartBrand will buy back weaned calves at $800 a head or fed calves at $1,800 a head. 5/27/2014 Tr. at 286 (Andrien); Full-Blood Contract § VI.

Both Mr. Andrien and Dr. Dean recognized that, in industry terms, there is little or no "maintenance" associated with a calf that has not yet weaned. From the rancher's perspective, it is the mother that must be maintained; the calf takes all its nutrition from (and is thus "maintained" by) the mother. For that reason, the industry always describes production and maintenance costs during the pre-weaning phase in terms of the cost per "cow-calf unit," not cost on a per-head basis.[9]

Bear Ranch's request to impose both a per-head resale price plus a maintenance cost across all animals is thus particularly egregious with respect to calves born since the time of the inventory used at trial. For example, a calf born in May 2014 would typically have been on its mother's side for the duration of 2014 and in feed for 2015. In 2014, the cost to *both* maintain the mother and produce the calf would have been $700 or less. In 2015, the calf would be fed for around $850, and the mother could be maintained (if not producing again) for only $350. Thus, for a total cost of $1900, a rancher can produce and feed a calf over two years, and maintain its mother over those same two years. But under the guise of recovering its "costs," Bear Ranch wants about $1840 to maintain the calf, about $700 to maintain the mother, *and* $3,898 for having produced the calf, which returns to Bear Ranch its $1900 in costs *plus a profit* of more than $4,500 per head.

Bear Ranch's approach is wrong, for two reasons. First, Bear Ranch is not entitled to earn profit on the ordered sale back to HeartBrand. The 2010 Contract does not provide for any maintenance charge or profit to be realized by a breaching producer, and as briefed to the Court previously, the unjust enrichment remedy on which the Court's approach is modeled does not allow a wrongdoer to realize a profit at the expense of the victim, or obtain credit for services that the victim did not request and from which it did not benefit.[10]

Second, Bear Ranch's approach does not benefit HeartBrand; in fact, it harms HeartBrand. Had HeartBrand owned the mother of each newly produced calf, it would have produced that calf itself for less than half of the $3,898-per-head price implied by the jury's verdict. Indeed, had Bear Ranch been selling fed cattle to HeartBrand as contemplated under the Full-Blood Contract, HeartBrand would have paid $1,800 for a fed calf, less than half the

---

[9] *See, e.g.*, 5/19/2014 Tr. at 117 (Dean).

[10] HeartBrand's Reply in Support of Mot. for Entry of Final Jdgmt. (Dkt. #205) at 26 ("A conscious wrongdoer is allowed a credit for money expended in acquiring or preserving property or in carrying on the business that generates the profits to be disgorged, but is not entitled to a credit for his services. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51(5)(c). Moreover, a wrongdoer is not entitled to a credit for services it performed if allowing the credit requires the claimant to pay for services the claimant had no opportunity to refuse or from which claimant did not benefit, or if the credit would allow the wrongdoer to benefit from providing such unrequested and non-beneficial services. *Id.* § 51 cmt. h & illus. 16-20.").

$3,898 per-head price.  The reason for this disparity is not because the jury was wrong; rather, it is because the jury did not award a per-head value.  The jury awarded a total dollar amount meant to capture the cost of acquiring, maintaining, and producing a set of animals that existed in 2014, which included a particular mix of mature, weaned, and unweaned animals.  While it would effect the Court's order to apply this per-head price to all the cattle being repurchased, adding maintenance charges on top of this per-head value is inappropriate where the per-head price already overcompensates Bear Ranch for the cost of producing recent calves from breeding mothers.

For that reason, HeartBrand's proposed judgment applies a reasonable evidence-based maintenance cost to mature bulls and cows for the last year and a half only if those cows were not producing calves being repurchased.  For those cows that were producing calves, the cost of maintaining both those cows and their calves are built into the generous price Bear Ranch is receiving for the produced calf.

**Practical commercial concerns**

In addition, Bear Ranch's proposed judgment does not address basic, practical concerns.  The form calls for a judicial sale in 90 days with no discussion of how it will be carried out.  Under the form, HeartBrand bears all risk of loss from the health condition of the animals and the possibility that the cattle are not the progeny they are represented to be.  HeartBrand is ordered to bear transportation costs that would not be necessary but for Bear Ranch's wrongdoing.  HeartBrand's form of judgment corrects these issues.

### Alternative judgment approach

As described above, Bear Ranch's overgenerous buyback approach inverts the Court's approach and has nothing to do with resolving the uncertain value of the cattle at issue.

While the Court has resolved the issue of how to value the cattle in light of uncertainties, the question of how to determine the cattle's reasonable cost (in light of uncertainties about the costs and the reasonableness of the business strategies that drive those costs) is the other side of the same coin.  Bear Ranch's approach actually reallocates the risks Bear Ranch took with its high-cost, narrow-market business model over to HeartBrand, a company that did not make those decisions.  Bear Ranch would force the aggrieved plaintiff to bail out the wrongdoer from bad business decisions the wrongdoer made.

Bear Ranch's proposed judgment assumes that the primary purpose of the contract and fraud remedies here is to protect Bear Ranch from having to bear costs associated with



its having owned the cattle. Bear Ranch misapprehends the purpose of the remedy. The primary purpose of the repossession remedy described in the contract (called an "equitable" remedy in that contract) is to protect HeartBrand's genetic asset in a practical way, and the primary purpose of the fraud remedy is to prevent Bear Ranch from being enriched from an asset it would not have absent its fraud. If those primary purposes can be served without resolving the uncertainty about how much or how reasonably Bear Ranch spent money on the cattle, the Court can avoid unnecessary prejudice to either side.

In the event that the Court concludes the maintenance and buyback scope issues are intractable under these circumstances, HeartBrand suggests the Court leave all of Bear Ranch's cattle in its possession and expand the scope of the injunction described in the Court's order to cover the 2010 Cattle as well. Because the Court's injunction will restore HeartBrand's business model and assure HeartBrand of Bear Ranch's compliance with its contract, the purpose of the contract remedy will be satisfied. Under such an approach, there will be no risk of creating a windfall to Bear Ranch or an unfair burden to HeartBrand, and the purpose of trial from the HeartBrand perspective—protecting HeartBrand's business model from Bear Ranch's wrongful conduct—will have been fulfilled.

We thank the Court for its consideration.

Sincerely,

*/s/James A. Reeder, Jr.*

James A. Reeder, Jr.

cc: *Via Email*
Mr. Arturo A. Rivera, Case Manager
Arturo_Rivera@txs.uscourts.gov

*Via CM/ECF*
Mr. Paul Yetter

US 3806639