# Vinson&Elkins

James A. Reeder, Jr.  jreeder@velaw.com
**Tel** +1.713.758.2202 **Fax** +1.713.615.5947

October 5, 2015

*Via CM/ECF*

The Honorable Gregg J. Costa
515 Rusk St., Room 4627
Houston, Texas 77002

      Re:    Cause No. 6:12-CV-14; *Bear Ranch, LLC v. HeartBrand Beef, Inc., et al.*; in the United States District Court for the Southern District of Texas

Dear Judge Costa:

      As it often has of late, Bear Ranch begins its response by cracking a joke and denigrating the passion HeartBrand has about its cattle and this case. Fair enough. We *are* passionate about this case. We are dealing with HeartBrand's business, and its only business; it is not a hobby or a diversion. It is a business built around a unique asset, and around the experience and know-how of people who are deeply and emotionally committed to the development of that asset. It is a business that centers on sharing opportunities with like-minded producers and feeders, not behaving opportunistically with them. At every step of the way, we have tried to preserve that business for the people who have invested so much in it. Bear Ranch's mockery of such passion exposes the foundation for its proposed order.

      Over the three weeks since the Court's order, HeartBrand has unsuccessfully attempted to work with Bear Ranch to effect the Court's plan, a plan that allows HeartBrand to control the recoupment of the uncertain value of the cattle Bear Ranch acquired by fraud and has held since its breach. We believe the judgment that Bear Ranch proposes perverts the Court's plan and exploits the matters left by the Court for further development by the parties. We have also learned a great deal more about how Bear Ranch has been mishandling its cattle since the time of trial.

      Bear Ranch is poised to fundamentally alter the buyback approach embodied in the jury's verdict and the Court's order. Bear Ranch wants to take a remedy that was to protect and return value to HeartBrand and transform it into a chance to reverse the foolish decision Bear Ranch made to scale up to the size of a major beef producer, and even better, to make HeartBrand pay handsomely for the privilege of bailing Bear Ranch out. Bear Ranch will accomplish this by changing the buyback from the lump-sum approach used by the jury to a per-head approach; then concealing information about how many head are subject to the buyback; then combining the per-head buyback number with "maintenance costs" that are in

**Vinson & Elkins LLP  Attorneys at Law**
Abu Dhabi  Austin  Beijing  Dallas  Dubai  Hong Kong  Houston  London
Moscow  New York  Palo Alto  Riyadh  San Francisco  Tokyo  Washington

1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
**Tel** +1.713.758.2222 **Fax** +1.713.758.2346 **www.velaw.com**

**V&E**

part duplicative of the per-head buyback price, and in part compensating Bear Ranch for wasting money on salvage cattle from which HeartBrand can derive no benefit. Bear Ranch never says how many millions more dollars this will represent than the jury found as an appropriate buyback price, and though it seems clear it will be millions more, HeartBrand cannot figure it out either. Bear Ranch hardly seems to disagree that its proposed variant of the Court's order will benefit Bear Ranch and injure HeartBrand.

**An introductory remark about value**

Throughout its letter, Bear Ranch remarks sarcastically about the value of Akaushi cattle, suggesting that it would be just deserts for HeartBrand to pay any price Bear Ranch can imagine for any animal Bear Ranch can find, at whatever age and in whatever condition it may be in. Because a reasoned understanding of the value issue is at the core of the equitable considerations in dispute, we should address that issue head-on at the outset.

As has been explained repeatedly in testimony, there are important differences between the value of an individual breeding animal, a terminal (culled or meat) animal, and a breeding nucleus of animals. On average, a terminal Akaushi animal is likely to be slightly more valuable than the average commodity cow or steer of similar age, because the Akaushi animal is more likely to grade favorably; the difference is a meaningful one, but small. Those small differences add up over time, and justify a producer's paying a significantly higher price for an Akaushi bull than he would pay for an ordinary bull, because the Akaushi bull can produce premium calves. The opportunity to sire multiple premium breeding bulls, therefore, is quite valuable; just as a top-quality Angus sire might fetch six figures or more at auction, top Akaushi sires that can produce quality breeding bulls are quite valuable as well. Finally, an unrestricted breeding nucleus of top-quality animals, because it can repeatedly generate top sires and serve as the foundation of a large meat program, is immensely valuable. But once one has an unrestricted nucleus, adding more terminal animals to one's collection generates only small additional value—usually the meat value itself.

