# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| BEAR RANCH, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 6:12-cv-00014 |
| | § | |
| HEARTBRAND BEEF, INC., | § | |
| AMERICAN AKAUSHI | § | |
| ASSOCIATION, INC., | § | |
| and RONALD BEEMAN, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF BEAR RANCH, LLC'S MOTION FOR NEW TRIAL

R. Paul Yetter
James E. Zucker
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010

Andrew R. Seger
KEY TERRELL & SEGER LLP
4825 50th St., Suite A
Lubbock, Texas 79414

Attorneys for Plaintiff Bear Ranch, LLC

# TABLE OF CONTENTS

Index of Authorities ........................................................................................3

Introduction ....................................................................................................5

Argument.........................................................................................................8

I.    HeartBrand's Insistence That It Maintains a Closed Business Model and Its Pleas to Give the Herd Back Warrant a New Trial.............................8

    A.    The newly discovered evidence of HeartBrand's open model warrants a new trial. ......................................................... 10

    B.    HeartBrand' arguments about its open business model and need for its cattle back permeated the entire case and prejudiced Bear Ranch............................................................................... 12

II.    The Erroneous Admission of Expert Andrien's Valuation Opinion Substantially Prejudiced Bear Ranch and Requires a New Trial. .................18

    A.    Andrien's valuation opinion was inadmissible and calculated to inflame passions and confuse issues. ................................. 19

    B.    Bear Ranch was not given a fair opportunity to rebut Andrien's opinion in front of the jury. ................................................. 22

    C.    The erroneous admission of Andrien's opinion prejudiced Bear Ranch ............................................................................... 23

Conclusion and Prayer .........................................................................24

INDEX OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Caldarera v. Eastern Airlines, Inc.*,
  705 F.2d 778 (5th Cir.1983) ................................................................15

*Carson v. Polley*,
  689 F.2d 562 (5th Cir. 1982) .......................................................19, 24

*Cates v. Creamer*,
  431 F.3d 456 (5th Cir. 2005) ...................................................*passim*

*Diaz v. Methodist Hosp.*,
  46 F.3d 492 (5th Cir. 1995) .............................................8, 10, 11, 12

*Eximco, Inc. v. Trane Co.*,
  737 F.2d 505 (5th Cir. 1984) .................................................9, 14, 15

*Gilster v. Primebank*,
  747 F.3d 1007 (8th Cir. 2014) ...........................................................10

*Johnson v. Ford Motor Co.*,
  988 F.2d 573 (5th Cir. 1993) ...............................................................9

*Lloyd v. Ga. Gulf Corp.*,
  961 F.2d 1190 (5th Cir. 1992) ...........................................................10

*Meyers v. Moody*,
  693 F.2d 1196 (5th Cir. 1982) ...........................................................15

*Montgomery Ward & Co. v. Duncan*,
  311 U.S. 243 (1940).....................................................................8, 12

*Smith v. Transworld Drilling Co.*,
  773 F.2d 610 (5th Cir. 1985) .........................................................8, 12

*Wells v. Dallas Indep. Sch. Dist.*,
  793 F.2d 679 (5th Cir.1986) .......................................................19, 24

**State Cases**

*Haase v. Glazner*,
    62 S.W.3d 795 (Tex. 2001)...................................................................13

*Prudential Ins. Co. v. Jefferson Assocs.*,
    896 S.W.2d 156 (Tex. 1995) ............................................................13

**Rules**

Federal Rule of Civil Procedure 59(a)..................................................5, 8

**Other Authorities**

Shannon Pratt, *Valuing a Business* (5th ed. 2008)...................................21

Pursuant to Federal Rule of Civil Procedure 59(a), plaintiff Bear Ranch, LLC respectfully moves for a new trial on both liability and damages.

## INTRODUCTION

Two issues independently warrant a new trial on the counterclaims HeartBrand prevailed on.

