## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| **BEAR RANCH, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 6:12-cv-14** |
| | § | |
| **HEARTBRAND BEEF, INC.,** | § | |
| **AMERICAN AKAUSHI** | § | |
| **ASSOCIATION, INC.,** | § | |
| **and RONALD BEEMAN,** | § | |
| | § | |
| **Defendants.** | § | |

## HEARTBRAND'S MOTION FOR NEW TRIAL,
## MOTION TO ALTER OR AMEND THE JUDGMENT,
## AND/OR MOTION FOR CLARIFICATION

The Court has issued a Final Judgment (Dkt. #256) addressing a panoply of issues over which the parties have litigated at length. Defendant HeartBrand Beef, Inc. recommends and requests certain modifications to the judgment, for the following three reasons.

<u>First</u>, HeartBrand identifies certain ambiguities in the Court's Final Judgment with respect to the non-monetary remedies HeartBrand may elect, the cattle to which those elections apply, and the scope of the resulting constructive trust. HeartBrand submits that, before any remedies are elected, these ambiguities should be clarified under Rule 60(a) to avoid any doubt about the meaning of the Court's Final Judgment.

Second, certain aspects of the Court's order allocating costs and risks for cattle subject to non-monetary remedies shift excess costs and risks to HeartBrand in a manner that may not have been intended by the Court, and that would be at odds with applicable facts and law.  HeartBrand seeks to reopen the judgment, and if necessary, present additional evidence in accordance with Rule 59, to allow entry of a new judgment addressing these concerns.

Third, resolution of these issues of non-monetary relief will require additional investment of judicial resources.  HeartBrand urges the Court to consider implementation of the jury's monetary remedies as an alternative approach.

Therefore, pursuant to Federal Rules of Civil Procedure 59 and 60, HeartBrand hereby moves this Court for a new trial, for alteration or amendment of the Final Judgment, and/or for clarification of certain, discrete portions of the Final Judgment.

## **LEGAL STANDARDS**

HeartBrand's requests are governed by several distinct provisions of the Federal Rules of Civil Procedure.

A Court may grant a motion for new trial for any reason which a motion for new trial or rehearing has been granted in any action at law or in equity in federal court.  FED. R. CIV. P. 59(a)(1).

Furthermore, because the remedy portion of the proceedings below was, effectively, a nonjury trial, the Court may, on a motion for new trial, "open the judgment …, take additional testimony, amend findings of fact and conclusion of law or make new ones, and direct the entry of a new judgment." FED. R. CIV. P. 59(a)(2).

A motion to alter or amend the judgment under Rule 59(e) "must clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003) (quotation marks and citation omitted).

Finally, "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." FED. R. CIV. P. 60(a).  Under Rule 60(a), a court may "correct a clerical error in a judgment if the error causes the judgment to inaccurately reflect the results of the court's adjudication." *Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 191 (5th Cir. 2011).

## ARGUMENT

### I.    The Final Judgment contains minor ambiguities that should be clarified with respect to the available elections and scope of relief.

Bear Ranch fraudulently induced HeartBrand to agree to the 2011 Beeman Purchase, and Bear Ranch is liable to HeartBrand for that fraud.  Dkt. #256 ¶ 3. The ordered remedy for this fraud is a form of disgorgement for unjust enrichment

"meant to prevent Bear Ranch from realizing any gain as a result of the fraud the jury found." Dkt. #255 at 2. In the Final Judgment, the Court ordered the imposition of a constructive trust over the "Beeman Cattle," which it defined as "those animals acquired by Bear Ranch from Ronald Beeman." Dkt. #256 ¶ 4, n.1. The Court also ordered that HeartBrand will have "an equitable claim to the cattle" and that Heartbrand may elect to buy-back the Beeman Cattle for an amount equivalent to the "reasonable amount of acquiring, producing, and maintaining" the Beeman Cattle, $3,796 per head, plus applicable maintenance costs. *Id.* ¶¶ 4-5. In the event that HeartBrand does not wish to buy back the Beeman Cattle, the Court also "authorized and ordered a judicial sale or auction process." *Id.* ¶ 5. However, if the proceeds of such a sale do not exceed $3,796 per head, plus applicable maintenance costs, HeartBrand will owe any difference to Bear Ranch. *Id.* HeartBrand requests three clarifications.