An unrestricted breeding nucleus is what Bear Ranch obtained through fraud. There is nothing inconsistent in saying that (i) Bear Ranch obtained an extraordinarily valuable herd of cattle that can produce substantial income, and (ii) that same herd, if returned to HeartBrand, would provide HeartBrand less marginal value than it could create for Bear Ranch. HeartBrand already has the breeding nucleus.

Likewise, there is nothing inconsistent in saying that (i) Bear Ranch has a set of breeders that can generate substantial income, and (ii) some of the individual terminal calves it has produced with those breeders have lost their value due to mismanagement. Mistreating a calf, or feeding it past the proper maturity for slaughter, will render that specific calf less

V&E

October 5, 2015   Page 3

valuable as a meat animal. That is a separate matter from whether the breeding nucleus is valuable and creates opportunities that can enrich Bear Ranch.

When Bear Ranch says that HeartBrand should be agreeable to paying any price for cattle, it is being intentionally myopic. Bear Ranch cannot deliver the value of a new nucleus to HeartBrand, because HeartBrand has a nucleus. So if Bear Ranch delivers a meat animal back to HeartBrand at a price higher than a meat animal brings in the HeartBrand system, then HeartBrand loses money on that animal. If Bear Ranch delivers a calf for more than it costs HeartBrand to produce calves from its own herd, HeartBrand loses money on that animal. Those animals are still valuable, and a herd of those animals enriches Bear Ranch immensely. But the herd is what enriches Bear Ranch. Returning an extra calf or an overfed steer to HeartBrand does not mean HeartBrand is benefiting in proportion to the benefits Bear Ranch would unjustly realize from a fraudulently obtained unrestricted herd.

With that background, we turn to the specifics of the judgment.

**The 2011 Beeman Cattle**

Bear Ranch, arguing that HeartBrand should be required to buy the 2011 Beeman Cattle or send them to auction, contends that HeartBrand's proposed judgment is inconsistent with the Court's order and HeartBrand's past requests for relief.

First, Bear Ranch disregards the language of the Court's Order. The Court said it is "willing to impose a constructive trust" allowing HeartBrand to purchase the 2011 Beeman Cattle "if HeartBrand elects to buy them back"; said that it would consider a judicial auction or sale "upon HeartBrand's request"; and said "the Court will also issue an injunction requiring Bear Ranch to abide by the 2010 contractual obligations as to any remaining Akaushi cattle." (Dkt. #240 at 22.) Bear Ranch simply ignores the injunctive relief element of the Court's order. As explained previously, Bear Ranch's interpretation makes no sense, as the injunctive relief element of the order (controlling what happens to the Spears and Twinwood cattle) would be superfluous if the 2011 Beeman Cattle were auctioned off.

Second, Bear Ranch seeks reconsideration of the Court's order, arguing incorrectly that the statute of frauds would bar an injunction keeping the 2011 Beeman Cattle under contract restrictions. Bear Ranch even claims that HeartBrand agreed with this proposition at the September 2014 arguments. Not so. As explained last year (and repeatedly in briefing), the statute of frauds bars *benefit-of-the-bargain damages* as a fraud remedy when the fraudulent promise is a contractual promise rendered unenforceable by the statute of frauds.[1]

---

[1] 9/24/2014 Hearing at 46-47 (discussing *Haase v. Glazner*, 62 S.W.3d 795 (Tex. 2001).