First, newly discovered evidence shows that HeartBrand is now selling unrestricted Akaushi cattle in the marketplace. That fact—which the jury never heard—alters the entire case and undermines all confidence in the jury's verdict as to HeartBrand's counterclaims and the Court's equitable remedies. The cornerstone of HeartBrand's case was its closed business model. It sold cattle, but with detailed contractual restrictions on subsequent sale and use of Akaushi cattle, along with registration, DNA testing, and other provisions agreed to by all producers, "do[ing] it the same way we're doing it." 5/19/204 Tr. at 71. HeartBrand argued repeatedly before the jury and Court that it wanted its cattle back from Bear Ranch because it was crucial to safeguard its closed business model and protect the integrity of its Akaushi cattle's genetics and brand. *See* 5/28/14 Tr. at 225-26, 279, 281 ("And we're here to get back what is ours . . . . [W]e're here because [they're our] cattle. We need them back.").

The jury and Court took HeartBrand at its word. The Court, in particular, devised an equitable remedial scheme designed to forestall alleged unjust

enrichment to Bear Ranch and give HeartBrand what it asked for: the return of its restricted cattle. Now HeartBrand has an open business model, sells Akaushi unrestricted in the open market, and no longer wants the cattle it said was all it ever wanted. Ex. A (1/25/16 HeartBrand Ltr. to AAA Members stating that HeartBrand "is going to begin selling unrestricted cattle.")

The rulings and remedies flowing from the 2014 trial relate to a factual landscape that no longer exists, if it ever did. In March 2014, the existence, necessity, and validity of HeartBrand's closed model at least could have been accepted by the jury and the Court, assuming the model wasn't already on its way out; but that is now no longer the case. Now, HeartBrand's voluntary move to an open model upends and undermines the core issues of the trial, including:

- The fraud finding as to the Beeman Purchase Cattle, because the predicate for fraud was that Bear Ranch fraudulently induced HeartBrand's assent to the Beeman sale by promising the purchase would be subject to closed-model restrictions that have no value now, even assuming they had some limited value at the time;

- The breach of contract finding, because HeartBrand's theory rested on failure to adhere to the same, closed-model restrictions; and

- The Court's equitable remedies, because they assumed the unjust enrichment to Bear Ranch was the receipt of unrestricted cattle obtained under pretenses that they would be subject to closed-model restrictions.

Accordingly, Bear Ranch respectfully submits that a new trial is required on HeartBrand's counterclaims, with a jury fully informed about HeartBrand's changes to its business model.

Second, the late-disclosed and wildly speculative unjust enrichment opinion of HeartBrand's valuation expert, Jeffrey Andrien, should never have been put before the jury. That opinion, which used the "methodology" of an imaginary and deeply unrealistic cattle operation to value all the cattle sold at over $90 million and the Beeman cattle at over $76 million, was calculated to, and did, inflame and confuse the jury. That it did so is shown by the jury's fraud finding against Bear Ranch, its $23 million advisory equitable award, and $1.825 million punitive damages award. This speculative expert opinion, introduced just before the close of evidence and the jury's deliberations, infected the verdict in full, including liability findings for contractual breach and fraud. Mr. Andrien's opinions were inadmissible and highly prejudicial to Bear Ranch, bolstering HeartBrand's contentions that its closed-model restrictions were incredibly important and valuable—even though it has abandoned them now. Moreover, this evidence was admitted in a manner that unfairly prejudiced Bear Ranch by preventing it from having an adequate opportunity to rebut the opinion before the jury.

Accordingly, Bear Ranch respectfully requests a new trial on liability and damages for HeartBrand's counterclaims, so that the jury's verdict and Court's rulings may reflect the reality of HeartBrand's business model, without the distortions caused by speculative and prejudicial expert opinion testimony.

**ARGUMENT**

The Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). Accordingly, a new trial is available when, among other things, there were erroneous evidentiary rulings, the trial was unfair, or a prejudicial error was committed in its course. *Smith v. Transworld Drilling Co*., 773 F.2d 610, 612-13 (5th Cir. 1985); *see Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). Newly discovered evidence may also warrant the grant of a new trial. *See Diaz v. Methodist Hosp*., 46 F.3d 492, 495 (5th Cir. 1995).