### A. HeartBrand seeks clarification that the election applies only to Beeman Cattle, not Beeman Cattle Offspring.

First, HeartBrand seeks clarification under Rule 60(a) that the purchase/sale election outlined both in the Final Judgment and above applies only to the Beeman Cattle (defined by the Court as the "animals acquired by Bear Ranch from Ronald Beeman," *id.* ¶ 4, n.1), and that this election does not apply to the "Beeman Cattle Offspring" (defined by the Court as "any animal with at least one forebear that is or was one of the Beeman Cattle or is descended from any [of] those animals," *id.*

4

¶ 15, n.13).   The Court's Final Judgment makes the purchase/sale election applicable only to the Beeman Cattle.  *Id.* ¶¶ 4-5.

HeartBrand seeks this clarification because, although the Court's description of the election refers to the Beeman Cattle and not the Beeman Cattle Offspring, the Court's description of the remedy also refers to evidence in the trial record that "there were 1,800 head of cattle from the 2011 Beeman sale."  *Id.* ¶ 4.  The trial record, however, is undisputed that the Beeman Cattle consisted of 500 cows and 14 bulls, not 1,800 head of cattle.  Dkt. #178-8.  The referenced 1,800 head included the Beeman Cattle Offspring, as calculated based on the limited evidence Bear Ranch had then produced.  Dkt. ##211-56–211-63.

It appears evident that the Court uses the 1,800 number, along with a jury figure for the cost of Beeman Cattle and Beeman Cattle Offspring, to calculate the per-head cost of producing Beeman Cattle,[1] and not for the purpose of expanding the definition of "Beeman Cattle," which is explicit in footnote 2 of the Final Judgment.   Nevertheless, to avoid any mistaken impression that the Court's description of the evidence was intended to alter the scope of the election, HeartBrand requests a clerical clarification to Paragraph 4 of the Final Judgment

---

[1]   Dkt. #256 ¶ 4 (referring to Jury Verdict Form (Dkt. #172) at 25, which finds the amount Bear Ranch "reasonably spent acquiring, producing and maintaining the … living Akaushi cattle that Bear Ranch acquired through the Beeman Purchase, *and any living offspring of those animals*").

pursuant to Rule 60(a).  Below, HeartBrand underlines its proposed insertions to

paragraph 4 and strikes through its proposed deletions:

> The Court orders the imposition of a constructive trust over the
> "Beeman Cattle."[FN1]  Bear Ranch will hold these cattle in constructive
> trust for HeartBrand, which will have an equitable claim to the cattle,
> and Bear Ranch will surrender the cattle to HeartBrand upon receipt
> of payment for Bear Ranch's costs.  For the avoidance of doubt, the
> remedies contemplated by this paragraph and paragraph 5 are limited
> only to the Beeman Cattle and do not extend to the Beeman Cattle
> Offspring.[FN1a]  The trial record reflects that the Beeman Cattle and
> Beeman Cattle Offspring consisted of there were 1,800 head of cattle
> from the 2011 Beeman sale, and the jury found that the buy-back
> price, reflecting the reasonable amount of acquiring, producing, and
> maintaining these cattle the Beeman Cattle and Beeman Cattle
> Offspring, was $6,832,000, or $3,796 per head.  HeartBrand will pay
> to Bear Ranch by wire transfer $3,796 per head, plus the maintenance
> costs detailed below, simultaneously with the transfer of title of the
> cattle.  The parties will split the cost of transporting the cattle from
> Bear Ranch's facilities in Colorado and Texas.
>
> FN1: The "Beeman Cattle" refers only to are those the 514 animals acquired by
> Bear Ranch from Ronald Beeman in July 2011.
>
> FN1a:  The "Beeman Cattle Offspring" refers only to those animals with at least
> one forebear that is or was one of the Beeman Cattle or is descended from any of
> those animals.