V&E

That has nothing to do with equitable remedies, which is a separate matter.[2] (Indeed, taken to its logical conclusion, Bear Ranch's argument would overturn not just the Court's order, but the equitable doctrine of promissory estoppel.) The Court's order does not violate the statute of frauds because applying the 2010 contract restrictions to the 2011 Beeman Cattle as an equitable remedy is not an award of benefit-of-the-bargain damages at law.

Third, Bear Ranch's claim that judicial estoppel prevents HeartBrand from exercising the election rights in the Court's order is preposterous. The doctrine of judicial estoppel applies when a party takes a position that is clearly inconsistent with a prior one on which a court has relied, causing an unfair detriment to the opposing party.[3] The doctrine has nothing to do with electing remedies. Judicial estoppel typically applies where a party changes its position on what the facts of a case are,[4] without some development in the facts that would justify the change in position.[5] For example, a party who obtains disability benefits by claiming in court to be disabled may be estopped from then denying his disability to pursue an employment discrimination suit.[6] That doctrine is entirely inapplicable to this case. One could never be judicially estopped from making an election explicitly granted by a court; by establishing the election right, a court necessarily disclaims reliance on any specific alternative being selected.

---

[2] Defs.' Am. Reply in Support of Mot. for Entry of Final J. (Dkt. #208) at 24-26 (discussing *Nelson v. Najm*, 127 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2003, pet. denied), in which equitable monetary remedies were awarded notwithstanding the statute of frauds).

[3] *Engines Southwest, Inc. v. Kohler Co.*, 263 F. App'x 411, 413 (5th Cir. 2013) (judicial estoppel may be applied where (1) a party's "position is clearly inconsistent with the previous one, (2) the court must have accepted the previous position, and (3) the nondisclosure must not have been inadvertent.… Additionally, the court may consider whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."); *Hotard v. State Farm Fire & Cas. Co.*, 286 F.3d 814, 818 (5th Cir. 2002) ("[A] party cannot advance one argument and then, for convenience or gamesmanship after that argument has served its purpose, advance a different and inconsistent argument.").

[4] *St. George Island, Ltd. v. Sun Bank, N.A.*, 96 B.R. 345, 348 (N.D. Fl. Bankr. 1989).

[5] Judicial estoppel has no application when a party's legal position justifiably changes in response to developments in the facts. *Stone v. Wall*, 2015 WL 1137544, at *8 (D.R.I. Mar. 12, 2015) ("Nevertheless, it is also accepted that there are well-recognized exceptions to judicial estoppel, in that a later inconsistent assertion of fact will not necessarily give rise to judicial estoppel if a reasonable justification can be offered for the change in positions."); *Barker v. Citigroup, Inc.*, 2012 WL 1379308, at *3 (D. Utah Apr. 20, 2012) ("Plaintiffs' claim that their position changed as a result of obtaining additional facts through discovery, and not as the result of 'the exigencies of the moment.' Such a change in a legal position is not improper and the purpose of the doctrine of judicial estoppel is not served by applying it in this case.").

[6] *Robinson v. Concerta Health Servs., Inc.*, 781 F.3d 42 (2d Cir. 2015); *see also In re Superior Crewboats, Inc.*, 374 F.3d 3390, 334-45 (5th Cir. 2004) (party estopped from asserting claim that he omitted from bankruptcy filings requiring disclosure of claims).

The Court has appropriately given HeartBrand the right to elect how best to garner the value of the cattle Bear Ranch fraudulently obtained.  Bear Ranch's proposed order turns the Court's order on its head.

**The 2010 Contract Cattle**

Though claiming to adhere to the jury's verdict, Bear Ranch says nothing about how its judgment would be a logical and fair application of the jury's May 2014 findings to a repossession occurring 18 months later.  Bear Ranch simply brushes under the rug the factual issues HeartBrand raised, issues that demonstrate serious prejudice that would result to HeartBrand from Bear Ranch's approach to the verdict.  Sadly, Bear Ranch's objections to the application of the remedy on the 2010 Contract Cattle appear designed to create the maximum opportunity for gamesmanship by Bear Ranch.