**I.     HeartBrand's Insistence That It Maintains a Closed Business Model and Its Pleas to Give the Herd Back Warrant a New Trial.**

HeartBrand argued extensively to the jury and the Court about its closed business model, under which commerce in Akaushi cattle is subject to certain restrictions that, according to HeartBrand, are vitally necessary to preserving the integrity of the Akaushi genetics. It said the core value of its business for selling Akaushi cattle "is to make sure that it's done within the system, within this closed system of producers." 5/28/14 Tr. at 231. To support its fraud claim, HeartBrand told the jury that Bear Ranch's alleged promises to obey the 2010 contract restrictions as to Beeman Purchase Cattle were "the only thing preserving HeartBrand's program" and "the only thing protecting the breed." *Id.* at 271-72.

-8-

The alleged vital importance of that closed model and preserving the Akaushi genetics is why HeartBrand argued just as extensively to the Court and jury for the return of its herd from Bear Ranch. "It's important that we get the cattle back . . . because this is a closed system." 5/19/14 Tr. at 74. This was HeartBrand's core theme to the Court and the jury:

- "And we're here to get back what was ours, to get back what was taken from us," 5/28/14 Tr. at 225-26;

- "[W]e're here because [they're our] cattle. We need them back," *id*. at 279;

- "And Mr. Koch and Bear Ranch, too, will go back to their lives, and all we're asking is that it's not with [our] cattle." *Id*. at 281.

But when afforded the opportunity after trial to get what it asked for before and during trial, HeartBrand made an about-face and no longer sought the return of all its cattle. *See* Dkt. No. 193 at 3-5 (Mot. for Judgment) (seeking disgorgement remedy in the form of money damages).

HeartBrand's arguments were improper and inflammatory, and they irreparably prejudiced the jury's verdict, as discussed in greater detail below. *See Eximco, Inc. v. Trane Co*., 737 F.2d 505, 512 (5th Cir. 1984) (new trial warranted if occurrence at trial irreparably prejudices verdict). Indeed, considering HeartBrand's theory for its counterclaims was premised on the need to return its cattle, and given the evidence as a whole and the verdict, it would visit manifest injustice on Bear Ranch to deny a new trial. *See Johnson v. Ford Motor Co*., 988

F.2d 573, 582 (5th Cir. 1993); *Lloyd v. Ga. Gulf Corp.*, 961 F.2d 1190, 1196 (5th Cir. 1992); *see also Gilster v. Primebank*, 747 F.3d 1007, 1010 (8th Cir. 2014).

Even more striking, however, is newly discovered evidence that the closed model that HeartBrand maintained throughout trial—as the cornerstone of its counterclaims and essential to its survival—no longer exists. As discussed in Bear Ranch's Motion to Alter and Amend the Final Judgment, which is being filed contemporaneously with this motion and is incorporated here in full, HeartBrand now has an open business model and is "selling unrestricted cattle." Ex. A (1/25/16 HeartBrand Ltr. to AAA Members); Ex. B at 6 (brochure for January 2016 auction for "[g]enetics never before available in the US," including three HeartBrand bulls "with full breeding rights from HeartBrand."). The Court should grant Bear Ranch's request for a new trial, given this critically important new evidence.

A.   **The newly discovered evidence of HeartBrand's open model warrants a new trial.**

The evidence of HeartBrand's open model satisfies all that is required for a new trial due to newly discovered evidence. In deciding whether a new trial is warranted, the Court considers whether the evidence (1) "could have been discovered earlier with due diligence," (2) "is merely cumulative or impeaching," and (3) "would probably have changed the outcome of the trial." *Diaz*, 46 F.3d at 495. Each of these considerations weighs heavily in favor of a new trial here.