**B.    HeartBrand seeks clarification that, as to the Beeman Cattle,
HeartBrand may elect purchase, judicial sale/auction, or an
ongoing constructive trust over proceeds.**

Second, HeartBrand seeks clarification under Rule 60(a) regarding the

remedies ordered by the Court with respect to the Beeman Cattle.  In the January

27, 2016 Order, the Court held that, "[a]s to the Beeman cattle, HeartBrand can

elect" from three remedies: "1) Buy the cattle back; 2) Hold an auction of the cattle

at which it sells either restricted or unrestricted cattle. … or 3) Keep the cattle with Bear Ranch" while "maintain[ing] a constructive trust over any profits Bear Ranch realizes from sale of the cattle."  Dkt. #255 at 1.  The Final Judgment appears to preserve all three of those options, recognizing that "a constructive trust over the proceeds of any sales" will apply to all Beeman Cattle and Beeman Cattle Offspring that HeartBrand "chooses to not purchase or sell at auction."  Dkt. #256 ¶ 15.  However, earlier in the Final Judgment, the Court specifies the price for acquiring Beeman Cattle and states "[i]f HeartBrand does not wish to reacquire the cattle on these terms, the Court authorizes *and orders* a judicial sale or auction process."  *Id.*  ¶¶ 4-5 (emphasis added).  This sentence could be read to suggest that if HeartBrand does not elect purchase, a sale or auction must occur.

To avoid any mistaken impression about the nature of the election, HeartBrand, pursuant to Rule 60(a), requests the following clarification to Paragraph 5 of the Final Judgment:

> If HeartBrand does not wish to reacquire the <u>Beeman Cattle</u> on these terms, the Court authorizes ~~and orders~~ a judicial sale or auction process, to be completed within 180 days from the date of this order. HeartBrand will be able to determine the contract terms of these sales. Proceeds from the judicial sale or auction up to $3,796 per head, plus the maintenance costs detailed below, will be paid to Bear Ranch with any proceeds above that amount paid to HeartBrand.  If a sale does not cover the amount of $3,796 per head, plus maintenance costs described herein, HeartBrand will owe the difference to Bear Ranch. <u>In the event that HeartBrand does not wish to either reacquire the</u> <u>Beeman Cattle on the terms described in paragraph 4 or does not wish</u> <u>to proceed with a judicial sale or auction of the Beeman Cattle, the</u>

7

<u>Beeman Cattle will remain in Bear Ranch's possession with HeartBrand maintaining a constructive trust over the proceeds of any such cattle as described below in paragraph 15.</u>

## C. **HeartBrand seeks clarification that the constructive trust over proceeds includes all proceeds, not just proceeds from sales of live cattle.**

Finally, with respect to the constructive trust remedy, the Court has previously ordered that the constructive trust will apply to "any profits Bear Ranch realizes on cattle it keeps." Dkt. #255 at 2. This is consistent with the nature of the constructive trust remedy, which is intended to prevent an intentional wrongdoer from realizing a benefit from a fraud. *See* Dkt. #205 at 31-32.

The Final Judgment echoes the language of the Court's January order, applying "a constructive trust over the proceeds of any sales of such cattle" not purchased by HeartBrand or sold at auction. Dkt. #256 ¶ 15. However, because the word "cattle" is sometimes used in the industry to distinguish animals from the beef products created from those animals, the Final Judgment could be read to suggest the constructive trust only applies to profits realized by Bear Ranch when it sells *live cattle*, as opposed to carcasses or beef products that are themselves proceeds from such cattle.[2]

---

[2] A constructive trust is typically traceable to all proceeds of wrongfully-obtained assets. *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 58(1) (2011) [hereinafter RESTATEMENT].

To avoid any mistaken impression about the nature of the constructive trust, HeartBrand requests, pursuant to Rule 60(a), the following clarification to Paragraph 15 of the Final Judgment:

> As to all remaining Beeman Cattle or Beeman Cattle Offspring, (that is, any that HeartBrand chooses to not purchase or sell at auction), HeartBrand will maintain a constructive trust over the proceeds of ~~any sales of~~ such cattle, including any sales of such cattle; sales of semen, embryos, or other genetics collected from such cattle; or sales of beef products derived from such cattle. Any amounts Bear Ranch receives for proceeds of such cattle above $3,796 per head, plus maintenance costs described herein, shall be paid to HeartBrand within 30 days of sale.

## II. The Final Judgment shifts excess costs and risks to HeartBrand, requiring a partial new trial on certain aspects of the Court's remedies.

### A. There is insufficient evidence to support the per-head cost figure in the Final Judgment, and the figure is against the weight of the evidence.