*The cattle identification issue is a trap waiting to be sprung.*  Bear Ranch does not deny the problems that its newly-produced inventory brought to light.  Poor record-keeping, intermixing of cattle, and the failure to verify or even identify parentage call into question all of the assertions Bear Ranch has made about whether it can make HeartBrand whole through non-monetary remedies.  Bear Ranch tries to sidestep this issue altogether, suggesting that as long as all its cattle are Akaushi, HeartBrand need not worry about which cattle are 2010 Contract Cattle and which are 2011 Beeman Cattle.  That approach, dismissive as it is of HeartBrand's right to elect or not elect acquisition of the 2011 Beeman Cattle, reflects Bear Ranch's true desires to unload the cattle it now regrets fraudulently acquiring.

It may have seemed odd that Bear Ranch's version of the judgment did not calculate an amount of money to be paid, state a number of cattle to be repurchased, or attach a list of animals to be delivered.  But the reason for that is clear now.  Bear Ranch knows that the 2010 and 2011 groups have been thoroughly mixed, and wants to wait until after judgment to reveal how many "uncertain" progeny it will claim belong in the 2010 group.  Bear Ranch wants the right to control how much HeartBrand will pay, and only advise HeartBrand and the Court of that amount after the die is cast.

*Bear Ranch's cattle identification trap is intended to create unjust enrichment, not prevent it.*  Acknowledging that it may never be able to draw the lines between the 2010 and 2011 groups that both the jury and the Court presumed could be drawn, Bear Ranch feigns generosity, offering to "stipulate" to abide the jury's figure of $3,796 per head for the 2011 Beeman Cattle as being applicable to all cattle.  With all due respect, Bear Ranch is attempting to exploit a cost figure that the jury did not actually determine on a per-head basis.

The jury was not asked to determine a "per-head" figure. The jury was asked to establish the amount reasonably spent by Bear Ranch acquiring, producing, and maintaining an actual set of cattle alive as of March 2014, a set that did not include any calves born since then, and that has changed markedly in the last year and a half.

What we have learned from Bear Ranch's cattle inventory is that approximately 16% of Bear Ranch's current herd had not been born as of March 2014. Indisputably, Bear Ranch did not spend $3,796 per head acquiring, producing, or maintaining those new calves, and it does not deny that it will realize a massive profit on these hundreds of new calves. Moreover, Bear Ranch's latching on to that figure demonstrates that it has abandoned any commitment to the 2010 Contract as the measure of how the parties should handle this remedy. Had Bear Ranch been selling new calves to HeartBrand at the contract price, it would have sold them at the $800 contract price for weaned calves, or possibly fed them to earn the $1,800 price for fed calves. Those contractually agreed prices would have been profitable to Bear Ranch already. But Bear Ranch is not satisfied; it wants thousands more in profits on top of that.[7]

So when Bear Ranch asks for a judgment that ignores any herd cost number found on the jury verdict form, and asks instead for a per-head price to be applied to an undefined and growing number of cattle—a number that is only undefined because Bear Ranch did not keep the careful records it claimed it was keeping—the reason is obvious. Bear Ranch wants the right to put as many animals as it can to HeartBrand, at a price far in excess of the cost to acquire, produce, or maintain those animals. It wants a court-ordered profit as a reward for its wrongdoing, and it wants the right to keep testing animals and keep delivering them until it has squeezed every last court-ordered dollar it can squeeze out of HeartBrand.

That is the only reason why Bear Ranch, which insists it intends to appeal this Court's order, is willing to stipulate to the remedy the Court has ordered. Under Bear Ranch's twist on the order, Bear Ranch will benefit greatly, and in still-untold amounts.