The new evidence could not "have been discovered earlier with due diligence." *Id*. Indeed, Bear Ranch exercised diligence in trying to ascertain whether HeartBrand was operating an open model but was stymied by HeartBrand: Bear Ranch alerted the Court in July 2015 to evidence of unrestricted Akaushi sales by third parties like Matador Ranch, which sales HeartBrand denied. Dkt. #238 (Mot. to Reopen Evidence at Ex. A¶¶7-8); *but see* Dkt. #254 (Resp. to Pl.'s Update at 3) ("Matador Ranch has not been selling unrestricted cattle."). And despite Bear Ranch's diligent efforts to uncover before and during trial the status of HeartBrand's closed model, it is unknown when HeartBrand first began planning to change, and in fact did change, its business model. Bear Ranch only learned of the change this year, well after trial, following a letter HeartBrand sent in late January 2016 to all its producers—all except Bear Ranch. Ex. A (1/25/16 HeartBrand Ltr. to AAA Members) (stating that HeartBrand will begin "selling unrestricted cattle."). Nor did HeartBrand find it necessary to inform the Court of its fundamental change to its business, which impacts virtually every important ruling in this case.

As discussed further below, the evidence of HeartBrand's open model is not "merely cumulative or impeaching" and "would probably have changed the outcome of the trial." *Diaz*, 46 F.3d at 495.

**B.    HeartBrand' arguments about its open business model and need for its cattle back permeated the entire case and prejudiced Bear Ranch.**

HeartBrand's arguments about its closed model, and concomitant need for the return of its cattle to protect that model, permeated the entire case and unfairly prejudiced Bear Ranch and rendered the trial unfair. *See Smith*, 773 F.2d at 612; *Montgomery Ward*, 311 U.S at 251. The newly discovered evidence, in other words, was not merely cumulative or impeaching and would have changed the outcome of the case, had it been presented at trial. *Diaz*, 46 F.3d at 495.

HeartBrand's counterclaims were built on the premise that without the Court's (and jury's) protection, HeartBrand's "closed" business model would be irreparably harmed by Bear Ranch's alleged breaches and fraud. As the Court has recognized, HeartBrand's counterclaims were "*premised* on the notion that allowing Bear Ranch to maintain unrestricted cattle . . . would undermine the integrity of the Akaushi genetics [that HeartBrand] had spent two decades maintaining." Dkt. #240 at 2 (9/4/15 Memo & Order) (emph. added). Indeed, the Court noted that this "concern [regarding the closed business model] animated HeartBrand's final plea at trial, which was to get its cattle back, 'to get back what was taken.'" *Id*. (quoting Dkt. #188-5, at 25-26).

The new evidence undermines the jury's findings ranging across liability and damages, beginning with its fraud finding. The predicate for HeartBrand's

fraud claim was that Bear Ranch fraudulently induced HeartBrand's consent to the 2011 Beeman purchase by falsely promising to abide by restrictions on the cattle that were designed to protect the integrity of HeartBrand's closed business model:

> HeartBrand's theory of fraudulent inducement was that Bear Ranch had represented . . . it would comply with the 2010 contractual obligations. Instead, according to HeartBrand, Bear Ranch . . . *never intended to abide by the restrictions*.

Dkt. #240 at 5 (emph. added); *see* Dkt. #91 at 23 (granting MSJ on HeartBrand's first fraud theory).

The jury's fraud finding is completely undermined, if not entirely vitiated as a matter of law, by evidence that HeartBrand is operating an open business model. The finding is certainly against the great weight and preponderance of the evidence, given the new evidentiary landscape the jury had no opportunity to assess. *See Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005) (verdict against the great weight and preponderance of the evidence warrants a new trial). For example, HeartBrand could not have detrimentally relied on Bear Ranch's alleged representations about restrictions on the cattle if an open model was imminent (a subject on which Bear Ranch is at least entitled to discovery). *See, e.g.*, *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001) ("proof that a party relied to its detriment on an alleged misrepresentation is an essential element of a fraud claim"). Likewise, Bear Ranch's alleged representations could not have been material to HeartBrand. *See, e.g.*, *Prudential Ins. Co. v. Jefferson Assocs.*, 896

S.W.2d 156, 163 (Tex. 1995) (alleged predicate misrepresentation for fraud claim must be material). Nor could HeartBrand have been harmed, where Bear Ranch sold no cattle acquired, and where HeartBrand itself sells Akaushi unrestricted. And even assuming *arguendo* that some evidence might support a verdict to the contrary, that verdict is against the great weight and preponderance of the evidence when the new evidence is considered. *See Cates*, 431 F.3d at 460.