The Final Judgment provides that HeartBrand may elect, among other options noted above, to purchase Beeman Cattle for $3,796 per head, plus maintenance costs. To arrive at that cost figure of $3,796 per head plus maintenance costs, the Court utilized the jury's finding for the amount Bear Ranch "reasonably spent acquiring, producing and maintaining the … living Akaushi cattle that Bear Ranch acquired through the Beeman Purchase, and any living offspring of those animals": specifically, $6,832,000 for 1,800 then-known cattle. Dkt. #172 at 25.

HeartBrand submits that the jury's total cost for the 1,800 cattle alive in 2014 does not apply on a *per-head* basis either to the herd as it existed when the Final Judgment was rendered or to the herd as it will exist as the specified remedies are carried out. The jury was not asked to determine a "per-head" figure but was, instead, asked to establish the amount reasonably spent by Bear Ranch acquiring, producing, and maintaining an actual set of cattle living as of March 2014. *See* Dkt. #172 at 25 (jury's calculation of amounts Bear Ranch reasonably spent acquiring, producing and maintaining "the living Akaushi cattle that Bear Ranch acquired through the Beeman Purchase and any living offspring of those animals"). The jury's figure is not adaptable to the purposes to which it was put in the Court's order for at least three reasons.

First, the "per-head" figure includes prorated amounts spent acquiring the living Beeman Cattle in existence as of March 2014. *Id.* However, more than two dozen of the original Beeman Cattle that were alive in March 2014 are no longer alive, and the portion of the jury's total figure related to those deceased cattle is no longer applicable or legally relevant, since none of the deceased cattle can be turned over to HeartBrand.[3] Because the total cost of the Beeman Cattle has changed since the time of trial, the average derived from that total no longer makes mathematical sense. Although the per-head average is intended to calculate the

---

[3] Bear Ranch recognized the change in herd totals in its "Update to Prior Briefing" and attached an inventory of cattle identified by purchase code. Dkt. #253-1; Dkt. #253-2 ¶ 14.

average cost of cattle in one group (the cattle alive in 2016), the average is calculated by dividing up the total cost of a different group of cattle (those alive in 2014). In addition, since the time of trial, it has become apparent that cattle were not managed as carefully as Bear Ranch claimed. Rather than maintaining separate groupings of 2010 and 2011 cattle in Colorado and Texas respectively, Bear Ranch intermixed the herds and failed to keep detailed parentage records. Therefore, even segregating the Beeman Cattle Offspring from the other cattle proves more difficult than anticipated, creating uncertainty regarding the cost figures and the scope of the Final Judgment.

Second, the per-head figure is applied to Beeman Cattle Offspring born after March 2014, even though there is no evidence in the record that $3,796 approximates the amount reasonably spent by Bear Ranch acquiring, producing, and maintaining any calves born after March 2014.[4] The evidence before the Court was that it costs approximately $700 to produce and wean a calf. Dkt. #187 (May 27, 2014 Tr.) at 284-85 (Andrien Testimony). The reasonableness of this cost figure was reinforced by the contract documents signed by Bear Ranch setting calf prices at $800 for weaned calves and $1,800 for fed calves. Bear Ranch presented no evidence that it would expect to incur nearly $4,000 in costs raising a calf born

---

[4]  In fact, for any post-verdict Beeman Cattle Offspring, there would be no acquisition costs because that amount would be factored into the original jury amount for acquiring the Beeman Cattle.

just eighteen months ago; certainly none that would overcome its own acknowledgment that $1,800 would be a reasonable sale price for such an animal.

Third, the per-head figure allows Bear Ranch to profit on young cattle born since trial. Under the Final Judgment, Bear Ranch would be able to sell a newly weaned Beeman Cattle Offspring calf that cost it no more than $700 to produce for $3,796 (a profit of at least $3,000) without having to account to HeartBrand for any profit. Leaving profit like that in Bear Ranch's hands is contrary to the stated goals of the *Restatement* and the Court. *See* RESTATEMENT § 51; Dkt. #255 ("The decision to add these additional options, as well as the decision not to extend the injunction imposing restrictions to the Beeman cattle, is consistent with the nature of the unjust enrichment remedy which is to prevent Bear Ranch from realizing any gain as a result of the fraud the jury found.").