***Contrary to law, Bear Ranch seeks to shift the impact of the terminal and salvage cattle problem it created to HeartBrand.*** Bear Ranch next argues that the buyback remedy should apply to terminal cattle and salvage cattle, which are cattle that cannot in any practical

---

[7] Because of this new information, HeartBrand respectfully disagrees with the Court's conclusion that HeartBrand should pay a per-head price for the increase in the herd since the time of trial. However, HeartBrand is attempting to abide the Court's instruction to formulate a judgment premised on that approach through good faith negotiation with Bear Ranch. Bear Ranch has made that impossible, because Bear Ranch refuses to acknowledge that adding maintenance costs on top of the per-head price creates a windfall to Bear Ranch in violation of the restitution principles in the *Restatement*, based on the herd as it now exists.

V&E

sense be delivered back to HeartBrand. Bear Ranch does not even dispute the facts or pretend that its approach has anything to do with justice; it simply argues that HeartBrand did not previously ask to exclude these animals.

To put it plainly, it did not matter previously whether terminal or salvage animals were included in the herd being repurchased. The jury was asked to determine the cost Bear Ranch reasonably spent acquiring, producing, and maintaining a set of animals. That satisfied the equitable standard of insuring that HeartBrand account for benefits it obtained at Bear Ranch's expense, but not requiring HeartBrand to pay for unsolicited improvements, for expenses that did not benefit HeartBrand, or for any profit to Bear Ranch for its services.[8] If a particular animal in the herd as of the time of trial had been kept past its salvage age, any additional amount Bear Ranch unreasonably spent keeping that animal alive would have had no impact on HeartBrand, because the amount to be paid by HeartBrand did not include unreasonable costs. Likewise, if a few terminal animals had been overfed, that unreasonable overfeeding did not affect the way reasonable costs were determined for the herd. Whatever salvage value HeartBrand would be able to extract from any animals not usable in the HeartBrand meat program was reasonably acceptable, because HeartBrand would not have had to bear unreasonable costs to acquire those animals.

But Bear Ranch's proposed judgment wipes away the jury's lump-sum approach and replaces it with a per-head approach that is not based on either the jury's verdict or the rule of equity on which the jury's instruction was premised. And it applies that per-head price to a set of cattle that looks markedly different from the one the jury passed on.

The inventory of which the jury was informed had 834 terminal cattle in it. Only 303 of those were three or three-and-a-half year-olds—too old for the HeartBrand system, yes—but all attending trial would have assumed most or all of them were shortly to be slaughtered and packed for meat to be sold through 7X, never to be made available to HeartBrand, because that would have been consistent with the long feeding schedule Bear Ranch described at trial. The remaining terminal cattle were still at a useful age, and if HeartBrand had acquired them as a component of the jury-determined cost, that likely would have caused no harm. There were also about 368 salvage-age animals in the inventory not designated terminal.

Now, there are 720 terminal cattle that are above the Grade-A maturity cutoff, more than twice as many as before. In addition, there are 544 salvage animals, a 48% increase from before. From a value perspective, these animals are obviously worth much less today,

---

[8] See RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 54; see also HeartBrand's Mot. for Entry of Final J. (Dkt. #193) at 19-21 (discussing applicable Restatement sections).

but even from a cost perspective, things have changed.  Costs that had been incurred to produce a terminal animal that was 20 months at the time of trial could have been said to have been incurred for HeartBrand's benefit if the animal had been delivered at 20 months.  Now at 35 months, the animal cannot grade and is worth less than it was.  Now, even the cost incurred to get the animal to 20 months can no longer be treated as having been reasonably beneficial to HeartBrand, because HeartBrand can no longer extract full meat value from that animal.

If Bear Ranch had been acting reasonably, these cattle would not exist any longer.  They would have been slaughtered timely and used in Bear Ranch's 7X meat business, which has continued to kill animals and sell meat since the time of trial for Bear Ranch's account and for its benefit.  Had Bear Ranch acted reasonably, it would be in a position to deliver a smaller 2010 Contract Cattle group, and the jury's verdict would be proportionately reduced to account for cattle that Bear Ranch had slaughtered and used, because the cost incurred to produce or maintain those expensive, deceased animals would not have been costs benefiting HeartBrand.  Bear Ranch would justifiably be entitled to a credit for new calves born since trial, which would be a credit based on the reasonable cost of producing those calves, rather than a credit based on their sale value.