The jury's finding on breach of contract is undermined in much the same way. The theory of breach submitted to the jury was that Bear Ranch materially breached the 2010 agreements governing the purchase of 424 Akaushi cattle from HeartBrand by failing to comply with certain contract provisions, all of which were aimed at preserving the closed business model and integrity of the Akaushi genetics. *See* Dkt. #61 at 22-23.[1] Given that HeartBrand has an open business model, the Court can have little confidence that the jury would have found material breach; the jury's finding, in other words, was irreparably prejudiced. *See Eximco*, 737 F.2d at 512 ("A trial judge also may order a new trial if some event at trial

---

[1]    HeartBrand's amended counterclaims allege breach for: "(i) failing to register the offspring produced from the cattle and/or semen purchased  from HeartBrand and Beeman with the American Akaushi Association; (ii) failing to enroll its Akaushi cattle in the American Akaushi Association's Whole Herd Reporting System or pay the assessment fees for its entire herd; (iii) failing to comply with the rules of the American Akaushi Association; (iv) failing to submit DNA test results for offspring produced from its Akaushi cattle and from any calves produced from the semen purchased from HeartBrand; and (v) failing to sell to HeartBrand the full-blood offspring of the Akaushi cattle Bear Ranch did not intend to keep to grow its herd." Dkt. #61, at 22-23.

irreparably prejudiced the jury's verdict"). Moreover, HeartBrand's repeated arguments that it wanted its herd back to preserve the integrity of the Akaushi genetics also undermine this finding and were sufficiently prejudicial to Bear Ranch as to require a new trial. *See id*; *Meyers v. Moody*, 693 F.2d 1196, 1220 (5th Cir. 1982) (prejudicial closing arguments warrant new trial); *Caldarera v. Eastern Airlines, Inc*., 705 F.2d 778, 781 (5th Cir.1983) (inflammatory closing argument warrant new trial). Again, if these issues don't vitiate the findings completely, at a minimum, they reflect that the findings are against the great weight and preponderance of the evidence. *Cates*, 431 F.3d at 460.

The jury's finding in response to a question on excuse of breach is also undermined. *See id.* That question asked, among other things, whether HeartBrand had engaged in "intentional conduct inconsistent with claiming" its rights under the contract. Dkt. #172, at 23. In answering that question, the jury ought to have known that HeartBrand would soon be operating under an open model. Likewise, the jury was entitled to know that HeartBrand didn't actually need or want its herd back, information that also would have informed the jury's answers to questions on material breach and excuse.

HeartBrand's move to an open model also will have profound impacts on the Court's equitable remedies; those remedies require reevaluation by the Court, if not a new trial. Consistent with the nature of HeartBrand's counterclaims, the

Court's equitable remedy for the fraud claim was based on the assumption that preserving the restrictions on the cattle was necessary to prevent unjust enrichment of Bear Ranch:

> The Court therefore concludes that the surefire way to prevent Bear Ranch from being unjustly enriched as a result of obtaining the unrestricted use of the cattle under false pretenses is to keep that unjust enrichment from happening in the first place.

*See* Dkt.# 240, at 16. The Court accordingly devised a remedy "measured by the benefit conferred on Bear Ranch" when "Bear Ranch obtained restriction-free Akaushi." *Id*. "So the unjust enrichment is the difference between the value of the unrestricted cattle received and the restricted cattle that were orally promised." *Id*. at 11-12. Indeed, "the reason HeartBrand sought a continuance to allow its expert to amend his report [was] to reflect the greater value of the benefit conferred on Bear Ranch." *Id*. at n.9. With the restrictions rendered valueless and purposeless following HeartBrand's move to an open model, this remedial scheme protects a system that no longer exists and attempts to avoid unjust enrichment that has not, and could not, occur.