For these reasons, HeartBrand requests a new trial on remedies so that it may present new testimony and evidence regarding the appropriate acquisition, production, and maintenance costs of the Beeman Cattle Offspring. HeartBrand intends to present such evidence on a "formula" basis, so that the Court will be able to enter a judgment that accounts for costs notwithstanding the passage of time since the jury's verdict and during the pendency of any appeals in this case.

In making this request, HeartBrand notes that it did not have the burden at trial to present evidence assessing costs on a per-head basis. Per the *Restatement*,

12

the claimant's burden is only to present a "reasonable approximation" of the amount of the wrongful gain.  RESTATEMENT §51(5)(d), cmt. i.  If the wrongdoer has a claim in counter-restitution for costs or money expended in acquiring or preserving the property that is the source of the unjust enrichment, *id.* § 51(5)(c), the wrongdoer can present evidence of those costs (which are in essence credits against the value Bear Ranch gained by its fraud) to show that the "true extent of unjust enrichment" is less than the reasonable approximation presented by the claimant, *id.* § 51, cmt. i.  But in all cases, the "[r]esidual risk of uncertainty in calculating net profit is assigned to the defendant." *Id.* at § 51(5)(d).

Bear Ranch made no attempt to establish its costs on an average, per-head basis.  Moreover, as described above, even Bear Ranch's own evidence clearly establishes that $3,796 per head would be well in excess of the relevant costs for the more recently born cattle.  Accordingly, HeartBrand requests a new trial on these discrete remedy issues.

### B.    Requiring HeartBrand to guarantee a certain return to Bear Ranch for losses caused by Bear Ranch's fraud is contrary to law.

As noted above, the Final Judgment orders three alternative remedies, with HeartBrand having the option to elect the remedy it prefers:   Bear Ranch surrenders the fraudulently obtained cattle to HeartBrand (upon HeartBrand paying certain delineated costs) (Dkt. #256 ¶ 4); the fraudulently obtained cattle are sold in a judicial sale or auction (with Bear Ranch entitled to a credit of the proceeds to

13

cover certain delineated costs) (*id.* ¶ 5); or Bear Ranch maintains the fraudulently obtained cattle (and their offspring) in a constructive trust to the benefit of HeartBrand (*id.* ¶ 15).  *See also* Dkt. #255 at 1.

As to the second option—a judicial sale or auction—the Final Judgment provides that, if an animal's sale price does not cover the prescribed buy-back amount plus maintenance costs, HeartBrand will "owe the difference to Bear Ranch."  Dkt. #256 ¶ 5.  Under this provision, HeartBrand serves as a backstop or guarantor, ensuring that Bear Ranch recovers a set, threshold amount for every animal Bear Ranch fraudulently obtained and sells at auction[5]—shifting a commercial risk affecting substantial sums of money from the victim of a fraud to the conscious wrongdoer.

Although Bear Ranch sought an auction process as part of its requested judgment, Bear Ranch did not request that it be assured of a minimum sale price by the Court, or that a minimum sale price be guaranteed by HeartBrand.[6]  Such a request would have been without support in the law.

---

[5]   The Final Judgment does not impose this guaranty obligation on HeartBrand if it elects to leave the cattle in an ongoing constructive trust.  *See, e.g.*, Dkt. #256 ¶ 15 (no guaranty requirement for animals Bear Ranch holds in constructive trust but sells).

[6]   *See* Bear Ranch's Proposed Judgment (Dkt. #243) at 5, ¶ 5 ("Since HeartBrand does not wish to reacquire the cattle on these terms, the Court authorizes and orders a judicial sale or auction process, to be completed within 90 days from the date of this order, in which the cattle will be sold without contract restrictions. Proceeds from the judicial sale or auction up to $3,796 per head, plus the maintenance costs detailed below, will be paid to Bear Ranch, with any proceeds above that amount paid to HeartBrand."); *see also* Dkt. #220 at 4.

The purpose of the unjust enrichment remedy of disgorgement is "to strip the defendant of a wrongful gain." RESTATEMENT § 51 cmt. a.  While there is a counter-restitutionary principle requiring the claimant to account "all marginal costs incurred in producing the revenues that are subject to disgorgement," that is only in the nature of a "deduction" from revenues turned over by the wrongdoer to the claimant.  *Id.* § 51 cmt. h.  Nowhere does the *Restatement* provide that a conscious wrongdoer is guaranteed the value expended to obtain the asset being disgorged.  Indeed, the *Restatement* explicitly acknowledges that a wrongdoer may be obligated to account for the full benefits (value) he received from his fraud, even when he put that value to a losing enterprise and failed to fully realize the benefits obtained.  *Id.* § 51 cmt. d (any "[e]nrichment from benefits wrongfully obtained is not discounted to reflect some lesser value actually realized in advancing the purposes of the defendant").