But what Bear Ranch now proposes is that it should benefit at a high per-head rate for new calves it produced without bearing any of the burden of the "walking dead" animals whose useful life it has entirely consumed.  This would result in a massive transfer of value from the victim to the wrongdoer, contrary to the *Restatement*'s standard that the victim need only account for those benefits the victim actually receives at the wrongdoer's expense.

**Maintenance and production costs**

As HeartBrand has explained, Bear Ranch's approach inappropriately applies production and maintenance costs to calves that have been born since trial.  The result: Bear Ranch gets to shift over to HeartBrand 100% of the costs of creating those calves, and then forces HeartBrand to pay another $3,898-a-head bonus to Bear Ranch just as pure profit.

Bear Ranch responds by arguing that the production and maintenance costs are reasonable, and even introduces a late declaration of Dr. McGrann to that effect.  Bear Ranch misses the point.  The question is:  to what do the maintenance figures apply?  Bear Ranch has now given in on one obvious flaw, the application of cow-calf unit maintenance figures as though they should be applied on a per-head basis.  But Bear Ranch still has not dealt with the problem of shifting all the cost of producing a calf to HeartBrand and then charging HeartBrand an extra $3,898 for the calf HeartBrand paid to produce.

Dr. McGrann's affidavit avoids the real issue. Dr. McGrann contends that the Andrien-based production and maintenance costs are a conservative basis for determining the cost to produce a calf, but he is simply confirming what HeartBrand is saying. Production and maintenance costs would be a reasonable way to compensate Bear Ranch for producing calves born since the March 2014 trial inventory. Dr. McGrann never claims that a $3,898-per-head price is a reasonable way to compensate Bear Ranch for producing calves, and he certainly never says that production costs *plus* $3,898-per-head is reasonable.[9] Bear Ranch's omission of the only relevant issue reveals that even Bear Ranch knows its position is indefensible.

**Practical commercial concerns**

Bear Ranch inexplicably dismisses HeartBrand's issues with the vagueness of Bear Ranch's proposed judgment. Rule 65(d), FED. R. CIV. P., states that an order granting an injunction must "describe in reasonable detail" the acts restrained or required. There is no detail, much less reasonable detail, in Bear Ranch's proposed judgment about how the parties are to conduct themselves. Bear Ranch's judgment simply pretends there is no issue about the identification of cattle to the various groups; ignores the possibility that any of the elderly cattle Bear Ranch intends to transport down from the mountains will not survive the trip; and leaves entirely to the imagination how something as complicated as a sale or auction process would proceed. Bear Ranch's proposal, exposing HeartBrand to any number of possible abuses, appears consciously designed to create leverage opportunities for Bear Ranch.

Finally, Bear Ranch's contention that it is "industry custom" that a buyer of cattle pay transportation charges is entirely misguided. This is not a voluntary exchange. It is a remedy for Bear Ranch's breach of contract. The Full-Blood Contract provides that Bear Ranch will reimburse HeartBrand for attorney's fees and "any other costs incurred in enforcing the terms of this agreement."[10] The costs of transporting these cattle are part of enforcement, necessary only because of Bear Ranch's breach. As usual, Bear Ranch seems to forget who is at fault.

**Alternative judgment approach**

Bear Ranch begins and ends by arguing that HeartBrand should take a more "consistent" position in its reaction to the series of curveballs Bear Ranch has thrown at it. To be clear, HeartBrand has always preferred exactly what is written in Section XVI of the

---

[9] If additional expert evidence were appropriate at this stage, Mr. Andrien would be able to submit an affidavit explaining that his buyback calculations for calves were not premised on giving Bear Ranch any kind of per-head price above the cost of production and maintenance.