At the same time, the mechanism through which the Court was able to avoid a windfall to either party—and avoid relying on HeartBrand expert Andrien's speculative valuation report and opinion—was to order the cattle returned to HeartBrand; essentially, give HeartBrand what it claimed it always wanted, before Bear Ranch could be enriched by its alleged fraud:

> [T]he restrictions have value, but the most equitable way to prevent Bear Ranch from obtaining any benefit from their erosion is to give the cattle back to HeartBrand before Bear Ranch realizes any unjust enrichment from unrestricted use of the cattle.

Dkt. #240, at 3; *id.* at 22 (explaining that the goal of the equitable remedy was to "prevent unjust enrichment and a windfall to any party").

The Court also linked its remedies for the Twinwood and Spears sales to the fraud remedy, noting that the Twinwood and Spears remedy is "nonseverable from the other aspects of the remedy" and that calling into question either portion of the Court's remedy would "prompt the Court to reconsider in full the exercise of its equitable discretion reflected in this Order." Dkt. #240, at 21. The Court linked the remedies because of the importance of the closed model: "[A]ny such unrestricted sales [in connection with the Twinwood and Spears Purchase Cattle] undermines the integrity of the Akaushi program and run[s] the risk . . . that Bear Ranch would be unjustly enriched on all the cattle it has obtained, including the Beeman cattle . . . ." Dkt. #240 at 20. *Id.* (Court noting "equity requires ensuring that Bear Ranch not be able to sell any of the Akaushi (or their offspring) that are at issue in this suit.").

In sum, the foundation of the Court's equitable remedies was its reliance on HeartBrand's arguments that the restrictions have value because HeartBrand has a closed business model and wants its cattle back to preserve that model. Those representations were just as critical to the Court's rulings on equitable remedies as

they were to the jury's findings of breach and fraud. That foundation has now been undermined by new evidence of HeartBrand's open business model and its about-face on its request for return on the cattle. The Court should therefore order a new trial and, in the very least, "reconsider in full the exercise of its equitable discretion." Dkt. #240, at 21.

Further, the jury's other findings are also undermined and require a new trial. For example, the findings of clear and convincing evidence resulting from fraud are undermined, are certainly against the great weight and preponderance of the evidence, and cannot stand in light of these new developments.

To sum up, the jury at the very least was entitled to know, and should have known, that HeartBrand would soon have an open business model, if it did not already have one. It is likely, moreover, that additional discovery from HeartBrand is needed to ascertain at what point it first decided to move to an open business model. And to the extent HeartBrand might claim it is operating only some kind of hybrid or limited open model, discovery would be needed to confirm that as well. Likewise, the jury was entitled to know that HeartBrand did not in fact want or need its cattle back. A new trial is therefore required on all issues.

## II.   The Erroneous Admission of Expert Andrien's Valuation Opinion Substantially Prejudiced Bear Ranch and Requires a New Trial.

The Court should also grant a new trial because the inadmissible revised report and opinion of HeartBrand expert Jeffrey Andrien prejudiced Bear Ranch by

inflaming the jury and tainting its verdict on all issues, including its advisory damages findings regarding an equitable remedy for fraud and punitive damages. *See* Dkt. #150-1(Supplemental Expert Report of Jeffrey S. Andrien, May 1, 2014). "A district court, of course, has power to grant a new trial when the jury has inadvertently considered inadmissible evidence, and the evidence was prejudicial to the losing party." *Carson v. Polley*, 689 F.2d 562, 570 (5th Cir. 1982). A verdict that results from passion or prejudice warrants a new trial. *See Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 683 (5th Cir.1986).

### A.   Andrien's valuation opinion was inadmissible and calculated to inflame passions and confuse issues.

Andrien's revised opinion discussing some $90 million in "equitable damages" was inadmissible and calculated to inflame passions and confuse issues; it related to issues only relevant to the Court's determination of equitable remedies, was grossly inflated and improper, and should never have been allowed in front of the jury. For the two years of litigation before Andrien's revised opinion came on the scene, this was around a $1 million case. His eve-of-trial $90-million valuation of "equitable damages," which Bear Ranch did not have an adequate opportunity to rebut in front of the jury, inflamed and confused the jury, and unfairly prejudiced Bear Ranch.