The Final Judgment has the perhaps unintended consequence of requiring that Bear Ranch, not HeartBrand, be made whole no matter the results of an auction.  The guaranty provision goes beyond merely allowing a credit for "money expended in acquiring or preserving the property … that is the source of the profit subject to disgorgement," *id.* § 51(5)(c), which is provided for by the deduction from the proceeds of a figure to cover Bear Ranch's costs. Dkt. # 256 ¶ 5.  It

effectively serves to ensure that Bear Ranch, at the expense of HeartBrand, suffers no harm for its fraud.

Moreover, the shifting of auction risks is particularly troubling in light of the fact that Bear Ranch has had sole management of the cattle since 2011, and its management of the cattle will undoubtedly have an impact on the value the cattle bring.  Bear Ranch's apparent inability to document the specific lineage of its animals and its failure to keep performance records may affect the price the cattle bring at sale.  Shifting the risk of a shortfall from Bear Ranch to HeartBrand inequitably imposes on HeartBrand risks that it had no part in creating and had no way to mitigate, and saves Bear Ranch from its own poor management of this agricultural asset.

The requirement that HeartBrand guarantee Bear Ranch receive a certain price for the cattle auctioned according to the Final Judgment is manifest error of law on the remedy of unjust enrichment.  An alteration or amendment to the Final Judgment to remove that guarantee is necessary to avoid a windfall to the tortfeasor, Bear Ranch.  HeartBrand therefore requests that the Court reopen the judgment under Rule 59(a)(2)—or alter or amend the judgment under Rule 59(e)— and strike the sentence "If a sale does not cover the amount of $3,796 per head, plus maintenance costs described herein, HeartBrand will owe the difference to Bear Ranch" from Paragraph 5 of the Final Judgment.

16

**C.    The Final Judgment splits transportation costs of the 2010 Cattle in contravention of the terms of the Full-Blood Contract.**

Bear Ranch breached the terms of the 2010 Full-Blood Contract and the 2010 F1 Program Contract and is liable thereon.  Dkt. #256 ¶ 7.  To remedy these breaches, the Court ordered the delivery of certain, identified cattle, semen, embryos, DNA samples, and "Cattle Records" from Bear Ranch to HeartBrand. *Id.* ¶ 8.  The Court also ordered that HeartBrand and Bear Ranch "will split the cost of transporting the animals" delivered to HeartBrand from Bear Ranch as a remedy for Bear Ranch's breach of contract.  *Id.* ¶ 10.  Because the Full-Blood contract expressly assigns the costs of enforcing contractual remedies to Bear Ranch, the Final Judgment's provision that the transportation costs to return the cattle post-breach be split between the parties is a manifest error of law warranting relief under Rule 59(e).

The contractual remedy provided in the Full-Blood Contract is the return of the cattle purchased through the Full-Blood Contract.  Dkt. #7-1 § XVI.  The "Remedies for Breach" section of the Full-Blood Contract further provides that "PRODUCER [Bear Ranch] further agrees that it will reimburse HEARTBRAND all of its reasonable attorney fees and <u>any other costs incurred in enforcing the terms of this agreement.</u>"  *Id.* (emphasis added).  The cost of transporting the animals because of a breach is a cost "incurred in enforcing the terms of" the Full-

17

Blood Contract. Therefore, under the plain language of the Full-Blood Contract, the cost of transporting cattle in this instance should be borne by Bear Ranch alone.