[10] Full-Blood Contract § XVI.

contract: in the event of disputes, its business model should be preserved, and any harm done to its business model should be remedied. At different times in the case, the extent to which the Court can preserve HeartBrand's business model has been in question, and the extent to which HeartBrand therefore needed monetary relief as compensation has varied. The Court has now concluded that it can preserve HeartBrand's business model. In that light, the risks to HeartBrand revealed by the newly discovered facts about Bear Ranch's cattle management and Bear Ranch's seemingly punitive buyback approach are especially unwarranted.

Bear Ranch asserts that those risks cannot be avoided, because repossession is the only remedy spelled out in the contract, crowding out the possibility of specific performance. But repossession is not described in the contract as an exclusive remedy. Texas law is abundantly clear that the specification of a remedy in a contract should be regarded as cumulative of other lawful remedies unless the contract clearly indicates the specified remedy is exclusive.[11] Clauses like the one in the Full-Blood Contract, where a party stipulates to the availability of injunctive relief, have not been deemed to imply that other types of relief would be unavailable.[12]

But as to the broader "consistency" point, Bear Ranch cannot legitimately contend that their position is any way consistent with any remedy that HeartBrand has ever sought in this case. HeartBrand has at times sought a clean break if it can be accomplished, but Bear Ranch does not seek a clean break. Bear Ranch intends to retain at least the Spears and Twinwood cattle under an injunction, meaning the parties will need to continue dealing with one another into the future. HeartBrand sought a buyback when that seemed its only option, but asked for it on the *Restatement*-based reasonable cost approach found by the jury. Bear Ranch intends to recover profit-generating figures instead. HeartBrand sought a complete buyback of valuable breeding and meat animals. It turns out Bear Ranch has surprisingly few of those to deliver, and the price for protecting HeartBrand's genetics would be absorbing a massive loss for the benefit of the wrongdoer itself.

---

[11] *Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 05-13-00870-CV, 2015 WL 4472893, at *12 (Tex. App.—Dallas July 22, 2015, no. pet. h.) ("'A construction which renders the specified remedy exclusive should not be made unless the intent of the parties that it be exclusive is clearly indicated or declared.'") (quoting *Vandergriff Chevrolet Co., Inc. v. Forum Bank,* 613 S.W.2d 68, 70 (Tex. Civ. App.—Fort Worth 1981, no writ)); *Jackson v. Knight*, 05-01-01533-CV, 2002 WL 1470359, at *2 (Tex. App.—Dallas July 10, 2002, no pet.)( "[T]he fact that the contract provides a particular remedy does not mean that remedy is exclusive unless it is declared to be or it is clearly indicated.").

[12] *Ganske v. WRS Group, Inc.*, 10-06-00050-CV, 2007 WL 1147357, at *4 (Tex. App.—Waco Apr. 18, 2007, no pet.) (holding that "[n]othing in the [contract's injunctive relief] provision indicates that the equitable remedies are exclusive").

V&E

October 5, 2015   Page 11

      If Bear Ranch were acting with consistency, it would do what the contract says: sell calves back at $800 a head, not seek $4,000-and-up a head for calves that were just born in the last few months; turn over records that reveal what it has available; and bear the costs HeartBrand incurs for obtaining its remedy. To be certain, a clean break is much to be desired; but if Bear Ranch objects to paying the jury's contemplated compensation for a clean break, then perhaps the only way to achieve a clean break will be through a voluntary compromise. The parties may not be able to achieve that compromise until they part with the hope that the Court will end the contract advantageously for one party or the other.

      We thank the Court for its consideration.

                              Sincerely,

                              James A. Reeder, Jr.

cc:    *Via Email*
      Mr. Arturo A. Rivera, Case Manager
      Arturo_Rivera@txs.uscourts.gov

      *Via CM/ECF*
      Mr. Paul Yetter

US 3818687