Andrien's valuation rests entirely on projecting profits from a hypothetical cattle business, which the world has never seen, where supposedly hundreds of

Akaushi bulls would be sold, year after year, for astronomical prices of "at least" $50,000 each. A retired Texas A&M professor and 40-year veteran of this industry, Dr. Jim McGrann, explained that nobody in the industry values a herd of cattle this way—by equating cattle to the supposed present value of a hypothetical enterprise, of which cattle would be just one input. Dkt. #199 (Exh. 1, McGrann Decl., at 5-6). People in the industry always rely on market comparables to value cattle, which exist now that HeartBrand is selling unrestricted Akaushi. *Id.*

Rather than focus on any actual profits to be disgorged, Andrien's valuation is based on speculated future profits that someone is supposed to be able to make. The analytical gaps, leaps in logic, and unfounded assumptions in Andrien's opinion are legion. This opinion is not evidence and should not have been admitted. For example, the opinion assumes that:

1.  The law allows, which it does not, a valuation based on tracing from an allegedly unjust transaction not just to future profits but to assets produced, regardless of whether they ever result in profit;

2.  That HeartBrand has an equitable claim, which it does not, on the alleged value of all those new assets without any equitable apportionment for the effort to create them; and

3.  That a buyer would value those cattle, not based on market-comparable herd sales, but by modeling speculative future profits from an imaginary new enterprise into which the cattle would be a mere input. Any real buyer would not do so.

*See* Dkt. #199 (Suppl. Rpt. (Exh. 4) at 26-27 & Att. V); 5/27/14 Tr. at 267-01.

The improper Andrien opinion models profits from a new enterprise that does not exist and has not existed anywhere—a fictional company with a "track record" of selling hundreds of bulls for $50,000 each, year after year, with that pricing somehow immune to the flood of Akaushi genetics streaming into the market. Dkt. #199 (Suppl. Rpt. (Exh. 4) Att. V at 7). The profits Andrien imagines someone earning into perpetuity are then discounted to present value—a business-valuation method that is "extremely sensitive to changes in the input variables." Shannon Pratt, *Valuing a Business* 224 (5th ed. 2008). And nearly every assumption and input that Andrien uses to confect that imaginary business is based on the say-so of HeartBrand's interested employees or owners, if explained at all, and not tested. Dkt. #199 (Suppl. Rpt. (Exh. 4) Att. V at 2-4); *Id.* (Ex. 2, Bayley Decl. at 4). Andrien does not consider sales data on herds of other beef cattle. He categorically rejects the idea that a rancher would ever consider other breeds as an alternative constraining demand, though he consulted with no ranchers outside HeartBrand and has no livestock experience himself. And even just staying within the Akaushi breed, Andrien says there is no constraining effect from any cattle outside of HeartBrand's control, whether cattle owned by Bear Ranch itself or the numerous parent-verified Akaushi cattle registered with other breed associations. Dkt #199 (Suppl. Rpt. (Ex. 4) at 23-26).

Andrien concludes that Bear Ranch presently has around 1,780 Akaushi cattle assignable in some way to its purchase from Beeman, and that Bear Ranch is "enriched" by the market value of those cattle less Andrien's view of the costs to produce them. Dkt #199 (Suppl. Rpt. (Ex. 4) at 27-28, Att. III at 1). Andrien then treats all of that alleged "enrichment" as assignable to buying 514 cattle from Beeman three years ago (paying the full $2.5 million purchase price), with none of the alleged enrichment due to Bear Ranch's own land, labor, and commitment. *Id.* Andrien's unjust enrichment opinions were unreliable beyond all measure, and the jury should not have been allowed to consider them.