Nothing in the Full-Blood Contract contemplates HeartBrand bearing any transportation costs related to the cattle Bear Ranch purchased.[7] When Bear Ranch initially acquired the cattle, the "Delivery Location" for the purchased animals was HeartBrand's Ranch near Harwood, Texas, where Bear Ranch was obligated to pick up the cattle at its own cost. *Id.* § III. Whether restoring the pre-contract status or satisfying the parties' expectations following a breach, the appropriate allocation of costs is for Bear Ranch to deliver the cattle to HeartBrand at Bear Ranch's expense.[8]

By assigning a portion of the transportation costs for the 2010 cattle to HeartBrand, the Final Judgment contains an error of law that warrants altering or amending the judgment to reflect the allocation of costs—to Bear Ranch— embodied in the plain language of the Full-Blood Contract. HeartBrand therefore

---

[7]   Neither party interpreted the Full-Blood Contract as requiring a split of transportation costs. Bear Ranch sought to shift these costs to HeartBrand, but not on the basis of the Full-Blood Contract terms. Instead, it argued that HeartBrand, "as the party buying the cattle," should bear transportation costs according to alleged custom applicable to voluntary transactions in the cattle business. Dkt. #199 at 53. But this is not a voluntary transaction in which HeartBrand is "buying" cattle; this is a contractual remedy carried out under the Full-Blood Contract.

[8]   The Full-Blood Contract's allocation of transportation costs to the Producer makes sense because Bear Ranch, not HeartBrand, controls where the cattle are located. Had the contract contemplated HeartBrand bearing responsibility for any return transportation costs, the contract likely would have specified where the cattle would be located so that those costs could be predicted or understood. Bear Ranch's choice to locate the cattle at a great distance from HeartBrand's facilities was solely its own, and the cost of that choice should be solely its own.

requests that the Court reopen the judgment under Rule 59(a)(2) (or alter or amend the judgment under Rule 59(e)), strike the sentence "The parties will split the cost of transporting the animals" from Paragraph 10 of the Final Judgment, and insert in its place the sentence "Bear Ranch will bear all costs of transporting the items described in Paragraph 8 to be delivered to HeartBrand."

### III.    Alternatively, the Court Can Alter or Amend the Final Judgment (or Order a New Trial) to Adopt the Remedy Provided by the Jury.

An alternative, viable way to resolve the outstanding issues in this case is to amend the judgment, adopt the monetary remedy provided by the jury, and allow the parties to part ways. The relationship between Bear Ranch and HeartBrand, as the Court has recognized, "has deteriorated to a point beyond repair"; thus, the remedy in this action should "aim[] at providing practical avenues for ending the relationship between the parties."    Dkt. #255 at 2.   The simplest, most straightforward remedy is to adopt the jury's well-supported finding that Bear Ranch was unjustly enriched by $23,199,000 by the Beeman Purchase and order that Bear Ranch pay HeartBrand $23,199,000 for the fraudulent inducement of the Beeman Purchase.  Such an approach will allow the parties to go their separate ways as expeditiously as possible and eliminates the need for Court supervision of Bear Ranch's ongoing profitability.  Moreover, adopting the jury approach avoids imposing the risks of wrongdoer Bear Ranch's deficient herd management (including overfeeding, failure to control mating selections, and failure to track

lineage or production data as required by contract) on HeartBrand, the victim of the wrongdoing.   HeartBrand respectfully urges the Court to invoke its power under Rule 59(a) or 59(e) to reopen the judgment and adopt the jury's unjust enrichment remedy.

## **PRAYER**

Defendants respectfully request that the Court grant this motion and grant them such additional and further relief to which they may show themselves entitled.

Respectfully submitted,

VINSON & ELKINS L.L.P.

*/s/ James A. Reeder, Jr.*
James A. Reeder, Jr.
Attorney-in-Charge
Texas Bar No. 16695010
Federal Bar No. 12381
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760
Telephone:  713-758-2636
Facsimile:  713-615-5033

OF COUNSEL:

Jason M. Powers
Texas Bar No. 24007867
Federal Bar No. 23567
Stacy M. Neal
Texas Bar No. 24060322
Federal Bar No. 892868
J. Eric Pardue
Texas Bar No. 24074852
Federal Bar No. 2312738
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760

**ATTORNEYS FOR DEFENDANTS**

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2016, a true and correct copy of the foregoing document was served on all counsel of record via the Court's electronic filing system.

*/s/ Stacy M. Neal*
Stacy M. Neal

## **CERTIFICATE OF CONFERENCE**

I hereby certify that on March 22-23, 2016, the undersigned conferred with counsel for Plaintiff, Bear Ranch, LLC, who informed me that Bear Ranch is opposed to the relief requested in this motion.

*/s/ Jason M. Powers*
Jason M. Powers