### B.    Bear Ranch was not given a fair opportunity to rebut Andrien's opinion in front of the jury.

HeartBrand disclosed Andrien's revised report on May 1, 2014. Trial started May 19. The rules require disclosure at least 90 days before trial and permit rebuttal 30 days after disclosure. Although the Court exercised its discretion to permit HeartBrand to amend its expert disclosures in light of a summary judgment ruling, the Court unfairly prejudiced Bear Ranch by allowing Andrien's opinion to go in front of the jury without affording Bear Ranch an adequate opportunity to rebut it in front of the jury. The Court should have withheld Andrien's opinion from the jury and reserved the equitable-remedy question purely for the Court, which would have allowed Bear Ranch to serve a rebuttal expert report within 30

days of Andrien's new opinion and to have that fully-formed opinion considered by the Court (only) in determining the correct equitable remedy post-trial.

### C.   The erroneous admission of Andrien's opinion prejudiced Bear Ranch

The erroneous admission of Andrien's opinion prejudiced Bear Ranch because it inflamed the jury, affecting the jury's contract and fraud liability determinations, and caused a wildly inflated $23-million jury finding on an equitable remedy for unjust enrichment and a punitive damages award of $1.825 million. The jury's determinations that punitive damages should be awarded and their amount, in particular, were the result of passion and prejudice and are not supported by sufficient evidence. But the $90 million figure also infected the contract liability question because it gave credence to HeartBrand's theory that a breach of the restrictions in its contracts with Bear Ranch was material. Likewise, the $90 million figure affected the fraud finding because it bolstered HeartBrand's theory that alleged Bear Ranch misrepresentations about the Beeman sale being subject to restrictions were material and induced HeartBrand's consent to the sale. It also infected the fraud ruling because it supported HeartBrand's position that there was harm from the fraud—which there was not, given that Bear Ranch had never sold any of the cattle and given what we know now: that there is no "closed" business model to be harmed by the alleged fraud.

-23-

The opinion prejudiced Bear Ranch even though the jury's findings on the amount of an equitable remedy for the fraud claim were advisory and rejected by the Court as speculative. With valuation evidence before it of a supposed $90 million windfall to Bear Ranch, the jury was inflamed when assessing whether and in what amount punitive damages should be awarded. Indeed, the jury advised a $23 million figure for the unjust enrichment award, which reflects that it adopted Andrien's speculative valuation, at least in part. If the jury had been instructed, as the Court concluded, that "Bear Ranch has not yet realized any of the gains from its theoretical unjust enrichment" and that simple return of the Beeman Purchase Cattle would "keep that unjust enrichment from happening in the first place," there would likely be no award of exemplary damages. Dkt. #240 at 15-16. Likewise, the $90 million valuation, and the jury's advisory $23-million award that flowed from it, also skewed the Court's equitable remedy, and Bear Ranch was prejudiced in that way as well.

The Court should grant a new trial. *See Carson*, 689 F.2d at 570; *Wells*, 793 F.2d at 683.

## CONCLUSION AND PRAYER

For these reasons, Bear Ranch respectfully requests a new trial on all issues.

-24-

Dated: March 23, 2016                    Respectfully submitted,

                                          /s/ R. Paul Yetter
                                          R. Paul Yetter
                                          Attorney-in-Charge
                                          State Bar No. 22154200
                                          James E. Zucker
                                          State Bar No. 24060876
                                          YETTER COLEMAN LLP
                                          909 Fannin, Suite 3600
                                          Houston, Texas 77010
                                          (713) 632-8000
                                          (713) 632-8002 (Fax)

                                          Andrew R. Seger
                                          State Bar No. 24046815
                                          KEY TERRELL & SEGER LLP
                                          4825 50th St., Suite A
                                          Lubbock, Texas 79414
                                          (806) 793-1906
                                          (806) 792-2135 (Fax)

                                          Attorneys for Plaintiff Bear Ranch, LLC

## Certificate of Service

I certify that on March 23, 2016, a copy of the foregoing document was served on all counsel of record using the Court's e-filing system.

                                          /s/ James E. Zucker
                                          James E. Zucker